## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **COMMON CAUSE/NEW YORK**, as an organization and on behalf of its members,<br><br>  Plaintiff,<br><br>  v.<br><br>**ROBERT A. BREHM**, Co-Executive Director, **TODD D. VALENTINE**, Co-Executive Director, in their official capacities as Co-Executive Directors of the **NEW YORK STATE BOARD OF ELECTIONS**; and **PETER S. KOSINSKI,** Co-Chair, **DOUGLAS A. KELLNER,** Co-Chair, **ANDREW J. SPANO,** Commissioner, and **GREGORY P. PETERSON**, Commissioner, in their official capacities as Commissioners of the **NEW YORK STATE BOARD OF ELECTIONS,**<br><br>  Defendants. | CIVIL ACTION NO.<br><br>**COMPLAINT** |

Plaintiff Common Cause/New York ("Common Cause"), by and through its undersigned counsel, for its Complaint against Defendants Robert A. Brehm and Todd D. Valentine in their official capacities as the Co-Executive Directors of the New York State Board of Elections ("NYS BOE" or the "Board") and Peter S. Kosinski, Co-Chair, Douglas A. Kellner, Co-Chair, Andrew J. Spano and Gregory P. Peterson, in their official capacities as Commissioners of the NYS BOE, allege and state as follows:

### INTRODUCTION

1. This action seeks declaratory and injunctive relief to redress the State of New York's ("New York" or "New York State") past and ongoing violations of its obligations under

Section 8 of the National Voter Registration Act of 1993 (the "NVRA"), 52 U.S.C. § 20507. The NYS BOE is the governmental entity responsible for overseeing voter registration and conducting elections in New York State, and Defendants Brehm and Valentine, as Co-Executive Directors, are the Co-Chief Elections Officials responsible for ensuring New York's compliance with the NVRA. *See* N.Y. Elec. Law § 3-102.

2. The NVRA was adopted with widespread bipartisan support as part of an effort to make voter registration more widely available and accessible. Congress sought to prevent the improper removal of registered voters from the voter registration rolls, thereby increasing the number of properly registered eligible voters for federal elections. *See* 52 U.S.C. § 20501(a)-(b). The statute reflects Congress' intent to combat the disproportionate harm to voter participation "by various groups, including racial minorities," caused by "discriminatory and unfair registration laws and procedures." 52 U.S.C. § 20501(a)(3); H.R. Rep. No. 103-9, at 106-07 (1993).

3. Section 8 of the NVRA ("Section 8") specifically addresses the procedures a state must follow before it may lawfully remove an eligible voter from the official list of registered voters for federal elections on the basis of a purported change in residence. Specifically, Section 8 precludes a state from removing a registered voter from the official list of registered voters based on a belief that the voter has changed residence unless either (a) the voter confirms in writing that he or she has moved to a different jurisdiction or (b) the voter has failed to respond to a notice seeking confirmation that the voter continues to reside in the jurisdiction *and* the voter fails to vote in two consecutive general elections for federal office. 52 U.S.C. § 20507(d).

4. New York Election Law provides that if mail to a voter is returned as undeliverable or if the postal service receives notice that a voter has moved without leaving a

forwarding address, the local board of elections must send a confirmation notice to the voter asking the voter whether he or she continues to reside in the jurisdiction. N.Y. Elec. Law § 5-712(1). Despite the NVRA's strict and specific requirements for when a voter can be removed from the official list of eligible voters, voters in New York State are moved to "inactive" status as soon as they are mailed a confirmation notice. N.Y. Elec. Law §§ 5-213(1), 5-712(5).

5. "Inactive" status is the functional equivalent of having been removed from the voter registration list – the "inactive" voter's name will not appear in the official poll book at the voting precinct on Election Day and the "inactive" voter will be unable to vote using a regular ballot. *See* N.Y. Elec. Law § 5-213; *see also* 9 C.R.R.-N.Y. § 6217.9(2).

