UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------
COMMON CAUSE/NEW YORK, as an
organization and on behalf of its members,

                                                          **Case No. 1:17-cv-06770-AJN**

                                        -Plaintiffs,

-against-

ROBERT A. BREHM, Co-Executive
Director, TODD D. VALENTINE,
Co-Executive Director, PETER S. KOSINSKI,
Co-Chair, DOUGLAS A. KELLNER, Co-Chair,
ANDREW J. SPANO, Commissioner, and
GREGORY P. PETERSON,
Commissioner, in their official capacities as
Commissioner of the NEW YORK STATE
BOARD OF ELECTIONS,

                                        -Defendants.
-----------------------------------------------------------------


# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS PURSUANT
## TO FEDERAL RULES OF CIVIL PROCEDURE 12 (b)


**NICHOLAS R. CARTAGENA**,
Deputy Counsel
**WILLIAM J. MCCANN**,
Deputy Counsel
**BRIAN L. QUAIL**,
Counsel
*Attorneys For Defendants*
New York State Board of Elections
40 North Pearl Street, Suite 5
Albany, New York 12207
Phone: (518) 474-2064

**TABLE OF CONTENTS**

I.      Introduction ……………………………………………………………… 1

II.     New York Election Law § 5-213 Facially Complies
        with the Express Language of Section 8 of the NVRA
        and its Congressional Intent……………………………………………… 2

        A.  NVRA Background………………………………………………………2

        B.  New York's Voter Maintenance Program………………………………………..3

        C.  New York's Voter Maintenance Program Including Election Law
            5-213 (2) Complies With Section 8 of The NVRA………………………………5

        D.  Not Including a Voter's Name in a Poll Book is not a Violation
            of the NVRA of Federal Law because Poll Books are Not
            Considered the Official Registry of Voters…………………………………………6

III.    Common Cause Fails To State A Claim Upon Which Relief Can
        Be Granted Because It Fails To Allege Plausible Facts Showing
        "Inactive" Voters Are Disenfranchised………………………………………………9

        A.  Standard For Motion To Dismiss Under FRCP 12 (b) (6)………………………9

        B.  FRCP 12(b) (6) Analysis…………………………………………………...11

            1.  "Effective" Or "de facto" Removal Is Not
                A Claim Under The NVRA…………………………………………………..11

            2.  Common Cause Does Not Adequately Allege
                A Claim That Inactive Voters Are Removed
                "de facto" In That It Fails To Allege "Inactive"
                Voters are Disenfranchised……………………………………………………..13

                (i)     Voting Via An Affidavit Ballot, Rather Than A
                        "Regular" Ballot, Does Not Disenfranchise
                        An "Inactive" Voter……………………………………………..…13

                (ii)    Common Cause Fails To Allege Any Facts That
                        Poll Workers Rarely Inform Inactive Voters
                        That They May Vote Via An Affidavit Ballot…………………..14

                (iii)   Common Cause Fails To Cite Any Facts In Its
                        Assertion That The Majority of Affidavit Ballots
                        Are Not Counted…………………………………………………… 16

IV.    The Complaint Fails To Allege Facts Sufficient To
        Establish Article III Standing…………………………………………………17

        A.  Standing Requirements…………………………………………………17

        B.  Common Cause Lacks Standing: Both Representational
            /Associational And Direct………………………………………… 19

            1.  Representational/Associational Standing…………………………...19

            2.  Direct Standing…………………………………………………...20

V.     Conclusion……………………………………………………………..22

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                        **Pages**

<u>Alexander v. Yale Univ.,</u> 631 F.2d 178, 183 (2d Cir.1980) ……………...........…………………….18

<u>Ashcroft v. Iqbal,</u> 556 U.S. 662, 678 (2009)……………………………………………….........10

<u>Bell Atl. Corp. v. Twombly,</u> 550 U.S. 544, 570 (2007)……………………………………………….9

<u>Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC,</u>
443 F.3d 181, 198 (2d Cir. 2005) ……………………………………………………………….19

<u>Comm'n v. Geraghty,</u> 445 U.S. 388, 395-96 (1980)……………………………………………….18

<u>Cook v. Colgate Univ.,</u> 992 F.2d 17, 19 (2d Cir 1993)……………………………………………….18

<u>County of Suffolk v. Sebelius,</u> 605 F.3d 135, 140 (2d Cir. 2010)……………………………………17

<u>Dessaint v. Lignel,</u> 584 FED Appx. 30, 30 (2d Cir. 2014) (summary order)………………………...17

<u>Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.,</u>
675 F.3d 149, 156-57 (2d Cir 2012)……………………………………………………………….19

<u>Fair Housing Council of San Fernando Valley v. Roomate.com, LLC.,</u>
666 F. 3d 1216, 1219 (9th Cir 2012)……………………………………………………………….20

<u>FW/PBS, Inc. v. City of Dallas,</u> 493 U.S. 215, 231 (1990)……………………………………………….19

<u>Hassan v. United States,</u> 441 Fed. Appx. 10, 11 (2d Cir. 2011)………………………………………...18

<u>Knife Rights, Inc. v. Vance,</u> 802 F. 3d 377, 390 (2d Cir 2015)………………………………………....20

<u>Lujan v. Defenders of Wildlife,</u> 504 U.S. 555, 560-61 (1992)………………………………...18, 20, 21

