UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 3 0 2018

Common Cause/New York, *as an organization and on behalf of its members*,

Plaintiff,

–v–

Robert A. Brehm *et al.*,

Defendants.

17-CV-6770 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Common Cause/New York ("Common Cause") brings this action against the New York State Board of Elections ("BOE"), its Co-Executive Directors, and its Commissioners seeking declaratory and injunctive relief to redress the State of New York's alleged violations of the National Voter Registration Act of 1993 (the "NVRA"), 52 U.S.C. § 20501 *et seq.*

On November 17, 2017, Defendants moved to dismiss the complaint in this case. Dkt. No. 36. For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

I.    **Background**

On a Rule 12(b)(6) motion, a court must take the facts alleged in the complaint as true and draw all reasonable inferences in plaintiff's favor. *See Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 74 (2d Cir. 2013). The Court accordingly draws the following statement of facts from the complaint.

## A.    The Parties

Plaintiff Common Cause is the New York chapter of the 501(c)(4) nonprofit Common Cause.  Complaint ¶ 12.  Common Cause represents itself as a "nonpartisan grassroots organization dedicated to upholding the core values of American democracy" that "has committed and continues to commit time and personnel to conducting voter registration, voter assistance, election protection, and to ensuring that eligible citizens remain registered to vote in New York State."  Complaint ¶ 12.  Common Cause has "more than 800,000 members in 50 states plus the District of Columbia" and "more than 70,000 activists and members reside in New York State, which includes more than 25,000 activists and members in New York City." Complaint ¶ 12.

Plaintiff brings this action against various individuals in their official capacities as co-executive directors, co-chairs, and commissioners of the New York State Board of Elections. According to Plaintiff, the BOE is "the state entity responsible for overseeing voter registration and conducting elections in New York State," while the Co-Executive Director Defendants are "the Co-Chief Elections Officials responsible for ensuring New York's compliance with the NVRA."  Complaint ¶ 1 (citing N.Y. Elec. Law § 3-102); *id.* ¶¶ 13–19.

## B.    The National Voter Registration Act[1]

This action arises out of New York State's alleged violations of the National Voter Registration Act ("NVRA").  Plaintiff represents that the NVRA was adopted by Congress to increase the number of eligible citizens who register to vote and to ensure that accurate voter registration rolls were maintained.  Complaint ¶ 2.  Section 8 of the NVRA ("Section 8")

---

[1] Because of the nature of this statutory challenge, Plaintiff's Complaint consists in large part of statements of law as well as fact.  Though the Court summarizes Plaintiff's statements of the law here to give color to its claims, the Court articulates the pertinent legal standards in full in Part IV *infra*.

addresses the procedures a state must follow before it may remove an eligible voter from the official list of registered voters.  Complaint ¶ 3; 52 U.S.C. § 20507.  In relevant part, Section 8 provides that a state may not remove a registered voter from the official list of registered voters based on the belief that a voter has changed residence unless (1) the voter confirms in writing that he or she has moved to a new jurisdiction or (2) the voter has failed to respond to a notice seeking confirmation that the voter continues to reside in the jurisdiction and the voter fails to vote in two consecutive general elections for federal office.  Complaint ¶ 3; 52 U.S.C. § 20507(d).  New York is subject to the requirements of the NVRA.  Complaint ¶ 39.

### C.      New York Election Law

Plaintiff alleges, and New York Election Law provides, that if mail sent to a voter is returned as undeliverable, or if the postal service receives notice that a voter has moved without leaving a forwarding address, the local board of elections sends a confirmation notice to the voter asking the voter whether he or she continues to reside in the jurisdiction.  Complaint ¶ 4 (citing N.Y. Elec. Law § 5-712(1)).  As soon as a voter is sent a confirmation notice, he or she is moved to "inactive" status.  Complaint ¶ 4 (citing N.Y. Elec. Law §§ 5-213(1), 5-712(5)).  According to the amended complaint, voters may be moved to inactive status although they are still eligible to vote and although they have never moved.  Complaint ¶ 32.

When a voter is moved to "inactive" status, two consequences follow.  First, an inactive voter's name "will not appear in the official poll book at the voting precinct on Election Day."  Complaint ¶ 5.  Plaintiff notes that New York is one of just two states that follow this practice.  *See* Complaint ¶ 5 & Ex. C at 2.  Instead, the only lists containing "inactive" voters are maintained separately by the BOE.  *See* Complaint ¶ 34.  Second, an "'inactive' voter will be

unable to vote using a regular ballot" and will be given an affidavit ballot instead.  Complaint ¶¶ 5–6; *see also* N.Y. Elec. Law §§ 5-213, 8-302(3)(e)(ii)); 9 C.R.R.-N.Y. § 6217.9(2).

Plaintiff alleges that (1) the removal of an inactive voter's name from the "official poll book at the voting precinct" and (2) the allowance that inactive voters may only vote by affidavit ballot amount to the "functional equivalent" of "remov[al] from the voter registration list" or "*de facto* removal" from the same.  Complaint ¶¶ 5, 29.  They allege this removal constitutes a violation of the NVRA because it occurs without the procedures required by Section 8. Complaint ¶ 53.

### D.    New York State's Application of its Election Law

Plaintiff also alleges that New York violates the NVRA in its application of the above-described election laws.  Plaintiff alleges that application of these laws further limits "inactive" voters' access to the polls, again resulting in "*de facto* removal."  Complaint ¶ 29.  First, Plaintiff's experience, through the calls it receives on its nonpartisan Election Protection hotline, is that "inactive" voters are "routinely told by poll workers that they are not registered to vote." Complaint ¶ 6.  Plaintiff further alleges that "voters whose names are not in the official poll book are not even offered a ballot"—or that affidavit ballots are offered "only at a voter's insistence." Complaint ¶ 6.  Poll workers generally are not trained or informed that "inactive" voters are eligible to vote or that there is a separate list maintained by the BOE with a list of "inactive" voters.  Complaint ¶ 34.   With respect to the affidavit ballot allowance, Plaintiff alleges that voters offered affidavit ballots "often choose to leave the polling precinct without casting the election ballot."  Complaint ¶ 6.  Of those who do cast affidavit ballots, many are nonetheless "disenfranchised," as Plaintiff alleges that "the majority of affidavit ballots cast by New Yorkers in each election are not counted."  Complaint ¶ 6.

