# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**COMMON CAUSE NEW YORK, as an** :
**organization and on behalf of its members**,
                                                    :
            Plaintiff,
                                                    :
      -against-
                                                    :
**ROBERT A. BREHM**, Co-Executive Director,        Case No.  1:17-cv-06770-AJN
**TODD D. VALENTINE**, Co-Executive                 :
Director, **PETER S. KOSINSKI**, Co-Chair,
**DOUGLAS A. KELLNER,** Co-Chair,                   :
**ANDREW J. SPANO,** Commissioner, and
**GREGORY P. PETERSON**, Commissioner,
in their official capacities as Commissioners of
the **NEW YORK STATE BOARD OF**
**ELECTIONS**,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## FIRST AMENDED COMPLAINT

Plaintiff Common Cause/New York ("Common Cause"), by and through its undersigned

counsel, for its First Amended Complaint against Defendants Robert A. Brehm and Todd D.

Valentine, in their official capacities as the Co-Executive Directors of the New York State Board

of Elections ("NYS BOE" or the "Board"), Peter S. Kosinski and Douglas A. Kellner, in their

official capacities as the Co-Chairs of the NYS BOE, and Andrew J. Spano and Gregory P.

Peterson, in their official capacities as Commissioners of the NYS BOE, allege and state as

follows:

## INTRODUCTION

1.      This action seeks declaratory and injunctive relief under Section 8 of the National Voter Registration Act of 1993 (the "NVRA"), 52 U.S.C. § 20507 and the Fourteenth Amendment of the United States Constitution, to redress the State of New York's ("New York" or "New York State") policy and the implementation thereof of removing eligible voters from poll books upon the mailing of certain confirmation notices.  *See* N.Y. Elec. Law § 5-712.  NYS BOE is the governmental entity responsible for overseeing voter registration and conducting elections in New York State, and Defendants Brehm and Valentine, as Co-Executive Directors, are the Co-Chief Elections Officials responsible for ensuring New York's compliance with the NVRA.  *See* N.Y. Elec. Law § 3-102.

2.      New York Election Law provides that if mail to a voter is returned as undeliverable, or if the postal service receives notice that a voter has moved without leaving a forwarding address, the local board of elections must send a confirmation notice to the voter asking the voter whether he or she continues to reside in the jurisdiction.  *Id.*  Upon the mailing of such a notice, the eligible voter is: (i) immediately moved to "inactive" status; (ii) removed from the poll books used at polling locations on Election Day, and (iii) relegated to casting an affidavit ballot.  N.Y. Elec. Law §§ 5-712(5), 5-213, 8-302(3)(e)(ii).

3.      The State has offered inconsistent justifications for this policy.  *See* Dkt. No. 58 at 22 n.2 ("[T]he state itself has taken inconsistent positions on whether removing names from the voter rolls enhances or undermines the efficiency and integrity of the electoral process.").  Removing "inactive" voters' names from the poll books used at polling locations on Election Day serves no purpose; it does not actually help maintain the voter rolls, nor does it enhance the

integrity of the electoral process.  Instead, it simply impedes the ability of certain eligible voters to exercise their right to vote on Election Day.

4. Keeping "inactive" voters in the poll books used at polling locations on Election Day (with the notation that they are "inactive") would, on the other hand, achieve both of the State's purported justifications for its policy.  Such a system would also be significantly less burdensome on the right to vote.

5. Furthermore, in Common Cause/NY's experience, gained through fielding calls through its non-partisan Election Protection hotline over multiple election cycles, "inactive" voters are routinely and wrongly told by poll workers that they are not registered to vote.  And all too frequently, voters whose names are not in the poll books used at polling locations on Election Day are not even offered an affidavit ballot—leaving them disenfranchised with no recourse.  *See, e.g.*, Letter from Eric T. Schneiderman, Attorney General, State of New York, to New York State Board of Elections (Oct. 17, 2016) (attached hereto as **Exhibit A**).  In addition, the majority of affidavit ballots cast by New Yorkers in each election are not counted—a fact that has further eroded voters' confidence in the State's electoral system.

6. New York's removal policy thereby imposes a severe and undue burden on the fundamental right to vote in direct contravention of the Fourteenth Amendment.

7. New York's implementation of its removal policy also violates Section 8 of the NVRA ("Section 8"), which sets forth the procedures that a state must follow before it can lawfully deny an otherwise eligible voter the right to vote in a federal election on the basis of a purported change in residence.  Specifically, Section 8 precludes a state from removing a registered voter from the official list of registered voters based on a belief that the voter has changed residence unless either (a) the voter confirms in writing that he or she has moved to a

different jurisdiction; or (b) the voter has failed to respond to a notice seeking confirmation that the voter continues to reside in the jurisdiction *and* the voter fails to vote in two consecutive general elections for federal office.  52 U.S.C. § 20507(d).

8.      As a direct result of New York's non-compliance with Section 8 and the Fourteenth Amendment, tens of thousands of New Yorkers have been disenfranchised.  *See, e.g.*, Michael D. Regan, *Officials Investigating Why 126,000 Voters Were Purged from NY Rolls*, PBS NEWSHOUR, (Apr. 23, 2016), http://www.pbs.org/newshour/rundown/officials-investigating-why-126000-voters-were-purged-from-ny-rolls/.

9.       Moreover, this non-compliance has had a disproportionate impact on the state's most vulnerable citizens, particularly its low-income and minority communities.  The state's policy decisions, of course, have an especially acute impact on these citizens' well-being.

