IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **COMMON CAUSE/NEW YORK,** as an organization and on behalf of its members,<br><br>Plaintiff,<br><br>v.<br><br>**ROBERT A. BREHM**, Co-Executive Director, **TODD D. VALENTINE**, Co-Executive Director, in their official capacities as Co-Executive Directors of the **NEW YORK STATE BOARD OF ELECTIONS**; and **PETER S. KOSINSKI,** Co-Chair, **DOUGLAS A. KELLNER,** Co-Chair, **ANDREW J. SPANO,** Commissioner, and **GREGORY P. PETERSON**, Commissioner, in their official capacities as Commissioners of the **NEW YORK STATE BOARD OF ELECTIONS,**<br><br>Defendants. | CIVIL ACTION NO.<br><br>1:17-cv-06770-AJN |

## FIRST AMENDED COMPLAINT

Plaintiff Common Cause/New York ("Common Cause"), by and through its undersigned counsel, for its First Amended Complaint against Defendants Robert A. Brehm and Todd D. Valentine, in their official capacities as the Co-Executive Directors of the New York State Board of Elections ("NYS BOE" or the "Board"), Peter S. Kosinski and Douglas A. Kellner, in their official capacities as the Co-Chairs of the NYS BOE, and Andrew J. Spano and Gregory P.

- 1 -

Peterson, in their official capacities as Commissioners of the NYS BOE, allege and state as follows:

## INTRODUCTION

1. This action seeks declaratory and injunctive relief under Section 8 of the National Voter Registration Act of 1993 (the "NVRA"), 52 U.S.C. § 20507 and the Fourteenth Amendment of the United States Constitution, to redress the State of New York's ("New York" or "New York State") policy and the implementation thereof of removing eligible voters from poll books upon the mailing of certain confirmation notices. *See* N.Y. Elec. Law § 5-712. NYS BOE is the governmental entity responsible for overseeing voter registration and conducting elections in New York State, and Defendants Brehm and Valentine, as Co-Executive Directors, are the Co-Chief Elections Officials responsible for ensuring New York's compliance with the NVRA. *See* N.Y. Elec. Law § 3-102.

2. New York Election Law provides that if mail to a voter is returned as undeliverable, or if the postal service receives notice that a voter has moved without leaving a forwarding address, the local board of elections must send a confirmation notice to the voter asking the voter whether he or she continues to reside in the jurisdiction. *Id.* Upon the mailing of such a notice, the eligible voter is: (i) immediately moved to "inactive" status; (ii) removed from the poll books used at polling locations on Election Day, and (iii) relegated to casting an affidavit ballot. N.Y. Elec. Law §§ 5-712(5), 5-213, 8-302(3)(e)(ii).

3. The State has offered inconsistent justifications for this policy. *See* Dkt. No. 58 at 22 n.2 ("[T]he state itself has taken inconsistent positions on whether removing names from the voter rolls enhances or undermines the efficiency and integrity of the electoral process."). Removing "inactive" voters' names from the poll books used at polling locations on Election

Day serves no purpose; it does not actually help maintain the voter rolls, nor does it enhance the integrity of the electoral process. Instead, it simply impedes the ability of certain eligible voters to exercise their right to vote on Election Day.

4. Keeping "inactive" voters in the poll books used at polling locations on Election Day (with the notation that they are "inactive") would, on the other hand, achieve both of the State's purported justifications for its policy. Such a system would also be significantly less burdensome on the right to vote.

5. Furthermore, in Common Cause/NY's experience, gained through fielding calls through its non-partisan Election Protection hotline over multiple election cycles, "inactive" voters are routinely and wrongly told by poll workers that they are not registered to vote. And all too frequently, voters whose names are not in the poll books used at polling locations on Election Day are not even offered an affidavit ballot—leaving them disenfranchised with no recourse. *See, e.g.*, Letter from Eric T. Schneiderman, Attorney General, State of New York, to New York State Board of Elections (Oct. 17, 2016) (attached hereto as **Exhibit A**). In addition, the majority of affidavit ballots cast by New Yorkers in each election are not counted—a fact that has further eroded voters' confidence in the State's electoral system.

6. New York's removal policy thereby imposes a severe and undue burden on the fundamental right to vote in direct contravention of the Fourteenth Amendment.

