IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**COMMON CAUSE/NEW YORK, as an**
**organization and on behalf of its members,**

      Plaintiff,

     v.

**ROBERT A. BREHM**, Co-Executive
Director, **TODD D. VALENTINE**, Co-
Executive Director, in their official capacities
as Co-Executive Directors of the **NEW**
**YORK STATE BOARD OF ELECTIONS**;
and **PETER S. KOSINSKI,** Co-Chair,
**DOUGLAS A. KELLNER,** Co-Chair,
**ANDREW J. SPANO,** Commissioner, and
**GREGORY P. PETERSON**, Commissioner,
in their official capacities as Commissioners
of the **NEW YORK STATE BOARD OF**
**ELECTIONS,**

      Defendants.

CIVIL ACTION NO.
1:17-cv-06770-AJN

_____

**PLAINTIFF'S PRETRIAL MEMORANDUM OF LAW**

# TABLE OF CONTENTS

Page

PRETRIAL MEMORANDUM OF LAW ...................................................................................... 1

I.     BACKGROUND ............................................................................................................... 1

       A.     Constitutional Right To Vote .................................................................................. 1

       B.     The National Voter Registration Act ...................................................................... 2

       C.     New York Election Law ......................................................................................... 3

II.    DISCUSSION .................................................................................................................. 4

       A.     NVRA Claim .......................................................................................................... 4

       B.     Fundamental Right To Vote .................................................................................... 6

III.   PLAINTIFF'S STANDING ........................................................................................... 10

IV.   CONCLUSION .............................................................................................................. 12

## **TABLE OF AUTHORITIES**

**CASES**

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)...............................................................................................................1, 2

*Arcia v. Florida Sec'y of State*,
    772 F.3d 1335 (11th Cir. 2014) ...............................................................................................11

*Baker v. McCollan*,
    443 U.S. 137 (1979)...................................................................................................................2

*Burdick v. Takushi*,
    504 U.S. 428 (1992)...............................................................................................................1, 8

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017).................................................................................................10, 11

*Common Cause New York v. Board of Elections in the City of New York*,
    No. 1:16-cv-06122-NGG-RML (E.D.N.Y.) ............................................................................12

*Common Cause/Georgia v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) ...........................................................................................2, 11

*Crawford v. Marion Cty. Election Bd.*,
    553 U.S. 181 (2008)...................................................................................................................8

*Curling v. Raffensperger*,
    --- F. Supp. 3d ........................................................................................................................2, 9

*Curling v. Raffensperger*,
    --- F. Supp. 3d ...........................................................................................................................8

*Frank v. Walker*,
    819 F.3d 384 (7th Cir. 2016) .....................................................................................................2

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
    528 U.S. 167 (2000).................................................................................................................10

*Georgia Coalition for the People's Agenda, Inc. v. Kemp*,
    347 F. Supp. 3d 1251 N.D. Ga. 2018..................................................................................9, 12

*Gomez v. Toledo*,
    446 U.S. 635 (1980)...................................................................................................................2

*Greater Birmingham Ministries v. Merrill*,
    250 F. Supp. 3d 1238, 1242-43 (N.D. Ala. 2017)...................................................................11

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)...................................................................................................................10

*Hunt v. Washington State Apple Advert. Comm'n.*,
   432 U.S. 333 (1977)...................................................................................................................11

*Husted v. A. Philip Randolph Institute*,
   —— U.S. ——, 138 S.Ct. 1833 (2018) at 30-31 ........................................................................6

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
   418 F.3d 168 (2d Cir. 2005)......................................................................................................10

*New York Civil Liberties Union v. NYC Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012)......................................................................................................11

*New York Immigration Coalition, Common Cause/New York v. Jason Schofield, et al.*, *Common Cause Indiana v. Lawson*,
   327 F. Supp. 3d 1139 (S.D. Ind. 2018).....................................................................................12

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011)......................................................................................................10

*Timmons v. Twin Cities Area New Party*,
   520 U.S. 351(1997).....................................................................................................................8

*United States v. Bd. of Election Comm'rs for the City of St. Louis*,
   No. 4:02-CV-1235-CEJ (Stipulation) .........................................................................................5

*United States v. Cibola Cty*,
   No. 1:93-cv-01134-LH-LFG, Dkt. 91 (Order), at 2 (D.N.M. Mar. 19, 2007) ...........................5

*Veasey v. Perry*,
   29 F. Supp. 3d 896, 903-04 (S.D. Tex. 2014)...........................................................................11

