UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------
COMMON CAUSE/NEW YORK, as an
organization and on behalf of its members,

                                     -Plaintiffs,

-against-

ROBERT A. BREHM, Co-Executive
Director, TODD D. VALENTINE,
Co-Executive Director, PETER S. KOSINSKI,
Co-Chair, DOUGLAS A. KELLNER, Co-Chair,
ANDREW J. SPANO, Commissioner, and
GREGORY P. PETERSON,
Commissioner, in their official capacities as
Commissioner of the NEW YORK STATE
BOARD OF ELECTIONS,

                                  -Defendants.
----------------------------------------------------------------

**INITIAL PROPOSED FINDINGS
OF FACT AND CONCLUSIONS
OF LAW**
Case No. 1:17-cv-06770-AJN
Hon. Alison J. Nathan

      Defendants, by and through undersigned counsel, submit the following proposed findings

of fact and conclusions of law under Fed. R. Civ. P. 52(a) and the Court's individual rules.

**I. Findings of Fact**

<u>New York's Voter Removal Process</u>

1.    The NVRA requires that states engage in list maintenance activities.  Section 8(a) of the

      NVRA requires "each State" to "conduct a general program that makes a reasonable

      effort to remove the names of ineligible voters from the official lists of eligible voters by

      reason of … a change in the residence of the registrant." 52 U.S.C. § 20507(a).  The

      purpose of this requirement is to ensure that accurate and current voter registration rolls

      are maintained.  Brehm Dec. ¶ 2.

2. To reach this policy goal, Chapter Law 659 of the Laws of 1994 was enacted.  Under this Chapter Law, the removal process begins under certain circumstances (e.g. when any mail sent to such voter is returned as undeliverable by the postal service without any indication of a forwarding address; receipt of a change of address notification; etc.).  *Id.* at ¶ 3.

3. Each year, the board of elections of each county or city sends out a "check of registrants and information notice by mail" pursuant to N.Y. Election Law § 4-117.  These notices are sent as unforwardable by first class mail (or with equivalent services to first class mail with regard to obtaining address forwarding information).  As a result the post office returns any such mailing that cannot be delivered as addressed and provides back to the board of elections any "forwarding information."  This forwarding information is used to update the voter record addresses.  Connolly Dec. at ¶ 27.

4. Every board of elections certifies to the New York State Board of Elections that they mailed the notices required by Election Law.  *Id.* at ¶ 28.

5. As indicated in the 2016 report, a total of 10,386,353 mail check notices were sent in 2016. A total of 400,843 of those cards were returned to boards of elections, and they were reported by boards of elections into five categories:

   a. 85,288 reflected "in-county" transfers

   b. 61,753 reflected out of county moves

   c. 181,798 reflected they were undeliverable

   d. 64,971 were returned for miscellaneous reasons that do not fit other categories

   e. 1,719 cards were returned marked "deceased" *Id.* at ¶ 30.

6. The 85,288 cards indicating the voter moved to a new address within the county or city should have resulted in those voters' addresses being updated to the new address and a "transfer notice" would be sent to the voter giving the voter an opportunity to indicate on a postage-prepaid form that the transfer should not in fact occur if the voter remains at the original registration residence. The 61,752 cards returned in 2016 indicating a new address outside of the county should have resulted in these voters being made inactive with a notice sent to them postage paid to indicate that the updated address information is incorrect and a voter registration form the voter could use to register in the new jurisdiction. *Id.* at ¶ 31.

7. Owing to a change in state law in 2019, out of county movers no longer need to affirmatively register to vote in the new county they moved to. These voters are inactivated in the original county, placed on the voter rolls in the new county as an active voter unless returned information from the voter indicates otherwise. Once the voter is on the rolls in the new county, statewide voter duplicate management will result in the cancellation of the prior registration in the county from which they moved. Should an error occur, as with any active or inactive voter, the voter would remain eligible to cast a valid affidavit ballot at the correct poll site for the voter's residence. *Id.* at ¶ 32.

8. Mail check cards returned undeliverable could result in the voter being placed in inactive status and a forwardable confirmation notice being sent to the voter. *Id.* at ¶ 34.

9. The forwardable confirmation notice includes a postage paid card on which the voter can confirm that he or she still resides at the address to which the notice was sent, or can notify the board of elections of any change of address. The confirmation notice is forwardable and is sent to voters when returned mail or when National Change of Address ("NCOA") information indicates no forwarding address. The notices are also

sent to voters when information from the Department of Motor Vehicles or a NVRA agency or NCOA indicates an address change to outside of the jurisdiction of the board of elections.  *Id.* at ¶ 35.

10. Upon mailing a confirmation notice the registered voter is moved to inactive status.  If at any time the voter responds to the notice by sending it back indicating the voter is at the address of original registration – and the return card is provided with return postage paid -- the voter will be restored to active status.  *Id.* at ¶ 38.

11. The New York process to place a voter on inactive status thus always requires an indication that the voter has moved (returned mail, NCOA) which must be followed by the sending of a forwardable confirming mailing with a postage paid return to the voter for the purpose of enabling the voter to indicate any error or correction.  *Id.* at ¶ 39.

12. The double check provision of the confirmation notice is augmented by the blackout provisions of state and federal law.

13. Confirmation notices, as a matter of state law, are not to be sent between June 1 and the general election or within ninety days of a federal election unless the returned mail is an acknowledgement notice (which is sent to a voter when they register to vote) OR the mail returned indicates a change of address to an address not in the county.  Valentine Dec. at ¶ at ¶ 4.

