UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------------------------------------------------

COMMON CAUSE/NEW YORK,
as an organization and on behalf of its members,

-Plaintiffs,

-against-

ROBERT A. BREHM, Co-Executive Director,
TODD D. VALENTINE, Co-Executive Director,
PETER S. KOSINSKI, Co-Chair,
DOUGLAS A. KELLNER, Co-Chair,
ANDREW J. SPANO, Commissioner, and
GREGORY P. PETERSON, Commissioner,
in their official capacities as Commissioner of the
NEW YORK STATE BOARD OF ELECTIONS,

-Defendants.

Case No. 1:17-cv-06770-AJN
Hon. Alison J. Nathan

---------------------------------------------------------------------------------------------------------------------

## *DEFENDANTS' PRE-TRIAL MEMORADUM OF LAW*

---------------------------------------------------------------------------------------------------------------------

NEW YORK STATE BOARD OF ELECTIONS
Brian L. Quail
William J. McCann, Jr.
Nicholas R. Cartagena
*Counsel for Defendants*

*Office & PO Address:*
New York State Board of Elections
40 North Pearl Street, Suite 5
Albany, NY 12207
Tel: 518-474-6367 / Fax: 518-486-4068

# TABLE OF CONTENTS

Page

Table of Authorities ............................................................................................................ ii

## PRE-TRIAL MEMORANDUM OF LAW

I.      Preliminary Statement ................................................................................................1

        A.  Constitutional Claims ....................................................................................2

        B.  NVRA Claim ..................................................................................................4

        C.  Plaintiff Lacks Standing ................................................................................5

        D.  Legislative Prerogative ..................................................................................5

II.     Background ................................................................................................................6

        A.  NVRA Background ..........................................................................................6

        B.  New York State Law........................................................................................7

III.    Argument ...................................................................................................................9

        A.  Under Anderson-Burdick, Reasonable, Nondiscriminatory
            Election Laws are Presumably Constitutional ...............................................9

        B.  The Challenged Laws Impose Little Burden on Voters ................................12

        C.  The Challenged Laws Serve Legitimate State Interests ...............................15

        D.  NVRA Claim.................................................................................................17

            a.  Standard...........................................................................................18

            b.  Plaintiff Does Not Have Enough Evidence to Show Systematic
                Failure in New York's Election System.............................................19

            c.  Because of Recent Changes in the Election Law, the Standard for
                Evaluating Affidavit Ballots Has Been Liberalized, Making More
                Affidavit Ballots Eligible to be Valid...............................................20

            d.  The State Board Engages in Activities to Ensure Poll Workers are
                Adequately Trained ..........................................................................24

        Standing

        A.  Common Cause/NY Lacks Organizational Standing .....................................25

        B.  Common Cause Lacks Associational Standing ..............................................31

        C.  To the Extent Plaintiff Makes an "As-Applied" Fourteenth Amendment
            and NVRA  Challenge to New York's Voter Removal Procedure,
            Plaintiff Lacks Standing ................................................................................33

IV.     Conclusion .......................................................................................................................

# TABLE OF AUTHORITIES

Page

## Statutes and Constitutional Provisions

52 U.S.C. §§ 20501–11 (2017), NVRA Section 8, ECF 118 ........................................................1
52 U.S.C. §§ 20501–11 (2017), NVRA Section 8, ECF 118, p. 23 ...........................................3
52 U.S.C. §§ 20501–11 (2017), NVRA Section 8, ECF 118, p. 26 ...........................................3
52 U.S.C. §§ 20501–11 (2017), NVRA Section 8, ECF 118 ........................................................6
52 U.S.C. §§ 20501–11, NVRA Section 8, ECF 118, p. 23, 26, 24-25 .....................................6
52 U.S.C. §20507(d)(1)(B) ...........................................................................................................7
Election Law §5-712 .....................................................................................................................7
Election Law §5-712(3) ................................................................................................................8
Election Law §5-213(1) ................................................................................................................8
Election Law §5-213(2) ................................................................................................................8
Election Law §8-302(3)(e)(ii)) .....................................................................................................8
Election Law §5-213(3) ................................................................................................................8
Election Law §9-209(2)(a)(i)(C) .................................................................................................14
Election Law §9-209(2)(a)(i)(D) .................................................................................................14
Election Law §9-209(2)(a)(ii) .....................................................................................................15
Election Law §17-130(3) .............................................................................................................16

## Federal Case Citations

*Allen v. Wright*, 468 U.S. 737 (1984).........................................................................................25
*Alliance for Open Society Int'l, Inc., v. U.S. Agency for Int'l Dev.*, 651 F.3d 218 (2d Cir.2011)...........33
*Alvarez v. Espinoza*, 844 S.W.2d 238, 249 (Tex. App.,1992).....................................................4
*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................................................ 10, 11, 27
*Baker v. Carr*, 369 U.S. 186 (1962)...........................................................................................32
*Bano v Union Carbide Corp.*, 361 F3d 696 (2d Cir 2004) .........................................................33
*Burdick v. Takushi*, 504 U.S. 428 (1992) ....................................................................2, 9, 10, 11, 12
*Burns v. Fortson*, 410 U.S. 686, 687 (1973) .............................................................................15
*Bush v Hillsborough County Canvassing Bd.*, 123 F Supp 2d 1305 (ND Fla 2000)...................20
*Bush v. Hillsborough Count Canvassing Board*, 123 F.Supp.2d 1305 (N.D. Fla. 2000) ..............4
*Center for Food Safety v. Price*, 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ........................28
*Citizens for Responsibility and Ethics in Washington v. Trump* ("CREW ")
    276 F.Supp.3d 174 (S.D.N.Y. 2017).....................................................................................28
*City of Canton v. Harris*, 489 U.S. 378 (1989)..........................................................................18
*Clingman v Beaver*, 544 US 581, (2005) ............................................................................. 9. 13
*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008).........................................2, 15, 16
*DaimlerChrysler Corporation v. Charlotte Cuno, et al.*, 547 U.S. 332 (2006) ..........................26
*Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*,
    675 F.3d 149 (2d Cir. 2012) .................................................................................................32
*Dudum v. Arntz*, 640 F.3d 1098 (9th Cir. 2011) ........................................................................16
*Electronic Privacy Information Center v. Federal Aviation Administration*,
    892 F.3d 1249 (D.C. Cir. 2018).............................................................................................31

*Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1 (2004) ................................................26

**Federal Case Citations**

*Florida State Conference for NAACP v. Browning*, 569 F. Supp. 2d 1237 (N.D.Fla. 2008) ...............15
*Frank v. Walker,* 768 F. 3d 744 (2014)....................................................................................15
*Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000)...........25
*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ...............................................................................32
*Gonzales v. Arizona*, 624 F.3d 1162, 1198 (9th Cir. 2010)........................................................15
*Griffn v. Roupas*, 385 F.3d 1128 (7th Cir. 2004).............................................................. 9, 10, 15
*Havens Realty Corp. v Coleman,* 455 US 363 (1982) .............................................................28
*Hope, Inc. v. Du-Page County, Ill.*, 738 F.2d 797 (7th Cir. 1984) ..............................................31
*Hunt v. Wash. State Apple Advertising Comm'n,* 432 U.S. 333 (1977) ........................................33
*Husted v. A. Phillip Randolph Institute*, 138 S. Ct. 1833 (2018)...................................................3
*Indiana Democratic Party*, 458 F.Supp.2d 775 (2006) ............................................................31
*Intl. Union, United Auto., Aerospace and Agr. Implement Workers of Am. v Brock*,
   477 US 274 (1986) .........................................................................................................33
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).................................................................26
*Marbury v. Madison,* 5 U.S. 137 (1803) ...............................................................................25
*Marston v. Lewis*, 410 U.S. 679 (1973) ...................................................................................2
*McDonald v. Bd. of Elections Comm'rs of Chicago*, 394 U.S. 802 (1969)....................................2
*McMillan v. Ashtabula County Bd. of Elections*, 1993 WL 150420, 7 (Ohio App. 11 Dist.,1993) ......4
*Md. Minority Contractors Ass'n, Inc. v. Lynch*, Nos. 98-2655, 99-1272,
   2000 WL 135103, at 5 (4th Cir. Feb. 7, 2000) .................................................................28
*Mid-Hudson Catskill Rural Migrant Ministry Inc. v. Fine Host Corp.*, 418 F.3d 168 (2d Cir. 2005) ...31
*National Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6 (D.C. Cir. 2011)....................................31
*National Congress for Puerto Rican Rights ("NCPRR ) v. City of New York*,
   75 F.Supp.2d 154 (S.D.N.Y. 1999)...................................................................................29
*Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428 (D.C. Cir. 1995)............................26
*Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) ................... 10, 11, 15
*Norman v. Reed*, 502 U.S. 279 (1992) ...................................................................................10
*Obama for Am. v. Husted,* 697 F.3d 423 (6th Cir. 2012) ...........................................................10
*Ohio Council 8 Am. Fed. of State v. Husted,* F3d, 2016 WL 537398, at *3 (6th Cir. Feb. 11, 2016) .........12
*People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture*,
   797 F.3d 1087 (D.C. Cir. 2015).......................................................................................31
*Price v New York State Bd. of Elections*, 540 F3d 101 (2d Cir 2008) .........................................11
*Raines v. Byrd*, 521 U.S. 811 (1997) ...................................................................................26
*Reynolds v. Sims*, 377 U.S. 533 (1964) ...............................................................................32
*SEC v. Forex Asset Management, LLC,* 242 F.3d 325 (5 Cir. 2001)..........................................25
*Siegel v. LePore*, 234 F.3d 1163, 1184 (11th Cir. 2000) .........................................................15
*Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).............................29
*South Carolina v. United States*, 898 F. Supp. 2d 30 (D.D.C. 2012) .........................................15
*Stone v. Bd. of Election Comm'rs for Chicago*, 750 F.3d 678 (7th Cir. 2014)............................12
*Storer v. Brown*, 415 U.S. 724 (1974)...................................................................................10
*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997)......................................10, 11, 16
*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................................32