6. Common Cause/NY's experience, gained through fielding calls through its non-partisan Election Protection hotline, is that "inactive" voters are routinely told by poll workers that they are not registered to vote. All too frequently, voters whose names are not in the official poll book are not even offered a ballot. *See* Letter from Eric T. Schneiderman, Attorney General, State of New York, to NYS BOE (Oct. 17, 2016) (attached hereto as **Exhibit A**). If a voter is offered a ballot, which is often only done at his or her insistence, he or she will not be offered a regular ballot and will be required to cast an affidavit ballot. *See* N.Y. Elec. Law § 5-213; *see also* 9 C.R.R.-N.Y. § 6217.9(2) and N.Y. Elec. Law § 8-302(3)(e)(ii). Those voters who are offered an affidavit ballot often choose to leave the polling precinct without casting the affidavit ballot, and even those voters who do cast an affidavit ballot are often disenfranchised, as the majority of affidavit ballots cast by New Yorkers in each election are not counted.

7. As a direct result of New York's non-compliance with Section 8, tens of thousands of New Yorkers have been disenfranchised.[1] Moreover, New York's failure to comply with the strict requirements of Section 8 before removing eligible voters from the voter rolls has had a disproportionate impact on the state's most vulnerable citizens, particularly its low-income and minority communities. The state's policy decisions, of course, have an especially acute impact on these citizens' well-being.

8. The systemic violations of Section 8 caused by the implementation of the New York Election Law contribute to voter registration and turnout "gaps" reflecting a disparate impact on minority New York voters. For example, United States Census data from the November 2016 election indicates that only 60.2 percent of New /York's eligible Latinx[2] citizens of voting age were registered, as compared to 70.6 percent of New York's non-Hispanic white citizens of voting age – a voter registration gap of over 10.4 percentage points.[3] The turnout gap between the groups is even larger – approximately 21.0 percentage points. *Id.* The

---

[1] *See, e.g.*, Michael D. Regan, *Officials Investigating Why 126,000 Voters Were Purged from NY Rolls*, PBS NewsHour, (Apr. 23, 2016), http://www.pbs.org/newshour/rundown/officials-investigating-why-126000-voters-were-purged-from-ny-rolls/.

[2] The gender-neutral term "Latinx", along with the terms "Latina", "Latino" and "Hispanic" are used interchangeably throughout this Complaint to refer to the group designated by the Census as "Hispanic." Specifically, a report on the 2010 Census states that "'Hispanic or Latino' refers to a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." Karen R. Humes, Nicholas A. Jones, & Roberto R. Ramirez, *Overview of Race and Hispanic Origin: 2010, 2010 Census Briefs*, 1, 2 (March 2011) https://www.census.gov/prod/cen2010/briefs/c2010br 02.pdf (last visited Sept. 5, 2017). *See also generally,* Sarah Hayley Barett & Oscar Nñ, *Latinx: The Ungendering of the Spanish Language*, NPR, (Jan. 29, 2016) http://www.npr.org/2016/01/29/464886588/latinx-the-ungendering-of-the-spanish-language.

[3] *See* U.S. Dep't of Commerce, United States Census Bureau, Voting and Registration in the Election of November 2016, Table 04B, Reported Voting and Registration by Sex, Race and Hispanic Origin, for States: November 2016, Released May 2017, *available at* https://census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.

census data reports other significant voter registration and turnout disparities; for example, the turnout disparity between non-Hispanic white and African-American voting age citizens is 6.7 percentage points, and the gap is 28.1 percentage points between non-Hispanic white and Asian-American voting age citizens.  *Id.*

9. The implementation of the New York Election Law similarly helps to perpetuate the 16 percentage point registration gap between low- and high-income New York citizens. Only 63.9 percent of New Yorkers of voting age who live in "low-income" neighborhoods (defined as census tracts where the median income is among the bottom 20 percent in the state) are registered to vote, compared to 79.9 percent of voting age New Yorkers who live in "high-income" neighborhoods (census tracts where the median income is top 20 percent in the state).