<u>Lupo v. Human Affairs Int'l, Inc.,</u> 28F3d 269, 273 (2d Cir. 1994)………………………………….19

<u>Mahon v. Ticor Title Ins. Co.,</u> 683 F.3d 59, 62 (2d Cir. 2012)…………………………………….18, 19

<u>Mid-Hudson Catskill Rural Migrant Ministry, Inc. v.  Fine Host Corp.,</u>
418 F.3d 168, 173 (2 d Cir. 2005)………………………………………………………...….18, 19

Powell v Power, 436 F.2d 84(2nd Cir 1970)……………………………………………………………9

Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 89 (2d Cir 2009)…………………………………18

Summers v. Earth Island Institute, 555 U.S. 488, 499 (2009)………………………………………20

Susan B. Anthony List v. Driehaus, 134 S. Ct. at 2341 (2014)……………………………………..20

True the Vote v. Hosemann, 43 F. Supp. 3d 693 (S.D. Miss. 2014)…………………………………8

United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,
517 U.S. 544, 553 (1996)………………………………………………………………………...18, 19

United States v. City of St. Louis Board of Elections, No. 4:02CV1235 (E.D. Mo. 2002)………11,12

United States v. Greenbaum, 581 Fed. Appx. 61, 62 (2d Cir. 2014)……………………………..18

United States v. Mercurris, 192 F.3d 290, 293 (2d Cir. 1999)……………………………………18

Warth v. Seldin, 422 U.S. 490, 518 (1975)…………………………………………………19, 20

**STATUTES**

52 U.S.C. § 20501………………………………………………………………………………2

52 U.S.C. § 20507……………………………………………………………………………*passim*

52 U.S.C. § 21083………………………………………………………………………………7

N.Y. Election Law § 5-213……………………………………………………………… *passim*

N.Y. Election Law § 5-614…………………………………………………………………...7, 8

N.Y. Election Law § 5-712………………………………………………………………2, 3, 4, 12

N.Y. Election Law § 8-104(1-a)(c)…………………………………………………………….15

N.Y. Election Law § 8-302………………………………………………………… *passim*

N.Y. Election Law § 9-209…………………………………………………………...5, 16, 17

**Legislative History**

Legislative Bill Memorandum for New York's Chapter 659 of the Laws of 1994 …………………… 4

Proceedings and Debates of the 103rd Congress, First Session Thursday, February 4, 1993 ………… 5

H.R. REP. 103-9 ……………………………………………………………………………………...6

## I.      Introduction

Plaintiff, Common Cause/New York ("Common Cause"), brings this action alleging that New York's procedure of not including "inactive" voters in poll books constitutes an unlawful removal in violation of section 8 of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20507(b), despite the fact poll books are not the "official voter registry."  Specifically, Common Cause alleges New York's practice of not printing the names of "inactive" voters in poll books, in combination with alleged deficiencies in the voting process, constitutes an unlawful "de facto" removal of the "inactive" voter from the official voter registry in violation of section 8 of the NVRA.

Defendants now move to dismiss this action as the Complaint fails to state a claim on which relief can be granted.  First, facially, Election Law § 5-213, which requires that the names of "inactive" voters not be included in poll books, complies with both the express language of the NVRA and the congressional intent of the act.  Poll books do not list all eligible voters and are not considered the "official voter registry" of New York State; hence not including "inactive" voters in poll books is not a "removal" from the official registry.  The purpose of not including "inactive" voters' names in poll books is administrative.  Election Law § 8-302(3-a) requires "inactive" voters to vote by affidavit ballot, which, contrary to Plaintiff's assertion, is permissible under the NVRA.

Second, Common Cause fails to state a claim on which relief can be granted because no plausible facts are plead demonstrating "inactive" voters are disenfranchised.

Lastly, the Complaint should be dismissed for lack of standing, as the Complaint fails to name any members of its organization that have been harmed, nor does the Complaint state a particularized, or concrete, injury to the organization.

## II.   New York Election Law § 5-213 Facially Complies with the Express Language of Section 8 of the NVRA and its Congressional Intent

In 1994, the New York State legislature enacted landmark legislation to comply with the NVRA.  See Chapter 659 of the Laws of 1994.  This legislation included Election Law § 5-712 which requires local boards of elections to mail address confirmation notices to certain voters, as well as Election Law § 5-213 which provides that a voter who is sent a confirmation notice is placed in "inactive" status. This change in status from "active" to "inactive" does not deregister a voter. The inactive voter's name simply is not printed in the poll book because the voter is required to vote by affidavit ballot instead of casting a vote using election day scanners.  Id. As discussed below, this statutory process is compliant with the express language of the NVRA and the congressional intent of the act.

### A.  NVRA Background

In 1993, Congress enacted the NVRA, 1319 Pub. L. No. 103–31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501–11 (2017)), in part to "increase the number of eligible citizens who register to vote," while protecting "the integrity of the electoral process" by ensuring that "accurate and current voter registration rolls are maintained." 52 U.S.C. 20501(b). Section 8 of the NVRA lays out all permissible reasons for which states may remove registered voters from the voter rolls.  In other words, section 8 lays out the criteria of when a State can cancel a voter's registration.