As a final matter, the Complaint contends that New York State's voting laws have "pernicious" overall effects on "low-income" and "minority" voters and voters who move locally. Complaint ¶ 7–9. According to the Complaint, New York State's "systemic" violations of Section 8 "contribute to voter registration and turnout 'gaps' reflecting a disparate impact on minority New York voters" and on "low-income New York citizens." Complaint ¶¶ 7–9. The Complaint further alleges that New York's voting laws have "a particularly pernicious effect" on voters who move locally but who nonetheless may not be permitted to vote at their former polling places. Complaint ¶ 36.

### E.   Harm to Plaintiff Common Cause

Plaintiff Common Cause alleges that it has been harmed by New York State's election law because it has "diverted resources from its efforts to register and mobilize voters" in order to (1) assist voters "who are confused about their 'inactive' status and have been adversely impacted by New York's list maintenance procedures," Complaint ¶ 46; (2) respond to complaints from voters who reported to the correct polling place or who believed they were registered to vote but who did not appear in the poll ledger, Complaint ¶¶ 47, 49; and (3) testify at hearings, conduct press conferences, and discuss list maintenance procedure issues with the BOE, Complaint ¶ 50. Further, New York election law has allegedly required "[p]ost-election follow-up work caused by responding to [voter] complaints." Complaint ¶ 48.

### F.   Procedural Background

The NVRA creates a private right of action for "a person who is aggrieved by a violation" of the NVRA. 52 U.S.C. § 20510(b)(1). Prior to bringing an action to enforce the NVRA, the aggrieved person must give written notice to the "chief election official of the State" to identify the violation(s) and to provide the State with an opportunity to cure the violation(s)

prior to the commencement of an action. *Id.* On November 2, 2016, Plaintiff sent a letter to Defendants notifying them "that the procedures for processing 'inactive' voters at polling places, as applied by your office and election officials, violate Section 8 of the [NVRA]." *See* Complaint, Ex. C. According to the complaint, the violations were not remedied by the BOE. Complaint ¶ 41.

Plaintiff filed its complaint on September 6, 2017. Dkt. No. 1. On November 17, 2017, Defendants moved to dismiss the complaint. Dkt. No. 36. On December 22, 2017, Plaintiff filed an opposition to Defendants' motion. Dkt. No. 45. On January 12, 2018, Defendants filed a reply in support of their motion to dismiss. Dkt. No. 51. On June 19, 2018, the Court issued an order stating that each party could submit a brief explaining if and how the Supreme Court's recent opinion in *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018) impacted the pending motion to dismiss. Dkt. No. 54. Both parties filed supplemental briefs. Dkt. Nos. 55–56.

## II.    Standing

As a threshold matter, Defendants argue that Plaintiff lacks standing—both organizational standing and associational standing. Dkt. No. 37, Def. Br. at 17–22. The Court disagrees, concluding that Plaintiff has sufficiently alleged organizational standing to proceed at this stage.

Article III restricts federal courts' authority to hearing only disputes involving "Cases" and "Controversies." U.S. CONST. art. III, §2. Accordingly, a party invoking a court's jurisdiction must have standing to sue. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 188 (2000). In order to have standing, a plaintiff must establish three elements. A plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quotations omitted). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* And at the pleading stage, a plaintiff need only "clearly allege facts demonstrating each element." *Id.* When an organization argues it has standing in its own right, the inquiry is the same as if the plaintiff were an individual. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).

An organization can also assert "associational standing" on behalf of its members. To assert associational standing, an organization must show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

### A.    Plaintiff Has Organizational Standing

The Court will first address the organizational standing arguments. Defendants restrict their argument to contending that Plaintiff has failed to establish that it has suffered an injury in fact sufficient to support organizational standing. Def. Br. at 20–22. The Court therefore does not need to address the causality and redressability prongs. *See N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) (addressing only the challenged "injury-in-fact" prong, and then concluding there was standing). To establish injury in fact, a plaintiff must demonstrate an injury that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The Second Circuit has repeatedly described the injury-in-fact requirement as a "low threshold." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d

732, 736 (2d Cir. 2017) (quoting *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008));

*see also WC Capital Mgmt., LLC v. UBS Sec., LLC*, 711 F.3d 322, 329 (2d Cir. 2013).

The Supreme Court and the Second Circuit have recognized diversion of resources as an

injury in fact that may be sufficient to establish organizational standing. *See Havens*, 455 U.S. at

379; *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011); *Ragin v. Harry Macklowe Real Estate

Co.*, 6 F.3d 898, 905 (2d Cir. 1993). The diversion of resources need not be monetary. *See Mid-

Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174–75 (2d Cir.

2005) (an organization expending resources to locate, recruit, manage, train, and supply

volunteers conferred standing). Additionally, when a defendant's actions impede an

organization's ability to carry out its responsibilities, the plaintiff has suffered an injury in fact.

*See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104,

110 (2d Cir. 2017); *N.Y. Civil Liberties Union*, 684 F.3d at 295.

Under this standard, Plaintiff has alleged an injury in fact sufficient to confer standing.

Plaintiff alleges that it has "devoted significant resources to addressing the concerns about New

York's list maintenance procedures." Complaint ¶ 50. This includes assisting individuals

testifying at hearings, conducting press conferences, and discussing the issue with the staff of the

BOE. Complaint ¶ 50. As a result, Plaintiff has had to divert resources from "its efforts to

register and mobilize voters," which Plaintiff represents is essential to its mission, "in order to

assist voters who have been improperly placed on 'inactive' status and/or removed from the

voter rolls." Complaint ¶ 51. Plaintiff alleges that "work caused by responding to these

complaints consumes significant time and resources." Complaint ¶ 48. It maintains that "[t]his

was particularly the case following the April 2016 primary election," with the overall effect that

"the organization has therefore had less time to devote to other core aspects of its mission." Complaint ¶ 48.