10.     For example, United States Census data from the November 2016 election indicates that only 60.2 percent of New York's eligible Latinx[1] citizens of voting age were registered, as compared to 70.6 percent of New York's non-Hispanic white citizens of voting age—a voter registration gap of over 10.4 percentage points.  *See* U.S. DEP'T OF COMMERCE, U.S. CENSUS BUREAU, VOTING AND REGISTRATION IN THE ELECTION OF NOVEMBER 2016, TABLE 04B (May 2017), *available at* https://census.gov/data/tables/time-series/demo/voting-and-

---

[1]  The gender-neutral term "Latinx", along with the terms "Latina", "Latino" and "Hispanic" are used interchangeably throughout this Complaint to refer to the group designated by the Census as "Hispanic."  Specifically, a report on the 2010 Census states that "'Hispanic or Latino' refers to a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race."  Karen R. Humes, Nicholas A. Jones, & Roberto R. Ramirez, *Overview of Race and Hispanic Origin: 2010, 2010 Census Briefs*, 1, 2 (March 2011) https://www.census.gov/prod/cen2010/briefs/c2010br 02.pdf (last visited Sept. 5, 2017).  *See also generally,* Sarah Hayley Barett & Oscar Nñ, *Latinx: The Ungendering of the Spanish Language*, NPR, (Jan. 29, 2016), https://www.npr.org/2016/01/29/464886588/latinx-the-ungendering-of-the-spanish-language.

registration/p20-580.html.  The turnout gap between the groups was even larger—approximately 21.0 percentage points.  *Id.*  The census data reports other significant voter registration and turnout disparities; for example, the turnout disparity between non-Hispanic white and African-American voting age citizens was 10.5 percentage points, and the gap was 28.1 percentage points between non-Hispanic white and Asian-American voting age citizens.  *Id.*  As a result, these minority voters in the State of New York are less likely or have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

11.     New York's removal policy similarly helps to perpetuate the 16 percentage point registration gap between low- and high-income New York citizens.  Only 63.9 percent of New Yorkers of voting age who live in "low-income" neighborhoods (defined as census tracts where the median income is among the bottom 20 percent in the state) are registered to vote, compared to 79.9 percent of voting age New Yorkers who live in "high- income" neighborhoods (census tracts where the median income is top 20 percent in the state).

12.     There are a total of nearly 200,000 "inactive" voters in New York, Bronx and Westchester Counties alone.  In addition, in Kings County, approximately 44,000 voters were improperly moved from active to "inactive" status between the summer of 2015 and April 2016, and an additional approximately 70,000 voters were improperly removed from the voting list entirely after having previously been listed as "inactive." *See* N.Y. State Bd. Of Elections, NYSVoter Enrollment by County, Party Affiliation and Status, Voters Registered as of April 1, 2016, https://www.elections.ny.gov/NYSBOE/enrollment/county/county_apr16.pdf (last visited Sept. 5, 2017).

13.     New York is aware that enforcement of the election law violates the NVRA. Plaintiff's counsel first contacted the Co-Executive Directors of the NYS BOE about these NVRA violations more than two years ago on October 13, 2016, *see* **Exhibit B**, and Plaintiff submitted a formal notice letter to the Co-Executive Directors on November 2, 2016 (attached hereto as **Exhibit C**).  In response, Defendant Co-Executive Director Brehm replied that remedying the violations would require a legislative change because the current practice is required by Section 5-213 of the New York Election Law (attached hereto as **Exhibit D**). Thereafter, upon information and belief, Defendants have not taken sufficient steps to: (i) prevent the unlawful removal of voters from the poll books that are used at polling locations on Election Day; (ii) ensure that all "inactive" voters are offered affidavit ballots; or (iii) ensure that all affidavit ballots are counted.

14.     Plaintiff therefore brings this action for declaratory and injunctive relief, asking this Court to enjoin N.Y. Elec. Law §§ 5-712, 5-213, 8-302(3)(e) to the extent that they violate the NVRA or the Fourteenth Amendment and to ensure that the names of "inactive" voters are included in the poll books used at polling locations on Election Day.  Alternatively, Plaintiff asks this Court for injunctive relief to ensure that: (i) voters are not placed in "inactive" status without first receiving a confirmation notice and thereafter not voting in two consecutive federal general elections; (ii) all "inactive" voters are offered affidavit ballots; and (iii) all affidavit ballots submitted by eligible "inactive" voters are counted.

## PARTIES

15.     Plaintiff Common Cause/New York is the New York chapter of Common Cause,

a 501(c)(4) not-for-profit corporation.  Common Cause/New York's principal place of business

is located in New York, New York.

16.     Common Cause is a nonpartisan grassroots organization whose mission mirrors

that of the NVRA and the Fourteenth Amendment.  Specifically, it is dedicated to upholding the

core values of American democracy.  It works to create open, honest, and accountable

government that serves the public interest; to promote equal rights, opportunity, and

representation for all; and to empower all people to make their voices heard in the political

process.

17.     Common Cause has more than 800,000 members in 50 states plus the District of

Columbia.  More than 70,000 activists and members reside in New York State, which includes

more than 25,000 activists and members in New York City.

18.     Common Cause/New York has committed and continues to commit time and

personnel to conducting voter registration, voter assistance, election protection, and to ensuring

that eligible citizens remain registered to vote in New York State.  The purpose of this activity is

to increase the level of voter registration and thereby increase the level of voter participation in

our democracy.

19.     Common Cause/New York members include individuals who have received or

may in the future receive a confirmation notice from New York State and may not respond to

that notice.  These individuals face removal from the official list of "active" voters to an

"inactive" registration status under which their names would not appear in the poll books on

Election Day.  They would not be permitted to vote a regular ballot, may not be offered an

affidavit ballot, and, to the extent that they do vote an affidavit ballot, the affidavit ballot may not be counted.

20.     Defendant Robert A. Brehm is a Co-Executive Director of the NYS BOE and in that capacity is the co-chief elections official in New York responsible for coordinating New York's compliance with the NVRA.

21.     Defendant Todd D. Valentine is a Co-Executive Director of the NYS BOE and in that capacity is the co-chief elections official in New York responsible for coordinating New York's compliance with the NVRA.