7. New York's implementation of its removal policy also violates Section 8 of the NVRA ("Section 8"), which sets forth the procedures that a state must follow before it can lawfully deny an otherwise eligible voter the right to vote in a federal election on the basis of a purported change in residence. Specifically, Section 8 precludes a state from removing a registered voter from the official list of registered voters based on a belief that the voter has

changed residence unless either (a) the voter confirms in writing that he or she has moved to a different jurisdiction; or (b) the voter has failed to respond to a notice seeking confirmation that the voter continues to reside in the jurisdiction *and* the voter fails to vote in two consecutive general elections for federal office. 52 U.S.C. § 20507(d).

8. As a direct result of New York's non-compliance with Section 8 and the Fourteenth Amendment, tens of thousands of New Yorkers have been disenfranchised. *See, e.g.*, Michael D. Regan, *Officials Investigating Why 126,000 Voters Were Purged from NY Rolls*, PBS NEWSHOUR, (Apr. 23, 2016), http://www.pbs.org/newshour/rundown/officials-investigating-why-126000-voters-were-purged-from-ny-rolls/.

9. Moreover, this non-compliance has had a disproportionate impact on the state's most vulnerable citizens, particularly its low-income and minority communities. The state's policy decisions, of course, have an especially acute impact on these citizens' well-being.

10. For example, United States Census data from the November 2016 election indicates that only 60.2 percent of New York's eligible Latinx[1] citizens of voting age were registered, as compared to 70.6 percent of New York's non-Hispanic white citizens of voting age—a voter registration gap of over 10.4 percentage points. *See* U.S. DEP'T OF COMMERCE, U.S. CENSUS BUREAU, VOTING AND REGISTRATION IN THE ELECTION OF NOVEMBER 2016, TABLE

---

[1] The gender-neutral term "Latinx", along with the terms "Latina", "Latino" and "Hispanic" are used interchangeably throughout this Complaint to refer to the group designated by the Census as "Hispanic." Specifically, a report on the 2010 Census states that "'Hispanic or Latino' refers to a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." Karen R. Humes, Nicholas A. Jones, & Roberto R. Ramirez, *Overview of Race and Hispanic Origin: 2010, 2010 Census Briefs*, 1, 2 (March 2011) https://www.census.gov/prod/cen2010/briefs/c2010br 02.pdf (last visited Sept. 5, 2017). *See also generally,* Sarah Hayley Barett & Oscar Nñ, *Latinx: The Ungendering of the Spanish Language*, NPR, (Jan. 29, 2016), https://www.npr.org/2016/01/29/464886588/latinx-the-ungendering-of-the-spanish-language.

04B (May 2017), *available at* https://census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.  The turnout gap between the groups was even larger—approximately 21.0 percentage points.  *Id.*  The census data reports other significant voter registration and turnout disparities; for example, the turnout disparity between non-Hispanic white and African-American voting age citizens was 10.5 percentage points, and the gap was 28.1 percentage points between non-Hispanic white and Asian-American voting age citizens.  *Id.*  As a result, these minority voters in the State of New York are less likely or have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

11. New York's removal policy similarly helps to perpetuate the 16 percentage point registration gap between low- and high-income New York citizens.  Only 63.9 percent of New Yorkers of voting age who live in "low-income" neighborhoods (defined as census tracts where the median income is among the bottom 20 percent in the state) are registered to vote, compared to 79.9 percent of voting age New Yorkers who live in "high- income" neighborhoods (census tracts where the median income is top 20 percent in the state).

12. There are a total of nearly 200,000 "inactive" voters in New York, Bronx and Westchester Counties alone.  In addition, in Kings County, approximately 44,000 voters were improperly moved from active to "inactive" status between the summer of 2015 and April 2016, and an additional approximately 70,000 voters were improperly removed from the voting list entirely after having previously been listed as "inactive." *See* N.Y. State Bd. Of Elections, NYSVoter Enrollment by County, Party Affiliation and Status, Voters Registered as of April 1, 2016, https://www.elections.ny.gov/NYSBOE/enrollment/county/county_apr16.pdf (last visited Sept. 5, 2017).