*Wesberry v. Sanders*,
   376 U.S. 1 (1964).........................................................................................................................1

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886).....................................................................................................................1

**STATUTES**

42 U.S.C. § 1983.............................................................................................................................1, 2

52 U.S.C. § 20501..............................................................................................................................3

52 U.S.C. § 20507..............................................................................................................................3

52 U.S.C. § 20510(b)(1) ....................................................................................................................3

Help America Vote Act, 52 U.S.C. § 21082(a) .................................................................................4

N.Y. Elec. Law § 5-213 .....................................................................................................................4

N.Y. Elec. Law § 5-712 .................................................................................................................3, 4

National Voter Registration Act ............................................................................................... *passim*

**OTHER AUTHORITIES**

Fourteenth Amendment ...............................................................................................................1, 8

Rule 17(a)(3) of the Federal Rules of Civil Procedure ...................................................................12

H.R. REP. 103-9, 17-18, 1993 U.S.C.C.A.N. 105...........................................................................3

## PRETRIAL MEMORANDUM OF LAW

Plaintiff Common Cause/New York ("Plaintiff") respectfully submits this Pretrial

Memorandum of Law to highlight why, as the evidence adduced at trial will demonstrate, New

York's statute requiring voters to be moved to an "inactive" list – whereby the voter's name is

not included in the printed poll book used on Election Day and the voter is required to cast an

affidavit ballot rather than a regular ballot – based on information provided by the United States

Postal Service indicating that the voter might have moved – violates the National Voter

Registration Act of 1993 ("NVRA") as well as the Fourteenth Amendment to the United States

Constitution and 42 U.S.C. § 1983.

### I.  Background

#### A.    Constitutional Right To Vote

The Supreme Court has recognized that "[n]o right is more precious in a free country

than that of having a voice in the election of those who make the laws under which, as good

citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is

undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  And the Supreme Court has

repeatedly reaffirmed, most notably in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick

v. Takushi*, 504 U.S. 428 (1992), that the fundamental right to vote is protected by the First and

Fourteenth Amendments of the U.S. Constitution.  That is because "[i]t is beyond cavil that

voting is of the most fundamental significance under our constitutional structure," *Burdick*, 504

U.S. at 433 (citation omitted), and is a "fundamental political right" that is "preservative of all

rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

A violation of the fundamental right to vote is enforced against a person acting under

color of state law through 42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive

rights, but a method for vindicating federal rights elsewhere conferred by those parts of the

United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S.

137, 145 n.3 (1979). A claim under Section 1983 requires the plaintiff to prove that (1) she was

deprived of a federal right; and (2) such deprivation was effected by one acting under color of

state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

"The Supreme Court has rejected a 'litmus-paper test' for 'constitutional challenges to

specific provisions of a State's elections laws' and instead has applied a 'flexible standard.'"

*Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citing *Anderson* and

*Burdick*). Under this flexible standard,

> courts must first consider the character and magnitude of the
> asserted injury to the rights protected by the First and Fourteenth
> Amendments that the plaintiff seeks to vindicate. It then must
> identify and evaluate the precise interest put forward by the State as
> justifications for the burden imposed by its rule. In passing
> judgment, the [c]ourt must not only determine the legitimacy and
> strength of each of those interests; it also must consider the extent
> to which those interests make it necessary to burden the plaintiff's
> rights.

*Anderson*, 460 U.S. at 789. "'However slight the burden [imposed on voters] may appear . . . it

must be justified by relevant and legitimate state interests sufficiently weighty to justify the

limitation.'" *Common Cause/Georgia*, 554 F.3d at 1352 (quoting Crawford *v. Marion Cty.*

*Election Bd.*, 553 U.S. 181, 211 (2008)); *see also Curling v. Raffensperger*, --- F. Supp. 3d ----,

2019 WL 3822123, at *55 (N.D. Ga. Aug. 15, 2019). Indeed, the government must be able to

substantiate its interests in imposing a voting restriction even if "99%" of all voters are able to

easily overcome that restriction. *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016).