14. If the mail returned indicates a different address in the county, then the voter is sent a transfer notice and the address is simply updated in the county and state systems.  Now, as of the changes in law in 2019, if the address change is to an address in another county, the county inactivates the voter at the "old address" by sending a confirmation notice, but the

county also sends the new address information to the "new" county, and the voter is added to the voter rolls there. *Id.* at ¶ 4.

15. Additionally, county board of elections must complete not later than 90 days prior to the date of a primary or general election for federal office any program the purpose of which is to systemically remove the names of ineligible voters from the lists of eligible voters. *Id.* at ¶ 5.

16. Moving a voter to inactive status does not remove the voter as a registered voter. The consequence is that the voter will not appear in the poll book and must vote by affidavit ballot. *Id.* at ¶ 9.

17. In 2018, 405,036 confirmation notices were sent. The total number of New York voters in inactive status as of November 1, 2016 was 1,016,817. As of November 1, 2018 the total number of voters in inactive status was 1,131,828. Connolly Dec. at ¶ 41.

18. When a voter is placed in inactive status there is a significant reason to believe, based on address information received by the board of elections, typically in some way from the United States Postal Service, that the voter is no longer residing at the voter registration address on record. *Id.* at ¶ 45.

19. Pursuant to New York Election Law, on Election Day, a voter can only vote in one poll site, which is associated with the voter's residence. Pursuant to the New York Election Law, the political unit that is the basis for all elections is the Election District. Election Law 4-100. An Election District is a geographically defined and distinct area. *Id.* All of the residents of an Election District are entitled to vote at single polling place designated for that Election District. Election Law 4-104.

20. In addition to the initial notification that the voter does not appear to be at the address of record, to be functionally in "inactive" status, the voter has not responded to the forwardable confirmation notice (or that notice too was returned to the board of elections sender).  *Id.* at ¶ 46.

21. The registration poll records of all such voters must be removed from the poll ledgers and maintained at the offices of the board of elections in a file arranged alphabetically by election district.  If the board uses computer generated registration lists (as all New York Boards of Elections now do), the names of such voters may not be placed on such lists at subsequent elections other than lists prepared pursuant to the other provisions of the Election Law, but must be kept as a computer record at the offices of such board.  Brehm Dec. at ¶ 3.

22. The effect of not being in the poll book is that the voter has to vote via an affidavit ballot. An inactive voter is a registered voter.  If at any time the voter responds to the notice by sending it back indicating the voter is at the address of original registration – and the return card is provided with return postage paid, the voter will be restored to active status. *Id.* at ¶ 5.

23. In addition to maintaining an accurate voting record, the purpose of this process is to ensure that voters are voting in the correct jurisdiction.  *Id.* at ¶ 6.

24. A policy concern for including the names of voters in inactive status in poll books is that if a voter had a choice to go to their former poll site, where their name is in the poll book, or go to their new poll site, where their name would not be in the poll book (because they have moved and not updated their records), the voter may choose to vote at their former poll site.  *Id.* at ¶ 7.  As noted by New York City Board of Elections Executive Director

Michael Ryan, " Unfortunately, people, being creatures of habit often don't vote at their new location and go back to their old voting location and vote by scanner where they're actually in the poll book."  Ryan Depo. At pg. 83.

25. Moreover, the legislature wanted to give election inspectors a binary choice, either provide a "regular" ballot that will be canvassed by the voting machine to voters listed in the poll book, or provide an "affidavit" ballot to persons not listed in the poll book, enhancing efficiency at the poll site.  Brehm Dec. at ¶ 17.

26. As election inspectors only work one to three times a year, providing additional duties upon election inspectors could bog down the voting process.  *Id.*

Affidavit Ballot Process

27. Affidavit voting in New York is the process whereby a voter does not vote on the voting machine but rather marks a regular ballot with his or her choices and places it inside an envelope that contains an "affidavit" that states the voter's entitlement to have the ballot cast and counted.  Connolly Dec. at ¶ 50.

28. Voters must vote by affidavit ballot, or obtain a court order to vote on the voting machine, when the voter is at the correct election district and the voter's name does not appear in the poll book for a primary, special, or general election.  *Id.* at ¶ 51.

29. Under New York's process, when a voter appears to vote and his or her name does not appear in the poll book, poll workers are required to ascertain whether the voter is at the correct polling place.  Specifically, New York requires the poll worker to consult a map, street finder (listing of street addresses that indicates the election district and polling place for each address range on the street) or other description of all of the polling places and election districts.  *Id.* at ¶ 53.

30. If necessary, the statute provides the poll workers will contact the board of elections to obtain the relevant information and inform the voter of the voter's correct polling place for the voter's residence address. *Id.* at ¶ 54; *see also* Defendants' Trial Exhibit 11 and 12.

31. Some boards of elections require poll workers to contact the board of elections before issuing an affidavit ballot. The State Board of Elections has issued guidance that this consultation process cannot delay the timely issuance of an affidavit ballot. *Id.* at ¶ 55.

32. If a voter who does not appear in the poll book, but does live in the election district, New York provides the voter with two options that are detailed on a "notice to voter" which must be provided to the voter. *Id.* at ¶ 56.

33. The form of the actual ballot provided to an affidavit voter is in the same form as the ballot provided to all other voters. *Id.* at ¶ 57.

34. The affidavit voter then takes the ballot and the affidavit ballot envelope and goes to a private area, often a privacy booth, to complete the ballot and places it in the completed affidavit envelope. *Id.* at ¶ 59.