**New York Case Citations**

*Bonelli v. Bahren,* 196 A.D.2d 866, 602 N.Y.S.2d 62 (2d Dep't 1993)..................................23, 24

*Capitano v. Kelly*, 242 A.D.2d 343, 661 N.Y.S.2d 262 (2d Dep't 1997)....................................23

*Matter of Cozzolino v. Columbia County Bd. of Elections,*
   218 A.D. 2d 921 (N.Y. App. Div 1995) ...........................................................................23

*Curley v. Zacek*, 22 A.D.3d 954, 803 N.Y.S.2d 221 (3d Dep't 2005) .......................................23

*Detres v. Westchester County Bd. of Elections*, 65 A.D.3d 639  (2d Dep't 2009).......................22

*Di Stefano v. Kiggins*, 254 A.D.2d 688, 678 N.Y.S.2d 416 (4th Dep't 1998).............................23

*Donnelly v. McNab*, 83 A.D.2d 896, 442 N.Y.S.2d 532 (2d Dep't 1981)...................................23

*Franco v. Velez*, 65 N.Y.2d 967, 493 N.Y.S.2d 1022, 483 N.E.2d 1154 (1985) ........................23

*Higby v Mahoney*, 48 NY2d 15 (1979) .....................................................................................22

*Hogan v. Goodspeed*, 196 A.D.2d 675, 601 N.Y.S.2d 356 (3d Dep't 1993),
   82 N.Y.2d 710, 602 N.Y.S.2d 793, 622 N.E.2d 293 (1993) ...............................................23

*Keal v. Board of Elections of State of N.Y.*, 164 A.D.2d 962, 559 N.Y.S.2d 763 (3d Dep't 1990).....23

*Lozano v. Scaringe*, 253 A.D.2d 569, 677 N.Y.S.2d 404 (3d Dep't 1998) ................................23

*Maher v. New York State Bd. of Elections*, 120 A.D.3d 891, 992 N.Y.S.2d 153 (3d Dep't 2014)......23

*Molloy v. Scaringe*, 153 A.D.2d 782, 545 N.Y.S.2d 217 (3d Dep't 1989)..................................23

*Price v. Letteri*, 89 A.D.2d 976, 454 N.Y.S.2d 128 (2d Dep't 1982).........................................23

*Rosen v. Epstein*, 153 A.D.2d 723, 544 N.Y.S.2d 689 (2d Dep't 1989) ....................................23

**Other Case Citations**

*Bonzon v. Weinstein*, 514 S.W.2d 357, 364 (Mo.App. 1974) .......................................................4

*State ex rel. Myles v. Brunner*, 120 Ohio St. 3d 328, 2008-Ohio-5097, 899 N.E.2d 120 (2008) .......22

**Miscellaneous References**

Chapter 659 of the Laws of 1994 (NY)..................................................................................7, 8

Chapter 6 of the Laws of 2019 (NY) .......................................................................................13

Chapter 3 of the Laws of 2019 (NY) ................................................................................ 13, 21

Chapter 55, Part CCC, of the Laws of 2019 (NY).....................................................................13

A.1320-A[Cahill]/S.3045-B[Comrie] (NY) ....................................................................... 13, 21

Albany Times Union Newspaper Editorial, Jerry Goldfeder
   https://www.timesunion.com/opinion/article/Commentary-New-York-s-arcane-election-laws-
   14382695.php).................................................................................................................23
   .......................................................................................................................................23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------

COMMON CAUSE/NEW YORK, as an
organization and on behalf of its members,

**PRE-TRIAL MEMORADUM OF LAW**
Case No. 1:17-cv-06770-AJN
Hon. Alison J. Nathan

-Plaintiffs,

-against-

ROBERT A. BREHM, Co-Executive
Director, TODD D. VALENTINE,
Co-Executive Director, PETER S. KOSINSKI,
Co-Chair, DOUGLAS A. KELLNER, Co-Chair,
ANDREW J. SPANO, Commissioner, and
GREGORY P. PETERSON,
Commissioner, in their official capacities as
Commissioner of the NEW YORK STATE
BOARD OF ELECTIONS,

-Defendants.

----------------------------------------------------------------

## I.  Preliminary Statement

When regulating elections, States may prescribe reasonable, nondiscriminatory rules.

And that is what this case involves: reasonable, nondiscriminatory rules for placing voters in

inactive status when there is evidence that the voter has moved.  Under New York Election Law,

when there is evidence that a voter has moved (e.g. when a local board of elections receives

returned mail from a voter), the voter is sent a confirmation card and placed in "inactive" status.

For various policy reasons, such as protecting the integrity of the election and enhancing the

efficiency of the poll site, when inactive voters do not respond to confirmation cards and have

not previously updated their registration records, they are required to vote via an affidavit ballot

if they present themselves at their poll site.  It has already been established that New York's voter

removal process facially complies with the section 8 of the National Voter Registration Act Of

1993 ("NVRA").  *See* ECF 118.  This process helps ensure that New York's registration list is

accurate and current while also protecting the integrity of the election and enhancing the efficiency of the poll site.  The burden on the voter is minimal, as it only requires the voter to contact the board of elections to confirm their address[1] or cast an affidavit ballot.

Although Plaintiff raises numerous claims, the Court should rule in the State's favor for several reasons. First, the challenged laws satisfy the *Anderson-Burdick* balancing test for evaluating election laws.   Next, to the extent Plaintiff alleges that New York is failing to enforce certain protections of inactive voters related to voting via an affidavit ballot, Plaintiff will be unable to prove that any failures are systemic to the point where New York is violating the Constitution or NVRA.  Lastly, even moving past the merits, there are several other flaws-including lack of standing with Plaintiffs' case.

A. *Constitutional Claims*

Election regulations will unavoidably impact some voters, but this does not mean such regulations are automatically invalid (or subject to strict scrutiny). To be sure, voting is a fundamental right; and protecting this right is vital to our system of government.  But States must regulate the time, place, and manner of elections. To regulate elections, States must have rules, even though these rules will affect voting and/or voter turnout in some fashion.

Recognizing this reality, the Supreme Court has upheld a wide array of election rules, including many far more burdensome than the laws challenged here. For example, the Court has upheld regulations: prohibiting write-in voting, *Burdick v. Takushi*, 504 U.S. 428 (1992); mandating that voters register to vote fifty days before an election, *Marston v. Lewis*, 410 U.S. 679 (1973); omitting pretrial inmates, still eligible to vote, from the list of people who could

---

[1] To that end, a board of elections provides a postage free card the voter can mail to the board of elections.  See Connolly Dec. ¶ 31.

receive absentee ballots, *McDonald v. Bd. of Elections Comm'rs of Chicago*, 394 U.S. 802 (1969); and requiring all in-person voters to present government-issued identification, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008).  Most significantly here, the Supreme Court upheld Ohio's voter removal process, where the Court reasoned that the NVRA permits states to treat failure to respond to notice cards sent because of a failure to engage in voter activity as sufficiently reliable evidence that a registrant has moved. *Husted*, 138 S. Ct. at 1845—46. It is worth noting that this Court has already held that this same logic applies to New York's removal process, stating: " (t)he same logic extends to failure to respond to a notice card sent because mail was returned as undeliverable." ECF 118 Page 23.

Plaintiff raises a constitutional challenge, but it does not have merit. To begin, any potential burdens associated with the New York's removal process are minimal at most.  The only consequence of being an inactive voter is that the voter has to cast an affidavit ballot. As noted by this Court, "(p)ermitting inactive voters to cast affidavit ballots is expressly contemplated by the NVRA, notwithstanding any discouraging effects it may have on prospective provisional voters."  ECF 118 pg. 26. As noted by this Court, "it is certainly correct that there are limits on how expansively states may use affidavit ballots when such use impedes voting rights separately protected by the First Amendment, Fourteenth Amendment or Voting Rights Act," however, "here, where New York's removal process 'follows subsection (d) to the letter,'  and its affidavit ballot practices fall safely within the realm contemplated by 52 U.S.C. § 20507(e)(3), the Court cannot find that the State has facially violated§ 20507(d)." (citations omitted) ECF 118  pg. 24-25.