10. New York is aware that its election law violates the NVRA.  Counsel for Common Cause first contacted the Co-Executive Directors of NYS BOE about these NVRA violations on October 13, 2016 (attached hereto as **Exhibit B**), and Common Cause submitted a formal notice letter to the Co-Executive Directors on November 2, 2016 (attached hereto as **Exhibit C**).  In response, Defendant Co-Executive Director Brehm replied that remedying the violations would require a legislative change because the current practice is required by Section 5-213 of the New York Election Law (attached hereto as **Exhibit D**).  Thereafter, Defendants have not taken any steps to prevent the unlawful removal of voters from the official list of registered voters whose names appear in the poll books on Election Day, or to ensure that the names of "inactive" voters are available in each voting precinct on Election Day and that such voters who have been moved to "inactive" status under state law are nevertheless able to vote a regular ballot.

11.     Plaintiffs bring this action for declaratory and injunctive relief, asking this Court to enjoin enforcement of New York Election Law Section 5-213(2) to the extent it violates the NVRA or, alternatively, to ensure that the names of "inactive" voters are included in the official list of voters available in the polling place and that such "inactive" voters are permitted to vote a regular ballot on Election Day.

## PARTIES

12.     Plaintiff Common Cause/New York is the New York chapter of Common Cause, a 501(c)(4) not-for-profit corporation.  Common Cause/New York's principal place of business is located in New York, New York.  Common Cause is a nonpartisan grassroots organization dedicated to upholding the core values of American democracy.  It works to create open, honest, and accountable government that serves the public interest; to promote equal rights, opportunity, and representation for all; and to empower all people to make their voices heard in the political process.  Common Cause has more than 800,000 members in 50 states plus the District of Columbia.  More than 70,000 activists and members reside in New York State, which includes more than 25,000 activists and members in New York City.  Common Cause has committed and continues to commit time and personnel to conducting voter registration, voter assistance, election protection, and to ensuring that eligible citizens remain registered to vote in New York State.  The purpose of this activity is to increase the level of voter registration and thereby increase the level of voter participation in our democracy.  Common Cause members include individuals who have received or may in the future receive a confirmation notice from New York State and may not respond to that notice.  These individuals face removal from the official list of "active" voters to an "inactive" registration status under which their names would not appear in the official poll book on Election Day, and they would not be permitted to vote a regular ballot.

13. Defendant Robert A. Brehm is the Co-Executive Director of the NYS BOE and in that capacity is the co-chief elections official in New York responsible for coordinating New York's compliance with the NVRA.

14. Defendant Todd D. Valentine is the Co-Executive Director of the NYS BOE and in that capacity is the Co-Chief Elections Official in New York responsible for coordinating New York's compliance with the NVRA.

15. Defendant Peter S. Kosinski is the Co-Director of the NYS BOE.

16. Defendant Douglas A. Kellner is the Co-Director of the NYS BOE.

17. Defendant Andrew J. Spano is a Commissioner of the NYS BOE.

18. Defendant Gregory P. Peterson is a Commissioner of the NYS BOE.

19. Established on June 1, 1974, the NYS BOE is a bipartisan agency vested with the responsibility for the "administration and enforcement of all laws relating to elections in New York State."[4] In addition, the Board is "charged with the preservation of citizen confidence in the democratic process and enhancement in voter participation in elections."[5]  The Board is further responsible for implementing numerous requirements of the NVRA, including those related to voter registration and list maintenance.  N.Y. Elec. Law § 3-102(13), (14); N.Y. Elec. App. § 6213.5.

**JURISDICTION AND VENUE**

20. This action is brought pursuant to 52 U.S.C. § 20510(b).

---

[4] *See* N.Y. State Bd. of Elections, *About the New York State Board of Elections*, https://www.elections.ny.gov/AboutSBOE.html (last visited Sept. 5, 2017).