The NVRA establishes two specific procedures by which an individual may be removed from the voter registration rolls based on a change in residence: (i) when the registrant herself provides the information and/or confirmation that she has moved outside the jurisdiction in which she is registered, or (ii) when reliable second-hand information indicates the voter may have changed address, and then only after the state sends a confirmation notice in accordance with 52 U.S.C. § 20507(d)(2) to which the voter fails to respond and fails to vote in any election in a period encompassing two subsequent federal general elections. Id. § 20507(d)(1)(B).

Section 8 also describes how a voter, who fails to respond to an address confirmation card, may vote. Contrary to Plaintiff's allegation in paragraph 28 of the Complaint, the NVRA does not require a voter be permitted to vote at a former polling place when he or she "moves from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district." Rather, 52 U.S.C. § 20507(e)(2)(B) provides that voting at a former polling place need not be provided *if* State Law provides that a voter may vote at the new polling place upon oral or written affirmation by the registrant of the new address.

B. New York's Voter Maintenance Program

New York Election Law provides when a board of elections must send a voter a "confirmation notice" (e.g. when any mail sent to such voter is returned as undeliverable by the postal service without any indication of a forwarding address; receipt of a change of address notification; etc.). Election Law § 5-712. The confirmation notice asks recipients to reply promptly with their current address using a statutorily provided postage-paid return card. Election Law 5-712 (3). When a voter is sent a confirmation notice, the voter's name must be placed in "inactive" status. Election Law § 5-213(1). The registration poll records of all such

voters must be removed from the poll ledgers and maintained at the offices of the board of elections in a file arranged alphabetically by election district. Election Law § 5-213(2).  If the board uses computer generated registration lists (as all New York Boards of Elections now do), the names of such voters may not be placed on such lists at subsequent elections other than lists prepared pursuant to the other provisions of the Election Law, but must be kept as a computer record at the offices of such board.

The purpose of this provision is to require "inactive" voters to vote by affidavit ballot.[1] See Cartagena Decl., Exhibit A; see also Election Law § 8-302(3)(e)(ii). As stated in the Legislative Bill Memorandum for Chapter 659 of the Laws of 1994, "any voters in inactive status who appear, are permitted to vote by affidavit ballot. If the person is eligible, the ballot will be counted and the voter's name restored to active status. The voter will be notified of the action." Id. at pg. 1.  As such, movement from the "active" to the "inactive" list does not mean the person has been removed from the official registration list. The voter is still registered to vote, allowed to vote, and, if the voter has any contact with the electoral system -- including but not limited to voting -- the voter will move back to the "active" voters list.  See Election Law § 5-213(3)(provides that if an "inactive" voter contacts the board of elections, or the board finds that a voter has validly signed a designating or nominating petition that states he resides at the same address, or casts a ballot in an affidavit ballot, the board elections shall restore the voter to active status).

---

[1] The confirmation notice notifies recipients "that voters who have not moved or who have moved within the county or city and who do not respond may be required to vote by affidavit ballot..."  Election Law 5-712 (3).

C. <u>New York's Voter Maintenance Program, Including Election Law § 5-213(2), Complies With Section 8 Of The NVRA</u>

Placing voters in "inactive" status, as in the Election Law, complies with section 8 of the NVRA. Nothing in the NVRA prohibits state or local officials from placing a voter in "inactive" status. In fact, legislative history[2] shows that Congress contemplated voters being placed on "inactive" status. During debate of the NVRA in the House of Representatives, Congressman Al Swift, who sponsored the bill, stated that it would be permissible for state or local officials to place voters who fail to respond to change of address forms in "inactive" status. <u>See</u> 139 Cong. Rec. H 514 (1993) (Question from Rep. Thurman to Rep. Swift).

Additionally, contrary to Common Cause's assertions in paragraphs 5, 6, 10, 11, 29, and 53 of the Complaint, that an "inactive" voter has the right to vote via "regular" ballot,[3] nothing in the NVRA prohibits a state from requiring an inactive voter from voting via an affidavit ballot. In fact, the NVRA specifically permits it. <u>See</u> §20507 (e)(2)(B) (providing that a state may require a voter who failed to return an address confirmation to vote in the current election upon oral or written affirmation at the poll site of his or her address).

---

[2] Legislative history may be considered in the context of a FRCP 12(b) (6) motion. <u>See e.g. Hj Inc. v. Northwestern Bell Telephone Co</u>, 492 US 226, 233 (1989) (noting that in deciding whether a motion to dismiss was properly granted, "[o]ur guides in this endeavor must be the text of the statute and its legislative history."); <u>US v Aceto Agr. Chemicals Corp,</u> 872 F.3d 1373, 1380 (8th Cir. 1989).

[3] Inactive voters who vote by affidavit ballot use the same *form* of ballot other voters receive, but instead of casting the ballot using a polling place ballot scanner, the inactive voter's ballot is placed in an envelope containing the affidavit of the voter attesting to her entitlement to vote. If the voter preparing the affidavit is found to be eligible to vote (and an inactive voter is eligible), the affidavit ballot is duly canvassed. <u>See</u> Election Law § 9-209 (directing board of elections to "proceed in the manner hereinafter prescribed to cast and canvass any…ballots voted…by voters who are in inactive status.")

Legislative history indicates that the use of "provisional ballots" were contemplated for voters who did not respond to change of address cards.  In discussing paragraph (e), subdivision 8 of the NVRA, the House Report states:

> If the registration records incorrectly indicate that a registrant has changed his or her residence, the registrant shall be permitted to vote upon oral or written affirmation that the registrant continues to reside at the same address.