Taken as true, these allegations substantiate a "consequent drain on the organization's resources" that represents "more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379; *see also Ragin*, 6 F.3d at 905. And courts in other circuits have recognized diversion of resources as an injury in fact in cases in which voting rights organizations have had to expend resources addressing perceived barriers to voter participation created by election laws. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350–51 (11th Cir. 2009); *Greater Birmingham Ministries v. Merrill*, 250 F. Supp. 3d 1238, 1242–43 (N.D. Ala. 2017); *Veasey v. Perry*, 29 F. Supp. 3d 896, 903–04 (S.D. Tex. 2014). Defendants' alleged actions have therefore "perceptibly impaired" Plaintiff's ability to carry out its mission of voter registration and mobilization. *Havens*, 455 U.S. at 363; *see also N.Y. Civil Liberties Union*, 684 F.3d at 295; Complaint ¶ 12.

Defendants argue that Plaintiff's diversion of resources claims are generalized and conclusory. Def. Br. at 21–22. However, Defendants place too high of a burden on Plaintiff at this stage. Plaintiff need only "allege facts" sufficient to demonstrate an injury-in-fact at the motion to dismiss stage. *Warth v. Seldin*, 422 U.S. 490, 504 (1975). Plaintiff has done so here. Defendants further argue that Plaintiff's assertion of diversion of resources is undermined by its failure to sufficiently allege an NVRA violation. Def. Br. at 21–22. But—as far as standing is concerned—there is no requirement that the Court evaluate the substantive merits of Plaintiff's purported reasons for diverting its resources, provided Plaintiff plausibly alleges the diversion occurred because of Defendants' alleged actions. *See, e.g., Fla. St. Conf. of the NAACP v.*

9

*Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008) (evaluating standing claim before turning to the merits in action challenging state statute's compliance with NVRA and HAVA).

Accordingly, Plaintiff has sufficiently alleged an injury in fact. Plaintiff has therefore, at this stage, satisfied the requirements of organizational standing. *Laidlaw*, 528 U.S. at 188 (2000). Because it finds Plaintiff has organizational standing, the Court need not address the associational standing arguments.

### III.   Motion to Dismiss Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Pleadings that contain no more than conclusions are not entitled to the assumption of truth otherwise applicable." *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (citations omitted).

In resolving a motion to dismiss, review is generally limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

### IV.   Discussion

Plaintiff articulates two bases for its claim for relief under the NVRA. First, it alleges that certain portions of New York election law are facially invalid under Section 8 of the NVRA. Second, they contend that, as applied, New York election law violates Section 8.

Defendants argue that Plaintiff fails to sufficiently allege that placing voters in "inactive" status and requiring them to file affidavit ballots violates the NVRA on either basis. Def. Br. at 2–17. The Court agrees with Defendants that Plaintiff's facial challenge should be dismissed. However, the Court concludes that Plaintiff has sufficiently alleged an as-applied challenge for its claim to survive a motion to dismiss.

### A.     Requirements for Voter Removal Under the NVRA

Section 8 of the NVRA bars a state from removing the names of registered voters "from the official list of eligible voters" in federal elections "on change-of-residence grounds unless either (A) the registrant confirms in writing that he or she has moved or (B) the registrant fails to return a preaddressed, postage prepaid 'return card' containing statutorily prescribed content." § 20507(d)(1); *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838–39 (2018). If the registrant does not return the card, Section 8 provides that his or her name must be "kept on the list for a period covering two general elections for federal office." *Husted*, 138 S. Ct. at 1839. "If the registrant fails to vote during that period and does not otherwise confirm that he or she lives in the district . . . the registrant's name may be removed." *Id.* at 1839–40. The Help America Vote Act ("HAVA"), together with subsection (d)(3) of Section 8, renders this removal mandatory. *Id.* (citing § 20507(d)(3); § 21083(a)(4)(A)).

Many states, including New York, designate voters "inactive" if their conduct suggests that they meet some, but not all, of Section 8's criteria. To comply with the NVRA, states may not remove such voters from the official eligible voter lists on the basis of "inactive" status— until the statutorily required time period elapses. For example, as the Supreme Court discussed at length in *Husted*, Ohio identifies as "inactive" those registrants "who have not engaged in any voter activity for a period of two consecutive years," including "signing a petition, filing a voter

registration form, and updating a voting address with a variety of state entities." *Id.* at 1840–41 (brackets and quotation marks omitted). To determine whether voters designated as inactive should be removed from the official list of eligible voters, Ohio mails them notices and removes them only after they have "continue[d] to be inactive for an additional period of four consecutive years, including two general elections." *Id.* This additional waiting period ensures that Ohio "follows subsection (d) to the letter." *Id.* at 1842.

Similarly, New York election law provides that voters become "inactive" when any mail sent to the voter is returned as undeliverable or when a change of address is received through the National Change of Address System. N.Y. Elec. Law § 5-712(1), (5). Along with this status change, BOE officials are required to send inactive voters "confirmation notices" asking the voters to confirm their residences or notify the board of any change of address and informing voters of the consequences of failing to do so. *Id.* § 5-712(1), (3).

In this respect, New York's election law is similar to Ohio's. But there are two pertinent differences. First, in New York, "inactive" status does not merely place a voter in a holding pattern until the federally mandated waiting period expires. Rather, "inactive" voters are immediately removed from registration poll books available at polling stations on Election Day, and maintained only at the offices of the BOE. Second, the consequences of failing to return confirmation notices are different. In addition to the possibility that New York voters' registrations will be cancelled if they do not vote in any election up to and including the second federal election after such notice—a provision consistent with Ohio's—"inactive" voters in New York also may be required to vote by affidavit ballot.