22.     Defendant Peter S. Kosinski is a Co-Chair of the NYS BOE.

23.     Defendant Douglas A. Kellner is a Co-Chair of the NYS BOE.

24.     Defendant Andrew J. Spano is a Commissioner of the NYS BOE.

25.     Defendant Gregory P. Peterson is a Commissioner of the NYS BOE.

26.     Established on June 1, 1974, the NYS BOE is a bipartisan agency vested with the responsibility for the "administration and enforcement of all laws relating to elections in New York State."  N.Y. State Bd. of Elections, About the New York State Board of Elections, https://www.elections.ny.gov/AboutSBOE.html (last visited Nov. 24, 2018).  In addition, the Board is "charged with the preservation of citizen confidence in the democratic process and enhancement in voter participation in elections."  *Id.*  The Board is further responsible for implementing numerous requirements of the NVRA, including those related to voter registration and list maintenance.  N.Y. Elec. Law § 3-102(13), (14); N.Y. Elec. App. § 6213.5.

## JURISDICTION AND VENUE

27.     This action is brought pursuant to 52 U.S.C. § 20510(b) and 42 U.S.C. § 1983.

28.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

29.     This Court has personal jurisdiction over each defendant because each is a citizen of New York State and each is being sued in his official capacity as Co-Executive Director, Co-Chair and/or Commissioner of the NYS BOE.

30.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this district.

31.     As described in detail below, an actual and justiciable controversy exists between Plaintiff and Defendants.

## FACTUAL ALLEGATIONS

### New York Election Law

32.     If mail to a voter is returned as undeliverable by the postal service without any indication of a forwarding address, or if the postal service receives notice that the voter has moved without leaving a forwarding address, New York Election Law requires local boards of elections to send confirmation notices to such voters.  N.Y. Elec. Law § 5-712.  Upon the mailing of such a notice, the voter is moved to "inactive" status and is immediately removed from the poll books available at polling places on Election Day.  *Id.*; N.Y. Elec. Law §5-213(1), (2) ("The registration poll records of all [inactive] voters shall be removed from the poll ledgers.").  The voter is thereby relegated to casting an affidavit ballot.  N.Y. Elec. Law § 8-302(3)(e)(ii).

33.     Section 5-213(3) further provides that the name of an "inactive" voter will not be restored to the poll book available at his or her polling place on Election Day unless and until the

"inactive" voter: (i) responds to the confirmation notice; (ii) provides notice that he or she resides at the listed address; (iii) signs a designating or nominating petition that includes the listed address; (iv) votes with an affidavit ballot; (v) votes in a local election (such as a town or school district election), or (vi) obtains a court order and presents said order at the polling place.

34.     Each of these additional steps increases the cost—time, money, and other resources—of voting for these eligible voters.

35.     Furthermore, eligible voters are frequently moved to "inactive" status without even receiving the confirmation notice.

36.     Moreover, an investigation revealed that there is no mechanism at polling places for determining whether a voter whose name does not appear in the poll book on Election Day is missing because the voter is "inactive" (and therefore is still eligible to vote) or because the voter is not registered to vote.  Defendants' own training materials confirm the same.

37.     Defendants' public education efforts and training of local officials involved in election administration remain woefully inadequate to inform eligible New York voters of: (i) their right to cast an affidavit ballot and (ii) the steps they need to take to be restored to "active" status.  For example, poll workers are generally not trained or informed that "inactive" voters are eligible to vote.

38.     "Inactive" voters are arbitrarily and inconsistently informed that: (i) they may vote an affidavit ballot, (ii) their affidavit ballot should be counted if they are voting at the correct precinct; and (iii) casting an affidavit ballot automatically restores them to the active voter list for future elections.

39.     As a result, "inactive" voters are frequently confused and frustrated when their names do not appear in the poll books used at polling locations on Election Day and are often

uncertain about whether or not their affidavit ballots will even be counted.  Worse yet, many

"inactive" voters do not even attempt to cast an affidavit ballot, either because they do not

believe it will be counted or because they are told that they are not eligible to vote and are turned

away.

40.     Similarly, because the names of inactive voters do not appear in in the poll book

on Election Day, even those poll workers who do offer an inactive voter an affidavit ballot

cannot conclusively tell an inactive voter that he or she is casting the ballot at the correct

location, meaning that the affidavit ballot may not be counted.

41.     In addition to disproportionally affecting minority and low income communities,

New York's removal policy and New York's implementation thereof have a particularly

pernicious effect on voters who move locally, *e.g.*, within a county or within New York City.  In

New York, an "inactive" voter who moves to a new precinct within the same jurisdiction and

congressional district may not be allowed to vote at his or her former polling place.  *See* N.Y.

Elec. Law §§ 8-302(3)(e)(ii), 9-209(2)(E)(iii).

**National Voter Registration Act of 1993**

42.     The NVRA, 52 U.S.C. § 20501 et seq., was adopted with widespread bipartisan

support as part of an effort to make voter registration more widely available and accessible.

Congress sought to prevent the improper removal of registered voters from the voter registration

rolls, thereby increasing the number of properly registered eligible voters for federal elections.

*See* 52 U.S.C. § 20501(a)–(b).  The statute also reflects Congress' intent to combat the

disproportionate harm to voter participation "by various groups, including racial minorities,"

caused by "discriminatory and unfair registration laws and procedures."  52 U.S.C. §

20501(a)(3); H.R. Rep. No. 103-9, at 106-07 (1993).

43.     Indeed, the NVRA has as its principal purpose "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1).  The NVRA also seeks to "protect the integrity of the elec[tion] process" and to "ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b)(3), (4).

44.     The NVRA further prescribes the procedures a state must follow before it can remove the name of a registrant from the official list of registered voters on the ground that the registrant has changed residence.  Specifically, Section 8(d) of the NVRA, titled "Removal of Names from Voting Rolls," provides:

(1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—
(A)   confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
(B)
(i)   has failed to respond to a notice described in paragraph (2); and
(ii)   has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.
(2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:
(A)   If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B)   If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

52 U.S.C. § 20507(d).

45.     The NVRA requires that if a voter moves "from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district," he or she "shall be permitted to correct the voting records and vote at the registrant's former polling place…."  52 U.S.C. § 20507(e)(2)(A).