13. New York is aware that enforcement of the election law violates the NVRA. Plaintiff's counsel first contacted the Co-Executive Directors of the NYS BOE about these NVRA violations more than two years ago on October 13, 2016, *see* **Exhibit B**, and Plaintiff submitted a formal notice letter to the Co-Executive Directors on November 2, 2016 (attached hereto as **Exhibit C**).  In response, Defendant Co-Executive Director Brehm replied that remedying the violations would require a legislative change because the current practice is required by Section 5-213 of the New York Election Law (attached hereto as **Exhibit D**). Thereafter, upon information and belief, Defendants have not taken sufficient steps to: (i) prevent the unlawful removal of voters from the poll books that are used at polling locations on Election Day; (ii) ensure that all "inactive" voters are offered affidavit ballots; or (iii) ensure that all affidavit ballots are counted.

14. Plaintiff therefore brings this action for declaratory and injunctive relief, asking this Court to enjoin N.Y. Elec. Law §§ 5-712, 5-213, 8-302(3)(e) to the extent that they violate the NVRA or the Fourteenth Amendment and to ensure that the names of "inactive" voters are included in the poll books used at polling locations on Election Day.  Alternatively, Plaintiff asks this Court for injunctive relief to ensure that: (i) voters are not placed in "inactive" status without first receiving a confirmation notice and thereafter not voting in two consecutive federal general elections; (ii) all "inactive" voters are offered affidavit ballots; and (iii) all affidavit ballots submitted by eligible "inactive" voters are counted.

## PARTIES

15. Plaintiff Common Cause/New York is the New York chapter of Common Cause, a 501(c)(4) not-for-profit corporation. Common Cause/New York's principal place of business is located in New York, New York.

16. Common Cause is a nonpartisan grassroots organization whose mission mirrors that of the NVRA and the Fourteenth Amendment. Specifically, it is dedicated to upholding the core values of American democracy. It works to create open, honest, and accountable government that serves the public interest; to promote equal rights, opportunity, and representation for all; and to empower all people to make their voices heard in the political process.

17. Common Cause has more than 800,000 members in 50 states plus the District of Columbia. More than 70,000 activists and members reside in New York State, which includes more than 25,000 activists and members in New York City.

18. Common Cause/New York has committed and continues to commit time and personnel to conducting voter registration, voter assistance, election protection, and to ensuring that eligible citizens remain registered to vote in New York State. The purpose of this activity is to increase the level of voter registration and thereby increase the level of voter participation in our democracy.

19. Common Cause/New York members include individuals who have received or may in the future receive a confirmation notice from New York State and may not respond to that notice. These individuals face removal from the official list of "active" voters to an "inactive" registration status under which their names would not appear in the poll books on Election Day. They would not be permitted to vote a regular ballot, may not be offered an

affidavit ballot, and, to the extent that they do vote an affidavit ballot, the affidavit ballot may not be counted.

20. Defendant Robert A. Brehm is a Co-Executive Director of the NYS BOE and in that capacity is the co-chief elections official in New York responsible for coordinating New York's compliance with the NVRA.

21. Defendant Todd D. Valentine is a Co-Executive Director of the NYS BOE and in that capacity is the co-chief elections official in New York responsible for coordinating New York's compliance with the NVRA.

22. Defendant Peter S. Kosinski is a Co-Chair of the NYS BOE.

23. Defendant Douglas A. Kellner is a Co-Chair of the NYS BOE.

24. Defendant Andrew J. Spano is a Commissioner of the NYS BOE.

25. Defendant Gregory P. Peterson is a Commissioner of the NYS BOE.

26. Established on June 1, 1974, the NYS BOE is a bipartisan agency vested with the responsibility for the "administration and enforcement of all laws relating to elections in New York State." N.Y. State Bd. of Elections, About the New York State Board of Elections, https://www.elections.ny.gov/AboutSBOE.html (last visited Nov. 24, 2018). In addition, the Board is "charged with the preservation of citizen confidence in the democratic process and enhancement in voter participation in elections." *Id.* The Board is further responsible for implementing numerous requirements of the NVRA, including those related to voter registration and list maintenance. N.Y. Elec. Law § 3-102(13), (14); N.Y. Elec. App. § 6213.5.

## JURISDICTION AND VENUE

27. This action is brought pursuant to 52 U.S.C. § 20510(b) and 42 U.S.C. § 1983.

28. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

29. This Court has personal jurisdiction over each defendant because each is a citizen of New York State and each is being sued in his official capacity as Co-Executive Director, Co-Chair and/or Commissioner of the NYS BOE.

30. Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this district.