## B. The National Voter Registration Act

The NVRA was adopted by Congress to increase the number of eligible citizens who

register to vote and to ensure that accurate voter registration rolls were maintained. Among the

-2-

purposes of the NVRA is to implement the Act "in a manner that enhances the participation of eligible citizens as voters" in federal elections. 52 U.S.C. § 20501(b)(2).  In enacting the NVRA, Congress sought to implement a uniform nationwide system of voter registration to help "increase the number of eligible citizens who register to vote," and to eradicate discriminatory and unfair registration practices that diminish voter turnout. 52 U.S.C. § 20501(b)(1). Congress has expressed that "an underlying purpose" of the NVRA is that, "once registered, a voter should remain on the list of voters so long as the individual remains eligible to vote." H.R. REP. 103-9, 17-18, 1993 U.S.C.C.A.N. 105, 121-22.

Section 8 of the NVRA addresses the procedures a state must follow before it may remove an eligible voter from the official list of registered voters.  52 U.S.C. § 20507.  In relevant part, Section 8 prohibits a State from "remov[ing] the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence" unless and until one of the following two conditions is met: (1) the voter confirms in writing that he or she has moved to a different jurisdiction; or (2) the voter fails to respond to a notice seeking confirmation that the voter continues to reside in the jurisdiction (the "Confirmation Notice") *and* the voter fails to vote in two consecutive general elections for federal office. 52 U.S.C. § 20507(d).  The NVRA creates a private right of action for "a person who is aggrieved by a violation" of the NVRA. 52 U.S.C. § 20510(b)(1).

## C.    New York Election Law

New York Election Law provides that if mail sent to a voter is returned as undeliverable, or if the postal service receives notice that a voter has moved without leaving a forwarding address, the local board of elections must send a Confirmation Notice to the voter.  N.Y. Elec. Law § 5-712(1).  As soon as a voter is sent a Confirmation Notice, he or she is moved to

-3-

"inactive" status, without giving the voter a chance to respond to the Confirmation Notice or to remain an active voter simply by voting in one of the next two federal general elections. N.Y. Elec. Law §§ 5-213(1), 5-712(5). The names of voters in inactive status "shall be removed from the poll ledgers" and "shall not be placed on" any "computer generated registration lists" at polling places. *Id*. § 5-213(2). Inactive voters must cast affidavit ballots when they attempt to vote, unless they obtain a court order permitting them to vote on a regular ballot. *Id*. §§ 5-213(3), 5-712(3).

## II. Discussion

### A. NVRA Claim

The consequence of being moved to New York's inactive voter list is severe: New York law purportedly prohibits inactive voters from being included in the printed poll register used in polling places on Election Day – and purportedly and inexplicably also prevents inactive voters' names from being included in "electronic poll books" once that technology is adopted pursuant to recent New York election reforms.

The evidence will leave no doubt that being excluded from the printed poll book constitutes a removal from the official list of eligible voters. Indeed, when an inactive voter attempts to vote in his or her polling place, the voter will be informed that his or her name is not in the poll book. While any person who believes he or she is eligible to vote but whose name is not included in the poll book is supposed to be offered an affidavit ballot, as required by the Help America Vote Act, 52 U.S.C. § 21082(a), the evidence will show that in practice poll workers often are unaware of this requirement or otherwise fail to follow it. The result is that eligible voters routinely are turned away from the polls without being permitted to cast any ballot.

-4-

Courts have ordered relief in at least two NVRA cases that included a de facto removal claim. *See* Second Order Extending and Modifying Stipulation and Order Originally Entered April 21, 1994, *United States v. Cibola Cty*, No. 1:93-cv-01134-LH-LFG, Dkt. 91, at 2 (D.N.M. Mar. 19, 2007) (Attached hereto as **Exhibit 1**); Stipulation of Facts and Consent Order, *United States v. Bd. of Election Comm'rs for the City of St. Louis*, No. 4:02-CV-1235-CEJ, at ¶¶ I-XXXIII, pp. 7-20 (E.D. Mo. Aug. 14, 2002) (Attached hereto as **Exhibit 2**). The *Cibola County* and *City of St. Louis* courts entered or modified an existing consent decree and ordered relief based on a finding that the jurisdiction's list maintenance procedures, in combination with other deficiencies in the State's election administration policies and procedures, disenfranchised affected voters.