35. When the voter has completed the affidavit ballot, the voter returns it to the appropriate poll workers who will return it to the board of elections. *Id.* at ¶ 61.

36. The board of elections will open the affidavit ballot and count the ballot if the board's research determines that the voter was eligible. *Id.* at ¶ 62.

37. Prior to 2019, a voter who moved across county lines and cast an affidavit ballot would have his affidavit ballot rejected. But in 2019 the law changed. An affidavit ballot from a voter who is registered to vote anywhere in New York can cast a valid affidavit for the poll site of their new residence anywhere in New York. *Id.* at ¶ 63.

38. The board of elections will send the voter a notice indicating whether the affidavit ballot was not counted.   It is common for boards of elections to send a notice to all affidavit voters indicating whether the ballot was or was not counted.. *Id.* at ¶ 64.

39. The alternative to an affidavit ballot is a court order.  The voter may apply for a court order requiring that the voter be permitted to vote in the regular manner on a voting machine.  *Id.* at ¶ 79.

40. Such court applications are made by voters directly to the judges.    There is no filing fee to make these applications and determinations are decided promptly on election day or, in many instances, in the days leading up to an election day.  *Id.* at ¶ 81-82.

41. In the most populous areas of the state, state law requires the duty judges to hear applications at the offices of the board of elections, and this is common practice in most counties.  *Id.* at ¶ 83.

Poll Workers

42. As of the General Election in 2016, New York had approximately 5,300 poll sites, 15,083 election districts and 61,790 poll workers who staffed the election.  The poll worker numbers fluctuate from year.  *Id.* at ¶ 12.

43. At the election district table, poll workers, known as election inspectors, distribute ballots for that election district to voters presenting themselves to vote who are listed in the poll book (a list of active voters for the election district with signature exemplars which the voter signs to receive a ballot).  These inspectors also typically administer the affidavit balloting process.   *Id.* at ¶ 15.

44. Most poll workers work only one to three times a year, but many poll workers work the polls year to year.  Generally, county boards of elections make efforts to staff poll sites so there are experienced poll workers at every site.  *Id.* at ¶ 17.

Training of Poll Workers

45. Pursuant to section 3-412(1-a) of the Election Law, the State Board has established a mandatory core curriculum for poll worker training.  The State Board has issued this training to county boards of elections.  *Id.*  County boards of elections may augment the core curriculum with local procedures not inconsistent with the core curriculum.  Brehm Dec. ¶ 42.

46. Included in the training is a section of what happens when a voter is not listed in a poll book.  This section is attached as Defendants' Trial Exhibit 10.   First, the training directs the poll worker to determine if the voter is in the correct polling site and/or sign in table.  If the voter assures the worker that they are in the correct polling site, the poll worker is then directed to check the map, street guide, or other tools provided by the county board.  If the voter is in the correct district, then the poll worker is directed to provide the voter with a "Notice to Voter."  If the poll worker is unsure if the voter is in the correct district, the poll worker is directed to call the county board.  The training goes on to say that the voter is entitled to vote by "affidavit ballot or obtain a court order from a judge." *Id.* at 37.

47. The training of these poll workers is provided at the county level and is informed by the New York State Election Law which requires annual poll worker training and testing.  As reflected in the aforesaid Report 1(e):  The duration of poll worker training sessions ranges from one and half hours to six hours, depending on the county.  The duration in the five

counties comprising New York City is four hours, and poll workers are paid to attend training.  In 2016, the class sizes ranged from two persons to 100, and statewide the total number of poll worker classes held was 5,974.   Connolly at ¶ 16.

<u>Oversight of Local County Officials</u>

48. This Court finds that the State Board adequately oversees New York's Election system.

49. The major responsibilities of the New York State Board of Elections include the oversight and support of New York State's 62 county Boards of Elections.  In relation to the facts in this case, the State Board engages in the following activities.  *Id.* at ¶ 111

50. The State Board has drafted and provided a "Guide to Operating a County Board of Elections" for the benefit of local county election administrators.  *Id.* at. ¶ 66.  *See also* Defendants' Trial Exhibit "41."  This Guide details the responsibilities a county board must undertake, including, how Affidavit Ballots are processed, how voter list maintenance is performed, and information on how to run a poll site.  *Id.*

51. In response to a letter from the Attorney General's office expressing concern about New York's affidavit ballot process, the State Board issued guidance to local boards, outlining the proper procedure of issuing and processing notice to voters, including the issuance of affidavit ballots.  Brehm Dec. ¶ 39-43; *see also* Defendants' Trial Exhibits 11 and 12.

52. The Guidance reminds local county election officials that affidavit ballots must be provided to voters who assert they live in the election district and who claim to be entitled to vote.  *See* Defendants' Trial Exhibits 11 and 12.  The Guidance states that: "(w)hile it is acceptable for poll workers to call the board of elections to confirm the residency of an affidavit voter in an effort to provide the affidavit voter with accurate information, the furnishing of an affidavit ballot should not be delayed, and a voter who

requests an affidavit should be provided an affidavit ballot promptly." *Id.* The Guidance goes on to outline the process a voter who is not listed in the poll book, including, giving such voters a Notice of Voters. *Id.* The Guidance provides for a process for providing affidavit ballots, which is also found in the Model Training Manual, created by the State Board. *Id.; see also* Defendants' Trial Exhibit 10.

53. The State Board of Elections provides County Boards of Elections with oversight and support through; phone calls, conference calls, e-mails, customized workshops and site visits tailored to individual counties, informative conference presentations, participation in and appearances at Election Commissioners Association regional meetings, topical memorandums, and the provision of extensive procedural documents and forms for implementation at the local level. Connolly Dec., ¶ 111.