The challenged laws also serve New York's legitimate, and even compelling, interests in ensuring the integrity of the election, enhancing poll site efficiency, ensuring the voter

registration list is accurate and current, and ensuring that voters are voting in the correct jurisdiction. All of this puts New York in compliance with the mandates of the NVRA and maintains the integrity of New York's electoral system.

B. *NVRA Claim.*

In addition to its Constitutional Claims, Plaintiff alleges that New York's "inconsistent implementation" of its removal policy violates Section 8 of the NVRA.  While the Amended Complaint does not use the term "defacto removal", Plaintiff appears to allege that inactive voters are, in effect, removed from New York's voter registration because New York fails to provide for protections mandated by subparagraph (e) of section 8 of the NVRA in relation to protections for provisional ballots.  Plaintiff will provide evidence that there were a number of instances where errors occurred. While it is unfortunate that these errors occurred, this evidence is insufficient in providing that New York systematically fails to provide for the protection of inactive voters in New York State.  In context, there are over 12 million registered voters in New York State, and over 1 million inactive voters registered. There are over 15,083 election districts with 5,313 poll sites in New York, with over 61,790 poll workers. Unfortunately, errors are bound to happen.  Human error is unavoidable on this scale; however, the Election Law provides safeguards to minimize these errors.  Such safeguards include, but are not limited to: the bi-partisan check of election administration (Election Law §§ 3-100 and 3-200); the posting and publishing of candidates and sample ballots (Election Law §§ 4-120(1), 4-120(2), 7-118, and 8-104); the posting of a bill of rights ( Election Law §  8-104); the use of maps or a street finder (Election Law § 8-302(3)(e)); the ability to vote via an affidavit ballot (Election Law § 8-302(3)(e)(ii)); judicial supervision (Article 16 of the Election Law); and nine days of early voting (Chapter 3 of the Laws of 2019).

In evaluating election systems, Courts generally recognize that the system must be fair, but nothing obligates that the system be perfect. *See, e.g., Bush v. Hillsborough Count Canvassing Board*, 123 F.Supp.2d 1305, 1317 (N.D. Fla. 2000) ("The court recognizes that much can be done to guarantee - fair election; but no matter how hard we try, regrettably we may never be able to guarantee a perfect election."); *McMillan v. Ashtabula County Bd. of Elections*, 1993 WL 150420, 7 (Ohio App. 11 Dist.,1993) ("A less than perfect election will not permit the judiciary to invade the political branch of government."); *Alvarez v. Espinoza*, 844 S.W.2d 238, 249 (Tex. App.,1992) ("We recognize that elections are seldom perfect, and that courts do not order new elections because of errors that did not affect the outcome."); *State ex rel. Bonzon v. Weinstein*, 514 S.W.2d 357, 364 (Mo.App. 1974) ("No candidate expects nor will he receive a perfect election; he can expect a fair and open one in which the electorate may freely express their will.").

C. *Plaintiff Lacks Standing*

Of course, all of this presumes Plaintiff has standing to bring its claims. It does not. An organization's mere interest in an issue is not enough to confer standing; and organizations do not automatically receive standing to pursue the rights of unidentified future voters. Here, Plaintiff will be unable to demonstrate that the challenged laws have directly injured them or any of their members.

Critically, at this trial stage, Plaintiff now bears the burden of showing that it has standing by a preponderance of the evidence.  It can no longer rely on vague allegations of injury; it must offer specific proof. Moreover, it is well established that standing is not dispensed in gross.  It is a claim by claim inquiry. Plaintiff, therefore, has the burden to establish standing for every one

of the many claims they raise (which challenge many different aspects of New York's election system). They will be unable to do so.

### D. *Legislative Prerogative.*

This trial is not a legislative debate. When crafting voting laws and procedures, lawmakers and executive officials must consider and balance a cavalcade of important interests, interests that often compete with one another. These interests include, but are not limited to:

- o Encouraging voting and ensuring that all eligible voters are able to vote;
- o Making sure election officials are able to effectively and efficiently identify voters and screen out ineligible ballots (whether intentionally or unintentionally cast);
- o Drafting rules and procedures that are intricate enough to account for the many situations officials face when processing millions of voters;
- o Drafting rules and procedures that are simple (and uniform) enough so that both voters and officials can understand and apply them and ensure that they fit into federally required mandates;
- o Allowing all voters many convenient opportunities to vote;
- o Ensuring quick and accurate election results;
- o Reducing the administrative burdens on election officials as well as the overall costs of elections;
- o Registering eligible, but unregistered voters; and
- o Protecting the public's overall confidence in the electoral process.

The Constitution leaves this complex tight-rope walk to the States.  It recognizes there is no perfect answer. The question in this trial, therefore, is not whether New York has balanced these interests perfectly (a standard no State could ever meet). Nor is it whether Plaintiffs' preferred approach would be better. The only question this Court must answer is whether New York's voting laws comply with federal law. The answer is yes, they do.

## II. Background

### A. *NVRA Background*

In 1993, Congress enacted the NVRA, 1319 Pub. L. No. 103–31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501–11 (2017)), in part to "increase the number of eligible citizens who register to vote," while protecting "the integrity of the electoral process" by

ensuring that "accurate and current voter registration rolls are maintained." 52 U.S.C. 20501(b). Section 8 of the NVRA lays out all permissible reasons for which states may remove registered voters from the voter rolls. In other words, section 8 lays out the criteria of when a State can cancel a voter's registration.

The NVRA establishes two specific procedures by which an individual may[2] be removed from the voter registration rolls based on a change in residence: (i) when the registrant herself provides the information and/or confirmation that she has moved outside the jurisdiction in which she is registered, or (ii) when reliable second-hand information indicates the voter may have changed address, and then only after the state sends a confirmation notice in accordance with 52 U.S.C. § 20507(d)(2) to which the voter fails to respond and fails to vote in any election in a period encompassing two subsequent federal general elections. *Id.* § 20507(d)(1)(B). Section 8 also describes how a voter, who fails to respond to an address confirmation card notice, may vote.

Contrary to Plaintiff's allegation in paragraph 45 of the Complaint, the NVRA does not require a voter be permitted to vote at a former polling place when he or she "moves from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district." Rather, 52 U.S.C. § 20507(e)(2)(B) provides that voting at a former polling place need not be provided if State Law provides that a voter may vote at the new polling place upon oral or written affirmation by the registrant of the new address.

B. *New York State Law*

---

[2] While NVRA provides of when a voter "may" be removed, a state is required to have a list maintenance process to ensure a list of registrants is accurate.

In 1994, the New York State Legislature enacted landmark legislation to comply with the NVRA. *See* Chapter 659 of the Laws of 1994. This legislation included Election Law § 5-712 which requires local boards of elections to mail address confirmation notices to certain voters, as well as Election Law § 5-213 which provides that a voter who is sent a confirmation notice is placed in "inactive" status. This change in status from "active" to "inactive" does not deregister a voter. The inactive voter's name simply is not printed in the poll book because the voter is required to vote by affidavit ballot instead of casting a vote using election day scanners. *Id*. As discussed below, this statutory process is compliant with the express language of the NVRA and the congressional intent of the act.

New York Election Law provides when a board of elections must send a voter a "confirmation notice" (e.g. when any mail sent to such voter is returned as undeliverable by the postal service without any indication of a forwarding address; receipt of a change of address notification; etc.). Election Law § 5-712. The confirmation notice asks recipients to reply promptly with their current address using a statutorily provided postage-paid return card. Election Law § 5-712 (3). When a voter is sent a confirmation notice, the voter's name must be placed in "inactive" status. Election Law § 5-213(1). The registration poll records of all such voters must be removed from the poll ledgers and maintained at the offices of the board of elections in a file arranged alphabetically by election district. Election Law § 5-213(2). If the board uses computer generated registration lists (as all New York Boards of Elections now do), the names of such voters may not be placed on such lists at subsequent elections other than lists prepared pursuant to the other provisions of the Election Law, but must be kept as a computer record at the offices of such board. If the voter responds to the confirmation notice indicating that they are still at the same address, the board will reactivate the voter.

The purpose of this provision is to require "inactive" voters to vote by affidavit ballot. *See also* Election Law § 8-302(3)(e)(ii). As stated in the Legislative Bill Memorandum for Chapter 659 of the Laws of 1994, "any voters in inactive status who appear, are permitted to vote by affidavit ballot. If the person is eligible, the ballot will be counted and the voter's name restored to active status. The voter will be notified of the action." Defendants Trial Exhibit 1 at pg. 10.  The inactive voter is still registered to vote, allowed to vote, and, if the voter has any contact with the electoral system -- including but not limited to voting -- the voter will move back to the "active" voters list. *See* Election Law § 5-213(3)(provides that if an "inactive" voter contacts the board of elections, or the board finds that a voter has validly signed a designating or nominating petition that states he resides at the same address, or casts a ballot in an affidavit ballot, the board elections shall restore the voter to active status).