[5] *Id.*

21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

22. This Court has personal jurisdiction over each defendant because each is a citizen of New York State and each is being sued in his official capacity as Co-Executive Director, Co-Chair and/or Commissioner of the NYS BOE.

23. Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this district.

24. As described in detail below, an actual and justiciable controversy exists between Plaintiff and Defendants.

## FACTUAL ALLEGATIONS

### National Voter Registration Act of 1993

25. The NVRA, 52 U.S.C. § 20501 *et seq.*, has as its principal purpose "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1). The NVRA also seeks to "protect the integrity of the elec[tion] process" and to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3), (4).

26. In furtherance of its purposes, the NVRA provides, among other things, that each motor vehicle driver's license application "shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application" and in addition, mandates that "each state shall designate as voter registration agencies – (A) all offices in the state that provide public assistance." 52 U.S.C. §§ 20504, 20506.

27. The NVRA further prescribes the procedures a state must follow before it can remove the name of a registrant from the official list of registered voters on the ground that the registrant has changed residence. Specifically, Section 8(d) of the NVRA, titled "Removal of Names from Voting Rolls," provides:

> (1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—
> (A)   confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
> (B)
> (i)   has failed to respond to a notice described in paragraph (2); and
> (ii)   has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.
> (2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:
> (A)   If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.
>
> (B)   If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

52 U.S.C. § 20507(d).

28. The NVRA requires that if a voter moves "from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district," he or she "shall be permitted to

- 9 -

...

correct the voting records and vote at the registrant's former polling place…." 52 U.S.C. § 20507(e)(2).

29. Despite these requirements, the New York Election Law directs the removal of registrants from the "active" list of registered voters without the protections mandated by the NVRA. For all practical purposes, removal from the "active" voter list constitutes a *de facto* removal from the official list of registered voters. This is because only voters on the "active" list appear in the "official" poll book on Election Day and only "active" voters are permitted to vote on Election Day using a regular ballot. *See* N.Y. Elec. Law § 5-213; *see also* 9 C.R.R.-N.Y. § 6217.9(2) and N.Y. Elec. Law § 8-302(3)(e)(ii). Indeed, "inactive" voters frequently are simply turned away from the polls, and those "inactive" voters who do persist are required to vote using an affidavit ballot, which carries a high risk of not being counted at all.

30. New York Election Law provides that the local board of elections must send a confirmation notice to a voter if mail to that voter is returned as undeliverable by the postal service without any indication of a forwarding address or if the postal service receives notice that the voter has moved without leaving a forwarding address. N.Y. Elec. Law § 5-712. Section 5-213 of the New York Election Law further provides that the voter becomes "inactive" once the board of elections sends the confirmation notice to the voter.

31. An "inactive" voter is restored to the official active voter list only by responding to the confirmation notice, providing notice that he or she resides at the listed address, signing a designating or nominating petition that includes the listed address, voting with an affidavit ballot, voting in a local election (such as a town or school district election), or obtaining a court order and presenting it at the polling place. N. Y. Elec. Law § 5-213(3). If an "inactive" voter fails to

take one of those actions and fails to vote in one of the next two federal general elections, the voter's registration is canceled. N.Y. Elec. Law § 5-712(3).

32. As a matter of practice, many New York voters are moved to "inactive" status even though they are still eligible to vote. Many voters are moved to "inactive" status even though they never moved from the address at which they are registered to vote.

33. Under Section 5-213(2) of the New York Election Law, "[t]he registration poll records of all [inactive] voters shall be removed from the poll ledgers." Therefore, while "inactive" voters remain part of the files maintained at the board of elections offices, they are not included in the poll books available at polling places on Election Day.