> This section of the bill attempts to incorporate an underlying purpose of the Act; that once registered, a voter should remain on the list of voters so long as the individual remains eligible to vote in that jurisdiction. This section ensures that if a registered voter moves within the jurisdiction of the same registrar, he or she should be permitted to vote. However, while this section sets out where an individual may vote, it is silent as to how that individual may be permitted to vote. Under certain circumstances **it would be appropriate, and in compliance with the requirements of this Act, to require that such a person vote by some form of provisional ballot.** It is not the intent of this provision to pre-empt any State requirement that a person whose eligibility to vote is challenged may be required to vote by a special ballot that is subject to post election rejection, where the challenge is sustained.

> H.R. REP. 103-9, 17-18, 1993 U.S.C.C.A.N. 105, 121-22 (emphasis added).

As such, New York State's requirement that inactive voters use affidavit ballots cannot be a violation of section 8 of the NVRA.

D.     Not Including a Voter's Name in a Poll Book is not a Violation of the NVRA of Federal Law because Poll Books are Not Considered the Official Registry of Voters

Not including an "inactive" name in a poll book is not a "removal" under the NVRA. The NVRA provides "that the name of a registrant may not be removed from the **official list of eligible voters except**" unless (1) the registrant has died; (2) pursuant to state laws disenfranchising those mentally incapacitated or convicted of certain crimes; (3) at the request of the registrant; or (4) the registrant has moved, and certain procedures are followed. 52 U.S.C. § 20507(a)(3)(emphasis added).

In New York State, the official list of registered voters is NYSVoter, maintained by the New York State Board of Elections.  See Election Law § 5-614; 9 NYCRR 6217.1 (a) (providing for "the statewide voter registration list to be known as NYSVoter.") This official registry of voters includes inactive voters. See Election Law § 5-614; 9 NYCRR 6217.9 (a) (2) (defining NYSVoter status code of "[i]nactive" noting "[t]he voter is still eligible to vote in elections, but is not included in the poll book.")

The NVRA, despite establishing a uniform system for registration, did not require states to maintain a centralized voter registration list.  This requirement is found in the Help America Vote Act, ("HAVA"), Public Law 107-252, 52 U.S.C. §  20901, et seq,, where Congress required that each state establish a Computerized Statewide Voter Registration List (52 USC §21083) on a state level, interactive in nature and centralized.  The creation of the NYSVoter list was delegated to the State Board of Elections by the Legislature in Chapter 24 of the Laws of 2005 (Election Law §5-614), as was the task of promulgating administrative regulations with respect to the creation of the system and its maintenance. See Election Law § 5-614(1), which provides that there shall be one official record of the registration of each voter, that such record shall be maintained in an interactive, statewide, computerized, voter registration list, that such statewide voter registration list shall constitute the official list of voters for the state of New York, and that such list shall be in the custody of the State Board of Elections and administered and maintained by the State Board of Elections, subject to rules and regulations promulgated by the State Board of Elections.  The statewide voter registration list "serves as the **official voter registration list** for the conduct of all elections in the state which are administered by local boards of elections." Election Law § 5-614(3)(h)(emphasis added).  The list maintenance required of the State Board and the local boards of elections must be conducted to ensure that the name of each registered

voter appears in the statewide voter registration list; only names of persons who are not registered or who are not eligible to vote are removed from such list; and that the prior registrations of duplicate names are removed from such list.  See Election Law § 5-614(12)(b).

As the registry provided for by Election Law § 5-614, NYSVoter alone is the official registry of voters. Poll books are not the "official list(s)" of voters in New York, they are administrative tools used to conduct elections, defining voters permitted to vote using a voting machine at a polling place.  As noted in a letter attached to Common Cause's Complaint, four states, including New York, do not list inactive voters in poll books.  See Complaint, Exhibit B page 1.

In True the Vote v. Hosemann, 43 F. Supp. 3d 693 (S.D. Miss. 2014), an action where Plaintiff sought to compel disclosure of poll books under the Public Disclosure provision of the NVRA, the Court held:

> The Court concludes that poll books are not subject to disclosure under the NVRA Public Disclosure Provision. **Poll books do not reflect all voters eligible to vote on election day. Poll books list only active status voters, which is a subset of all registered and potentially eligible voters**. Inactive and pending status voters, for example, may still vote in an election despite not being listed in a poll book. The fact that these voters voted in the election will not be recorded in a precinct's poll book.

> Because poll books are only partial lists of eligible voters, they are not records that are reviewed to ensure the accuracy and currency of "official lists of eligible voters.

Id. at 725 (emphasis added).

Not printing the names of "inactive" voters in the poll books is not a "removal" under section 8 of the NVRA.