This case presents the question whether these additional steps violate the NVRA's limitations on removing inactive voters from the official election lists, either because failing to

maintain inactive voters' names in poll records facially violates subsection (d) of Section 8, or because the BOE's implementation of its policy constitutes de facto removal of voters from the official eligible voter lists in violation of subsection (d).  The Court addresses each question in turn.

**B.      Plaintiff Has Not Successfully Stated a Facial Challenge Based on New York's Failure to Maintain Voter Names in Poll Records**

To facially violate subsection (d) under Plaintiff's first theory, New York's election laws must remove voter names from the "official list of eligible voters" without waiting the requisite two consecutive general election cycles. 52 U.S.C. § 20507(d).

Plaintiff contends that they do.  According to Plaintiff, removal from the "active" voter list constitutes the "functional equivalent" of having been removed from "official list of eligible voters" because "only voters on the 'active' list appear in the 'official' poll book on Election Day and only 'active' voters are permitted to vote on Election Day using a regular ballot."  Complaint ¶¶ 5, 29.  Because New York makes this purported removal immediately, Plaintiff contends it flunks subsection (d)'s requirements. *See* Complaint ¶ 27.

Defendants counter that assignment of "inactive" status does not constitute removal because it is the list maintained at BOE offices, not poll book records, that constitutes the "official list of eligible voters."  Def. Br. at 7.  They maintain that New York election law provides the dispositive definition of this term: the statewide voter registration list, NYSVoter, "serves as the official voter registration list for the conduct of all elections in the state which are administered by local boards of elections."  N.Y. Elec. Law § 5-614(3)(h).

To resolve their disagreement, the parties make arguments based on (a) text and (b) their respective functional understandings of the purpose of the NVRA.  The Court begins with the text.

### 1.     The Plain Text of Section 8 Does Not Bar New York's Definition of Official List

The NVRA does not define "official list of eligible voters." Merriam-Webster defines the operative term, "official," as relevant here, as "prescribed or recognized as authorized." *Official*, Merriam-Webster Dictionary (2018), http://www.merriam-webster. com/dictionary/official; *see also Official*, Black's Law Dictionary (10th ed. 2014) (defining "official" as "[a]uthorized or approved by a proper authority"). In context, this term could mean, as Defendants seem to argue, whichever list New York State "prescribe[s] or recognize[s] as authorized" in the operation of its election system. Plaintiff responds that federal election law cannot provide states such expansive leeway. Because other protections and requirements of federal election law hinge on the definition, Plaintiff urges that the Court must examine whether, taken in context, the State's definition fits the logic and serves the purposes of the NVRA.

Although the Court will not second-guess the State's policy judgments in complying with Section 8, the Court agrees with Plaintiff that it must examine whether New York's definition is a reasonable interpretation of the federal statute. This is the path the Sixth Circuit followed when confronted with a similar question in *United States Student Association Foundation v. Land*, 546 F.3d 373 (6th Cir. 2008). There, the Sixth Circuit determined that it could not permit state law, standing alone, to "control the definition of 'registrant,'" as that term is used in subsection (d). *Id.* at 382. If states had the last word in defining "registrant," they "could circumvent the limitations of the NVRA by simply restricting the definition, and hence the federal protections of the NVRA, to a limited class of voters." *Id.* The same risk exists here. The Second Circuit has endorsed the same interpretive principle in other contexts. *See, e.g., Hayes v. Human Resources Admin. of City of N.Y.*, 648 F.2d 110, 117–18 (2d Cir. 1981) (rejecting state administrative directive that defined "necessary educational costs" for purposes

14

of Aid to Families with Defendant Children program in an overly restrictive manner that "discourage[d] individuals from participating in a program that Congress expressly favor[ed]"). Accordingly, the Court turns to other clues in the statute to verify whether New York's definition "circumvents" or accords with the meaning of "official list."

### a.   Case law

Turning first to case law, the Court does not find any persuasive authorities clarifying whether "official list" may be defined not to constitute the list available at a polling station. The parties each point to district court cases using the term as they submit it must be understood. *See Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1265 (D. Colo. 2010) (inferring "that Colorado's poll books, which were "made up of electors in . . . 'active' or 'inactive' registration status, constitute[d] the 'official list of eligible voters' for each county in any given election"); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 725 (S.D. Miss. 2014) ("Poll books do not reflect all voters eligible to vote on election day. Poll books list only active status voters, which is a subset of all registered and potentially eligible voters."). But these cases merely describe the function of poll books in their respective jurisdictions; neither undertakes an investigation of subsection (d)'s statutory meaning. Accordingly, the Court does not find either illuminating for the purposes relevant here—narrowly interpreting the NVRA's "official list" statutory language.

### b.   Federal Election Law

The Court next turns to other uses of the contested term in federal election law. Although Plaintiff identifies some language suggesting that Congress envisioned the official list of eligible voters as poll-site-specific, the Court does not find the cited language sufficient to foreclose New York's interpretation of "official list."

Plaintiff's argument begins with Section 203 of HAVA, which concerns provisional voting. Section 203 provides that "[i]f an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to vote and that individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot" as the statute further describes. 52 U.S.C. § 21082(a). Plaintiff maintains that this provision makes clear that the poll books constitute the "official list of eligible voters" for two reasons. First, the provision refers to "the official list of eligible voters as being specific to the polling place." Dkt. No. 45, Pl. Br. at 4. Second, Plaintiff argues that Section 203 presumes that voters given provisional ballots are those whose names do not appear on such "official lists." *Id.* at 4 & n.1. Yet New York gives provisional ballots to inactive voters despite the fact that their names appear in the NYSVoter database. *Id.* Plaintiff contends that the only way to square this treatment with the text of Section 203 is to infer that the NYSVoter database is not the "official list"—the poll books are. *Id.*

Defendants respond that Section 203 does not prove quite this much. In particular, it requires that individuals be permitted to cast provisional ballots not merely if their names do not appear on the official list, but also if "an election official asserts that the individual is not eligible to vote." Dkt. No. 51, Def. Reply at 8. Further, Defendants point out that Section 203 does not provide the exclusive means through which states may use provisional voting. *Id.* at 8–9. For example, as Defendants discuss elsewhere, § 20507(e)(2) expressly provides that states must permit a voter who has moved and failed to notify the registrar of the change of address, or who "registration records indicate has moved," to cast a provisional ballot in the current election.