46.     The NVRA creates a private right of action for "a person who is aggrieved by a violation" of the NVRA.  52 U.S.C. § 20510(b)(1).  The NVRA requires that, prior to bringing an action to enforce the NVRA, an aggrieved person must give written notice to the "chief State election official" to identify the violation(s) and to provide the State with an opportunity to cure the violation(s) prior to the commencement of an action.  *Id.*

47.     New York State is subject to the requirements of the NVRA.  The NVRA applies to all states except a select few who qualify for one of the limited exclusions contained in the Act.  *See* 52 U.S.C. § 20503(b).  New York State does not qualify for any of the exclusions.

48.     New York has designated the Co-Executive Directors of the NYS BOE as the chief state election officials responsible for coordinating the responsibilities of the state under the NVRA, pursuant to the requirement of Section 10 of the NVRA, 52 U.S.C. § 20509, that each state designate such an official.

**Harm to Common Cause/New York**

49.     Voting rights and election reform are central to Common Cause/New York's mission of promoting open, honest, and accountable government that serves the public interest and empowering ordinary people to make their voices heard in the political process.  Ensuring that our elections are accessible, well-administered, and fair is part of its core mission to promote civic engagement and accountability in government.

50.     Common Cause/New York has committed, and continues to commit, time and resources to advocating for reforms that improve election administration in New York City and New York State, monitoring polling places on Election Day, documenting and analyzing voters' problems at polling places, conducting voter registration efforts, facilitating a coalition of groups that work on election administration and reform, and issuing reports and recommendations for the reform of New York election law and election administration practices.

51.     Common Cause/New York has traditionally spent a considerable amount of time and resources directed to voter registration efforts.  The organization conducted voter registration drives in New York City that resulted in hundreds of new registrants in 2016 and in 2018.

52.     For many years, Common Cause/New York has assisted voters who are confused about their "inactive" status and have been adversely impacted by New York's list maintenance procedures.

53.     The organization's election protection efforts include receiving and responding to complaints from voters who are or are likely in "inactive" status, such as voters who report to their correct polling place and should be on the voter registration list and are not in the poll ledger.

54.     Post-election voter follow-up work caused by responding to these complaints consumes significant time and resources.  This was particularly the case following the April 2016 primary election and is once again the case after the November 2018 general election.  The organization has therefore had less time to devote to other core aspects of its mission.

55.     In 2016 and in 2018, Common Cause/New York assisted numerous voters who believed they were registered to vote but whose names did not appear in the poll books at polling places on Election Day.

56.     Common Cause/New York has devoted significant resources to addressing the concerns about New York's list maintenance procedures by assisting individual voters, testifying at hearings, conducting press conferences, and discussing the issue with the staff of the NYS BOE.

57.     For example, Common Cause/New York has diverted and continues to divert significant resources from its efforts to register and mobilize voters in order to assist (i) voters who have been improperly placed in "inactive" status, (ii) "inactive" voters who have not been offered affidavit ballots, (iii) "inactive" voters who were told that their affidavit ballots were properly cast and would be counted, but were not counted, and (iv) voters whose affidavit ballots were otherwise not counted.

58.     If it were not for New York's removal policy and its inconsistent implementation thereof, Common Cause/New York would not have had to spend its limited resources on these activities and could instead focus on its central priorities.

## CLAIMS FOR RELIEF

## Count One: Violation of Section 8 of the National Voter Registration Act of 1993

## 52 U.S.C. § 20507(d)

59.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

60.     By denying eligible voters the right to vote in a federal election based on a purported change in residence without following the procedure set forth in Section 8 of the NVRA, 52 U.S.C. § 20507, Defendants' implementation of New York's removal policy violates Section 8.

61.     Plaintiff is aggrieved by Defendants' past and continuing violations of the NVRA, and has no adequate remedy at law.  Declaratory and injunctive relief are required to remedy

Defendants' past and continuing violations of the NVRA and to ensure Defendants' future compliance with the NRVA.

## Count Two: Threatened Infringement of the Right to Vote in Violation of Fourteenth Amendment

### 42 U.S.C. § 1983

62.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

63.     42 U.S.C. § 1983 provides, in pertinent part, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States of America, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

64.     Defendants' actions described herein were taken under color of the laws of the State of New York.

65.     The Fourteenth Amendment prohibits the imposition of severe burdens on the fundamental right to vote unless they are narrowly drawn to advance a state interest of compelling importance. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Further, even where a regulation or the implementation and/or enforcement thereof creates a slight burden on the right to vote, the state must show that the regulation is justified by a relevant state interest. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (internal citations omitted).

66.     By (i) immediately removing eligible voters from the poll books that are used at polling locations on Election Day upon the mailing of confirmation notices, and in certain instances, without mailing any confirmation notice; (ii) requiring such eligible voters to take

affirmative steps to restore their names to the poll books used at polling locations on Election Day; (iii) failing—due to wholly inadequate training of election officials—to offer all such eligible voters affidavit ballots; and (iv) failing to count the majority of affidavit ballots cast, Defendants have violated and continue to violate the Fourteenth Amendment.

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and enter an order:

(i)      Declaring that Defendants have violated Section 8 of the NVRA by denying eligible voters the right to vote based on a purported change in residence without following the procedures set forth in 52 U.S.C. § 20507;

(ii)      Directing Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to remedy the past and continuing violations of Section 8 of the NVRA, including, without limitation, ensuring that all persons affected by Defendants' violations of Section 8 of the NVRA are restored to active status;

(iii)      Directing Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with the requirements of Section 8 of the NVRA, including, without limitation, practices and policies for voter list maintenance, and training and monitoring poll workers to ensure that all registered voters are permitted to cast a ballot on Election Day that will count;

(iv)      Declaring that Defendants have violated the Fourteenth Amendment of the United States Constitution by improperly placing eligible voters in "inactive" status, failing to include the names of such voters in the poll books used at polling locations on Election Day, failing to

offer such eligible voters affidavit ballots, failing to count all affidavit ballots, and failing to provide proper training to poll workers;