31. As described in detail below, an actual and justiciable controversy exists between Plaintiff and Defendants.

## FACTUAL ALLEGATIONS

### New York Election Law

32. If mail to a voter is returned as undeliverable by the postal service without any indication of a forwarding address, or if the postal service receives notice that the voter has moved without leaving a forwarding address, New York Election Law requires local boards of elections to send confirmation notices to such voters. N.Y. Elec. Law § 5-712. Upon the mailing of such a notice, the voter is moved to "inactive" status and is immediately removed from the poll books available at polling places on Election Day. *Id.*; N.Y. Elec. Law §5-213(1), (2) ("The registration poll records of all [inactive] voters shall be removed from the poll ledgers."). The voter is thereby relegated to casting an affidavit ballot. N.Y. Elec. Law § 8-302(3)(e)(ii).

33. Section 5-213(3) further provides that the name of an "inactive" voter will not be restored to the poll book available at his or her polling place on Election Day unless and until the

"inactive" voter: (i) responds to the confirmation notice; (ii) provides notice that he or she resides at the listed address; (iii) signs a designating or nominating petition that includes the listed address; (iv) votes with an affidavit ballot; (v) votes in a local election (such as a town or school district election), or (vi) obtains a court order and presents said order at the polling place.

34. Each of these additional steps increases the cost—time, money, and other resources—of voting for these eligible voters.

35. Furthermore, eligible voters are frequently moved to "inactive" status without even receiving the confirmation notice.

36. Moreover, an investigation revealed that there is no mechanism at polling places for determining whether a voter whose name does not appear in the poll book on Election Day is missing because the voter is "inactive" (and therefore is still eligible to vote) or because the voter is not registered to vote. Defendants' own training materials confirm the same.

37. Defendants' public education efforts and training of local officials involved in election administration remain woefully inadequate to inform eligible New York voters of: (i) their right to cast an affidavit ballot and (ii) the steps they need to take to be restored to "active" status. For example, poll workers are generally not trained or informed that "inactive" voters are eligible to vote.

38. "Inactive" voters are arbitrarily and inconsistently informed that: (i) they may vote an affidavit ballot, (ii) their affidavit ballot should be counted if they are voting at the correct precinct; and (iii) casting an affidavit ballot automatically restores them to the active voter list for future elections.

39. As a result, "inactive" voters are frequently confused and frustrated when their names do not appear in the poll books used at polling locations on Election Day and are often

uncertain about whether or not their affidavit ballots will even be counted. Worse yet, many "inactive" voters do not even attempt to cast an affidavit ballot, either because they do not believe it will be counted or because they are told that they are not eligible to vote and are turned away.

40. Similarly, because the names of inactive voters do not appear in in the poll book on Election Day, even those poll workers who do offer an inactive voter an affidavit ballot cannot conclusively tell an inactive voter that he or she is casting the ballot at the correct location, meaning that the affidavit ballot may not be counted.

41. In addition to disproportionally affecting minority and low income communities, New York's removal policy and New York's implementation thereof have a particularly pernicious effect on voters who move locally, *e.g.*, within a county or within New York City. In New York, an "inactive" voter who moves to a new precinct within the same jurisdiction and congressional district may not be allowed to vote at his or her former polling place. *See* N.Y. Elec. Law §§ 8-302(3)(e)(ii), 9-209(2)(E)(iii).

## National Voter Registration Act of 1993

42. The NVRA, 52 U.S.C. § 20501 et seq., was adopted with widespread bipartisan support as part of an effort to make voter registration more widely available and accessible. Congress sought to prevent the improper removal of registered voters from the voter registration rolls, thereby increasing the number of properly registered eligible voters for federal elections. *See* 52 U.S.C. § 20501(a)–(b). The statute also reflects Congress' intent to combat the disproportionate harm to voter participation "by various groups, including racial minorities," caused by "discriminatory and unfair registration laws and procedures." 52 U.S.C. § 20501(a)(3); H.R. Rep. No. 103-9, at 106-07 (1993).

43. Indeed, the NVRA has as its principal purpose "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1). The NVRA also seeks to "protect the integrity of the elec[tion] process" and to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3), (4).