In *Cibola County*, the court directed the county "to come into complete compliance with the … NVRA" because the county and its officials conceded that "their voting practices and procedures violate[d] the National Voter Registration Act." Exh. 1, (Second Order), at 1-2; see also Amended Joint Stipulation, No. 1:93-cv-01134-LH-LFG, Dkt. 89, at 6 (D.N.M. Jan. 31, 2007) (conceding that the county "violate[d] Section 8 of the NVRA"). The NVRA violation occurred due to "the [c]ounty's practice of having voters' names removed from the registration list or placed on the inactive list solely on the basis that the voter had not voted in any election for two federal election cycles." *Id.* at 4. This practice, in combination with other election administration failures such as faulty provisional ballot procedures, resulted in the disenfranchisement of voters. *Id.* at 4-5. Similarly, in *City of St. Louis*, the court found that "it [was] the combination of [] factors, and not any one factor standing alone, that constituted a de facto removal under the NVRA." Ex. 2 (Stipulation of Facts and Consent Order) at 8.

### B.    Fundamental Right To Vote

Even when the voter is given the opportunity to cast an affidavit ballot, the fundamental

right to vote is unreasonably impaired.  The evidence will show that, even in the best of

circumstances, it takes longer to interact with the poll inspector and receive and vote an affidavit

ballot than it does to sign the poll book and cast a regular ballot; the additional delays result in

longer lines that negatively impact all voters in the election district; there is less confidence

among voters that an affidavit ballot will be counted; and in fact less than half of all affidavit

ballots are determined to be valid – sometimes because the voter in fact is not eligible to vote,

but oftentimes due to an immaterial mistake in completing the affidavit envelope by either the

voter or the poll worker.

In the face of this deprivation of (for voters not offered an affidavit ballot) or extreme

burden on (for voters offered an affidavit ballot) the right to vote, there is virtually no state

interest in excluding inactive voters from the printed poll book or in forcing inactive voters to

cast an affidavit ballot rather than a regular ballot.  In fact, the State of New York has previously

acknowledged in an amicus brief to the United States Supreme Court that "[v]oters whose

information is missing from the rolls ... require the time and attention of officials," resulting in "a

bottleneck at the check-in table that will slow the processing of voters and begin to cause back-

ups and lines.  These costs can be tremendous and unduly burdensome for both voters and states

and local officials."  Brief for the States of New York et al. as *Amici Curiae* Supporting

Respondents, *Husted v. A. Philip Randolph Institute*, —– U.S. ——, 138 S.Ct. 1833 (2018) at

30-31 (citing Republican Nat'l Lawyers Ass'n Report at 10 (April 2014)).

Neither Robert Brehm nor Thomas Valentine, the Co-Executive Directors of the State

Board of Elections, was able to identify any compelling state interest in either moving voters to

inactive status and excluding them from the poll book, or in prohibiting inactive voters from casting a regular ballot. Rather, Mr. Brehm and Mr. Valentine both testified that the primary state interest in the practice was complying with state law. Brehm Tr. at 51:1-53:9; Valentine Tr. at 105:8-14. The only other purported justification offered by either was that excluding inactive voters from the poll book and requiring them to vote an affidavit ballot "serves the purpose of confirming that the voter is actually given the correct ballot for the offices which they're eligible to vote for." Valentine Dep. 105:23-106:2. This rationale makes no sense on its face. Not only are inactive voters' affidavit ballots counted if they write down their address of registration on the envelope, but Defendants have not explained how New York's regime deters voters who have recently moved from attempting to vote at their old polling place. Both under the law and as a matter of practice, poll workers treat inactive voters the same as voters who are not registered to vote at all.

The overwhelming evidence – from the testimony of both Michael Ryan, the Executive Director of the New York City Board of Elections, and Plaintiff's expert, Trey Grayson, the former Kentucky Secretary of State – shows that the extensive use of affidavit ballots is contrary to the efficient administration of elections because of both the exponential human time and expense required to determine eligibility and then count valid ballots compared to scanning regular ballots into the computer at the polling site and the impact on voter confidence of completing and scanning the ballot compared to handing in a paper ballot in an affidavit envelope.

Perhaps most troubling, the evidence will show that the massive movement of voters to inactive status – hundreds of thousands of voters every year – is based on completely unreliable information provided by the United States Postal Service. The evidence will include the

-7-

testimony of numerous individual voters who were improperly moved to inactive status even though they continued to reside at the same address where they registered to vote, the testimony of Mr. Ryan concerning his first-hand experiences dealing with the Postal Service and the impact that has had on administering voter lists and elections in New York City – which comprises approximately one-half of all registered voters in New York State – statistical data provided by the New York State Board of Elections showing that more than 10,000 voters who received Confirmation Notices in 2016 and responded by advising their County Boards of Elections that they continued to reside at the same address (nearly as many as those who responded by confirming to the County Boards of Elections that they had moved), and the expert testimony of Marc Meredith, who calculated that more than 40,000 affidavit ballots were cast in the 2016 general election by voters who continued to reside at the same address.