54. The State Board of Elections also provides National Change of Address (NCOA) information to all of New York State's county Boards of Elections. NCOA services are a required component of New York State's statutory voter registration list maintenance procedures, and help to ensure that voter addresses are synchronized with information on file with the U.S. Postal Service. Connolly Dec. ¶ 112.

Voter Poll Site Lookup

55. There are several ways a voter in New York can determine where the voter's poll site is located. *Id.* at ¶ 85.

56. The annual mail check card sent to all active voters indicates the voter's poll site, and if the information as to where the voter votes changes subsequent to that mailing, the board of elections must send a poll site change notification by mail. *Id.* at ¶ 86.

57. When a voter first registers to vote, the voter is also sent a card indicating the voter is registered to vote and indicating where the voter's poll site is located. *Id.* at ¶ 87.

61. A voter can call the board of the elections at any time to find out where the voter's poll site is located. *Id.* at ¶ 89.

62. Prior to each election, poll site information is published in a newspaper of general circulation in every county. *Id.* at ¶ 90.

63. The New York State Board of Elections has a poll site lookup feature on its website which can be used statewide to determine whether a voter is registered, their party enrollment what their voter status is (active or inactive) and where the voter's poll site is located. *Id.* at ¶ 91.

64. To effectuate a look-up, the voter must provide their Last Name, Date of Birth, Zip code, First Name and County. The reason for the specificity of the information required is reasonable as it provides privacy for the voter so the voter look up feature cannot be readily used as a generic online address look-up for non-voter purposes. *Id.* at ¶ 93.

65. If the search does not result in a match, the system generates a response of "No Matches Found   Please contact your County Board of Elections." *Id.* at ¶ 96.

66. The instruction to the voter to "Please contact your County Board of Elections," is a hyperlink to the relevant contact information for the board of elections. When the voter clicks on the hyperlink, the voter is brought to a contact page that provides the specific contact information for the voter's local board of elections. In addition to the phone number, fax number and address of the board of elections, the board of election's email address, webpage information and the names of the county commissioners and deputy commissioner are provided. *Id.* at ¶ 98.

67. In 2016, the number of users accessing the voter look-up page was over 2.5 million with over 13.4 million page views.  And in 2018 the number of users accessing the voter look-up page was over 1.3 million with over 5.7 million page views.  While these traffic numbers do not indicate a precise number of look-ups performed, the look-up feature page experiences considerable traffic.  *Id.* at ¶ 10.

68. New York law requires that each poll site be equipped with information in the form of maps or street finders to enable poll workers to direct wayward voters to their correct polling locations.  A street finder is a look up tool that generally consists of a listing of all streets in a jurisdiction and lists the election district or election districts that the street is a part of by address range.  It enables poll workers to direct a voter to the correct poll site by simply looking up the voter's address.  *Id.* at ¶ 108.

69. All of the website voter look-up and poll site finder tools work as well for both active and inactive voters.  *Id.* at ¶ 109.

No Systemic Failure in New York's Systemic Failure in new York's Election System

70. In its Complaint, Common Cause claims certain conduct and factors that allegedly disenfranchise inactive voters.  Allegations that suggest New York State implementation of its removal process violates the NVRA and/or Constitutional rights of New York voters must be proven by a preponderance of the evidence.  Plaintiff's burden to show that New York State has failed to comply with the law by a preponderance of the evidence.

71. To succeed, alleged injury must result from a systemic failure not from the actions of a particular incident.  New York has a large voter population.  As of February 1, 2019, New York had 12,695,762 voters.  Of that number 11,676,265 are in "active" status, and

1,019,497 are voters listed in "inactive" status.  A voter in active status is a voter whose poll record would appear in a poll book on election day, and an inactive voter is a voter believed to no longer reside at the address of record based on information received by the board of elections.  Inactive voters are registered voters but their names do not appear in the poll book, they must vote by affidavit ballot or pursuant to court order.  See Connolly Dec. at ¶ 2.

72. As of November 1, 2018, New York had 12,706,050 voters.  Of that number 11,574,222 are in active status, and 1,131,828 are voters listed in inactive status.  *Id.* at ¶ 4.

73. As of November 1, 2016, New York had 12,493,250 voters.  Of that number 11,476,433 are in active status, and 1,016,817 are voters listed in inactive status.  *Id.* at ¶ 6.

74. The voter turnout in 2016 was 7,801,985.  *Id.* at ¶ 10.

75. At the 2018 General Election, 125,920 affidavit ballots were cast statewide.  Of that number 73,922 were valid.  *Id.* at ¶ 68.

76. In the 2018 General Election Annual Statistical Report, New York City did not provide data indicating voters reactivated as a result of casting an affidavit ballot. For the jurisdictions that did provide this information, reactivated voters (voters moving from inactive to active status as a result of casting an affidavit ballot) were 10,444 of the 53,250 affidavits processed (19.6%) and 10,444 of the 33,852 valid affidavits cast in those jurisdictions (30.85%).  *Id.* at ¶ 71.

77. At the General Election in 2016, 268,964 affidavit ballots were cast statewide.  Of those, the 141,293 affidavits found valid for various reasons specified in the report, although not every jurisdiction provided a full breakdown. Of the 124,933 found invalid, 69,472 were persons found not to be registered in the county (55.6%).  *Id.* at ¶ 69.