### III. Argument

Plaintiff incorrectly contends that New York's Voter removal process unconstitutionally burdens the right to vote in violation of the First and Fourteenth Amendments. *See* Amd Compl. ¶ 6. This contention invokes the well-established *Anderson-Burdick* framework. The challenged laws meet this flexible balancing test because they impose little burden on voting and serve various legitimate interests.

A. *Under Anderson-Burdick, reasonable, nondiscriminatory election laws are presumably constitutional*

As mentioned in the introduction, state laws regulating elections take place at a unique crossroad. It is undeniable that "voting is of the most fundamental significance under our constitutional structure." *Burdick v Takushi,* 504 US 428, 433, (1992*)* (internal quotation omitted). But the States must also play a significant role in regulating elections and, by

extension, voting: "The Constitution provides that States may prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections." Id. In analyzing election laws, therefore, courts must reconcile the often competing objectives of (i) protecting the right to vote and (ii) allowing "the states broad authority to regulate the conduct of elections ...." *Griffn v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004).

The resolution to the above tension is not a legal system in which federal courts subject every state election law to strict constitutional scrutiny. *Clingman v Beaver,* 544 US 581, 593, (2005). Rather, the Supreme Court has recognized that "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' " *Burdick*, 504 U.S. at 433 (*quoting Storer v. Brown*, 415 U.S. 724, 730 (1974)).

And the States retain authority to impose election rules even when such rules ultimately disallow some attempted ballots. *Griffin*, 385 F.3d at 1130. As *Griffin* aptly explained, any voting restriction "is going to exclude, either *de jure or de facto*, some people from voting ...." *Id.; see also Burdick*, 504 U.S. at 434 (acknowledging that "all election regulations" "have an impact on the right to vote"). But "state legislatures may [still] without transgressing the Constitution impose extensive restrictions on voting." *Griffin*, 385 F.3d at 1130 (rejecting argument that the Constitution mandates absentee voting for working mothers).

The Supreme Court has created a unique approach for determining whether an election law unconstitutionally burdens the right to vote. *Burdick*, 504 U.S. at 434; *Anderson v.*

*Celebrezze*, 460 U.S. 780, 789 (1983). Applying the *Anderson-Burdick* framework, federal courts apply a sliding scale of review; the less severe the burden, the less rigorous the review. *Burdick*, 504 U.S. at 434. Put differently, the level of scrutiny that applies to an election law "depends upon the extent to which a challenged regulation burdens [voting] rights." *Id.*

In evaluating the constitutionality of laws that impose no burden on the fundamental right to vote, courts apply rational basis review. *Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012).  On the other hand, a law that " 'severely' burdens the fundamental right to vote," such as a poll tax, triggers strict scrutiny, *Obama for Am.,* 697 F.3d at 429 (*quoting Burdick*, 504 U.S. at 434), and must be "narrowly drawn to advance a state interest of compelling importance," *Norman v. Reed*, 502 U.S. 279, 289 (1992). And "[fo]r the majority of cases falling between these extremes, [courts] apply "the 'flexible' *Anderson-Burdick* balancing test." *Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d at 592 (*quoting Burdick*, 504 U.S. at 434).

In other words, as  the Second Circuit has stated:

> If the plaintiffs' rights are severely burdened, the statute is subject to strict scrutiny. Burdick, 504 U.S. at 435, 112 S.Ct. 2059. If the burden is minor, but non-trivial, Burdick's balancing test is applied. Under this balancing test, the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests. Id. Review in such circumstances will be quite deferential, and we will not require "elaborate, empirical verification of the weightiness of the State's asserted justifications." Timmons, 520 U.S. at 364, 117 S.Ct. 1364. Nonetheless, … *where the burden imposed by the law is non-trivial, we must weigh the State's justification against the burden imposed*. See Burdick, 504 U.S. at 439, 112 S.Ct. 2059; see also Timmons, 520 U.S. at 364, 117 S.Ct. 1364.

*Price v New York State Bd. of Elections*, 540 F3d 101, 109 [2d Cir 2008](emphasis added)

A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments

11

that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights." *Burdick*, 504 U.S. at 434 (*quoting Anderson*, 460 U.S. at 789).

Even within this flexible middle tier, *Anderson-Burdick* is not the same as traditional intermediate scrutiny (e.g., gender classifications): rather, *Anderson-Burdick* remains a sliding scale based on the extent of the burden. *See Burdick* 504 U.S. at 434. The less severe a burden the more deferential the review (closer to rational basis); the more severe a burden the more rigid the review (closer to strict scrutiny). *See id.* As the Sixth Circuit recently explained, when regulations are minimally burdensome "a less-searching examination closer to rational basis applies ...." *Ohio Council 8 Am. Fed. of State v. Husted*, - F.3d -, 2016 WL 537398, at *3 (6th Cir. Feb. 11, 2016).

And critically, the presumption under the *Anderson-Burdick* middle tier is that reasonable, neutral requirements will pass: "when a state election law provision imposes only reasonable, nondiscriminatory restrictions ... the state's important regulatory interests are generally sufficient to justify the restrictions." *Id.; Stone v. Bd. of Election Comm'rs for Chicago*, 750 F.3d 678, 681 (7th Cir. 2014) ("If the burden is merely 'reasonable' and 'nondiscriminatory,' by contrast, the government's legitimate regulatory interests will generally carry the day."). The Sixth Circuit has specifically held that application of *Anderson-Burdick* to "minimally burdensome and nondiscriminatory election law[s]" is "a form of review akin to rational-basis review." *Ohio Council 8 Am. Fed. of State*, 2016 WL 537398, at *7. Under this standard, "plaintiffs bear[] a heavy constitutional burden to demonstrate that a state's election law is unconstitutional." *Id.* (emphasis added, internal quotations omitted).

B.  *The challenged laws impose little burden on voters*

The first step under *Anderson-Burdick* is to measure the burden, so that the Court can tell what relative level of scrutiny to apply. *See Burdick*, 504 U.S. at 434. Here, any burdens the challenged laws impose are minimal, and should lead to rational basis review or, at most, lenient middle-tier review (well towards the deferential end of the spectrum).

Primarily, Plaintiff is relying on its expert witness, Marc Meredith, to establish that New York's requirement that inactive voters cast an affidavit ballot increases the "calculus to vote"  and/or voting cost of the inactive voter. Under this theory, voters are less likely to vote when the "voting cost" increases. As noted in Marc Meredith's expert report, any action by the State, such as there mere fact of having a voter registration list, increases voter costs.  Plaintiff is relying on this increase in voter cost to show that voting via an affidavit ballot is an "undue burden." This showing is insufficient.

First, Marc Meredith's report does not place a measurable value of the purported "voter cost" affidavit ballots place on inactive voters.  The expert report discusses the demographics of inactive voters, the number of inactive voters who live in the same address and cast a ballot, and hypothesizes that voters may get confused or  have to wait on longer lines. However, the report does not place a value of the voter cost of casting an affidavit ballot. It is respectfully submitted that the Court must be reticent before labeling a burden severe: "To deem ordinary and widespread burdens ... severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Clingman*, 544 U.S. at 593.

Additionally, Marc Meredith failed to take into account Election Law Reforms the legislature enacted in early 2019 in calculating "voter costs."   Such reforms that will improve

voter turnout, and lower voting costs as it relates to affidavit ballots, include: early voting

(Chapter 6 of the Laws of 2019), universal transfer (where a voter's registration record can be

transferred to another county when moving)(Chapter 3 of the Laws of 2019); and online voter

registration(Chapter 55, Part CCC, of the Laws of 2019).  To the extent that affidavit ballots not

getting counted increases voting costs, the legislature enacted legislation (which is awaiting the

signature of the Governor) that reforms how affidavit ballots canvassed. (A.1320-

A[Cahill]/S.3045-B[Comrie]).  Under this legislation, when a voter substantially complies with

the Election Law, the affidavit ballot will be counted, further decreasing the voting costs of using

affidavit ballots.  In his deposition, Marc Meredith conceded that he did not take these reforms

into consideration in his analysis.

New York also has several procedures in place that further reduce any burden associated

with inactive voters not being placed in poll books.  When a voter who is not in the poll book

presents themselves to a poll worker, Election Law § 8-302(3)(e) requires the poll worker to

"consult a map, street finder or other description of all of the polling places and election districts

within the political subdivision in which said election district is located and if necessary, contact

the board of elections to obtain the relevant information and advise the voter of the correct

polling place and election district for the residence address provided by the voter to such poll

clerk or election inspector."  Election Law § 8-302(3-a) requires that poll workers must give a

copy of a notice, in a form prescribed by the New York State Board of Elections, "to every

person whose address is in such election district for whom no registration poll record can be

found and, in a primary election, to every voter whose registration poll record does not show him

to be enrolled in the party in which he wishes to be enrolled…advising such person of his right

to, and of the procedures by which he may, cast an affidavit ballot or seek a court order

permitting him to vote.." Election Law § 8-104(1-a)(c) further provides that information be conspicuously posted in the polling place related to instructions on how to cast an affidavit ballot. In its current form, such posting is located in the voter's bill of rights, which clearly states: "(w)henever your name does not appear in the poll ledger or the voter registration or enrollment list, or you do not provide identification when required, you will be offered an affidavit ballot."   The purpose of these requirements is clear: to give effective notice to voters of their right to vote via an affidavit ballot if their name is not in the poll book.