34. Moreover, an investigation revealed that there is no mechanism at polling places for determining whether a voter who does not appear on the poll ledger is "inactive" or is not registered to vote, and poll workers generally are not trained or informed that "inactive" voters are eligible to vote or that the board of elections maintains a list of "inactive" voters.

35. "Inactive" voters are rarely informed that they may vote an affidavit ballot, that their affidavit ballot will be counted if they are voting at the correct precinct, or that casting an affidavit ballot automatically restores them to the active voter list for future elections. As a result, "inactive" voters are frequently confused and frustrated when their names do not appear in the official poll book and are often uncertain about whether or not their affidavit ballots will even be counted. Worse yet, many "inactive" voters do not even attempt to cast an affidavit ballot, either because they do not believe it will be counted or because they are told that they are not eligible to vote and are turned away.

36. New York's procedures have a particularly pernicious effect on voters who move locally, *e.g.*, within a county or within New York City. In New York, an "inactive" voter who

moves to a new precinct within the same jurisdiction and congressional district may not be allowed to vote at his or her former polling place. *See* N.Y. Elec. Law. §§ 8-302(3)(e)(ii), 9-209(2)(e)(iii).

37. There are a total of nearly 200,000 "inactive" voters in New York, Bronx and Westchester Counties alone. In addition, in Kings County, approximately 44,000 voters were improperly moved from active to "inactive" status between the summer of 2015 and April 2016, and an additional approximately 70,000 voters were improperly removed from the voting list entirely after having previously been listed as "inactive." *See* N.Y. State Bd. Of Elections, *NYSVoter Enrollment by County, Party Affiliation and Status, Voters Registered as of April 1, 2016,* https://www.elections.ny.gov/NYSBOE/enrollment/county/county_apr16.pdf  (last visited Sept. 5, 2017).

38. The NVRA creates a private right of action for "a person who is aggrieved by a violation" of the NVRA. 52 U.S.C. § 20510(b)(1). The NVRA requires that, prior to bringing an action to enforce the NVRA, an aggrieved person must give written notice to the "chief State election official" to identify the violation(s) and to provide the State with an opportunity to cure the violation(s) prior to the commencement of an action. *Id.*

39. New York State is subject to the requirements of the NVRA. The NVRA applies to all states except a select few who qualify for one of the limited exclusions contained in the Act. 52 U.S.C. § 20503(b). The New York State does not qualify for any of the exclusions.

40. New York has designated the Co-Executive Directors of the NYS BOE as the chief state election officials responsible for coordinating the responsibilities of the state under the NVRA, pursuant to the requirement of Section 10 of the NVRA, 52 U.S.C. § 20509, that each state designate such an official.

41. On November 2, 2016, a letter was sent to Defendants, on behalf of Common Cause, to notify them "that the procedures for processing 'inactive' voters at polling places, as applied by your office and election officials, violate Section 8 of the [NVRA]." (A copy of the November 2, 2016 notice letter is attached hereto as **Exhibit C**.) The violations of the NVRA described in the notice letter have not been remedied.

### Harm to Common Cause/New York

42. Voting rights and election reform are central to Common Cause's mission of promoting open, honest and accountable government that serves the public interest, and empowering ordinary people to make their voices heard in the political process. Ensuring that our elections are accessible, well-administered, and fair is part of its core mission to promote civic engagement and accountability in government.

43. Common Cause has more than 25,000 activists and members in New York City out of a total of more than 70,000 activists and members statewide.

44. Common Cause has committed, and continues to commit, time and resources to advocating for reforms that improve election administration in New York City and New York State, monitoring polling places on Election Day, documenting and analyzing voters' problems at the polling place, conducting voter registration efforts, facilitating a coalition of groups that work on election administration and reform, issuing reports and recommendations for the reform of New York election law and election administration practices.

45. Common Cause has traditionally spent a considerable amount of time and resources directed to voter registration efforts. The organization conducted voter registration drives in New York City that resulted in hundreds of new registrants in 2016 and has been actively engaged in training and deploying volunteers to register voters, particularly young voters, in New York City throughout this summer.