**III.    Common Cause Fails To State A Claim Upon Which Relief Can Be Granted Because It Fails To Allege Plausible Facts Showing "Inactive" Voters Are Disenfranchised**

As stated above, Election Law § 5-213 (2) facially complies with Section 8 of the NVRA. However, Common Cause also alleges that the manner of which that Election Law § 5-213(2) is implemented violates Section 8 of the NVRA to the extent that failure to include "inactive" voters in the poll books, <u>in combination with</u> other alleged deficiencies, constitute "de facto" removal.  In other words, Common Cause is alleging that implementation of § 5-213(2), in combination with other alleged deficiencies (e.g. that poll workers rarely provide affidavit ballots to "inactive" voters, most affidavit ballots are not counted, etc.), disenfranchises "inactive" voters, and constitutes a "de facto" removal under section 8 of the NVRA.  These claims should be dismissed.  First, the NVRA does not provide for relief for "de facto" removal, nor is there relevant case law that supports such a theory, which would allow virtually any alleged combinations of imperfections in state election administration to fall within federal jurisdiction. <u>See eg</u> <u>Powell v Power</u>, 436 F.2d 84 (2nd Cir 1970) (holding "[a]bsent a clear and unambiguous mandate from Congress, we are not inclined to undertake such a wholesale expansion of our jurisdiction into an area ["state's election machinery"] which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts."). To the extent that relief for "de facto" removal is a valid cause of action, Common Cause fails completely to allege facts to claim that "inactive" voters are disenfranchised.

A.  <u>Standard For Motion To Dismiss Under FRCP 12(b)(6)</u>

When a party moves to dismiss under Rule 12(b)(6), the pleading will withstand the motion so long as it alleges "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." <u>Id</u>. Regardless of the level of factual detail provided, if "the

allegations in a complaint, however true, could not raise a claim of entitlement to relief," then the

Court will dismiss the case. <u>Twombly</u>, 550 U.S. at 558.  <u>See also</u> <u>Barbara Nixon and Joyce Smith</u>

<u>v. TWC Administration LLC and Time Warner Cable, Inc</u>. 16-CY-6456 (AJN), 2017 WL

4712420, at *2 (S.D.N.Y. Sept. 27, 2017)

While a Complaint does not need to "set out in detail the facts upon which [the claim is

based]," the pleading must contain at least "some factual allegation [s]." <u>Ashcroft v. Iqbal</u>, 556

U.S. 662, 670 (2009).  More specifically, the "[f]actual allegations must be enough to raise a

right to relief above the speculative level [to a plausible level]," assuming that all the allegations

in the complaint are true. <u>Id</u>.

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>  "[D]etermining

whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires

the reviewing court to draw on its judicial experience and common sense.... [W]here the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." <u>Id</u>. [internal

quotation marks and citations omitted]. However, while the plausibility standard "asks for more

than a sheer possibility that a defendant has acted unlawfully," <u>id</u>., it "does not impose a

probability requirement." <u>Twombly</u>, 550 U.S. at 556.

B. <u>FRCP 12(b) (6) Analysis</u>

     *1. "Effective" Or "de facto" Removal Is Not A Claim Under The NVRA*

Common Cause alleges that "inactive" voters not being included in poll books, <u>in combination with several deficiencies</u>, constitute "de facto" removal in violation of section 8 of the NVRA.  The NVRA does not provide relief for the so called "effective" or "de facto" removal, nor is there any relevant case law granting such relief.

     The plain language of the NVRA does not provide for "de facto" or "effective" removal. The plain language of the NVRA pertains to "removal" from the official registry of voters.  As outlined above, "inactive" voters are not removed from New York's official registry, NYSVoter. Election Law § 5-213(2) merely provides that "inactive" voters are not included in poll books, and such voters must vote by affidavit ballot.  As such, Common Cause's Complaint should be dismissed for failure to state a cause of action.

     Additionally, there is no case law that provides relief for "de facto" removal.  In its original claim letter to the State Board of Elections, Common Cause did cite a Stipulation of Facts and Consent Order as precedent for "de facto" removal.  <u>See</u> Complaint, Exhibit C, pg. 3, <u>citing</u> <u>United States v. City of St. Louis Board of Elections</u>, No. 4:02CV1235 (E.D. Mo. 2002). In that matter, the United States Department of Justice alleged that the city of St. Louis' methods of compiling lists of voters to be placed on inactive registration status, combined with its Election Day procedures, constituted an unlawful removal of the voters from the rolls in violation of Section 8 of the NVRA.  Per the stipulation, the procedures that ran afoul of Section 8 included: 1) inactive voters were not included in the poll book; 2) voters not in the poll book could only cast a ballot if an election judge at the precinct obtains authorization, either by

telephone or in writing, from an official at the board of elections "downtown" headquarters, or if the voter appears in person at the downtown headquarters and casts a ballot there; 3) the St. Louis board of elections did not notify inactive voters of their status prior to election day; and 4) during the 2000 and 2001 elections, a number of inactive voters were unable to cast ballots because the St. Louis board of elections could not handle the volume of requests due to lack of resources, leading to certain voters being turned away.

> Given the above, the Stipulation of Facts and Consent Order stated:
>
> Eligible registered voters who had been placed on inactive status by the Board of Election … were removed from the list of eligible voters within the meaning of Section 8 of the NVRA because, as a result of several factors in combination, it was impossible for them to secure active status in time to vote on election day. These factors included: 1) the lack of any notice to these voters before election day that they had been placed on an inactive list and thus would be required to complete certain administrative steps before voting; 2) the Board's requirement that eligible inactive voters receive approval from officials at the Board's downtown headquarters prior to voting; 3) election judges' lack of telephone access to the Board's downtown headquarters; 4) the lack of adequate resources at polling places to respond to voters whose names were not on the list of active registered voters; and 5) the lack of adequate resources at the Board's downtown headquarters on election day to respond to election judges by telephone or to voters who appeared in person. In this case, it is the combination of these factors, and not any one factor standing alone, that constituted a de facto removal under the NVRA.