16

Although Plaintiff offers a plausible interpretation of the statute, the Court cannot find, as a matter of law, that the statutory text forecloses Defendants' interpretation.  As an initial matter, Defendants are clearly correct that, as § 20507(e)(2) provides, the State is not limited to giving voters provisional ballots only if their names do not appear on the relevant list.  Plaintiff's stronger argument is that Section 203 appears to contemplate that the "official list of eligible voters" corresponds to a given polling station.  Together with its use of the present tense to describe the appearance of a voter's name on such a list, the provision could be interpreted to refer to poll officials' referencing the rolls before them—not a separate list preserved in a different location.

Plaintiff's interpretation is bolstered by the fact that HAVA's primary purpose was to provide for a single, centrally maintained voter registration list—and when it discussed that list, HAVA used different language.  *See* 52 U.S.C. § 21083(a)(1)(A) ("[E]ach state . . . shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State."); *compare id.* § 21083(a)(2)(A)(i) ("if an individual is to be removed from the *computerized list*") *with id.* § 21083(a)(2)(A)(ii) ("For purposes of removing names of ineligible voters from *the official list of eligible voters* . . .") (emphasis added).  The final step of Plaintiff's argument could be that because the NVRA and HAVA should be read *in pari materia*, HAVA's use of the term "official list of eligible voters" clarifies the term's meaning in subsection (d).  *See United States v. Stewart*, 311 U.S. 60, 64–65 (1940) (noting that acts are *in pari materia* when they "deal with precisely the same subject matter" and when the "later act can therefore be

17

regarded as a legislative interpretation of the earlier act in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting").

But while HAVA illuminates the *possibility* that treating the "official lists of eligible voters" and the "computerized statewide voter registration list" as the same document may not have been at the forefront of congressional minds when the statutory language was drafted, as a textual matter, it does not foreclose the interpretation New York State has offered.

### 2.    The Purposes of Section 8, the NVRA, and HAVA Does Not Bar New York's Definition of Official List

The Court considers next whether the statutes' claimed purposes shed any light on Section 8's meaning.  It concludes that Plaintiff's arguments as to the purpose of the NVRA and HAVA do not warrant the conclusion that New York State's interpretation of "official voter list" is facially invalid.

The NVRA lists as among its purposes (1) "increas[ing] the number of eligible citizens who register to vote" and (2) "enhanc[ing] the participation of eligible citizens as voters"—as well as (3) "protect[ing] the integrity of the electoral process" and (4) "ensur[ing] that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501; *see also Husted*, 138 S. Ct. at 1838 ("The [NVRA] had two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls.").  Plaintiff urges that enhancing participation is the NVRA's *core* purpose.  In particular, it notes that in the context of removal the NVRA's legislative history provides:

> Within the official list of eligible voters, notations (such as an asterisk or "I" for inactive status) may be made of those eligible voters who have failed to respond to a notice under Section 8(d)(2).  The requirement that names with notations be maintained on the official list of eligible voters permits the State to decline to use these names in performing the type of routine, administrative responsibilities *that do not impair the right of such voters to vote as set forth in the Act…*

18

S. Rep. 103-6, 33; H.R. Rep. 103-9, 16 (emphasis added); *see also United States v. Louisiana*, 196 F. Supp. 3d 612, 670 (M.D. La. 2016) (describing as "unduly cribbed" an interpretation of the NVRA that clashed with its "primary purpose" of "increas[ing] the number of eligible citizens to register to vote"], *vacated on other grounds*, No. 3:11-CV-470-JWD-RLB, 2017 WL 4118968 (M.D. La. Aug. 21, 2017).

Plaintiff maintains that permitting New York to define the "official list of eligible voters" to be different than the list that voters and poll workers use on Election Day runs the risk of impeding this primary purpose, and accordingly urges that a "narrow construction of Section 8" is inconsistent with congressional intent. *See* Pl. Br. at 10–11.  To advance this argument, Plaintiff draws an analogy to *Land*, in which the Sixth Circuit invalidated a Michigan voter registration scheme that cancelled voter registrations when voter ID cards bounced back in the mail.  546 F.3d at 386.  In *Land*, Michigan maintained that because receiving the ID card completed the registration process, voters who had not received cards were not "registrants" whom the state had removed without following Section 8's process.  *Id.*  The Sixth Circuit rejected that argument, determining that "it does not matter whom Michigan decides to call a 'registrant'; what matters is, functionally speaking, when an individual becomes able to cast a ballot." *Id.* at 384.  In the present case, Plaintiff contends that New York's practice of defining the poll books not to constitute the "official list of registered voters" is equivalent to Michigan's attempt to "define[ ] away the term registrant." Pl. Br. at 12.  In Plaintiff's view, "for all practical purposes, poll books function as the 'official list of eligible voters'": New York election law calls on election inspectors to "verify[ ] the rights of persons to vote" but only provides them with poll books, not NYSVoter; and it calls for consulting "a registration poll record," the "poll

ledger," or a "computer generated list" for this purpose. *Id.* at 10–11 (citing N.Y. Elec. Law §§ 8-202, 8-302).