(v)      Enjoining Defendants, their officers, agents, servants, employees, and successors in office, and all persons in active concert or participation with them, from enforcing N.Y. Elec. Law §§ 5-712, 5-213, 8-302(3)(e) to the extent these laws violate the Fourteenth Amendment;

(vi)      Directing Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to remedy the past and continuing violations of the Fourteenth Amendment, including, without limitation, ensuring that all persons affected by Defendants' violations of the Fourteenth Amendment are restored to active status;

(vii)      Directing Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with the requirements of the Fourteenth Amendment, including, without limitation, practices and policies for voter list maintenance and training and monitoring poll workers to ensure that all registered voters are permitted to cast a ballot on Election Day that will count;

(viii)      Awarding Plaintiff the costs and disbursements incurred in connection with this action, including, without limitation, their reasonable attorneys' fees, expenses, and costs, pursuant to 52 U.S.C. § 20510(c) and 42 U.S.C. § 1983;

(ix)      Retaining jurisdiction over this action to ensure that Defendants are complying with any order(s) issued by this Court and with their obligations the NVRA and the Fourteenth Amendment; and

(x)      Awarding such additional relief as to this Court seems just and proper.

Dated:  New York, New York.　　　　　　Respectfully submitted,
　　　　　November 30, 2018
　　　　　　　　　　　　　　　　　　　　DECHERT LLP


　　　　　　　　　　　　　　　　　　　By: /s/ Neil A. Steiner
　　　　　　　　　　　　　　　　　　　　　Neil A. Steiner
　　　　　　　　　　　　　　　　　　　　　1095 Avenue of the Americas
　　　　　　　　　　　　　　　　　　　　　New York, NY  10036-6797
　　　　　　　　　　　　　　　　　　　　　(212) 698-3500

　　　　　　　　　　　　　　　　　　　　　Ezra Rosenberg (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　John Powers (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　Lawyers' Committee for Civil Rights
　　　　　　　　　　　　　　　　　　　　　Under Law
　　　　　　　　　　　　　　　　　　　　　1401 New York Avenue, N.W., Suite 400
　　　　　　　　　　　　　　　　　　　　　Washington, D.C.  20005
　　　　　　　　　　　　　　　　　　　　　(202) 662-8336
　　　　　　　　　　　　　　　　　　　　　erosenberg@lawyerscommittee.org
　　　　　　　　　　　　　　　　　　　　　jpowers@lawyerscommittee.org

　　　　　　　　　　　　　　　　　　　　　Jose L. Perez
　　　　　　　　　　　　　　　　　　　　　Jackson Chin
　　　　　　　　　　　　　　　　　　　　　LatinoJustice PRLDEF
　　　　　　　　　　　　　　　　　　　　　99 Hudson St., 14th Floor
　　　　　　　　　　　　　　　　　　　　　New York, NY 10013
　　　　　　　　　　　　　　　　　　　　　(212) 219-3360
　　　　　　　　　　　　　　　　　　　　　jperez@latinojustice.org
　　　　　　　　　　　　　　　　　　　　　jchin@latinojustice.org

　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*
　　　　　　　　　　　　　　　　　　　　　*Common Cause/New York*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this November 30, 2018 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


By:  <u>*/s/ Neil A. Steiner*</u>

# EXHIBIT A



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
CIVIL RIGHTS BUREAU

October 17, 2016

Peter S. Kosinski, Co-Chair
Douglas A. Kellner, Co-Chair
Andrew J. Spano, Commissioner
Gregory P. Peterson, Commissioner
New York State Board of Elections
40 North Pearl Street, Suite 5
Albany, NY 12207-2729

VIA FIRST CLASS MAIL AND EMAIL

Dear Co-Chairs Kosinski and Kellner, and Commissioners Spano and Peterson:

The New York State Office of the Attorney General ("OAG") is committed to protecting the rights of all eligible voters to participate fully and meaningfully in the electoral process. To that end, the OAG has operated a statewide hotline during almost every election since 2012. During the Presidential Primary on April 19, 2016, our office received an unprecedented number of complaints from voters in counties throughout the state alleging various issues with the registration and voting processes.

Consequently, the OAG is conducting an inquiry into these complaints, which includes reviewing the laws, policies, and practices that govern voter registration and voting.[1] Our goal is to determine what, if any, election administration reforms are necessary to ensure access to the ballot box. We plan to release detailed findings and recommendations for reform once we conclude our review.

In the interim, we write to alert you to our preliminary findings concerning the practices of local Boards of Elections ("BOEs") regarding affidavit ballots. As you are aware, both New York State and federal election law provide all voters who reside in an election district the right to cast

---

[1] After the Primary, the OAG sent letters to eight local Boards of Elections ("BOEs") representing 13 counties (see footnote 3) requesting information regarding individual voter registration files, voter registration policies and procedures, and affidavit and absentee balloting information. The OAG is reviewing this information and has interviewed senior BOE officials about their policies and procedures governing the electoral process. We also have been in communication with Brian L. Quail in counsel's office at the New York State Board of Elections ("NYS BOE"). Mr. Quail is currently consulting with other NYS BOE staff to gather information in response to questions we have submitted to him. We thank Mr. Quail for his responsiveness to our queries and continued assistance.

paper ballots after signing an affidavit affirming their eligibility.[2] However, our review of the written policies of eight large BOEs in New York State,[3] as well as information gathered in interviews with officials at these BOEs, suggests that many poll workers are not receiving consistent guidance about their legal obligations with respect to affidavit ballots. Indeed, as explained in more detail below, we have identified some BOE policies and procedures that do not comply with New York State and federal election laws. For that reason, the OAG requests that the New York State Board of Elections ("NYS BOE") take immediate action to ensure that affidavit ballots are made available to voters as required by law during the upcoming General Election on November 8, 2016.