44. The NVRA further prescribes the procedures a state must follow before it can remove the name of a registrant from the official list of registered voters on the ground that the registrant has changed residence. Specifically, Section 8(d) of the NVRA, titled "Removal of Names from Voting Rolls," provides:

> (1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—
> (A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
> (B)
> (i) has failed to respond to a notice described in paragraph (2); and
> (ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.
> (2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:
> (A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.
>
> (B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

52 U.S.C. § 20507(d).

45. The NVRA requires that if a voter moves "from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district," he or she "shall be permitted to correct the voting records and vote at the registrant's former polling place…." 52 U.S.C. § 20507(e)(2)(A).

46. The NVRA creates a private right of action for "a person who is aggrieved by a violation" of the NVRA. 52 U.S.C. § 20510(b)(1). The NVRA requires that, prior to bringing an action to enforce the NVRA, an aggrieved person must give written notice to the "chief State election official" to identify the violation(s) and to provide the State with an opportunity to cure the violation(s) prior to the commencement of an action. *Id.*

47. New York State is subject to the requirements of the NVRA. The NVRA applies to all states except a select few who qualify for one of the limited exclusions contained in the Act. *See* 52 U.S.C. § 20503(b). New York State does not qualify for any of the exclusions.

48. New York has designated the Co-Executive Directors of the NYS BOE as the chief state election officials responsible for coordinating the responsibilities of the state under the NVRA, pursuant to the requirement of Section 10 of the NVRA, 52 U.S.C. § 20509, that each state designate such an official.

### Harm to Common Cause/New York

49. Voting rights and election reform are central to Common Cause/New York's mission of promoting open, honest, and accountable government that serves the public interest and empowering ordinary people to make their voices heard in the political process. Ensuring that our elections are accessible, well-administered, and fair is part of its core mission to promote civic engagement and accountability in government.

50. Common Cause/New York has committed, and continues to commit, time and resources to advocating for reforms that improve election administration in New York City and New York State, monitoring polling places on Election Day, documenting and analyzing voters' problems at polling places, conducting voter registration efforts, facilitating a coalition of groups that work on election administration and reform, and issuing reports and recommendations for the reform of New York election law and election administration practices.

51. Common Cause/New York has traditionally spent a considerable amount of time and resources directed to voter registration efforts. The organization conducted voter registration drives in New York City that resulted in hundreds of new registrants in 2016 and in 2018.

52. For many years, Common Cause/New York has assisted voters who are confused about their "inactive" status and have been adversely impacted by New York's list maintenance procedures.

53. The organization's election protection efforts include receiving and responding to complaints from voters who are or are likely in "inactive" status, such as voters who report to their correct polling place and should be on the voter registration list and are not in the poll ledger.

54. Post-election voter follow-up work caused by responding to these complaints consumes significant time and resources. This was particularly the case following the April 2016 primary election and is once again the case after the November 2018 general election. The organization has therefore had less time to devote to other core aspects of its mission.

55. In 2016 and in 2018, Common Cause/New York assisted numerous voters who believed they were registered to vote but whose names did not appear in the poll books at polling places on Election Day.

56. Common Cause/New York has devoted significant resources to addressing the concerns about New York's list maintenance procedures by assisting individual voters, testifying at hearings, conducting press conferences, and discussing the issue with the staff of the NYS BOE.

57. For example, Common Cause/New York has diverted and continues to divert significant resources from its efforts to register and mobilize voters in order to assist (i) voters who have been improperly placed in "inactive" status, (ii) "inactive" voters who have not been offered affidavit ballots, (iii) "inactive" voters who were told that their affidavit ballots were properly cast and would be counted, but were not counted, and (iv) voters whose affidavit ballots were otherwise not counted.

58. If it were not for New York's removal policy and its inconsistent implementation thereof, Common Cause/New York would not have had to spend its limited resources on these activities and could instead focus on its central priorities.

## CLAIMS FOR RELIEF

### Count One: Violation of Section 8 of the National Voter Registration Act of 1993
### 52 U.S.C. § 20507(d)

59. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

60. By denying eligible voters the right to vote in a federal election based on a purported change in residence without following the procedure set forth in Section 8 of the NVRA, 52 U.S.C. § 20507, Defendants' implementation of New York's removal policy violates Section 8.

61. Plaintiff is aggrieved by Defendants' past and continuing violations of the NVRA, and has no adequate remedy at law. Declaratory and injunctive relief are required to remedy

Defendants' past and continuing violations of the NVRA and to ensure Defendants' future compliance with the NRVA.