This extensive evidence – and the lack of any state interest in excluding inactive voters from the poll book or requiring inactive voters to cast an affidavit ballot – easily clears the hurdle of the *Anderson/Burdick* balancing analysis. Specifically, this evidence demonstrates that the New York Election Law imposes severe burdens on the fundamental right to vote, which are prohibited by the Fourteenth Amendment unless they are narrowly drawn to advance a state interest of compelling importance. *Burdick*, 504 U.S. at 434; *Timmons v. Twin Cities Area New Party*, 520 U.S. 351(1997). And even if the Court were to conclude that New York's inactive voter regime imposed only a slight burden on the right to vote, New York must still show that the regulation is justified by a relevant state interest – which it cannot do here. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (internal citations omitted).

The evidence here compares favorably to recent cases in which federal district courts have found a violation of the fundamental right to vote. For example, in *Curling v.*

-8-

*Raffensperger*, --- F. Supp. 3d ----, 2019 WL 3822123 (N.D. Ga. Aug. 15, 2019), the court found that Georgia's DRE voting system likely "burdens and deprives [Georgia voters] of their rights to cast secure votes that are reliably counted." *Id*. at \*54.  The court reached this conclusion even though there was no conclusive evidence that a malfunctioning voting machine had directly disenfranchised any particular voter.  *See id.* at \*37-45 (describing evidence of "a variety of problematic issues" and "problems with the voting process" from voters, poll watchers, and county election officials).  The *Curling* court ordered appropriate relief even though Georgia will be employing new voting machines for the 2020 elections.  *Id*. at \*57-58.  By contrast, here, Defendants cannot dispute that New York's statutory regime has actually disenfranchised inactive voters such as Denise and Angela Roberts and Stephanie Goldberg who were attempting to exercise their fundamental right to vote.  These are not isolated incidents but the result of systemic problems that will continue absent the court granting the relief requested by Plaintiff.

In *Georgia Coalition for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 N.D. Ga. 2018), the district court found that Georgia's exact match process imposes a "burden [that] is severe for those individuals who have been flagged and placed in pending status due to citizenship."  *Id*. at 1264.  The court granted the plaintiffs' motion for preliminary injunction even though only 3,141 individuals had been flagged by Georgia as non-citizens.  *Id*. at 1255, 1269.  In short, the size of the affected universe of affected individuals in *Kemp* was much smaller than the group at issue in this case – as the state's own statistical report shows and as Dr. Meredith has demonstrated in his analysis of the number of inactive voters who continue to reside at their residence of address.  Meredith Decl. at 14-15

## III.    Plaintiff's Standing

Unable to overcome the evidence on the merits, it appears that Defendants will challenge

Plaintiff's standing to bring this action.  Plaintiff may establish standing on either of two bases:

(1) that Plaintiff itself has been injured by the Defendant's wrongful conduct, which is known as

organizational standing, or (2) that Plaintiff has members who have been injured and that

prosecution of the claims may be done by the organization on their behalf without the necessity

of individual participation, which is known as associational standing.  Plaintiff needs to satisfy

only one of the two methods to have standing.

A plaintiff has organizational standing and may sue on its own behalf for injuries it has

suffered if: (1) the organization has suffered an injury-in-fact that is concrete and particular, as

well as actual or imminent rather than hypothetical; (2) the organization's injury is traceable to

the defendant, meaning that there must be a causal connection between the injury and the

defendant's conduct; and (3) a favorable outcome in the case will redress the injury. *Friends of

the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).

Diversion of resources is a recognized injury-in-fact sufficient to establish organizational

standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Nnebe v. Daus*, 644 F.3d

147, 157 (2d Cir. 2011). An organization suffers an injury-in-fact when it directs money and

resources away from its other activities in order to focus on "established organizational

interests." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d

104, 110-11 (2d Cir. 2017). The resources expended need not be monetary or necessarily

quantifiable so long as they would not have existed but for the challenged action. *See*, *e.g.*, *Mid-

Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174-75 (2d Cir.