78. In the 2016 General Election Annual Statistical Report, New York City and Nassau County did not provide data indicating voters reactivated as a result of casting an affidavit ballot.  For the jurisdictions that did provide this information, reactivated voters (voters moving from inactive to active status as a result of casting an affidavit ballot) were 17,511 of the 81,379  affidavits processed (21.5%), and 17,511 of the 45,379 valid affidavits cast in those jurisdictions (38%).  *Id.* at ¶ 72.

Nancy Feldman

79. The reason Ms. Feldman was not in the poll book was related to a clerical error where her records indicated that she transferred to a different address.  New York's voter removal process did not play a role in her not being listed in the poll book.

Alison Matika

80. In her declaration, Alison Matika testified that during the 2016 General Election, there were no poll books at her poll site, and she was forced to vote via an affidavit ballot.  *See generally* Matika Dec.  The allegations in this declaration do not relate to the issues in this case; that New York's implementation of its Removal Policy violates section 8 of the NVRA.  While this declaration may show New York's election officials are not infallible, such standard cannot reasonably used for NVRA violations.

Susan Stewart

81. The Ulster County Board of Elections placed Susan Stewart in "inactive status" in 2018 as a result of a postcard mailed by the Board of Elections having been returned by the United States Postal Service as "not deliverable as addressed."   Dittus Dec. ¶ 9.  A

confirmation notice notifying the voter she was placed in inactive status was mailed to the same address, to which there was no response.  *Id.*

Ellen Edelman

82. Election records indicate that Ellen Edelman went to the correct poll site, but wrong election district table.  Brehm at ¶ 66.  Because the poll workers could not find her name in the poll book, Ellen Edelman was offered an affidavit ballot, which she submitted.  *Id.* at ¶ 67.  Ellen Edelman's affidavit ballot was determined to be valid and was counted.  *Id.* at ¶ 68.

Mitchell Lavnick

83. Poll workers provided him with an affidavit, which he submitted.  Lavnick Dec. ¶ 11-12.  Mitchell Lavnick's affidavit ballot was determined to be valid and was counted.  Brehm at ¶ 72.

Robert Holman

84. Robert Holman also testified that he was not listed in the poll book and was offered an affidavit ballot.    Holman at ¶ 14 and 17-18.  The Erie County Board of Elections placed Robert Holman in "inactive status" in 2016 as a result of a postcard mailed by the Board of Elections having been returned by the United States Postal Service as "not deliverable as addressed."  *See* Mohr Decl. ¶ 17  A confirmation notice notifying the voter he was placed in inactive status was mailed to the same address, to which there was no response.  *Id.*

Sandra Copps

85. Sandra Copps testified that in the September 2018 primary, she went to her local poll site, but was not listed in the poll book despite being an active voter.  Copps Dec.  at ¶ 13. Sandra Copps testified that she did was not offered an affidavit ballot.  Copps Dec. at ¶ 18.   Voter registration records show that Sandra Copps is an active voter registered in the Independence Party.  Brehm Dec. at ¶ 50.  There were no Independence Primary races in Sandra Patricia Copps' election district on September 2018.  *Id.* at ¶ 51.  Because there is no primary, there was no Independence Party poll book that would have listed Sandra Copps' name.  There was a Democratic Primary in September 2018 that listed Democratic voters.  Sandra Patricia Copps would not have been listed in that book, as she is not a registered Democrat.  *Id.* at ¶ 52.

Denise Roberts and Angela Roberts

86. Both Denise Roberts and Angela Roberts testified that during the 2016 General Election they were not listed in the poll book and were offered an affidavit ballot.  D. Roberts Dec. at ¶ 11 and 14.  Denise Roberts testified that her vote did not count.  D. Roberts Dec. at ¶ 19.  The Tioga County Board of Elections should have counted the vote.  The State Board followed up with the Tioga County Board of Elections to ensure that the board counts such affidavit ballots in the future.  *See* Connolly Dec. at ¶ 110.

Katherine Baldus

87. Katherine Baldus testified that she was not listed in the poll book and voted via an affidavit ballot in the September 2018 primary.   Baldus Dec. at ¶ 13-18.  However, election records show that she was in active status.  Brehm Dec. at ¶ 47.  Katherine Louise Baldus' affidavit ballot was deemed valid and was counted.   *Id.* at 49.

Mara Wilson

88. Mara Wilson testified that she was not listed in the poll book and voted via an affidavit ballot in the September 2018 primary.   Wilson Dec. at ¶ 10 and 17-20.  Mara Wilson received a letter from the New York City Board of Elections that her voted counted.  *Id.* at 23.  Election records show that Mara Wilson was in active status during the 2016 General Election.  Brehm Dec. at ¶ 74.

Keoma Blake and Walter Ancarrow, IV

89. Keoma Blake and Walter Ancarrow, IV both testified that they had issues with the online NYS voter lookup page.  Their testimony is presumably meant to show that NYS online voter lookup is unreliable.  The New York City Board of Elections entered Keoma Blake's date of birth incorrectly, preventing the look up from making a match until it was corrected.  Brehm Dec. at ¶ 74.  It is unclear why Walter Ancarrow, IV had a problem with the voter lookup, whether it was a system failure or user error.  Regardless, the declaration of two individuals having issues with the voter lookup is insufficient to show a systemic problem with the voter lookup.

Jacques Fages

90. Jacques Fages testified that he was not listed in the poll book and voted via an affidavit ballot in the 2017 General Election.  Fages Dec. at ¶ 10 and 13-23.  Jacques Fages affidavit ballot was deemed valid and was counted.  Id. at ¶ 24.