Election Law § 9-209 provides how affidavit ballots are canvassed. That section provides that, when canvassing an affidavit ballot, if the voter is found to be registered and has not voted in person, an inspector must compare the signature on the affidavit envelope with the signature on the computer generated list of registered voters. If the signatures are found to correspond, absent objection, the inspectors must canvass such ballot. Election Law § 9-209(2)(a)(i)(C). If no challenge is made, or if a challenge made is not sustained, the envelope must be opened and the vote canvassed. Election Law § 9-209(2)(a)(i)(D). Further, if the board of inspectors determines that a person was entitled to vote at such election, it must cast and canvass such ballot if such board finds that ministerial error by the board of elections or any of its employees caused such ballot envelope not to be valid on its face. See Election Law § 9-209(2)(a)(ii).

As previously stated above, not listing inactive voters in poll books is a mechanism that triggers the statutory requirement that the voter be offered an affidavit ballot.  This structure is a policy decision the State made, given the circumstances New York faces in administering elections.

C. *The challenged laws serve legitimate state interests*

In contrast to any limited burdens, the State's interests in this case are great. Federal courts, including the Supreme Court, have recognized that States have many significant interests in regulating elections.  Courts have broken down such interests in a variety of ways, including but not limited to:

- o protecting, safeguarding, and inspiring "public confidence in the integrity of the electoral process," (*Griffin*, 385 F.3d at 1130-31; *South Carolina v. United States*, 898 F. Supp. 2d 30, 44 (D.D.C. 2012)));
- o "assessing the eligibility and qualifications of voters," (*Gonzales v. Arizona*, 624 F.3d 1162, 1198 (9th Cir. 2010));
- o "election oversight," (*NEOCH*, 696 F.3d at 600);
- o preventing and deterring election fraud, (*Crawford*, 553 U.S. at 196; *NEOCH*, 696 F.3d at 600; *Frank*, 768 F.3d at 750; *South Carolina*, 898 F. Supp. 2d at 44);
- o "ensuring accurate and complete election results," (*Siegel v. LePore*, 234 F.3d 1163, 1184 (11th Cir. 2000) (concurrence));
- o keeping accurate voter records and registration rolls, (*Crawford*, 553 U.S. at 196; *Burns v. Fortson*, 410 U.S. 686, 687 (1973); *Florida State Conference for NAACP v. Browning*, 569 F. Supp. 2d 1237, 1251 (N.D.Fla. 2008))
- o reducing the potential for "invalid ballots," (*Griffin*, 385 F.3d at 1131)
- o consistency with federal registration and identification requirements, (*Crawford*, 553 U.S. at 192-94); and
- o maintaining orderly, efficient, and fair election processes, (*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997); *Dudum v. Arntz*, 640 F.3d 1098, 1115-16 (9th Cir. 2011)).

a.     Benefits of New York's Removal Process

Initially, it is important to recognize why a voter is placed in inactive status.  A board of elections places a voter in inactive status when there is evidence that the voter moved, namely, by getting mail returned to the board of elections.  As this Court has noted, this is an appropriate mechanism to place someone in inactive status under the NVRA. *See* ECF 118.  Additionally, as noted by this Court, permitting inactive voters to cast affidavit ballots is expressly contemplated by the NVRA, notwithstanding any discouraging effects it may have on prospective provisional voters. *Id.*

As evidenced by the legislative history, New York opted to remove inactive voters' names from poll books in order to guarantee that inactive voters are able to vote at the poll site embracing the voters' current addresses via an affidavit ballot.  As New York City Board of Elections Executive Director Michael Ryan noted, people, being creatures of habit, "often don't vote at their new location and go back to their old voting location and vote by scanner where they're actually in the poll book."  *See* Ryan Depo. Pgs. 89-90.

Moreover, the legislature wanted to give election inspectors a binary choice, either provide a "regular" ballot that will be canvassed by the voting machine to voters listed in the poll book, or provide an "affidavit" ballot to persons not listed in the poll book, enhancing efficiency at the poll site.  Notably, most voters using affidavit ballots are not voters in "inactive" status. Given that election inspectors only work one to three times a year, it is reasonable to believe that providing additional duties upon election inspectors (e.g. making determinations related to inactive voter's eligibility or determining which ballots a voter is eligible to cast) would bog down the voting process for everyone on Election Day with the potential of disenfranchising many voters.  Historical abuse in New York of challenge and oath processes in poll sites that bogged down voting, for example, lead the legislature to criminalize obstruction and hinderance of voters moving through the election process.  *See* Election Law § 17-130 (3).

The need to provide an efficient voting process that also ensures voters vote in the correct location for their current address supports New York's process of routinely distributing affidavit ballots and providing a robust, transparent post-election canvassing process that explores every possible basis to enfranchise a voter based on their written affidavit.

Plaintiff's solution appears to be that all inactive voters should be given a "regular" ballot to vote on the voting machine without verifying that the voter is voting at his or her current

address.  This is not a valid option as it invites voters who have in fact moved to vote the wrong

ballot in the wrong location. It is respectfully submitted that this is the opposite of the intent and

purpose of the State Election Law.

Further, as indicated above, a voter is placed in inactive status because the local board of

elections received evidence that a voter has moved.  New York's affidavit process gives the local

board an opportunity to assess the qualifications and eligibility of the voter.

Additionally, the main purpose of the State passing this process is compliance with the

NVRA, which this Court has already ruled that the State laws in question facially comply.

D.  *NVRA Claim*

In addition to its Constitutional Claims, Plaintiff alleges that New York's " inconsistent

implementation" of its removal policy violates Section 8 of the NVRA.  In general, Plaintiff

alleges that, due to inadequate public education efforts and training of local officials, inactive

voters are not informed of their right to vote via an affidavit ballot and the steps the voter needs

to take in order to restore the voter to active status.  *See Amd. Comp.* ¶ 37. Further, the Complaint

alleges that inactive voters are arbitrarily and inconsistently informed that the may vote via an

affidavit ballot, their affidavit ballot should be counted if they are voting in the correct precinct,

and casting an affidavit ballot restores the voter to active status.  *See Amd. Comp. ¶ 38.*

a.  *Standard*

Plaintiff alleges facts suggesting the Section 8 NVRA violations resulted from

inadequacies in training and public education.   As noted in this Court's decision in relation to

Defendants' motion to dismiss, New York's removal policy facially complies with Section 8 of

the NVRA.  However, "if New York failed to enforce (safeguards for inactive voters in the

Election Law) as written—for example, by failing to provide "inactive" voters with affidavit ballots—its conduct could rise to a violation of the NVRA."

In its decision, this Court indicated that an "as applied" claim of the NVRA may be had if "1) state poll workers 'routinely' informed inactive voters that they were not registered to vote; (2) state poll workers failed to inform inactive voters that they may vote by affidavit ballot; (3) state poll workers failed to offer inactive voters affidavit ballots; (4) state poll workers offered voters affidavit ballots only at their 'insistence'."

Plaintiff must prove its claims by a preponderance of the evidence.  To succeed, alleged injury must result from a systemic failure to train, not from the actions of a particular individual who might have benefitted from more training. *City of Canton v. Harris*, 489 U.S. 378 (1989).  In other words, Plaintiffs must show systemic, rather than localized, problems.

b. *Plaintiff Does Not Have Enough Evidence to Show Systematic Failure in New York's Election System*

Plaintiff plans to produce 19 declarations that purport to show deficiencies in New York's electoral system.  To the extent that these 19 declarations do show deficiencies, they are not enough to show systemic failure on part of New York's election system.  They are localized issues in which the SBOE is or has addressed. Plaintiff provides no expert witness that investigated, studied, analyzed, or discussed systematic failures at poll sites.  Instead, Plaintiff is relying on the declarations of 20 voters to show "systemic" failure.

Further, of these 19 declarations, some of them show no poll site error at all.  For instance, eight declarations merely show that the voter was not listed in the poll book, the voter was offered an affidavit ballot, and the affidavit ballot counted.  *See* Katherine Baldus; Jacques Fages; Mitchell Lavnick; Mara Wilson; James W. Johnson; Tracey Glodblum; Susan Stewart;

and Robert Holman.  That is preciously how the process is supposed to work.  Most of these declarations state that the voter was concerned about the affidavit process, or that they were unsure that their vote would count, either on the day of the election, or subsequent to the day of the election.  As this Court has noted in its decision to Defendants' motion to dismiss, inactive voters voting via provisional ballot is contemplated in the NVRA.  As such, these declarations do not show a violation of either the NVRA nor the Constitution.