46. For many years, Common Cause has assisted voters who are confused about their "inactive" status and have been adversely impacted by New York's list maintenance procedures.

47. The organization's election protection efforts include receiving and responding to complaints from voters who are or are likely in "inactive" status, such as voters who report to their correct polling place and should be on the voter registration list and are not in the poll ledger.

48. Post-election voter follow-up work caused by responding to these complaints consumes significant time and resources. This was particularly the case following the April 2016 primary election. The organization has therefore had less time to devote to other core aspects of its mission.

49. In 2016, Common Cause assisted numerous voters who believed they were registered to vote but did not appear on the rolls at the polling place.

50. Common Cause has devoted significant resources to addressing the concerns about New York's list maintenance procedures, including assisting individual voters, testifying at hearings, conducting press conferences, and discussing the issue with the staff of the NYS BOE.

51. As a result, Common Cause diverted resources from its efforts to register and mobilize voters in order to assist voters who have been improperly placed on "inactive" status and/or removed from the voter rolls.

## CLAIMS FOR RELIEF

### Violation of Section 8 of the National Voter Registration Act of 1993

52. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 51 as if fully set forth herein.

53. As a consequence of their removal of registered voters from the official active list of registered voters, placing them on "inactive" status and failing to include their names in the official poll book and permitting them to vote a regular ballot on Election Day, Defendants have violated and continue to violate Section 8.

54. Plaintiff is aggrieved by Defendants' past and continuing violations of the NVRA, and has no adequate remedy at law. Declaratory and injunctive relief are required to remedy Defendants' past and continuing violations of the NVRA and to ensure Defendants' future compliance with the NVRA.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and enter an order:

(i) Declaring, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510, that Defendants have violated Section 8 of the NVRA by improperly placing voters in "inactive" status and failing to include their names in the official poll book;

(ii) Enjoining Defendants, their officers, agents servants, employees and successors in office, and all persons in active concert or participation with them, from removing voters from the official list of registered voters or placing them in "inactive" status and failing to include their names in the official poll book or permitting them to vote a regular ballot on Election Day, in violation of Section 8 of the NVRA;

(iii) Directing Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to remedy the past and continuing violations of Section 8 of the NVRA, including, without limitation, ensuring that all

persons affected by Defendants' violations of Section 8 of the NVRA are restored to active status;

(iv) Directing Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with the requirements of Section 8 of the NVRA, including, without limitation, practices and policies for voter list maintenance, and training and monitoring poll workers to ensure that all registered voters are permitted to cast a ballot on Election Day that will count;

(v) Awarding Plaintiff the costs and disbursements incurred in connection with this action, including, without limitation, their reasonable attorneys' fees, expenses, and costs, pursuant to 52 U.S.C. § 20510(c);

(vi) Retaining jurisdiction over this action to ensure that Defendants are complying with any order(s) issued by this Court and with their obligations under the NVRA; and

(vii) Awarding such additional relief as to this Court seems just and proper.

Dated: September 6, 2017　　　　　　　　Respectfully submitted,

By: /s/ Neil A. Steiner

Neil A. Steiner
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Ezra D. Rosenberg
John Powers
Lawyers' Committee for Civil Rights
Under Law
1401 New York Avenue, N.W., Suite 400
Washington, D.C. 20005
(202) 662-8336
erosenberg@lawyerscommittee.org

jpowers@lawyerscommittee.org
(*Pro hac vice admission pending*)

Jose L. Perez
Bar No. JP0116
Joanna Elise Cuevas Ingram
Bar No. JC2704
LatinoJustice PRLDEF
99 Hudson St., 14th Floor
New York, NY 10013
Tel.: (212) 219-3360
Fax: (212) 431-4276
jperez@latinojustice.org
jcuevas@latinojustice.org