> To the extent this Court may find the St. Louis Stipulation and Consent Order persuasive,

there are several factors that distinguish the St. Louis matter with New York's procedure.  Most strikingly, in New York, an inactive voter is able to cast a ballot via an affidavit ballot without having to be placed in active status prior; in St. Louis, an inactive voter had to go through an arguably onerous process of waiting for a determination from a centralized location in order to cast a ballot.  Unlike St. Louis, in New York voters are not placed in inactive status without being sent the required NVRA notice.  See Election Law § 5-213; see also Election Law § 5-712.

The problems in St. Louis were exacerbated by the fact that, between the busy phone lines and inadequate staff at headquarters, inactive voters were not able to get determinations, effectively disenfranchising the voters.   In New York, inactive voters are entitled to vote via an affidavit ballot at the poll site upon arrival to vote.  See Election Law § 8-302(3)(e)(ii); see also Election Law § 5-213(3).  There is no other process that the voter needs to go through.

> 2. *Common Cause Does Not Adequately Allege A Claim That Inactive Voters Are Removed "de facto" In That It Fails To Allege "Inactive" Voters are Disenfranchised*

To the extent that this Court finds "de facto" removal could be a claim under the NVRA, it is respectfully submitted that the pleading of such claim must, at a minimum, allege facts and circumstances showing that "inactive" voters were actually disenfranchised.  As discussed below, Common Cause fails to make such allegations.

> (i)   *Voting Via An Affidavit Ballot, Rather Than A "Regular" Ballot, Does Not Disenfranchise An "Inactive" Voter*

First, Common Cause suggests that "inactive" voters have the right to vote via a "regular" ballot and that voting via an affidavit ballot constitutes disenfranchisement, which constitutes a "de facto" removal under the NVRA.  This is not accurate.  As discussed above, Congress contemplated allowing states to require "provisional ballots"[4] for voters who failed to return an address confirmation card.  Specifically, the House Report on NVRA states "while (the NVRA) sets out where an individual may vote, it is silent as to how that individual may be permitted to vote. Under certain circumstances it would be appropriate, and in compliance with

---

[4] An affidavit ballot is a provisional ballot.

the requirements of (the NVRA), to require that such a person vote by some form of provisional ballot."

(ii)   *Common Cause Fails To Allege Any Facts That Poll Workers Rarely Inform Inactive Voters That They May Vote Via An Affidavit Ballot*

Common Cause also makes a blanket allegation that "[i]nactive voters are rarely informed that they may vote an affidavit ballot, that their affidavit ballot will be counted if they are voting at the correct precinct, or that casting an affidavit ballot automatically restores them to the active voter list for future elections."   See paragraph 35.   In making this allegation, Common Cause does not cite any example.   It does not cite any dates, poll sites, or voters who, allegedly, are turned away at poll sites.

Further, the allegation that "inactive" voters are rarely informed that they may vote an affidavit ballot is not supported by plausible alleged facts.   In paragraph 6 of the Complaint, Common Cause alleges that: "experience, gained through fielding calls through its nonpartisan Election Protection hotline, is that 'inactive' voters are routinely told by poll workers that they are not registered to vote."   Then, citing a letter from the Attorney General's office to the State Board of Elections, Common Cause alleges: "All too frequently, voters whose names are not in the official poll book are not even offered a ballot."

First, it is unclear how the alleged fact in paragraph 6, that voters, whose names are not in the poll books, "all too frequently" do not receive an affidavit ballot, supports the allegation in paragraph 35 (that "inactive" voters rarely get an affidavit ballot.)   "All too frequently" is a relative term, while "rarely" indicates that affidavit ballots are seldom offered.

14

Additionally, the cited Attorney General letter does <u>not</u> state that "voters not in the poll book" are rarely offered a ballot.  The letter states that its investigation revealed that there is inconsistent guidance through the local boards of elections regarding affidavit ballots.  However, the letter does note that, out of all the counties interviewed, only one (Albany County) had a policy of not providing affidavit ballots to everyone who requested them.   This undercuts the alleged facts in paragraph 6, making it more akin to a conclusory statement.

Further, Election Law § 8-302(3-a) requires that inspectors must give a copy of a notice, in a form prescribed by the New York State Board of Elections, "to every person whose address is in such election district for whom no registration poll record can be found and, in a primary election, to every voter whose registration poll record does not show him to be enrolled in the party in which he wishes to be enrolled…advising such person of his right to, and of the procedures by which he may, cast an affidavit ballot or seek a court order permitting him to vote.."

Election Law § 8-104(1-a)(c) further provides that information be conspicuously posted in the polling place related to instructions on how to cast an affidavit ballot.  In its current form, such posting is located in the voter's bill of rights, which clearly states: "(w)henever your name does not appear in the poll ledger or the voter registration or enrollment list, or you do not provide identification when required, you will be offered an affidavit ballot."

The purpose of these requirements is clear: to give effective notice to voters of their right to vote via an affidavit ballot if their name is not in the poll book.  Common Cause fails to allege that these written notices were not given to "inactive" voters; nor does Common Cause allege that poll workers failed to post information related to affidavit ballots as required by the Election Law.   Further, Common Cause fails to allege that these notices did not give adequate notice,

causing the disenfranchisement to "inactive" voters.  As such, it is respectfully submitted that Common Cause's claims fail to adequately state a cause of action.