Defendants make several responses. First, they emphasize that New York election law's focus on minimizing delay and inefficiency at polling places is consistent with the NVRA's statutory purposes. Def. Reply at 3–4. Second, Defendants dispute Plaintiff's characterization of the poll books as functioning, for all practical purposes, as the official list of eligible voters. Instead, they characterize eligibility determinations as occurring not at the polling site based on poll books, but through subsequent determinations by BOE officials. *Id.* at 7. Third, they claim that the Court cannot infer that New York State's procedures are inconsistent with congressional intent because Congress in the NVRA expressly contemplated that inactive voters could be treated differently than active voters. *See* Def. Br. at 5–6 (citing H.R. Rep. 103-9, 17-18, 1993 U.S.C.C.A.N. 105, 121–22). For example, they note the fact that inactive voters may be permitted to vote by provisional ballot. *See* 52 U.S.C. § 20507(e). As to their definition of "official list," Defendants cite—nonbinding—FEC guidance suggesting that maintaining inactive names on a separate list is one permissible method to manage voter rolls. Dkt. No. 55, Def. Supp. Br. at 2–3.

Finally, and in the Court's view most importantly, Defendants contend that they have implemented procedures to protect inactive voters when they go to the polls. Defendants explain that the BOE (1) has "an election inspector consult[ ] with a map or street finder to determine if the voter is in the correct polling location,"(2) "provid[es] a written notice advising the voter of his or her right to vote via an affidavit ballot or seek a court order," and (3) posts a "bill of rights . . . in poll sites notifying voters of their right to vote via affidavit ballot. Def. Reply at 7.

20

Defendants argue that these procedures are sufficient to ensure that maintaining an "official list" that is separate from the poll sites' list does not impair NVRA's remaining objectives.

Evaluating these arguments, the Court concludes that New York's procedures do not so "upset the balance set by Congress between enhancing voter participation and protecting the integrity of the electoral process," Pl. Br. at 10, as to invalidate as a matter of law the State's decision to manage its voter rolls by maintaining a separate list.  The Court agrees with Plaintiff that the State cannot define the official list of eligible voters so as to be irrelevant, functionally speaking, from the casting and counting of valid votes.  If it could do so, Congress's effort to craft detailed protections preventing names from being removed from such a list would be pointless.

But the Court concludes that New York's treatment of its official list does not amount to a circumvention of federal law.  Defendants' definition of "official list" serves two of the NVRA's explicit statutory purposes—maintaining the accuracy of voter rolls and the integrity of the electoral process.  And they include safeguards that, at least as written, prevent pursuit of those purposes from undermining the NVRA's other objectives by ensuring that inactive voters are informed about and given opportunities to exercise their voting rights.  The NVRA's allowance of differential treatment for "inactive" voters embodies a similar compromise.  New York's definition of 'official list," if more restrictive than Plaintiff's, is nonetheless consistent with congressional intent.

In sum, because neither the plain text of the NVRA nor the statute's evident purpose forecloses Defendants' interpretation, the Court may not question whether the state has "reached

21

a wise policy judgment."[2]  *See Husted*, 138 S. Ct. at 1847.  Accordingly, Plaintiff's facial

challenge to New York's official list designation is hereby DISMISSED.

### C.    Plaintiff Has Not Successfully Stated a Facial Challenge Based on New York's Requiring Inactive Voters to File Affidavit Ballots

Although the parties are inconsistent in their labeling of this argument, Plaintiff appears

to raise an independent facial validity challenge contending that the mere fact of requiring

inactive voters to vote by affidavit ballot constitutes de facto removal from the official eligible

voter list.  The Court rejects this argument as inconsistent with the NVRA.

As noted *supra*, subsection (d) of Section 8 permits election boards to send registrants

notices confirming their addresses and explaining that they may be removed from the official list

of eligible voters if they fail to respond within the mail registration window or to vote within the

next two general elections for federal office.  52 U.S.C. § 20507(d)(B)(i)–(ii) & (C).  Subsection

(e) addresses what happens when voters fail to return those cards.  It gives states several different

options, including permitting voters to vote at a new polling place within the same jurisdiction by

affidavit ballot.  *Id.* § 20507(e)(2)(B).  This is what New York opts to do.  *See* Def. Reply at 3.

And it provides that voters who "the registration records indicate" have changed addresses shall

be permitted to submit affidavit ballots at the polling place that corresponds to their current

address.  52 U.S.C. § 20507(e)(3).

---

[2] While the Court declines to examine the wisdom of New York's policy decision, it notes that the State itself has taken inconsistent positions on whether removing names from the voter rolls enhances or undermines the efficiency and integrity of the electoral process.  While the DOE argues here that removing inactive voter names from poll books enhances efficiency, Def. Reply at 3–4 , the State argued in an *amicus* brief in *Husted* that "[v]oters whose information is missing from the rolls . . . require the time and attention of officials," resulting in "a bottleneck at the check-in table that will slow the processing of voters and begin to cause back-ups and lines.  These costs can be tremendous and unduly burdensome for both voters and states and local officials."  Brief for the States of New York et al. as *Amici Curiae* Supporting Respondents, *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018) at 30–31 (citing Republican Nat'l Lawyers Ass'n Report at 10 (April 2014)).

These provisions prevent Plaintiff's facial challenge from proceeding for two reasons. First, as a general matter, they make clear that the NVRA contemplates affidavit ballots as a means of ensuring that individuals who do not respond to address change notices nonetheless have the opportunity to vote.  This allowance means that requiring voters to submit affidavit ballots cannot be inherently disenfranchising, even if the inconvenience prompts some voters to decide not to cast ballots.  Rather, in order for affidavit balloting to result in "de facto removal" from the voter rolls, there must be other factors present that prevent individuals from properly casting their affidavit ballots.  The Court addresses this possibility below in its discussion of the as-applied challenge.

Second, New York can credibly argue that the NVRA facially permits precisely what it elects to do.  As soon as it gets a returned undeliverable receipt, the State's "registration records indicate [the registrant] has moved from an address"—and the NVRA explicitly provides for offering that registrant an affidavit ballot.  52 U.S.C. § 2057(e)(3).