Under New York State Election Law § 8-302(3-a), if a person residing at an address in an election district is not in the poll book for that poll site, poll workers should advise "such person of his right to, and of the procedures by which he may, cast an affidavit ballot or seek a court order permitting him to vote, and shall also give every such person who does not cast an affidavit ballot, an application for registration by mail." Under the Help America Vote Act ("HAVA"),

> "if an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot..."[4]

During the Presidential Primary, the OAG received complaints from voters in Albany, Clinton, Erie, Niagara, Ontario, Westchester, and Suffolk Counties who reported that they were denied affidavit ballots at their poll sites although they believed they were eligible to vote. The OAG's review found significant inconsistencies among BOEs' written policies regarding when affidavit ballots must be provided and the steps that should be taken, if any, to verify the voter's eligibility. Only one of the BOE policies that we examined – New York City's – adheres to the clear requirement that all voters must be offered an affidavit ballot even if the poll worker believes the voter is ineligible to vote in the election. By contrast, the written policies of Albany and Onondaga state that poll workers must call the BOE prior to providing an affidavit ballot.[5] Most of the queried BOEs indicated that they have an informal policy of providing liberal access to affidavit ballots if voters state that they are eligible to vote, even if this cannot be verified on Election Day. For example, senior officials in the Onondaga BOE indicated during an interview

---

[2] N.Y. Elec. Law § 8-302(3)(e)(ii); 52 U.S.C. § 21082.

[3] As part of our inquiry, the OAG has contacted eight of the largest BOEs in the state – representing 13 counties in total -- to follow up on individual voter complaints. Specifically, the OAG is focusing our inquiry on the five counties in New York City (Bronx, Kings, New York, Queens and Richmond Counties), as well as Nassau, Suffolk, Westchester, Erie, Onondaga, Monroe, and Albany Counties. Seventy-three percent of registered voters in New York State reside in these 13 counties. *See New York State Voter Enrollment by County, Party Affiliation and Status,* NEW YORK STATE BOARD OF ELECTIONS (Apr. 1, 2016), http://www.elections.ny.gov/NYSBOE/enrollment/county/county_apr16.pdf. These counties also account for more than 80% of the complaints recorded by the OAG during the Presidential Primary for which voters reported their county of residence.

[4] An affidavit ballot is the equivalent of a provisional ballot under HAVA. 52 U.S.C. § 21082.

[5] Onondaga's materials state, "DO NOT GIVE A VOTER AN AFFIDAVIT BALLOT UNTIL YOU OR THE VOTER SPEAKS TO THE BOARD OF ELECTIONS." (emphasis in the original); Albany's materials state, "Call the Board of Elections . . . BEFORE issuing an Affidavit Ballot." (emphasis in the original).

that, in contrast to their written procedures, poll workers are instructed during trainings to provide affidavit ballots to voters who insist they are eligible. Further, they stated that poll workers are not required to call the BOE to verify eligibility. This was echoed in interviews with senior election officials at the Nassau and Suffolk County BOEs. In contrast, Albany County BOE indicated during interviews that, in practice, they do not provide affidavit ballots to everyone who requests them.

Individuals who are eligible to vote and arrive at a polling place seeking to cast ballots in the General Election may not appear in poll books for a variety of reasons, many of which may have occurred through no fault of the voter. The OAG is concerned that many poll workers will be unaware of, or confused about, their legal obligations to provide affidavit ballots on November 8th, because they have not received clear and consistent written and verbal guidance on providing affidavit ballots.

For these reasons, the OAG urges that in advance of the November 8th General Election the NYS BOE issue clear guidance to local BOEs regarding the (a) procedures for determining the eligibility requirements for affidavit ballots; (b) process for casting such ballots; (c) importance of reviewing affidavit envelopes for completeness; and (d) necessity of providing persons who choose not to cast affidavit ballots with voter registration applications. BOEs also should be advised to provide written guidance and training to their poll workers, and to ensure that poll sites have sufficient affidavit ballots and voter registration applications to meet demand.

The OAG appreciates your cooperation on this matter, and we look forward to further collaborating with you in the coming months as we address issues in our State's voter registration and voting processes. If you have any questions, please contact our office.

Sincerely,

*Lourdes Rosado/APS*

Lourdes M. Rosado
Bureau Chief

cc:    Brian L. Quail, Co-Counsel
       Kimberly Galvin, Co-Counsel
       Todd D. Valentine, Co-Executive Director
       Robert A. Brehm, Co-Executive Director

# EXHIBIT B



1401 New York Avenue, NW   Tel: 202.662.8600
Suite 400                  Fax: 202.783.0857
Washington, DC 20005-2124  www.lawyerscommittee.org

October 13, 2016

*Co-Chairs*
John M. Nonna
James P. Joseph

*Secretary*
Eleanor H. Smith

*Treasurer*
Andrew W. Kentz

*General Counsel*
Nicholas T. Christakos

*President and*
*Executive Director*
Kristen Clarke

Robert A. Brehm, Co-Executive Director
Todd D. Valentine, Co-Executive Director
New York State Board of Elections
40 North Pearl Street, Suite 5
Albany, NY 12207-2729

Dear Messrs. Brehm and Valentine:

On behalf of the Lawyers' Committee for Civil Rights Under Law, we want to thank you for taking the time to speak with us a couple of weeks ago. Our conversation was constructive and productive. In particular, we appreciated your interest in Election Protection, the non-partisan coalition that includes more than 100 local, state, and national partners, and operates a state-of-the-art hotline (866-OUR-VOTE). Our successful collaboration with local and state election officials has played a large role in enabling Election Protection volunteers to effectively assist New York voters over the years.

The primary objective of Election Protection is to ensure that all voters have an equal opportunity to participate in the electoral process. In furtherance of that goal, we invite the State Board of Elections to consider whether it would be possible to promote access to the ballot for inactive voters who appear at New York polling places on Election Day. As you know, inactive voters are not included on the list of voters available at polling places, although they are eligible to vote and will be restored to active status if they cast a proper affidavit ballot. New York is one of only four states in the nation that do not include inactive voters in poll books at polling places, along with Alaska, Minnesota, and Mississippi.