## Count Two: Threatened Infringement of the
## Right to Vote in Violation of Fourteenth Amendment

### 42 U.S.C. § 1983

62. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

63. 42 U.S.C. § 1983 provides, in pertinent part, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States of America, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

64. Defendants' actions described herein were taken under color of the laws of the State of New York.

65. The Fourteenth Amendment prohibits the imposition of severe burdens on the fundamental right to vote unless they are narrowly drawn to advance a state interest of compelling importance. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Further, even where a regulation or the implementation and/or enforcement thereof creates a slight burden on the right to vote, the state must show that the regulation is justified by a relevant state interest. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (internal citations omitted).

66. By (i) immediately removing eligible voters from the poll books that are used at polling locations on Election Day upon the mailing of confirmation notices, and in certain instances, without mailing any confirmation notice; (ii) requiring such eligible voters to take

affirmative steps to restore their names to the poll books used at polling locations on Election Day; (iii) failing—due to wholly inadequate training of election officials—to offer all such eligible voters affidavit ballots; and (iv) failing to count the majority of affidavit ballots cast, Defendants have violated and continue to violate the Fourteenth Amendment.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and enter an order:

(i)     Declaring that Defendants have violated Section 8 of the NVRA by denying eligible voters the right to vote based on a purported change in residence without following the procedures set forth in 52 U.S.C. § 20507;

(ii)    Directing Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to remedy the past and continuing violations of Section 8 of the NVRA, including, without limitation, ensuring that all persons affected by Defendants' violations of Section 8 of the NVRA are restored to active status;

(iii)   Directing Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with the requirements of Section 8 of the NVRA, including, without limitation, practices and policies for voter list maintenance, and training and monitoring poll workers to ensure that all registered voters are permitted to cast a ballot on Election Day that will count;

(iv)    Declaring that Defendants have violated the Fourteenth Amendment of the United States Constitution by improperly placing eligible voters in "inactive" status, failing to include the names of such voters in the poll books used at polling locations on Election Day, failing to

offer such eligible voters affidavit ballots, failing to count all affidavit ballots, and failing to provide proper training to poll workers;

(v) Enjoining Defendants, their officers, agents, servants, employees, and successors in office, and all persons in active concert or participation with them, from enforcing N.Y. Elec. Law §§ 5-712, 5-213, 8-302(3)(e) to the extent these laws violate the Fourteenth Amendment;

(vi) Directing Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to remedy the past and continuing violations of the Fourteenth Amendment, including, without limitation, ensuring that all persons affected by Defendants' violations of the Fourteenth Amendment are restored to active status;

(vii) Directing Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with the requirements of the Fourteenth Amendment, including, without limitation, practices and policies for voter list maintenance and training and monitoring poll workers to ensure that all registered voters are permitted to cast a ballot on Election Day that will count;

(viii) Awarding Plaintiff the costs and disbursements incurred in connection with this action, including, without limitation, their reasonable attorneys' fees, expenses, and costs, pursuant to 52 U.S.C. § 20510(c) and 42 U.S.C. § 1983;

(ix) Retaining jurisdiction over this action to ensure that Defendants are complying with any order(s) issued by this Court and with their obligations the NVRA and the Fourteenth Amendment; and

(x) Awarding such additional relief as to this Court seems just and proper.

| | |
|---|---|
| Dated: New York, New York.<br>November 30, 2018 | Respectfully submitted,<br><br>DECHERT LLP<br><br><br>By: /s/ Neil A. Steiner<br>    Neil A. Steiner<br>    1095 Avenue of the Americas<br>    New York, NY  10036-6797<br>    (212) 698-3500<br><br>    Ezra Rosenberg (*pro hac vice*)<br>    John Powers (*pro hac vice*)<br>    Lawyers' Committee for Civil Rights Under Law<br>    1401 New York Avenue, N.W., Suite 400<br>    Washington, D.C.  20005<br>    (202) 662-8336<br>    erosenberg@lawyerscommittee.org<br>    jpowers@lawyerscommittee.org<br><br>    Jose L. Perez<br>    Jackson Chin<br>    LatinoJustice PRLDEF<br>    99 Hudson St., 14th Floor<br>    New York, NY 10013<br>    (212) 219-3360<br>    jperez@latinojustice.org<br>    jchin@latinojustice.org<br><br>    *Attorneys for Plaintiff*<br>    *Common Cause/New York* |