2005) (expending resources to locate, recruit, manage, train, and supply volunteers confers

standing). Courts routinely recognize diversion of resources as an injury-in-fact in cases where, as here, voting rights organizations have chosen to expend resources to address barriers to voter participation created by election laws. *See*, *e.g.*, *Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014) (finding injury where defendant's conduct "impair[ed] the organization's ability to engage in its own projects by forcing the organization to divert resources"); *Common Cause/Georgia*, 554 F.3d at 1350-51 (diverting resources from regular activities to educate and assist voters with complying with photo identification law confers standing); *Greater Birmingham Ministries v. Merrill*, 250 F. Supp. 3d 1238, 1242-43 (N.D. Ala. 2017) (expending resources to engage with the Secretary of State and others to lessen the effect of the law, as well as to conduct voter education and assistance, confers standing); *Veasey v. Perry*, 29 F. Supp. 3d 896, 903-04 (S.D. Tex. 2014) (finding standing for an organization that showed that the violation of its members' rights would cause a drain on its resources that were otherwise committed to those members' rights). An organization also suffers injury-in-fact where the defendant's actions interfere with its ability to accomplish its organizational mission. *New York Civil Liberties Union v. NYC Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012); *see Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017).

Plaintiff can establish associational standing and may sue on behalf of its members if: (1) some of the organization's members have standing to sue in their own right; (2) the interest the organization seeks to protect in the suit is germane to the organization's purpose; and (3) adjudication of the claim and relief requested does not require the participation of the organization's individual members. *Hunt v. Washington State Apple Advert. Comm'n.*, 432 U.S. 333, 343 (1977).

-11-

Here, the evidence will show that Common Cause easily meets both methods of establishing standing. Indeed, Defendants cannot meaningfully challenge that Common Cause has suffered an injury in fact, that it is germane to the organization's purposes, and that a favorable decision will redress its injuries. Rather, Defendants appear to challenge the standing of Common Cause/New York to participate as a party in this action because it is a chapter of Common Cause, Inc. and not a separately incorporated subsidiary of the national organization. But the evidence will show that Common Cause/New York has its own advisory board, does its own fundraising and sets its own priorities. Moreover, Common Cause/New York and other state chapters of Common Cause, Inc. have participated on multiple occasions in lawsuits in federal court, including *Common Cause New York v. Board of Elections in the City of New York*, No. 1:16-cv-06122-NGG-RML (E.D.N.Y.), *New York Immigration Coalition, Common Cause/New York v. Jason Schofield, et al.*, *Common Cause Indiana v. Lawson*, 327 F. Supp. 3d 1139 (S.D. Ind. 2018) and *Common Cause/Georgia. v. Kemp*, 347 F. Supp. 3d 1270 (N.D. Ga. 2018).

In any event, to the extent the Court questions Common Cause/New York's ability to participate as a party because it is only a chapter of Common Cause, Inc., Rule 17(a)(3) of the Federal Rules of Civil Procedure expressly provides that the proper course is to permit Common Cause, Inc. to ratify, join or substitute into the action, and for the case to proceed.

## IV.   CONCLUSION

For the foregoing reasons, and as the evidence adduced at trial will demonstrate, Plaintiff Common Cause/New York respectfully requests that the Court enter judgment in its favor on all claims.

Dated: New York, New York
       September 25, 2019

-12-

Respectfully submitted,


/s/ __*Neil A. Steiner*_____
**DECHERT LLP**
Neil A. Steiner
Katherine Shorey (*pro hac vice*)
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Telephone: 212-891-9418
Fax: 212-891-9598

Anna Do (*pro hac vice*)
633 West 5th Street
Suite 4900
Los Angeles, CA 90071
Telephone: 213-808-5700
Fax: 213-808-5760

Hilary Bonaccorsi (*pro hac vice*)
One International Place, 40th Floor
100 Oliver Street
Boston, MA 02110
Telephone: 617-728-7153
Fax: 617-426-6567

Tharuni Jayaraman (*pro hac vice*)
1900 K Street NW
Washington, DC 20006
Telephone: 202-261-3420
Fax: 202-261-3333

**LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW**
Ezra Rosenberg (*pro hac vice*)
John Powers (*pro hac vice*)
Ryan Snow (*pro hac vice*)
Lawyers' Committee for Civil Rights
Under Law
1401 New York Avenue, N.W., Suite 400
Washington, D.C.  20005
(202) 662-8336
erosenberg@lawyerscommittee.org
jpowers@lawyerscommittee.org
**LATINOJUSTICE PRLDEF**

-13-

Jackson Chin
LatinoJustice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 739-7572
jchin@latinojustice.org

*Attorneys for Plaintiff*
*Common Cause/New York*