Lauren Wolfe

91. Lauren Wolfe testified that she went to vote at her poll site in Brooklyn Borough Hall for the 2016 General Election, but was told that she was not in the poll book and that she was in the wrong poll site.  Wolfe Decl. at ¶ 10-11.  She was told that she had to go to St. Francis College.  Id. at ¶ 12.  The poll site in St. Francis college told her that she was not in the poll book, and that her correct poll site was Borough Hall.  Id. at ¶ 13.  After going back and forth, Lauren Wolf voted in St. Francis college.  Id. at ¶ 14.  Lauren Wolfe was in active status prior to the 2016 General Election.   Brehm Dec. at ¶ 59.  Election records show that the proper poll site for Lauren Wolfe is Brooklyn Borough Hall. It is unclear why poll workers were unable to find Lauren Wolfe's name in the poll book. It is also unclear why poll workers directed Ms. Wolfe to a different poll site per her testimony. Lauren Wolfe's affidavit ballot was determined to be invalid because she voted at the wrong poll site, St. Francis College.  *Id.* at ¶ 62.

Allison Agro-Paulson

92. Allison Agro-Paulson testified that she was not listed in the poll book and voted via an affidavit ballot in the 2016 General Election.  Agro-Paulson Decl. at ¶ 18-24.  Allison Agro-Paulson's affidavit ballot was deemed valid and was counted.  *Id* at ¶ 10.

Tracey Goldblum

93. Tracey Goldblum testified that she was not listed in the poll book and voted via an affidavit ballot in the 2016 General Election.  Goldblum decl. ¶ 10-14.  Voter registration records show was in active status prior to the 2016 General Election.  Brehm Dec. at ¶ 78. Tracey Goldblum's affidavit ballot was determined to be valid and was counted.  ¶ 80.

James Johnson

94. James Johnson testified that he was not listed in the poll book and voted via an affidavit ballot in the 2016 General Election. Johnson Decl. ¶ 10-14. He testified that he received a letter stating that his affidavit ballot counted. *Id.* at ¶ 17.

Stephanie Goldberg

95. Ms. Goldberg was an Orange County voter in inactive status at the time of the November 2018 general election.

96. Ms. Goldberg went to vote at the correct polling place but was turned away from the polls without being offered an affidavit ballot because her name was not in the poll book. Goldberg Dec. at ¶ 19 and 29.

97. Ms. Goldberg attempted to call the Orange County Board of Elections but could not get through. She then emailed the NYS BOE. By the time the State Board responded to Ms. Goldberg's email, she was already on her way to New York City for work and class, and did not have enough time to cast a ballot before the polls closed.

98. This Court has already determined that requiring voters in inactive status to vote via an affidavit ballot is compliant with the NVRA. *See* ECF 118. As such, declarations where an affidavit ballot was deemed valid cannot show a systematic failure of New York's Election system.

99. Out of the 19 declarations filed, only three would have been impacted by this lawsuit: Denise Roberts, Angela Robert, and Stephanie Goldberg. In relation to Denise and Angela Roberts, the State Board has already taken action in correcting the issue that arose in Tioga County. See Connolly Dec. at ¶ 110.

100.     Given the above, the 19 declarations submitted by Plaintiff cannot reasonably show systemic failure on the part of the Defendants.

Attorney General List

101.     Other evidence Plaintiff relies upon are records from the Attorney General's office.  The Attorney General records include various emails, and notes from the Attorney General hotline via a spreadsheet related to the 2016 presidential primary.  All of these documents contain hearsay, and are, thus, weighed appropriately.  Out of the 1,097 calls the Attorney General's Office received, only 12 are marked as instances where a voter was refused affidavit ballots.  Some of these instances include hearsay within hearsay, e.g. "overheard poll workers telling voters they didn't have provisional ballots"; or "Husband was told 'provisional ballots' did not exist."  *See* Plaintiff's Trial Exhibit 235.

102.     Given the above, the Attorney General List fails to reasonably show systemic failure on part of the Defendants.  The Attorney General's emails and complaint reports details complaints which are inevitable in election events involving millions of voters.

Expert Report of Marc Meredith

103.     Generally, as outlined in Marc Meredith's report, "voting costs" can depress voter turnout.  Marc Meredith does concede that most voter laws, rules, and regulations, including requiring voters to register, have some quantifiable voting cost.  However, even if there is some "voting cost", state regulation of elections is necessary in order to ensure that elections are fair, consistent, and orderly elections.  As noted by the Supreme Court in *Storer v. Brown*, 415 U.S. 724, 730 (1974): "as a practical matter, there must be a

substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."

104.     In his report, Marc Meredith states that one of the voter costs includes longer wait times, which could lead to voters deciding not to vote.  However, Marc Meredith does not quantify an increase in wait time related to inactive voters using affidavit ballots, and has not performed any observational studies related to the same.

105.     Additionally, Marc Meredith concludes that "many" inactive voters did not actually move; rather they reside at the same address.  Specifically, Marc Meredith estimates that 45,000 voters are at the same address.  Meredith Report, pg 9.

106.     In context, in November 2016, there were 12,493,250 registered voters in New York State.  *See* Connolly Dec. at ¶ 6.  Using the 45,000, that would represent 0.36% of all New York State voters.  In the 2016 General election, 7,801,985 ballots were canvassed in New York.   *Id.* at ¶ 10.  Using the 45,000 figure, that would represent 0.6% of all the ballots.  Further, on November 2016, there were 1,016,817 inactive voters. *Id.* at ¶ 6.  Using the  45,000 figure, that would constitute 4.4% of inactive voters.  Given these figures, this Court cannot find that 45,000 inactive voters living at the same address is such a large deviation where ts systematically disenfranchises voters.