Further, six of these declarations do not relate to New York's removal process.  For instance, Sandra Patricia Copps was not in the poll book for the 2018 September Democratic primary because she was not enrolled in the Democratic party.  Her issue of not being in the poll book does not relate to New York's removal process.  It is unclear why Lauren Wolfe was not in the poll book in the 2016 General Election as she was in active status.  The reason her affidavit ballot did not count was because she voted at the incorrect poll site.  Per her affidavit, Alison Matika voted via an affidavit ballot because her poll site did not have poll books.  Walter Ancarrow, IV and Keoma Blake's declarations relate to the voter-look up system, not their voter status or whether they voted via an affidavit ballot.  Ellen Edleman was an active voter who went to the correct poll site, but wrong table.  She was given an affidavit ballot, which was counted.  The issues raised in these five declarations would not be addressed by this litigation.

Plaintiff does submit two declarations where there was clear error; the declarations of Angela Roberts and Denise Roberts.  In both of these instances, the voter's affidavit ballots should have counted.  Both events happened at the same poll site in Tioga County.  While unfortunate, these three instances are not sufficient to show systemic error.

The other evidence proffered by the Plaintiff are various documents from local counties and the Attorney General's office.  This evidence includes the various e-mails as well as notes

taken from the Attorney General's Election Hotline from the 2016 Presidential Primary.  Plaintiff

provides Plaintiff Exhibits 129-134, 151, and 158, which includes hearsay within hearsay

observations from poll watchers in Ulster County stating that voters were not being provided

affidavit ballots.  As noted in Plaintiff Exhibit 132, many of these issues appeared to stem from

voters being in the wrong poll site.  Plaintiff also provides Plaintiff's Trial Exhibit 136, 141, 142,

and 150.  (Plaintiff also proports exhibit 167 of an occasion where a voter was not provided an

affidavit ballot, but this exhibit is illegible).

Additionally, Plaintiff provides a call log from the Attorney General's election hotline

from the April 2016 presidential primary election.  Of the 1,097 calls the Attorney General's

Office received, only 12 alleged are marked as a voter was refused an affidavit ballot.  Some of

these instances include hearsay within hearsay, e.g. "overheard poll workers telling voters they

didn't have provisional ballots"; or "Husband was told 'provisional ballots' did not exist."

Even assuming, arguendo, that all of these 17 examples happened as stated in the

documents, it cannot reasonably be construed as systemic failure on part of the Defendants.  As

noted in Director Thomas Connolly's declaration, there are approximately 5,300 poll sites,

15,083 election districts and 61,790 poll workers who staff an election.  Connolly Dec. ¶ 12.

While any error is unfortunate, and while the State strives to make any election as perfect as

possible, no election can possibly be perfect.  With such large numbers, it is unavoidable that

complaints will be made and that errors occasionally occur.  However, as noted earlier, there are

several protections in the Election Law that mitigates errors that may occur.  Ultimately, while

Plaintiff is able to point to some errors, it does not prove systemic problems.  As noted in *Bush v*

*Hillsborough County Canvassing Bd.*, the court recognized "that much can be done to guarantee

a fair election; but no matter how hard we try, regrettably we may never be able to guarantee a perfect election."  123 F Supp 2d 1305, 1317 [ND Fla 2000].

c. *Because of Recent Changes in the Election Law, the Standard for Evaluating Affidavit Ballots Has Been Reformed, Making More Affidavit Ballots Eligible to be Valid*

Plaintiff argues that a large number of affidavit ballots do not get counted, which, in turn, increases voter costs and/or deprives voters their right to vote.  Plaintiff relies on their expert, Marc Meredith, in making this assertion.  However, the data Marc Meredith relies on is dated and stale.  New York recently enacted legislation the reforms how affidavit ballots are evaluated, ensuring that many more affidavit ballots will be counted in the future.  This mitigates any potential increase in voter cost and/or deprivation of the right to vote.

First, it should be noted that Plaintiff argues that the majority of affidavit ballots do not get counted.  This is false, as shown by the testimony of Thomas Connolly.  See Connolly Aff. Para. 23-26.

To the extent Plaintiff argues that New York has a higher than average invalidation rate in relation to provisional ballots, such argument is moot given the 2019 Election Reforms recently passed by the legislature.  Moreover, New York also has the second highest number of valid affidavit ballots counted in the country.  *See* EAVS Report.

One of the largest reasons an affidavit ballot had been invalidated was because a voter moved to a different county without registering to vote.  Prior to 2019, the Election Law required voters to reregister whenever they moved outside the jurisdiction of their county board of elections.  However, in 2019, the Legislature and Governor enacted "universal transfer," which enables voters to transfer their registration with them wherever they move in the state.  *See* Chapter 3 of the Laws of 2019.  Given this significant reform, affidavit ballots of voters who

moved from outside the county will now be counted.  Additionally, the legislature enacted legislation (which is awaiting the signature of the Governor) that reforms how affidavit ballots are canvassed.  A.1320-A[Cahill]/S.3045-B[Comrie] requires boards of election to cast and canvass a voter's paper ballot (e.g. absentee, affidavit, emergency, etc.) if the voter is eligible to vote and "substantially complied" with the requirements of the Election Law.  Further, this bill provides that if a voter does not include their previous address on the affidavit ballot envelope, it shall not be considered a fatal defect, provided that the statewide voter registration system provides sufficient information to identify the voter. In such instances, the board shall cast and canvass such ballot accordingly.

This bill used the term "substantially complied" with the Election Law because "substantial compliance" is a term of art used in New York State Election Law cases, especially in relation to ballot access for candidates.  This bill borrows this term for purposes of setting out a standard for evaluating affidavit ballots.

Under common law, election statutes are mandatory and require strict compliance.  *State ex rel. Myles v. Brunner*, 120 Ohio St. 3d 328, 2008-Ohio-5097, 899 N.E.2d 120 (2008).  Substantial compliance can satisfy the requirements of a mandatory provision of an election statute and is acceptable only when an election provision expressly states that it is.  *Id.*

In New York, courts have generally held that there must be strict compliance with statutory commands as to matters of prescribed content, but substantial compliance is acceptable as to details of form.  *Higby v Mahoney*, 48 NY2d 15 [1979].  For instance, substantial compliance, in the absence of fraud or confusion, may justify the validation of a candidate's designating petition that is otherwise defective with respect to its form. *Detres v. Westchester County Bd. of Elections*, 65 A.D.3d 639  (2d Dep't 2009) (noting, however, that a board of

elections is not empowered to authorize, implicitly or explicitly, noncompliance with the

strictures set forth by the legislature and thus could not dispense with the requirement that if two

or more offices having the same title are to be filled for different terms, the terms of office shall

be included as part of the title of the office).

Courts have used substantial compliance, and declined to hold petitions and certificates

invalid for the following alleged defects:

- o   insufficient specification of the name of the office in a candidate's designating petition, as long as there is no reasonable probability of confusing or deceiving the signers, voters, or board of elections. *Lozano v. Scaringe*, 253 A.D.2d 569, 677 N.Y.S.2d 404 (3d Dep't 1998).
- o   omission of the term of office from the petition [Capitano v. Kelly, 242 A.D.2d 343, 661 N.Y.S.2d 262 (2d Dep't 1997)] or inclusion of the term of office on the candidate's certificate of acceptance [*Maher v. New York State Bd. of Elections*, 120 A.D.3d 891, 992 N.Y.S.2d 153 (3d Dep't 2014)].
- o   omission of the name of the town following the candidates' addresses, where the petition in question indicated the town in which the candidate lived [*Price v. Letteri*, 89 A.D.2d 976, 454 N.Y.S.2d 128 (2d Dep't 1982)] or omission of the town in stating the party position sought, where the information available made confusion unlikely [*Donnelly v. McNab*, 83 A.D.2d 896, 442 N.Y.S.2d 532 (2d Dep't 1981)].
- o   typographical error in certificate of authorization resulting in the incorrect designation of a candidate's assembly district *Di Stefano v. Kiggins*, 254 A.D.2d 688, 678 N.Y.S.2d 416 (4th Dep't 1998).
- o   inadvertent misstatement of the number of committee members on a certificate of authorization *Bonelli v. Bahren,* 196 A.D.2d 866, 602 N.Y.S.2d 62 (2d Dep't 1993).
- o   misnumbering of certain volumes of the designating petition *Franco v. Velez*, 65 N.Y.2d 967, 493 N.Y.S.2d 1022, 483 N.E.2d 1154 (1985).
- o   gaps in pagination *Rosen v. Epstein*, 153 A.D.2d 723, 544 N.Y.S.2d 689 (2d Dep't 1989).
- o   failure to meet the binding requirement for designating petitions, if the pages are temporarily secured pending binding *Hogan v. Goodspeed*, 196 A.D.2d 675, 601 N.Y.S.2d 356 (3d Dep't 1993),

24

aff'd in part, appeal dismissed in part on other grounds, 82 N.Y.2d
710, 602 N.Y.S.2d 793, 622 N.E.2d 293 (1993).
- o   relatively minor irregularities on one page of a designating petition
  *Keal v. Board of Elections of State of N.Y.*, 164 A.D.2d 962, 559
  N.Y.S.2d 763 (3d Dep't 1990).
- o   insubstantial alterations that do not involve forgery, concealment,
  [*Molloy v. Scaringe*, 153 A.D.2d 782, 545 N.Y.S.2d 217 (3d Dep't
  1989)] or other fraud or uninitialed alterations the reasons for
  which are credibly explained *Curley v. Zacek*, 22 A.D.3d 954, 803
  N.Y.S.2d 221 (3d Dep't 2005).