> (iii)    *Common Cause Fails To Cite Any Facts In Its Assertion That The Majority of Affidavit Ballots Are Not Canvassed*

Common Cause also makes a conclusory allegation that most affidavit ballots are not counted and, as such, disenfranchises voters in an "inactive" status.

Election Law § 9-209 provides how affidavit ballots are canvassed.  That section provides that, when canvassing an affidavit ballot, if the voter is found to be registered and has not voted in person, an inspector must compare the signature on the affidavit envelope with the signature on the computer generated list of registered voters.  If the signatures are found to correspond, absent objection, the inspectors must canvass such ballot.  Election Law § 9-209(2)(a)(i)(C). If no challenge is made, or if a challenge made is not sustained, the envelope must be opened and the vote canvassed.  Election Law § 9-209(2)(a)(i)(D).  Further, if the board of inspectors determines that a person was entitled to vote at such election, it must cast and canvass such ballot if such board finds that ministerial error by the board of elections or any of its employees caused such ballot envelope not to be valid on its face.  See Election Law § 9-209(2)(a)(ii).  Nowhere does Common Cause allege how this statutory process breaks down such that a voter in "inactive" status would not have their valid vote counted.  Instead, Common Cause makes a conclusory allegation that most affidavit ballots are not counted, as if it is common knowledge.[5]  Such conclusory allegations are insufficient to claim a cause of action as it lacks any specificity.  At a minimum, Common Cause must state where in the process outlined

---

[5] At the 2016 General Election, 266,362 affidavit ballot envelopes were completed by voters. The number opened and canvassed was 141,293.

in Election Law § 9-209 valid ballots of voters are not counted.  Further, Common Cause must cite *some* specific factual circumstances, dates, locations, or instances to back up its assertion.

Notably, Common Cause did not allege that the majority of "inactive" voters who vote via affidavit ballot are not counted; rather, the allegation is that, in general, most affidavit ballots are not counted.  Affidavit ballots may be submitted for a variety of reasons.  Election Law § 8-302(3)(e)(ii) provides that a voter can receive and submit an affidavit ballot if he or she is not listed in the poll book.  However, an affidavit voter may not appear in the poll book for a variety of reasons, such as not being registered to vote, attempting to vote in a primary where the voter is not a member of the party having the primary, being in the wrong poll site, having moved within the county into the election district but having not updated one's registration and being an inactive voter in the district.  Out of this admittedly partial list, only the in-county movers and inactive voters would cast *valid* affidavit votes.  That there are affidavit ballots submitted which are not counted, whether or not a majority, is thus no evidence of removal.

It is respectfully submitted that this allegation is conclusory and fails to survive 12(b)(6) scrutiny.

## IV.  The Complaint Fails To Allege Facts Sufficient To Establish Article III Standing

### A.  Standing Requirements

A fundamental bedrock of the federal judicial system is that "Article III of the Constitution limits federal courts' authority—that is, our subject matter jurisdiction—to disputes involving live cases and controversies.'"  Dessaint v. Lignel, 584 Fed. Appx. 30, 30 (2d Cir. 2014) (summary order) (quoting County of Suffolk v. Sebelius, 605 F.3d 135, 140 (2d Cir. 2010)).  "'In order to satisfy the case-or-controversy requirement, a party must, at all stages of

17

the litigation, have an actual injury which is likely to be redressed by a favorable judicial decision.'" Id. (quoting United States v. Mercurris, 192 F.3d 290, 293 (2d Cir. 1999)).  In addition to being "distinct and palpable," the requisite "injury must be suffered personally by the party invoking the court's assistance, and the relief requested must redound to that party's personal benefit." Alexander v. Yale Univ., 631 F.2d 178, 183 (2d Cir. 1980).  "Hence, litigants are required to demonstrate a 'personal stake' or 'legally cognizable interest in the outcome' of their case." Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir. 1993) (quoting U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 395-96 (1980)).

"'To ensure that this bedrock case-or-controversy requirement is met, courts require that plaintiffs establish their standing as the proper parties to bring suit.'" Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 62 (2d Cir. 2012) (quoting Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 89 (2d Cir. 2009)).  Accordingly, "[f]or Article III standing, a party must have 'suffered an injury in fact that is fairly traceable to the challenged action of the defendant, and that will be redressed by a favorable decision.'" United States v. Greenbaum, 581 Fed. Appx. 61, 62 (2d Cir. 2014) (summary order) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)); see also Hassan v. United States, 441 Fed. Appx. 10, 11 (2d Cir. 2011) (summary order) ("Our standing jurisprudence, which derives from the 'case or controversy' requirement of Article III…imposes on any party invoking federal jurisdiction a burden to establish: (1) that it has suffered an injury in fact, (2) that is causally connected to the defendant, and (3) that is likely to be redressed by the court.").  These requirements are equally applicable to both individual and organizational plaintiffs because "an organization may sue as a representative of its members only if the members 'have standing to sue in their own right.'" Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 173 (2d Cir. 2005) (quoting United

Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553 (1996)).