Prior to *Husted*, it may be that Plaintiff could have argued that New York's trigger for listing voters as inactive was too light.  But *Husted* forecloses this argument.  There, the Court reasoned that the NVRA permits states to treat failure to respond to notice cards sent because of a failure to engage in voter activity as sufficiently "reliable evidence that a registrant has moved."  *Husted*, 138 S. Ct. at 1845–46; *see also id.* ("Congress clearly did not think that the failure to send back a return card was of no evidentiary value because Congress made that conduct one of the two requirements for removal under subsection (d).").  The same logic extends to failure to respond to a notice card sent because mail was returned as undeliverable.

Plaintiff's primary argument appears to be that, whichever trigger for inactivity a State adopts, the NVRA does not endorse imposing an affidavit ballot requirement as a blanket

consequence.  Plaintiff describes references to provisional ballots in the NVRA's legislative

history as "limited" and "situation-specific endorsement[s]" that do not justify requiring voters to

"actively request them."  Pl. Br. at 13.  Plaintiff argues that New York's present practice takes a

section of the NVRA that "attempted to protect voters by providing them a 'fail-safe

mechanism,' . . . and turns it against voters to justify additional barriers to the franchise."  *Id.* at

14.  It also contends that Congress "understood that there were other circumstances in which

offering provisional ballots would not comply with the NVRA."  *See id.* at 14 (citing *Veasey v.*

*Abbott*, 830 F.3d 216, 254–55 (5th Cir. 2016) (en banc); *N.C. State Conference of the NAACP v.*

*McCrory*, 831 F.3d 204, 217 (4th Cir. 2016); *N.C. State Conference of the NAACP v. N.C. State*

*Bd. of Elections*, No. 16-CV-1274 (LCB), 2016 WL 6581284, at *10 (M.D.N.C. Nov. 4, 2016)).

And finally, "because affidavit ballots must be counted only if State law authorizes it," 52 U.S.C.

§ 21082(a)(4), and because "the majority of affidavit ballots cast by New Yorkers are not

counted each election cycle," Plaintiff maintains that New York's affidavit ballot requirement is

disenfranchising.  Pl. Br. at 13.

      As explained above, the Court finds this argument foreclosed by the text of the NVRA.

Plaintiff is correct that the NVRA describes the affidavit ballot allowance in the terms of a right

rather than an allowance.  Accordingly, it is certainly correct that there are limits on how

expansively states may use affidavit ballots when such use impedes voting rights separately

protected by the First Amendment, Fourteenth Amendment or Voting Rights Act.  *See, e.g.*,

*Veasey*, 830 F.3d at 254–55 (discussing evidence for a VRA Section 2 challenge); *McCrory*, 831

F.3d at 217 (same).  As Plaintiff notes, the court in *North Carolina State Conference of the*

*NAACP* even concluded that filing affidavit ballots was not an adequate remedy for removals

from the list of eligible voters that failed to follow subsection (d)'s removal requirements.  2016

WL 6581284, at *10.  But here, where New York's removal process "follows subsection (d) to

the letter," *Husted*, 138 S. Ct. at 1842, and its affidavit ballot practices fall safely within the

realm contemplated by 52 U.S.C. § 20507(e)(3), the Court cannot find that the State has facially

violated § 20507(d).

### D.    Plaintiff Has Successful Stated an As-Applied Challenge

The Court next turns to Plaintiff's argument that New York election law is invalid under

Section 8 as it is applied.

As discussed *supra*, the Court finds that New York's election laws do not facially violate

the NVRA because New York declines to remove voters from the official list of eligible voters

until the statutorily mandated period of time has expired; because New York uses a valid trigger

for shifting voters to "inactive" status; and because New York's reliance on affidavit ballots to

record the votes of inactive voters is expressly contemplated by the NVRA.  But if New York

failed to enforce these laws as written—for example, by failing to provide "inactive" voters with

affidavit ballots—its conduct could rise to a violation of the NVRA.  Plaintiff plausibly alleges

that just that has occurred here.

In particular, Plaintiff argues that New York engages in "de facto removal" in violation

of Section 8 based on its allegations that (1) state poll workers "routinely" informed inactive

voters that they were not registered to vote; (2) state poll workers failed to inform inactive voters

that they may vote by affidavit ballot; (3) state poll workers failed to offer inactive voters

affidavit ballots; (4) state poll workers offered voters affidavit ballots only at their "insistence";

(5) inactive voters "often choose to leave [the polls] without casting an affidavit ballot"; and

(6) affidavit ballots often are not counted.  Complaint ¶¶ 6, 34.  Plaintiff incorporates similar

allegations into its complaint from a letter the New York State Attorney General's Office sent to

the BOE.  This letter details that "poll workers are not receiving consistent guidance about their legal obligations with respect to affidavit ballots," and that specific counties "do not provide affidavit ballots to everyone who requests them."  Complaint, Ex. A at 2, Letter from Eric T. Schneiderman, Attorney General, State of New York, to NYS BOE (Oct. 17, 2016).  Some counties even required poll officials to have voters speak to the BOE.  *Id.* at 2 & n.5.

The fifth and sixth allegations cannot form the basis for a successful as-applied challenge, but the other allegations, taken as true, plausibly allege that New York failed to permit inactive voters to cast affidavit ballots in response to address confirmation cards, as required by the NVRA and New York election law.

### 1.      As-Applied Section 8 Claims Like Plaintiff's Are Cognizable

Permitting inactive voters to cast affidavit ballots is expressly contemplated by the NVRA, notwithstanding any discouraging effects it may have on prospective provisional voters. Similarly, as Plaintiff itself points out, how affidavit ballots are counted is left up to the states by the NVRA.  *See* Pl. Br. at 13 (citing 52 U.S.C. § 21082(a)(4)).  And a person is not removed, de facto or otherwise, from the official list of eligible voters if she is still permitted to cast an affidavit ballot, under the explicit terms of the NVRA, and if her eligibility is later adjudicated using the state official list.  As the Court canvassed above, Defendants persuasively argue that New York Law provides for the foregoing to occur consistent with the NVRA.