In our meeting, we suggested that New York resume its prior practice of including inactive voters' names in poll books. We continue to believe that such a procedure would ensure that all inactive voters are able to participate in the upcoming election. While it is legitimate to be concerned that this change could lead to confusion on the part of some poll workers, the potential for problems can be eliminated by creating clear procedures and effectively training poll officials. Some states, for example, use a unique designation for inactive voters and employ different procedures for processing inactive voters at polling places. *See, e.g.,* CONN. GEN. STAT. ANN. §§ 9-35, 9-42; TEX. ELEC. CODE ANN. § 15.112; ALA. CODE §§ 17-4-9, 17-4-30.

The Lawyers' Committee was formed at the request of President John F. Kennedy in 1963



**LAWYERS' COMMITTEE FOR**
# CIVIL RIGHTS
**U N D E R   L A W**

1401 New York Avenue, NW      Tel. 202.662.8600
Suite 400                     Fax. 202.783.0857
Washington, DC 20005-2124     www.lawyerscommittee.org

*Co-Chairs*
John M. Nonna
James P. Joseph

*Secretary*
Eleanor H. Smith

*Treasurer*
Andrew W. Kentz

*General Counsel*
Nicholas T. Christakos

*President and
Executive Director*
Kristen Clarke

We believe a procedure similar to the one previously employed by New York provides the best opportunity for increasing access to the ballot while safeguarding the integrity of the electoral process.  However, we would be open to and supportive of other ideas that could prevent voters from being disenfranchised under the current system.  We are happy to brainstorm about possible options and discuss their relative merits at your convenience.

Thank you for your consideration.  If the Lawyers' Committee can be of any further assistance, please do not hesitate to contact President & Executive Director Kristen Clarke at kclarke@lawyerscommittee.org or 202-662-8300.

Sincerely,

Kristen Clarke                        Dan Kolb

President and Executive Director      Board of Directors
Lawyers' Committee for Civil          Lawyers' Committee for Civil
Rights Under Law                      Rights Under Law

cc:     Brian Quail and Kimberly A. Galvin, SBE Co-Counsel
        Jon Greenbaum, Ezra Rosenberg, and John Powers, LCCRUL

# EXHIBIT C



LAWYERS' COMMITTEE FOR
# CIVIL RIGHTS
U N D E R   L A W

Via Email and Facsimile

November 2, 2016

Douglas A. Kellner, Co-Chair
Peter S. Kosinski, Co-Chair
Gregory P. Peterson, Commissioner
Andrew J. Spano, Commissioner
Robert A. Brehm, Co-Executive Director
Todd D. Valentine, Co-Executive Director
New York State Board of Elections
40 North Pearl Street, Suite 5
Albany, NY 12207-2729
Email: INFO@elections.ny.gov
Fax:     (518) 473-8315

**Re: Non-compliance with Section 8 of the National Voter Registration Act of 1993**

Dear Commissioners and Co-Executive Directors of the New York State Board of Elections:

We write on behalf of Common Cause NY, their respective members and affiliates, eligible New Yorkers whom they have assisted with attempting to vote, and others similarly situated, to notify you that the procedures for processing inactive voters at polling places, as applied by your office and election officials, violate Section 8 of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20507.

Under New York law, the board of elections sends a confirmation notice if mail sent to a voter is returned as undeliverable by the postal service without any indication of a forwarding address, or if the postal service receives notice a voter has moved without leaving a forwarding address. N.Y. ELEC. LAW § 5-712(1). A voter becomes "inactive" after the local board of elections sends that notice to the voter. N.Y. ELEC. LAW § 5-213(1). The notice asks that voters reply with their current addresses and warns that if they do not respond (1) they may be required to vote by affidavit ballot, and (2) their registrations may be cancelled if they do not vote within two federal election cycles. N.Y. ELEC. LAW § 5-712(3).

New York law requires that when voters are placed into inactive status, "[t]he registration poll records of all such voters shall be removed from the poll ledgers and maintained at the offices of the board of elections in a file." N.Y. ELEC. LAW § 5-213(4). While inactive voters remain part of that file and are eligible to vote, they are not included in the poll book available at polling places. 9 C.R.R.-N.Y. § 6217.9(2). Inactive voters may be restored to active status only after doing one of the following: (1) providing notice that he or she resides at the listed address; (2) signing a designating or nominating petition that includes the listed address; (3) casting a ballot in an affidavit envelope which states that he or she resides at the listed address; (4) voting in a local election, such as one held by a town or school district; or (5) obtaining a court order, presenting the order at a polling place, and casting a regular ballot. N.Y. ELEC. LAW §§ 5-213(3), 8-302(e)(i). Inactive voters are eligible to vote and are therefore distinct form purged voters, who are ineligible. 9 C.R.R.-N.Y. § 6217.9.

1

New York and Mississippi are the only states that do not include inactive voters in poll books at polling places while also not providing for either in-person early voting at a centralized location or a fail-safe registration mechanism. The vast majority of states make inactive voters' names available at polling places, while using a unique designation indicating inactive status or employing different procedures for processing these individuals. *See, e.g.*, CONN. GEN. STAT. ANN. §§ 9-35, 9-42; TEX. ELEC. CODE ANN. § 15.112; ALA. CODE §§ 17-4-9, 17-4-30.

We have conducted an investigation that included reviewing poll worker manuals from jurisdictions around the state, as well as speaking with poll workers and inactive voters who attempted to vote in New York. Poll workers are generally trained that, absent a court order, voters who do not appear on the poll ledger at the polling place should be given the option of completing an affidavit ballot. There is no mechanism at polling places for determining whether a potential voter does not appear on the rolls because they are inactive or simply not registered to vote. Poll workers are not trained or informed that inactive voters are eligible to vote in New York elections or that the board of elections maintains a list of those voters.

Inactive voters are therefore rarely, if ever, informed that their affidavit ballot will be counted or that casting an affidavit ballot automatically restores them to active status. Predictably, this had the effect of confusing and frustrating inactive New York voters who called the Election Protection Hotline on the day of the April 2016 presidential primary election. Those callers are only a small sample of the many similarly situated New Yorkers who have left polling places uncertain of whether their vote counted or, worse, did not attempt to cast an affidavit ballot because they did not believe it would count. New York's statutory framework also increases the risk that a poll worker tells an inactive voter that they are not eligible and turns them away.