107.     Marc Meredith speculates that "tens of thousands, if not more, additional inactive voters likely reneged either because it was taking too long to vote, the poll worker failed to offer an affidavit ballot, or they did not believe their vote would count."  Notably, Plaintiff fails to point to one example of an inactive voter not receiving an affidavit ballot, or leaving a poll site because the affidavit process was taking too long.

108.     Additionally, Marc Meredith estimates that 37,000 voters voted in the incorrect poll site in the 2016 General Election.  Marc Meredith speculates that "some fraction of these roughly 37,000 people who cast an invalid vote in the 2016 presidential election would have cast a valid vote had inactive registrants been listed in New York poll books."  Marc Meredith theorizes that poll workers would have been better able to direct these inactive voters.  Notably, Plaintiff fails to point to one inactive voter who voted in an incorrect poll site.

109.     Given the speculative nature of Marc Meredith's expert report, and given the lack of specificity regarding alleged disenfranchisement, Marc Meredith's expert report does not show that New York's voter removal system violates the NVRA or fourteenth amendment.

58. Expert Report of Trey Grayson

110.     In his expert report, Trey Grayson submits that New York places an undue burden on its inactive voters.

111.     Specifically, Trey Greyson opines that requiring inactive voters to fill out an affidavit ballot is a burden because it takes more time to fill out an affidavit ballot. However, he does not quantify the purported extra time.  Graysen Rep. ¶ 36.

112.     Trey Greyson notes that it is New York policy for the poll worker to give information to the voter about how to find out whether the affidavit ballot will be counted. *Id.* at 37.  However, Trey Greyson opines that inactive voters being unsure if their vote counted, or if they are eligible to vote when leaving a poll site is another burden.  *Id.* at ¶¶ 40 and 41.

113.     Additionally, Trey Greyson opined that New York's process increases voter wait times, however, he does not provide quantify such wait times, or provide any analysis of how he came to that conclusion. *Id.* at ¶ 43.

114.     Given the speculative nature of Trey Grayson's expert report, and given the lack of specificity regarding the purported undue burden on inactive voters, Trey Greyson's expert report does not show that New York's voter removal system violates the NVRA or fourteenth amendment.

## II. Conclusions of Law

Plaintiff's Fourteenth Amendment Claim is Without Merit

115.     Plaintiff contends that New York's Voter removal process unconstitutionally burdens the right to vote in violation of the First and Fourteenth Amendments. *See* Amd Compl. ¶ 6. This contention invokes the well-established Anderson-Burdick framework. The challenged laws meet this flexible balancing test because they impose little burden on voting and serve various legitimate interests.

116.     In evaluating the constitutionality of laws that impose no burden on the fundamental right to vote, courts apply rational basis review. *Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012). On the other hand, a law that "'severely' burdens the fundamental right to vote," such as a poll tax, triggers strict scrutiny, *Obama for Am.,* 697 F.3d at 429 (*quoting Burdick*, 504 U.S. at 434), and must be "narrowly drawn to advance a state interest of compelling importance," *Norman v. Reed*, 502 U.S. 279, 289 (1992). And "[fo]r the majority of cases falling between these extremes, [courts]

apply "the 'flexible' Anderson-Burdick balancing test." *Ne. Ohio Coal. For the Homeless*

*v. Husted*, 696 F.3d at 592 (*quoting Burdick*, 504 U.S. at 434).

59. In other words, as the Second Circuit has stated:

> If the plaintiffs' rights are severely burdened, the statute is subject to strict scrutiny. Burdick, 504 U.S. at 435, 112 S.Ct. 2059. If the burden is minor, but non-trivial, Burdick's balancing test is applied. Under this balancing test, the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests. Id. Review in such circumstances will be quite deferential, and we will not require "elaborate, empirical verification of the weightiness of the State's asserted justifications." Timmons, 520 U.S. at 364, 117 S.Ct. 1364. Nonetheless, … *where the burden imposed by the law is non-trivial, we must weigh the State's justification against the burden imposed*. See Burdick, 504 U.S. at 439, 112 S.Ct. 2059; see also Timmons, 520 U.S. at 364, 117 S.Ct. 1364.

*Price v New York State Bd. of Elections*, 540 F3d 101, 109 [2d Cir 2008](emphasis added)

117.    A court considering a challenge to a state election law must weigh "the character

and magnitude of the asserted injury to the rights protected by the First and Fourteenth

Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward

by the State as justifications for the burden imposed by its rule," taking into conPrimarily,

Plaintiff is relying on its expert witness, Marc Meredith, to establish that New York's

requirement that inactive voters cast an affidavit ballot increases the "calculus to

vote" and/or voting cost of the inactive voter. Under this theory, voters are less likely to

vote when the "voting cost" increases. As noted in Marc Meredith's expert report, any

action by the State, such as there mere fact of having a voter registration list, increases

voter costs. Plaintiff is relying on this increase in voter cost to show that voting via an

affidavit ballot is an "undue burden." This showing is insufficient.

118.     First, Marc Meredith's report does not place a measurable value of the purported "voter cost" affidavit ballots place on inactive voters.  The expert report discusses the demographics of inactive voters, the number of inactive voters who live in the same address and cast a ballot, and hypothesizes that voters may get confused or  have to wait on longer lines.