There was a recent editorial in the Albany Times Union by Jerry Goldfeder, the counsel

of Tiffany Caban, a candidate for Queens County District Attorney who lost the Democratic

Primary this year by 55 votes.  https://www.timesunion.com/opinion/article/Commentary-New-

York-s-arcane-election-laws-14382695.php.  In the editorial, he criticized the invalidation of 67

affidavit ballots.  He stated:

> First, 67 ballots by registered Democrats were thrown out because
> they forgot to write down on their affidavit that they were
> Democrats. Affidavit ballots are given to voters whose names do
> not appear in poll workers' registration books, and they must state
> their name, address and party affiliation. Affidavits with missing
> party IDs were no good — even though the board confirmed they
> were Democrats.

*Id.*

Errors, like failing to write down the appropriate party in a primary, would no longer be a

valid reason to invalidate an affidavit ballot under this new legislation.  As noted in *Matter of*

*Cozzolino v. Columbia County Bd. of Elections*, these types of errors would constitute " 'an

innocent violation of some technical requirement having no logical bearing upon the underlying

purpose of preventing fraud'[, which] should no longer 'abort candidacies and disenfranchise

voters'."  218 A.D.2d 921, 923; *see also, Matter of Bonelli v. Bahren*, 196 A.D.2d 866, 602

N.Y.S.2d 62.

Given the above, there will be a significant increase in the rate of affidavit ballots that will be deemed valid.

d.  *The State Board Engages in Activities to Ensure Poll Workers are Adequately Trained*

The State Board has engaged in several activities to ensure that poll workers are trained adequately, and that valid ballots are counted.  First, pursuant to Election Law § 3-412, SBOE creates a model training program for poll workers. This program includes information on how to deal with voters who are not in the poll books.  First, the poll work uses a street finder or map to determine the appropriate polling location for the voter. If the voter is at the correct poll site, or if the voter insists that they are entitled to vote at the poll site, the poll worker then provides the voter with a notice, indicating that the voter can vote via a court order of via an affidavit ballot.

Additionally, when the SBOE becomes aware of issues that may arise, it takes action to remedy such issues.   For example, when the New York State Attorney General issued a report indicating that some counties were not complying with the Election Law in relation to providing affidavit ballots to inactive voters, the SBOE issued policy guidance to all counties, reminding them of the Election Law and the requirements related to providing notices to inactive voters pursuant to Election Law § 8-302(3)(a).

Additionally, when the SBOE receives complaints from the public, the SBOE will contact the commissioners at the relevant county board of elections to resolve problems.

Standing

A.  *Common Cause/NY Lacks Organizational Standing*

The courts of the United States have an obligation to assure themselves of litigants standing under Article III of the U.S. Constitution. *Friends of Earth, Inc. v. Laidlaw*

*Environmental Services (TOC), Inc.*, 528 U.S. 167, 180 (2000). Even if constitutional standing is not raised by the parties, the court must, where necessary, raise it *sua sponte*. *SEC v. Forex Asset Management, LLC,* 242 F.3d 325, 328 (5 Cir. 2001).

This is so because the Federal Judiciary's authority to exercise judicial review and interpret the Constitution on the necessity to do so in the course of the judicial function of deciding cases. *Marbury v. Madison, 5 U.S. 137* (1803). The case or controversy requirement under Article III assumes particular importance in ensuring that the Federal Judiciary respects the proper and properly limited role of the courts. *Allen v. Wright*, 468 U.S. 737, 750 (1984). If a dispute is not a proper case or controversy, the courts have no business in deciding it or expounding the law in the course of doing so. No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies. *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

The case or controversy requirement thus plays a critical role, and Article III standing enforces the Constitution's case or controversy requirement. *DaimlerChrysler Corporation v. Charlotte Cuno, et al.,* 547 U.S. 332, 341-342 (2006). *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 11 (2004). Plaintiffs bear the burden of proving standing in order to invoke the court's jurisdiction under Art III's case or controversy requirement.

The inducible constitutional minimum of standing contains three elements. First, that plaintiffs must have suffered an "injury in fact," an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-- the injury has to be fairly traceable to the challenged action of the defendant. Third, it must be

likely as opposed to merely speculation that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

Common Cause lacks an injury in fact. In order to establish an injury in fact, Common Cause must show an invasion of a legally protected interest that is concrete and particularized. This cannot be a conjectural or hypothetical invasion of their interest; it must be an actual or imminent injury. Because Common Cause fails to satisfy the first element of the test for standing, it lacks standing to bring this lawsuit.

Common Cause/New York claims to have expended resources related to New York's voter removal procedure.  It claims that it diverted resources to investigate instances where voters, who expected to be listed in a poll book, were, in fact, not listed in the poll book.  Lerner Deposition pg. 21.  Specifically, Plaintiff claims that resources were diverted from preparation for get out the vote activities, in anticipation of the November 2018 elections and the training of volunteers for such activities.  *Id.*  Plaintiff has not quantified, either monetarily or time spent, the extent of such diversion.  Further, Plaintiff alleges that there may be other resources expended by the national Common Cause, who runs the voter assistance hotline.  *Id.*

To the extent Plaintiff alleges that it has standing because the national Common Cause organization expended resources due to New York's voter removal process, such as through its hotline, Plaintiff clearly does not have standing.  National Common Cause is not a party in this action, nor did it approve this lawsuit.  *See id.*  Common Cause/NY cannot act as national Common Causes' proxy in this action.

As for Common Cause's allegation that it diverted resources from its activities, such as get out the vote efforts, such allegations, and evidence to back it up, are vague and amorphous.

More is required. Common Cause fails to cite an example of investigating inactive voters not listed in the poll book, or quantify how it diverted resources away from its get out the vote efforts.  To show injury to itself, an organization must demonstrate through specific facts how it was "perceptibly impaired" by the acts it is challenging. *See, e.g., Anderson*, 770 F.2d at 1581-82 (denying standing to NAACP where it failed to provide "support for the bare allegation that [its] service was rendered ineffective by the City of Alpharetta's actions"); *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (finding no standing because organization failed to show that it expended resources it otherwise would not have); *Md. Minority Contractors Ass'n, Inc. v. Lynch*, Nos. 98-2655, 99-1272, 2000 WL 135103, at •5 (4th Cir. Feb. 7, 2000) (finding that organization did not present sufficient evidence regarding resources it claimed it spent in response to challenged activities).

Further, it should be noted that courts have been reluctant to extend this doctrine to organizations engaged primarily in social advocacy. This reluctance is grounded in language from the Supreme Court decision *Havens Realty Corp. v Coleman,* 455 US 363, 379 (1982), which recognized that standing cannot be asserted based on a mere "setback to the organization's abstract social interests."

In *Citizens for Responsibility and Ethics in Washington v. Trump* ("CREW "), 276 F.Supp.3d 174 (S.D.N.Y. 2017), the district court held that Citizens for Responsibility and Ethics in Washington ("CREW"), a non-profit organization whose self-proclaimed mission was to "protect the rights of citizens to be informed about the activities of government officials, ensure the integrity of government officials, protect the political system against corruption, and reduce the influence of money in politics," *id*. at 180 (alterations omitted), did not have standing to seek

declaratory and injunctive relief against the President of the United States for violations of the Emoluments Clause.

In *Center for Food Safety v. Price*, 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018), the district court held that organizations whose missions included "protecting people from eating unsafe food and ensuring food safety and the integrity of the food system" lacked standing to challenge regulations promulgated by the Food and Drug Administration ("FDA") that would allegedly weaken FDA's ability to oversee the safety of food additives. The court held that, to the extent the organization diverted resources to counteracting the regulation at issue, "[t]hese purported injuries are not sufficiently distinct from the general mission of the organizations at issue..... [T]o allow standing based on these allegations alone would mean that any entity that spends money on an issue of particular interest to it would have standing, which would in turn contravene the principle that an entity's 'mere interest in a problem' cannot support standing." Id. at *5 *(quoting Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).