Moreover, "'[i]t is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record.'" Steinberger, 634 Fed. Appx. at 11 (quoting FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)).  "The plaintiff thus bears the burden 'clearly to allege facts in his complaint demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" Id. (quoting Warth v. Seldin, 422 U.S. 490, 518 (1975)).  It therefore follows that if "'if the plaintiff fails to make the necessary allegations he has no standing.'" Id. (quoting Lupo v. Human Affairs Int'l, Inc., 28 F.3d 269, 273 (2d Cir. 1994)).  And finally, "[i]f plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim.'" Mahon, 683 F.3d at 62 (quoting Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC, 433 F.3d 181, 198 (2d Cir. 2005)).

B.  Common Cause Lacks Standing: Both Representational/Associational and Direct

   1. *Representational/Associational Standing*

As noted above, "an organization may sue as a representative of its members only if the members have standing to sue in their own right." Mid-Hudson Catskill Rural Migrant Ministry, 418 F.3d at 173 (citation omitted).  Thus, "[w]hen an association asserts standing solely as the representative of its members, it 'must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc., 675 F.3d 149, 156-57 (2d Cir. 2012)

(quoting <u>Warth</u>, 422 U.S. at 511).  Courts have accordingly "required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm."  <u>Summers v. Earth Island Institute</u>, 555 U.S. 488, 499 (2009).

The organizational Plaintiff here fails to identify a single "member" at all.  Its attempt to assert organizational standing fails on that basis alone.  <u>Small</u>, 388 F. Supp. at 96-97 (refusing to consider individual plaintiff as member of plaintiff organization for purposes of organizational standing analysis because complaint failed to state he was a member).

   *2. Direct Standing*

The Plaintiff attempts to assert standing on its own behalf, in conclusory fashion, based upon a series of allegations relating to their activities and allocation of related resources. <u>See</u> Complaint ¶¶ 46 – 51.  These are unavailing.  As noted above, there must be an injury in fact, causally connected to the Defendant, that is likely to be redressed by the Court.  Plaintiff's allegations simply do not meet these requirements. Further, an organization has "direct standing to sue [when] it show[s] a drain on its resources from both a diversion of its resources and frustration of its mission." <u>Fair Housing Council of San Fernando Valley v. Roommate.com, LLC</u> ,, 666 F. 3d 1216, 1219 (9th Cir. 2012). <u>See</u>, <u>also</u> <u>Knife Rights, Inc. v. Vance</u>, 802 F.3d 377, 390 (2d Cir. 2015).  As is outlined below, in the case of the Plaintiff herein, these alleged injuries are not actual injuries at all, but rather, are self-imposed actions, and are through no cause of the Defendant.  For an alleged injury to support constitutional standing, it "must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " <u>Susan B. Anthony List v. Driehaus</u>, 134 S.Ct.2334, 2341 (2014)(quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992) (other quotation marks omitted)).

Plaintiff claims that for many years it "has assisted voters who are confused about their 'inactive' status and have been adversely impacted by New York's list maintenance procedures." Complaint ¶ 46. This is of no moment.  As previously stated, the procedures used by the Defendants are permissible under NVRA.  Additionally, voters can and do contact their respective Boards of Elections for clarification or assistance concerning their voting status.  The mere fact that some voters are confused about the state's lawful requirements, none of which has been quantified by Plaintiff, or that the Plaintiff chooses to offer assistance to voters as part of its general mission, does not confer standing.

Plaintiff further claims that its efforts "include receiving and responding to complaints from voters who are or are likely in 'inactive' status, such as voters who report to their correct polling place and should be on the voter registration list and are not in the poll ledger." Complaint ¶ 47.  Again, as noted in <u>Lujan v. Defenders of Wildlife</u>, an injury sufficient for standing purposes is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  504 U.S. 555, 560 (1992).

Common Cause's allegations are not quantified in any fashion, are entirely speculative, and conclusory.  These voters may very well have reported to the correct polling place, and as previously outlined under permissible NVRA procedures, are not listed in the poll ledger.  Voters can, and do, contact their respective Boards of Elections for clarification and assistance concerning their voting status.  As previously outlined, voters can, and do, receive instructions from poll workers as to their options for casting provisional ballots on election day.

As an additional pleading, Plaintiff states that in 2016 it "assisted numerous voters who believed they were registered to vote but did not appear on the rolls at the polling place."

21

Complaint ¶¶ 49.  These voters, none of whom have been identified or even quantified, may very well have believed so, and as previously outlined, may have very well not appeared in the poll ledger.  However, even if true, this is not an injury in fact.   As previously outlined, not appearing in the poll book does not equate to not being registered to vote.  These individuals may have correctly not appeared in the poll book.  The fact that certain voters may have such a belief is irrelevant.  The fact that Plaintiff chooses to assist such voters is of no moment to Plaintiff's standing in this case.  These may be factual allegations, but they do not provide standing to the Plaintiff.

The remaining pleadings, which are generalized and conclusory, concerning the resources devoted to its core mission, or its choice to devote resources based upon a heretofore outlined erroneous understanding of what is permissible under NVRA, do not provide standing to the Plaintiff.

**V.  Conclusion**

For the reasons set forth above, Defendants respectfully request that the Court dismiss the Complaint.

Albany, New York
November 17, 2017

Respectfully submitted,

*/s/ Nicholas R. Cartagena*
Nicholas R. Cartagena, Esq.
Brian L. Quail, Esq.
William J. McCann, Jr., Esq.
New York State Board of Election
40 North Pearl Street, Suite 5
Albany, New York 12207
(518) 474-2064