But the very same provisions of the NVRA that made clear that New York's laws do not facially violate Section 8 cannot immunize New York's practices if the State fails to follow them.  If the State does not inform or permit inactive voters to cast an affidavit ballot, or if its poll workers are not informed of their right to do so, then the State fails to comply with the

express terms of subsection (e), and in so doing it fails to protect inactive voters from being denied the protections of the official list of eligible voters—in Plaintiff's terms, de facto removal.

Although facts leading to "de facto removal" are rare, courts have confronted them in the context of approving Department of Justice consent decrees. In *United States v. Board of Election Commissioners for the City of St. Louis*, for example, the district court approved a consent decree in which the United States charged that the St. Louis BOE had designated voters "inactive" based on mail returned undelivered, omitted such voters from the list of eligible voters provided to precinct judges, and permitted voters whose names did not appear on the precinct-level list to cast a ballot only if they obtained authorization from an official at the BOE's headquarters or appeared in person there. Dkt. No. 46-2, Stipulation of Facts and Consent Order, *United States v. Bd. of Election Comm'rs for the City of St. Louis*, No. 02-CV-1235 (CEJ), Dkt. No. 1, ¶¶ 6–8 (E.D. Mo. Aug. 14, 2002). Under these procedures, voters attempted to report to the BOE's headquarters, but "there were insufficient phone lines, staff, and other infrastructure" to process their votes. *Id.* ¶¶ 12–18. The consent decree concluded that "in combination," lack of notice, the approval requirement, and insufficient communication infrastructure and resources to process inactive voters resulted in a "de facto removal under the NVRA." *Id.* at *8. Similarly, in *United States v. Cibola County*, the district court approved a consent decree that found Cibola County had, in addition to classifying voters as "inactive," "fail[ed] to ensure that provisional ballots were available in all polling places" and "failed to provide some provisional voters with the voter identification/affirmation envelope," as well as that voters "did not receive provisional ballots until more than two hours after the polls opened," that this practice resulted in prospective voters being "turned away without being offered a provisional ballot," and finally that the County failed to properly train election officials to ensure that qualified voters received

provisional ballots in violation of HAVA's provisional voting requirements.  Dkt. No. 46-1,
Stipulation of Facts and Consent Order, *United States v. Cibola County*, No. 1:93-CV-1134
(LH), Dkt No. 89, at *6 (D.N.M. Jan. 34).

　　　To rebut this theory, Defendants respond that de facto removal claims are untenable after
*Husted* and reiterates its arguments why its interpretation of "official list" is a valid one.  The
Court agrees with Defendants that both *Husted* and prior law make clear that "inactive" status
designations applied by New York—or by Cibola and St. Louis counties—are not independently
actionable under the NVRA.  But Plaintiff's argument is a different one: it is that placing voters
in inactive status, and then failing to comply with the NVRA's protections for filing affidavit
ballots, constitutes de facto removal from the official list of eligible voters.  Defendant also
suggests that the facts presented by the *St. Louis* case were more egregious than those here:
inactive voters were not able to get determinations about their ability to vote, "effectively
disenfranchising the voters." Def. Br. at 12–13.  But it is not obvious that voters were more
burdened in St. Louis than they are in New York, as Plaintiff alleges its law is applied, because a
voter who is not informed she may cast or permitted to cast an affidavit ballot is just as
"disenfranchis[ed]" as a voter who is unable to receive a determination from her BOE.

　　　It may have been more straightforward for Plaintiff to argue simply that New York
election law, as applied, constituted a violation of Section 8 of the NVRA because it failed to
comply with the provisional ballot protections of subsection (e).  But because the purpose of
subsection (e) is to explain what procedures states must follow in order to ensure that address
confirmation notices are processed properly—and because Defendants themselves argue it is
subsection (e) compliance that precludes any subsection (d) deficiency—the Court concludes
that Plaintiff successfully states a violation of Section 8, whatever label it affords that claim.

###### 2.      Facts Supporting Plaintiff's As-Applied Section 8 Claim

The Court finally turns to whether Plaintiff's allegations, summarized above, are sufficient to state a claim for relief under Section 8 of the NVRA.  Defendants argue that the allegations are too conclusory to support an as-applied theory, particularly because of the "unspecified numbers" in which Plaintiff alleges it received hotline calls and assisted voters who did not appear on the rolls at their polling places, and particularly when Plaintiff has not identified a single disenfranchised voter as a plaintiff or in the pleadings.

The Court disagrees.  These allegations are not detailed, but they are not, as a matter of law, insufficient to state a claim.  Rather than legal conclusions or conclusory statements, they are summaries of Plaintiff's experience as an organization fielding questions and providing assistance to its members.  Failure to identify specific instances of a claimed problem renders the claim less plausible, but is not necessarily fatal to the claim.  *See, e.g.*, *Irrera v. Humphreys*, 859 F.3d 196, 199 (2d Cir. 2017) (finding plaintiff stated claim of retaliation based on alleged negative job references notwithstanding plaintiff's failure to identify specific reference).  In this case, Plaintiff's charges about affidavit balloting deficiencies are supported both by its own allegations and the New York State Attorney General's Office allegations as incorporated by reference into the complaint. The Court finds that these two sets of allegations are sufficient, for now, to allege that New York State did not implement its affidavit ballot procedures in compliance with the NVRA.  Any remaining infirmities are best tested through discovery. Finally, Defendants cite no law suggesting that Plaintiff's status as an organizational plaintiff, or its failure to identify the specific individuals burdened by New York election law, is fatal to its as-applied claims at this phase.[3]

---

[3] Nor do Defendants make any standing-related concerning as to whether an organizational plaintiff may bring an as-applied challenge.

Accordingly, the Court declines to dismiss Plaintiff's claim that New York election law, as applied, violates the NVRA.

**V.      Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  An initial pretrial conference will be scheduled in a separate order.  This resolves Docket Numbers 36, 47, and 53.

SO ORDERED.

Dated: September 30, 2018
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

30