Systemic barriers working in tandem – in particular the combined absence of (1) in-person early voting at centralized locations; (2) a fail-safe registration mechanism, (3) electronic poll books containing access to inactive voter information, and (4) a policy that requires poll workers to contact county election officials when a voter is not listed in the paper poll book – result in the disenfranchisement of inactive New York voters. As a practical matter, the only registration list accessible to inactive voters attempting to vote are the paper poll books available at polling places on Election Day. Inactive voters are generally treated the same as voters who never registered at all, and are required to cast an affidavit ballot without knowing whether or not it will count. In short, New Yorkers on the inactive list lack meaningful access to the computerized list of voters maintained at local boards of elections offices when they attempt to vote.

These procedures do not occur in a vacuum and can exacerbate other problems in the election administration apparatus. For example, the New York City Board of Elections confirmed that more than 126,000 Brooklyn voters were removed from the rolls between the summer of 2015 and the April 2016 presidential primary election. Media reports indicate that this included 44,000 people who were inappropriately moved from active to inactive status, and 70,000 people who were taken off the list entirely after previously having been inactive. Michael D. Regan, *Officials Investigating Why 126,000 Voters Were Purged from NY Rolls,* PBS NEWSHOUR, Apr. 23, 2016, *available at* http://www.pbs.org/newshour/rundown/officials-investigating-why-126000-voters-were-purged-from-ny-rolls/. We note that an investigation of the April 2016 presidential primary by the New York Attorney General's office remains ongoing. Letter from Lourdes M. Rosado, Bureau Chief, Office of the N.Y. Att'y Gen., to the Com'rs of the New York State Election Board, Oct. 17, 2016, *available at* https://ag.ny.gov/sites/default/files/2016_10_17_letter_to_state_boe.pdf.

Section 8 of the NVRA enumerates the exclusive list of reasons why voters may be removed from a registration list for a federal election. In particular, Section 8(a)(3) provides that "the name of a registrant may not be removed from the official list of eligible voters" unless (1) the registrant has died; (2) pursuant to state laws disenfranchising those mentally incapacitated or convicted of certain crimes; (3) at the request of the registrant; or (4) the registrant has moved and certain procedures are followed. 52 U.S.C. § 20507(a)(3). Additionally, Section 8(b)(1) requires that all list maintenance programs employed with respect to voter registration lists used in federal elections must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1).

The procedures employed in New York during the 2016 election cycle, as applied to voters assisted by Common Cause NY and similarly situated individuals, constitute effective removal from the voter registration rolls. Eligible registered voters placed on inactive status in New York were removed from the list of eligible voters within the meaning of Section 8 of the NVRA because, as a result of several factors in combination with the prohibition on including inactive voters' names in poll books, it was virtually impossible for them to ascertain their eligibility to vote on Election Day. These circumstances constitute de facto removal under the NVRA. *See* Stipulation of Facts and Consent Order, *United States v. Bd. of Elec. Com'rs for the City of St. Louis*, C.A. No. 4:02-CV-1235-CEJ (E.D. Mo. Aug. 14, 2002). Moreover, these burdens are borne more heavily by minority voters in New York because they are disproportionately placed on inactive status.

Please be advised that this letter serves as written notice pursuant to 52 U.S.C. § 20510(b). Please also note that these violations of Section 8(a)(3) and 8(b)(1) of the NVRA are current and ongoing. We are, of course, hoping that an amicable resolution can be reached swiftly. Please contact the undersigned to discuss this matter further.

Sincerely,

Kristen Clarke
President and Executive Director
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue NW, Suite 400
Washington, DC 20005

Susan Lerner
Executive Director
Common Cause NY
80 Broad Street, Suite 2703
New York, NY 10004

3

# EXHIBIT D

| | |
|---|---|
| **From:** | Kristen Clarke |
| **To:** | John Powers; Rosemarie Clouston |
| **Subject:** | FW: Following up on call with Lawyers" Committee |
| **Date:** | Tuesday, October 18, 2016 2:01:52 PM |

fyi

**From:** Brehm, Robert (ELECTIONS) [mailto:Robert.Brehm@elections.ny.gov]
**Sent:** Tuesday, October 18, 2016 1:36 PM
**To:** Kristen Clarke
**Cc:** Quail, Brian (ELECTIONS); Valentine, Todd (ELECTIONS); Galvin, Kimberly (ELECTIONS)
**Subject:** RE: Following up on call with Lawyers' Committee

Hello Kristen,

I believe the change you are requesting will require a legislative change.  New York State Election Law Section 5-213 requires that registration poll records of voters in inactive status be removed from the poll ledgers and maintained at the offices of the board of elections.

Bob Brehm

**From:** Nikki Thompson [mailto:nthompson@lawyerscommittee.org] **On Behalf Of** Kristen Clarke
**Sent:** Tuesday, October 18, 2016 11:40 AM
**To:** Brehm, Robert (ELECTIONS) <Robert.Brehm@elections.ny.gov>
**Cc:** Quail, Brian (ELECTIONS) <Brian.Quail@elections.ny.gov>; Valentine, Todd (ELECTIONS) <Todd.Valentine@elections.ny.gov>; Galvin, Kimberly (ELECTIONS) <Kimberly.Galvin@elections.ny.gov>
**Subject:** Following up on call with Lawyers' Committee

> ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.

Dear Mr. Brehm and Mr. Valentine,

Thank you for taking the time to speak with me a couple of weeks ago.  I'd like to follow up with you regarding one of the issues we discussed during that call, which relates to the procedures for processing inactive voters at polling places.  Please see the attached letter.

I'd be more than happy to discuss this matter further at your convenience.  Please let me know if you have any questions or if we can be of any further assistance on this issue.

Best,

Kristen Clarke
President and Executive Director