119.     However, the report does not place a value of the voter cost of casting an affidavit ballot. It is respectfully submitted that the Court must be reticent before labeling a burden severe: "To deem ordinary and widespread burdens ... severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Clingman*, 544 U.S. at 593.

120.     Additionally, Marc Meredith failed to take into account Election Law Reforms the legislature enacted in early 2019 in calculating "voter costs."   Such reforms that will improve voter turnout, and lower voting costs as it relates to affidavit ballots, include: early voting, universal transfer (where a voter's registration record can be transferred to another county when moving), and online voter registration.  To the extent that affidavit ballots not getting counted increases voting costs, the legislature enacted legislation (which is awaiting the signature of the Governor) that liberalizes how affidavit ballots canvassed. Under this legislation, when a voter substantially complies with the Election Law, the affidavit ballot will be counted, further decreasing the voting costs of using affidavit ballots.  In his deposition, Marc Meredith conceded that he did not take these reforms into consideration in his analysis.

121.     Further, to the extent Marc Meredith suggests that New York's Voter removal system increases voting wait times, or that it increases the likelihood that voters in inactive status will be directed to an incorrect poll site, such conclusions are based on speculation and are not grounded in fact.

122.     New York also has several procedures in place that further reduce any burden associated with inactive voters not being placed in poll books. Additionally, not listing inactive voters in poll books is a mechanism that triggers the statutory requirement that the voter be offered an affidavit ballot. This structure is a policy decision the State made, given the circumstances New York faces in administering elections.

123.     Given the above, this Court concludes that New York's voter removal process only imposes a slight burden.

124.     Additionally, New York's voter removal procedure serves a legitimate state interest. A board of elections places a voter in inactive status when there is evidence that the voter moved, namely, by getting mail returned to the board of elections. As this Court has noted in it decision on Defendants' motion to dismiss, this is an appropriate mechanism to place someone in inactive status under the NVRA. Additionally, as noted by this Court, permitting inactive voters to cast affidavit ballots is expressly contemplated by the NVRA, notwithstanding any discouraging effects it may have on prospective provisional voters. As evidenced by the legislative history, New York opted to remove inactive voters' names from poll books in order to guarantee that inactive voters are able to vote at the poll site embracing the voters' current addresses via an affidavit ballot. Moreover, the legislature wanted to give election inspectors a binary choice, either provide a "regular" ballot that will be canvassed by the voting machine to voters listed in the poll book, or

provide an "affidavit" ballot to persons not listed in the poll book, enhancing efficiency at the poll site.  Given that election inspectors only work two to three times a year, it is reasonable to believe that providing additional duties upon election inspectors (e.g. making determinations related to inactive voter's eligibility or determining which ballots a voter is eligible to cast) would bog down the voting process.

125.     Given the above, the State has an adequate policy goal in its voter removal procedure.

Plaintiff's NVRA Claim is Without Merit

126.     In addition to its Constitutional Claims, Plaintiff alleges that New York's " inconsistent implementation" of its removal policy violates Section 8 of the NVRA.  In general, Plaintiff alleges that, due to inadequate public education efforts and training of local officials, inactive voters are not informed of their right to vote via an affidavit ballot and the steps the voter needs to take in order to restore the voter to active status. See para 37. Further, the Complaint alleges that inactive voters are arbitrarily and inconsistently informed that the may vote via an affidavit ballot, their affidavit ballot should be counted if they are voting in the correct precinct, and casting an affidavit ballot restores the voter to active status.  *See* papra 38.

127.     Plaintiff must prove its claims by a preponderance of the evidence.  To succeed, alleged injury must result from a systemic failure to train, not from the actions of a particular individual who might have benefitted from more training. *City of Canton v. Harris*, 489 U.S. 378 (1989).  In other words, Plaintiffs must show systemic, rather than localized, problems.

128.    As discussed in the Findings of Fact, Plaintiff has not brought sufficient evidence of systematic failure of the Defendants related to their election administration duties.

Plaintiff Lacks Standing

129.    In order for an organization to assert representational standing on behalf of its members, three requirements must be met: (1) the organization's members "must have standing to sue on their own," (2) "the interests the organization seeks to protect" must be "germane to its purpose," and (3) "neither the claim asserted nor the relief requested" can "require[] individual participation by its members." *Hunt v. Wash. State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977) *Alliance for Open Society Int'l, Inc., v. U.S. Agency for Int'l Dev*., 651 F.3d 218, 228 (2d Cir.2011).

130.    In relation to the third prong, Courts have held that an "organization lacks standing to assert claims of injunctive relief on behalf of its members where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof,' *Bano v Union Carbide Corp.*, 361 F3d 696, 714 (2d Cir 2004)(citations omitted).

131.    Plaintiff's as-applied challenge cannot be litigated without individual participation of its members.  Plaintiff's entire as-applied challenge is that New York State has failed to comply with protections afforded in the NVRA and New York State Election Law.  This is not a case about the interpretation of the NVRA; rather, it is a case about whether New York is implementing the NVRA.

132.    As such, Plaintiff lacks standing with regard to its as-applied challenge to New York's Voter Removal Process.

Dated:  Albany, New York

September 25, 2019

Respectfully submitted,

/s/   Brian Lee Quail_____

**Brian Lee Quail**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
Brian.quail@elections.ny.gov

**Nicholas Robert Cartagena**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
Nicholas.cartagena@elections.ny.gov

**William J. McCann, Jr.**
NYS Board of  Election
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
William.mccann@elections.ny.gov