In *National Congress for Puerto Rican Rights ("NCPRR") v. City of New York*, 75 F.Supp.2d 154 (S.D.N.Y. 1999), the district court held that a civil rights group that "expends substantial resources at the city, state and national levels to advocate reforms to end police misconduct," *id.* at 159, could not sue on its own behalf to challenge New York City's stop-and-frisk practices. Importantly, there was no claim that the organization provided direct services, such as referrals or reimbursement of legal expenses, to or on behalf of people subject to racial discrimination. *See id.* at 165. Rather, its "interest in ending the unconstitutional practices of the [street crime unit] [was] a generalized concern related to its abstract social interest in eliminating discrimination against Puerto Ricans." *Id.*

According to Plaintiff's documents, produced during discovery, the national Common Cause's

mission statement is as follows:

> "Common Cause is a nonpartisan grassroots organization
> dedicated to upholding the core values of American
> democracy.  We work to create open honest and
> accountable government that serves the public interest,
> promote equal rights, opportunity and representation for all
> and empower all people to make their voices heard in the
> political process."

CCNY – 002065

In an application for grant funding, Common Cause/NY outlined its mission statement as

follows:

> Common Cause engages in national state and local efforts to
> strengthen our democracy and push back against attempts to
> suppress the participation of traditionally disenfranchised groups
> particularly people of color young adults and low income citizens
> in our elections to ensure the security of our elections in this new
> reality and to promote policies that expose and reduce the
> influence of special interest money in politics We also promote
> ethics and transparency in our democracy and fight media
> consolidation and efforts to gut net neutrality Common Cause
> Education Fund CCEF is a 501 c 3 fund organization that supports
> that work with a broad array of tools including research public
> education coalition building citizen engagement policy
> development and litigation and by helping state and national
> leaders with strategic support policy expertise materials and legal
> analysis.

And, according to its website, Common Cause/NY describes its work as follows:

> Common Cause New York is a 60,000-member-strong statewide
> nonpartisan good government organization. We're leading the
> charge to transform New York's antiquated voting system, hold
> our government and elected officials accountable, and tirelessly
> beat the drum of ethics reform. We empower and amplify our
> grassroots base as well as the voices and communities that have
> long been ignored by traditional power structures.

In its "About Us" section on its web site, Common Cause describes itself as follows:

> Since its founding in 1970, Common Cause has been dedicated to empowering and protecting the voice of the people in our political process by promoting equal rights, opportunity, and representation for all. With chapters in 35 states nationwide, Common Cause works with policymakers, organizers, and community leaders at both the state and federal levels to build a truly inclusive and representative democracy where all people have an equal say.

> Common Cause New York continues to be one of the most active state chapters in the country, representing tens of thousands of New Yorkers throughout the state. We are leaders in the movement for election administration reform, campaign finance reform and upholding ethics laws to impact systems that undermine people's faith in democracy. Our contributions with national campaigns, legislative analysis, and coalition building have secured significant victories in courtrooms, statehouses, local communities, and at the ballot box.

Common Cause's very own words show that it is an organization that is primarily engaged in social advocacy.   From its very first memo on this issue, it is clear that Plaintiff views New York's voter removal process as a policy setback.  *See* Brehm Dec. ¶ 15, *see also* Defendants' Trial Exhibit 1 at pg 83.   The cases above shows, however, that bringing an action on "pure issue-advocacy" is barred.  *See also Electronic Privacy Information Center v. Federal Aviation Administration*, 892 F.3d 1249, 1255 (D.C. Cir. 2018); *People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture*, 797 F.3d 1087, 1094 (D.C. Cir. 2015); *National Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 12 (D.C. Cir. 2011).   As such, Plaintiff lacks organizational standing.

### B. *Common Cause Lacks Associational Standing*

Common cause claims it has 70,000 members who live and vote in New York.  Nowhere in the Complaint does it name a member who was disenfranchised by New York's voter removal procedure.  Further, none of the witnesses Plaintiff plans on producing claims to be a member of Common Cause.

Courts have held that "an organization may sue as a representative of its members only if the members have standing to sue in their own right." *Mid-Hudson Catskill Rural Migrant Ministry*, 418 F.3d at 173 (citation omitted). Further, courts have held that a plaintiff organization does not have standing if "[it] has not alleged, much less proven that any of [its] members or directors either suffered an injury or was threatened with immediate injury to the extent that the member or director would be able to make out a justiciable case had he brought suit himself." *Indiana Democratic Party*, 458 F.Supp.2d at 817 (*citing Hope, Inc. v. Du-Page County, Ill.*, 738 F.2d 797, 814 (7th Cir. 1984)). Thus, "[w]hen an association asserts standing solely as the representative of its members, it 'must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" *Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149, 156-57 (2d Cir. 2012)

In order to justify associational standing, Plaintiff alleges that its membership includes members who "have received or may in the future receive a confirmation notice from New York State and may not respond to that notice." Such allegation is insufficient to allege standing in an as-applied challenge to both the Fourteenth Amendment and NVRA.

Such speculation about injury to a group's membership cannot support associational standing. In order to assert associational standing, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

In *Gill v. Whitford*, the Supreme Court underscored the point that standing to challenge election-related statutes depends on claims of concrete harm to individual voters. 138 S. Ct. 1916 (2018). In *Gill*, Chief Justice Roberts wrote for the Court that "[a] person's right to vote is 'individual and personal in nature.'" Id. at 1929 (*quoting Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). Only "'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." Id. (*quoting Baker v. Carr*, 369 U.S. 186, 206 (1962)). By alleging a general and speculative injury to members, rather than particular and personal disadvantages, Plaintiffs fail to establish that any members would have standing to sue in their own rights and therefore fail to establish the basis for associational standing.

B. *To the Extent Plaintiff Makes an "As-Applied" Fourteenth Amendment and NVRA Challenge to New York's Voter Removal Procedure, Plaintiff Lacks Standing*

In order for an organization to assert representational standing on behalf of its members, three requirements must be met: (1) the organization's members "must have standing to sue on their own," (2) "the interests the organization seeks to protect" must be "germane to its purpose," and (3) "neither the claim asserted nor the relief requested" can "require[] individual participation by its members." *Hunt v. Wash. State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977) *Alliance for Open Society Int'l, Inc., v. U.S. Agency for Int'l Dev*., 651 F.3d 218, 228 (2d Cir.2011).

In relation to the third prong, Courts have held that an "organization lacks standing to assert claims of injunctive relief on behalf of its members where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof,' *Bano v Union Carbide Corp.*, 361 F3d 696, 714 (2d Cir 2004)(citations omitted).

However, where the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members, the Hunt test may be satisfied.  *See Intl. Union, United Auto., Aerospace and Agr. Implement Workers of Am. v Brock*, 477 US 274 (1986)(holding that a union had standing to challenge a 'policy directive' of the United States Department of Labor that resulted in the denial of benefits to thousands of the Union's members. In so ruling the Court noted that the suit did not directly seek recovery of the individual union members' denied benefits and that state authorities would adjudicate benefits.)  The *Brock* Court concluded that the union had standing because it "raise[d] a pure question of law: whether the Secretary properly interpreted the Trade Act's ... eligibility provisions," *id*. at 287, 106 S.Ct. 2523; the union thus "c[ould] litigate th[e] case without the participation of those individual claimants," *id.* at 288, 106 S.Ct. 2523.

Here, however, Plaintiff's as-applied challenge cannot be litigated without individual participation of its members.  Plaintiff's entire as-applied challenge is that New York State has failed to comply with protections afforded in the NVRA and New York State Election Law. This is not a case about the interpretation of the NVRA; rather, it is a case about whether New York is implementing the NVRA.  As such, Plaintiff lacks standing with regard to its as-applied challenge.

**Conclusion**

New York's voter removal procedure is rational, reasonable, and attempts to minimize any burden on inactive voters through various voter protections as described above.  To challenge this procedure, and to prove that New York voters are unduly burdened, Plaintiff brings 19 declarations (where most of affidavit ballots cast were actually, in fact, deemed valid and counted), various documents from the Attorney General and/or local counties that are riddled

with hearsay and/or double hearsay, which represent inevitable complaints for election events involving literally millions of people, and two expert reports that are speculative and failed to take into account voting reforms that occurred in 2019, making their analysis stale.   The Supreme Court has often reiterated the importance of federal "[d]eference to state lawmaking," particularly given the important role of States as "laboratories" to devise different solutions to various issues. *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,* 135 S.Ct. 2652, 2673 (2015).   Given this deference, and given Plaintiff's burden to show systemic failure by a preponderance of the evidence, Defendants respectfully submit that Plaintiff has failed to meet its burden and its claim must fail.

For the above reasons, the Court should reject Plaintiffs' claims in their entirety and deny relief.

Dated:  Albany, New York
September 25, 2019

/s/   Brian Lee Quail_____

**Brian Lee Quail**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
Brian.quail@elections.ny.gov

**Nicholas Robert Cartagena**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
Nicholas.cartagena@elections.ny.gov

**William J. McCann, Jr.**

NYS Board of  Election
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
William.mccann@elections.ny.gov