# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **COMMON CAUSE/NEW YORK, as an organization and on behalf of its members,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 1:17-cv-06770-AJN |
| **ROBERT A. BREHM**, Co-Executive Director, **TODD D. VALENTINE**, Co-Executive Director, in their official capacities as Co-Executive Directors of the **NEW YORK STATE BOARD OF ELECTIONS**; and **PETER S. KOSINSKI,** Co-Chair, **DOUGLAS A. KELLNER,** Co-Chair, **ANDREW J. SPANO,** Commissioner, and **GREGORY P. PETERSON**, Commissioner, in their official capacities as Commissioners of the **NEW YORK STATE BOARD OF ELECTIONS,** ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Common Cause/New York respectfully submits the following Proposed Findings of Fact and Conclusions of Law:

## PROPOSED FINDINGS OF FACT

## I.    INTRODUCTION

1.     Plaintiff challenges New York's Election Law's prohibition on including inactive voters in the poll books used on Election Day and the refusal to permit inactive voters to cast regular ballots.

2.     Plaintiffs allege that New York's procedures for moving voters to the inactive list and processing inactive voters at polling places on Election Day, as applied to voters who continue to reside at the same address and whose election mail is erroneously processed by the United States Postal Service, violate Section 8 of the National Voter Registration Act of 1993 and the fundamental right to vote in violation of the First and Fourteenth Amendments to the United States Constitution.

## II.   OVERVIEW OF VOTER REGISTRATION AND LIST MAINTENANCE PROCEDURES IN NEW YORK

### A.    The New York State Board of Elections

3.     The New York State Board of Elections was established on June 1, 1974, as a bipartisan agency responsible for the "administration and enforcement of all laws relating to elections in New York State."  N.Y. State Bd. of Elections, About the New York State Board of Elections, https://www.elections.ny.gov/AboutSBOE.html (last visited Nov. 24, 2018).

4.     The New York State Board of Elections is "charged with the preservation of citizen confidence in the democratic process and enhancement in voter participation in elections."  *Id*.

5.      The New York State Board of Elections is the state entity responsible for overseeing voter registration and conducting elections in New York State.

6.      Defendants Robert Brehm and Todd Valentine are Co-Executive Directors of the New York State Board of Elections.

7.      Defendants Brehm and Valentine, as Co-Executive Directors, are the Co-Chief Elections Officials responsible for ensuring New York's compliance with the NVRA.  N.Y. Elec. Law § 3-102.

**B.      Registration Requirements and List Maintenance Procedures for Voters who have Allegedly Moved**

8.      New York residents must register to vote at least 25 days prior to an election to be eligible to vote.  N.Y. Elec. Law § 5-210.

9.      New York and federal law both require election officials to perform regular voter registration list maintenance to identify voters whose addresses may have changed.  Grayson Decl. ¶ 12.

10.      A state must have evidence of a changed address before removing a voter from the registration rolls.  Grayson Decl. ¶ 12.

11.      Once a year, New York County Boards of Election send a Mail Check Card to all voters notifying the voters of their polling locations and hours.  Grayson Decl. ¶ 17.

12.      A New York voter whose Mail Check Card is returned to the County Board of Elections by the post office as undeliverable is then sent a "confirmation notice" advising the voters that the County Board of Elections has reason to believe the voter has moved and asking the voter to confirm the voter's current address.  Grayson Decl. ¶ 17.

13.     Voters identified through the National Change of Address ("NCOA") matching or other methods of having a reason to believe the voter has moved are likewise sent a confirmation notice.  Grayson Decl. ¶ 17.

14.     Upon sending a confirmation notice, the County Board of Elections moves the voter from the "active" list of registered voters to the "inactive" list.  Grayson Decl. ¶ 17.

15.     New York state law provides that "[t]he board of elections **shall** send a confirmation notice by forwardable first class or return postage guaranteed mail to every registered voter or applicant for registration, at the address at which the voter is registered or the address on the application for registration, when any mail sent to such voter or applicant is returned as undeliverable by the postal service without any indication of a forwarding address and to any voter for whom notice that the voter has moved without leaving a forwarding address, is received from the United States Postal Service through the National Change of Address System."  N.Y. Elec. Law § 5-712(1) (emphasis added).

16.     New York state law provides that "[t]he board of elections **shall** also send a confirmation notice to every registered voter for whom it receives a notice of change of address to an address not in such city or county which is not signed by the voter."  N.Y. Elec. Law § 5-712(2) (emphasis added).

**C.     New York Law Concerning Voters in Inactive Status and Processing Inactive Voters at Polling Places**

17.     When a voter is sent a confirmation notice in New York, the voter's name shall be placed in inactive status.  N.Y. Elec. Law §§ 5-213(1), 5-712(5); Valentine Testimony.  The state is not required to take any further affirmative steps to verify that a voter should be moved to inactive status.  Valentine Testimony.

18.     Voters on the inactive list are eligible voters.  Grayson Decl. ¶ 13.

19.     Inactive voters have a right to cast a ballot that will be counted.  Grayson Decl. ¶ 20.

20.     Confirmation notices include a notification of inactive status and of the requirement to cast an affidavit ballot while in that status.  Confirmation notices also include a postage-paid return card on which the voter may confirm his or her address and mail it back to the county board of elections.  N.Y. Elec. Law § 5-712; Grayson Decl. ¶ 17 n.5.

21.     Pursuant to state and federal law, New York voters remain on the inactive voter list for two federal election cycles unless they (a) confirm that they have moved to a different jurisdiction, (b) vote, or (c) update their registration information.  Grayson Decl. ¶ 13.

22.     County boards of elections must restore inactive voters to active status if the voter (i) responds to the confirmation notice; (ii) provides notice that he or she resides at the listed address; (iii) signs a designating or nominating petition that includes the listed address; (iv) votes with an affidavit ballot; (v) votes in a local election (such as a town or school district election), or (vi) obtains a court order and presents said order at the polling place.  N.Y. Elec. Law § 5-213(3).

23.     If a voter remains in inactive status for two federal general elections without the voter (a) confirming that they have moved to a different jurisdiction, (b) voting, or (c) updating their registration information, the voter's registration status is marked as canceled.  Grayson Decl. ¶ 13.

24.     New York law requires the names of inactive voters to be removed from poll ledgers and maintained instead at county boards of elections.  N.Y. Elec. Law § 5-213(2).

25.     New York law likewise provides that if computer generated registration lists, or electronic poll books, are maintained at polling places, the names of inactive voters cannot be included.  N.Y. Elec. Law § 5-213(2).

26.     As a result, most county boards of elections do not provide lists of inactive voters' names to polling places on Election Day.  Grayson Decl. ¶ 24; N.Y. Elec. Law §5-213(1), (2) ("The registration poll records of all [inactive] voters shall be removed from the poll ledgers.").

27.     Nevertheless, a small number of County Boards of Elections provide a supplemental list of inactive voters for use in polling locations.  Martin Decl. ¶¶ 16, 29-30; *see also* Meredith Decl. at 21 n. 54; Schoharie County Board of Elections, 2018, "Election Day Guide", p. 13; Nassau County Board of Elections, 2015, "Reference Guide for Inspectors", p. 25 of PDF (p. 19 of document).

28.     New York law does not permit inactive voters to cast a regular ballot at the polling location.  Grayson Decl. ¶ 24; N.Y. Elec. Law § 8-302(3)(e)(ii).  Instead, an inactive voter may seek a Court order to cast a regular ballot or may cast an affidavit ballot – New York's term for what most states call a provisional ballot.  Grayson Decl. ¶ 24; N.Y. Elec. Law § 8-302(3)(e)(ii).

### D.     An Overview of the Affidavit Ballot Process in New York

29.     If the inactive voter decides to cast an affidavit ballot, the poll worker is supposed to hand the voter an affidavit envelope, which the voter must sign, confirming his or her identification and address and swearing that the voter is an eligible, registered voter.  Grayson Decl. ¶¶ 27, 37.

30.     In New York, the affidavit is printed on the outside of the affidavit ballot envelope.  Grayson Decl. ¶ 27.

31.     Once the inactive voter completes and signs the affidavit, the poll worker gives the voter an affidavit ballot.  Grayson Decl. ¶ 37.

32.     After marking the affidavit ballot, the voter then places the marked ballot inside the affidavit envelope, seals the envelope, and returns it to the poll worker.  Grayson Decl. ¶¶ 27, 37.

33.     A poll worker must make a notation of the names of all voters casting affidavit ballots cast on the appropriate roster.  Grayson Decl. ¶ 27.

34.     The poll worker is supposed to give information to the voter about the process of determining whether affidavit ballots will be counted and about how to find out whether the voter's affidavit ballot was counted.  Grayson Decl. ¶¶ 27, 37.

35.     The envelopes containing affidavit ballots are segregated from regular ballots. Grayson Decl. ¶ 27.

36.     The number of affidavit ballots issued, cast, spoiled and unused must be recorded as part of the precinct's ballot accountability record-keeping.  Grayson Decl. ¶ 27.

## III.   NEW YORK'S PROCEDURES FOR PROCESSING INACTIVE VOTERS ARE INEFFECTIVE DUE TO A SERIES OF STRUCTURAL DEFECTS

### A.   Structural Problem 1: Voters Who Remain Eligible and Have Not Moved Are Often Incorrectly Moved to Inactive Status

37.     The process of moving a registration from active status to inactive status is initiated when a county board of elections receives information indicating that a registrant in its county may no longer be living at his or her address of registration.  Meredith Decl. at 12.

38.     County boards of elections in New York may begin the process of moving a voter to inactive status if (1) a mailing sent from the county board of elections to the registrant is returned as undeliverable; (2) they receive information from the New York State Board of

Elections, prepared by a third-party vendor, that matches the registration record to a record in the National Change of Address (or NCOA) registry; (3) a different state sends a notice to New York election officials saying that a voter has moved; (4) one county receives notice from another county; or (5) if there is an address discrepancy resulting from a voter's interaction with the DMV.  Meredith Decl. at 12; Valentine Testimony.

39.     The county board of elections initiates the process of moving voters to inactive status by sending a confirmation notice to the voter's address of registration to confirm the voter's address.  Meredith Decl. at 12.

40.     Through this process, some New York registrants are moved to inactive status even though they have continuously resided at their address of registration and have not moved. Meredith Decl. at 12; Grayson Decl. ¶ 19; Ryan Dep. 93:7-11.

41.     Eligible New York voters are routinely moved from active to inactive status even though they have not moved and continue to reside at their address of registration.  Meredith Decl. at 12; Grayson Decl. ¶ 19; Ryan Dep. 101:21-102:17, 103:24-104:23.

42.     Inactive voters in New York do not receive notices in the mail from county boards of elections such as the annual NCOA mail check notice.  Valentine Testimony.

43.     According to Report 1k of the New York State Board of Elections' 2016 Annual Statistical Report, of the 325,907 confirmation notices sent out in the preceding year, only 17,246 voters sent back confirmation that their registration should be cancelled, while 11,367 responded and confirmed that they continued to reside at the same address; 121,205 confirmation notices were returned as purportedly undeliverable, while the largest group – 176,089 voters – simply did not respond to the notice. Connolly Testimony; P239, 2016 Annual Statistical Report, Report 1k, page 2.

44.     According to Report 5 of the New York State Board of Elections' 2016 Annual Statistical Report, a total of 10,386,353 mail check cards were sent to active voters by county boards of elections in 2016.  P239, 2016 Annual Statistical Report, Report 5, page 2.  A total of 400,843 mail check cards were returned to the board; of those, 181,798 were returned undeliverable, 64,971 were returned for "miscellaneous reasons," 85,188 cards were returned for "in-county transfers," and 61,752 were returned for "outside the county movers."  *Id.*

45.     Numerous voters who were moved to inactive status even though they had not moved and continued to reside at their address of registration have made complaints to the state and county boards of election and the New York Attorney General's Office.  *See* Goldberg Decl. ¶ 23 (moved to inactive status before November 2018 general election); Denise Roberts Dep. 44:25-45:20, 47:17-48:14 & Decl.  ¶¶ 11-13 (moved to inactive status before 2016 general election); Angela Roberts Decl. ¶¶ 16-28 (moved to inactive status before 2016 general election); Stewart Decl. ¶¶ 19-24 (moved to inactive status before the September 2018 primary), P231 (Stewart's voter records); Holman Dep. 39:3-20, 41:11-43:9 & Decl. ¶¶ 14-22 (moved to inactive status before the 2016 general election); Fages Decl. ¶ 17 (election official informs that mail sent to him was returned undeliverable and he would be removed if he did not vote in two federal election cycles), P218 (Fages' voter records); P144 (email complaint from Richmond County voter A.G. [redacted] reporting they were not listed in the poll book during the November 2016 election despite voting at the same location for decades); P145 (email complaint from New York City voter M.V. [redacted] reporting they were not listed in the poll book during the November 2016 election despite casting an affidavit ballot in the April 2016 election and subsequently updating her voter registration address); P146 (email complaint from Nassau County voter J.S. [redacted] reporting they were not listed in the poll book during the November

2016 election despite voting at the same location in numerous prior elections); P165 (email complaint from Kings County voter J.M. [redacted] reporting their daughter was not listed in the poll book during the April 2016 election despite voting at the same location for twelve years and living at the same address her whole life, and whose affidavit ballot was not counted for the purported reason that it was not cast at the correct polling place); P143 (email complaint from New York voter J.A. [redacted] reporting they were not listed in the poll book during the November 2016 election and were in inactive status despite voting in the same location in prior elections); P152 (email complaint from Bronx County voter S.P. [redacted] reporting they were not listed in the poll book during the April 2016 election and were in inactive status despite voting in nearly every election since 2000); P117 (email complaint from Nassau County voter Nick S. [redacted] reporting they were listed as inactive during the November 2018 election despite voting in every election and not changing anything about their voter registration); P118 (email complaint from Nassau County voter Carolynn W. [redacted] reporting she was told she was listed as inactive during the November 2018 election despite having voted at the same location for years, including recent elections); P125(email from New York Attorney General's Office to Clinton County Board of Elections investigating Clinton County voter R.D. [redacted] who had reported they were not listed in the poll book and were in inactive status during the November 2016 election despite voting at the same poll site for years).

46.     Indeed, Erie County voter Robert Holman has lived at the same address for 52 years but was erroneously moved from active to inactive status before the 2016 general election. Holman Dep. 12:5-19, Decl. ¶¶ 2-6, 19-22.

47.     Another voter, Jacques Fages, was moved from active to inactive status before a November 2017 election even though he had lived at the same address since 1980, and had

successfully voted in the 2016 federal elections.  Fages Decl.  ¶¶ 6-17, P218 (Fages' voter records).

48.     Voters incorrectly identified as having moved are moved to inactive status when confirmation notices are mailed by NYCBOE, and remain in inactive status until they vote, contact the NYCBOE, or do not vote in two consecutive elections, at which point (or soon thereafter) their registration is cancelled.  Ryan Dep. 93:7-95:8.

49.     Even the best mail carriers and optical character recognition scanners make mistakes from time to time.  For example, postal workers sometimes deliver parcels of mail to the wrong address.  Grayson Decl. ¶ 19; Ryan Dep. 99:14-18.

50.     Pieces of official mail from a New York elections board are sometimes returned as undeliverable even though they are sent to a registrant's correct address.  Meredith Decl. at 12; Ryan Dep. 100:24-101:20 (observing that there "could be a mistake by the postal worker").  This sometimes includes notice letters informing a voter who cast an affidavit ballot that their ballot was counted are sometimes returned as undeliverable, which would trigger the voter being moved back to inactive status despite their address having just been confirmed through the affidavit process.  Ryan Dep. 145:17-149:6.

51.     Michael Ryan, Executive Director of the New York City Board of Elections, has investigated the postal services' efforts, which have "caused us to have little faith in the overall reliability of the quality of information that we get from the post office."  Ryan Dep. 101:21-25.  As a result, the New York City Board of Elections limits the number of mailings it sends to voters to attempt to minimize the number of voters who are improperly moved to inactive status as a result of mailings being erroneously reported as being returned as undeliverable.  Ryan Dep. 98:18-99:9, 108:8-16.

52.     Postal service performance in New York City is of "poor quality" and "lack[s] consistency."  Ryan Dep. 103:24-106:2.  Individual postmasters in the city have discretion – there is a "varying degree of responsiveness" among particular postmasters to concerns raised by the New York City Board of Elections.  Ryan Dep. 102:18-103:15.  USPS workers use almost twenty different types of labels to indicate the reason why a particular piece of mail was returned as undeliverable, and it appears that there is a lack of consistency in applying labels to describe why a piece of mail was returned.  Ryan Dep. 206:25-211:7.

53.     Officials from the New York City Board of Elections have been meeting with USPS officials for several years in an attempt to understand and remedy issues related to mail being incorrectly returned as undeliverable but the problems remain ongoing.  Ryan Dep. 149:14-151:16.  Despite his efforts to work with the postal service, Michael Ryan, Executive Director of the New York City Board of Elections, believes that no progress has been made.  *Id.* 151:17-23.

54.     The speed of postal service mail delivery has slowed down in recent years.  Ryan Dep. 103:8-15; Connolly Testimony; P250, Bipartisan Policy Center, The New Realities of Voting by Mail, June 2016, available at https://bipartisanpolicy.org/wp-content/uploads/2019/03/BPC-Voting-By-Mail.pdf  (observing that "due to budgetary constraints and a massive restructuring, the U.S. Postal Service ("USPS") does not operate under the same service standards as it did in prior election cycles and there are fewer mail processing plants across the country, shorter production schedules at these remaining processing plants, and overall slower delivery standards, which maximize efficiencies of resources but result in "slower mail and less processing capacity ahead of Election Day . . .").

55.     County election officials in New York have been sufficiently unhappy with the performance of the postal service in recent years that representatives from the postal service have spoken at least two times at New York State Election Commissioners Association conferences that are held twice a year.  Connolly Testimony.  County board officials have experienced problems with the postal service and wanted to raise those concerns with postal officials.  Connolly Testimony (the purpose of inviting postal service representatives was to "yell[] at" them).

56.     Typos in a registration database or mistakes by the post office can cause mail sent to a correct address of registration nonetheless to be returned as undeliverable.  One study found that 30 to 50 percent of registrants who had at least one piece of mail sent to their registration address that was returned as undeliverable either immediately before or after an election still voted in that same election.  Meredith Decl. at 12-13.

57.     A substantial amount of mail from an elections board in New York that is sent to a registrant's address of registration is returned as undeliverable for reasons other than the registrant's having moved.  Ryan Dep. 93:7-11, 100:24-101:25, 103:24-106:3; Meredith Decl. at 12-13.

58.     Errors or inaccuracies resulting from the matching registration records to the NCOA registry can also incorrectly identify a New York registrant as having moved.  Meredith Decl. at 13; Grayson Decl. ¶ 19; Ryan Dep. 225:17-226:18 (stating "[t]he problems that we have identified with respect to the NCOA center more on those instances where somebody inadvertently checked the permanent box . . . and had only meant to temporarily have their mail forwarded to a particular location").

59.     If a board sends a registrant a piece of undelivered mail during the time that he or she lives elsewhere or the NCOA incorrectly describes a temporary move as a permanent one and the registrant fails to respond to a confirmation notice, the registrant would be moved to inactive status.  Meredith Decl. at 13; Ryan Dep. 211:25-213:12, 225:17-226:18.  Michael Ryan, Executive Director of the New York City Board of Elections, does not think that "there's adequate messaging" on the national change of address form informing voters who are moving temporarily that they may be subject to list maintenance procedures that should only be applied to people who are moving permanently.  Ryan Dep. 212:8-213:12.

60.     Some New Yorkers register to vote at an address, temporarily move away from that address, and then return to live at the address of registration once again.  Meredith Decl. at 13.

61.     The New York City Board of Elections sends out confirmation notices to voters identified through the NCOA process through a centralized batch job that is managed by the board's information services department.  Ryan Dep. 213:21-214:8 ("the NCOA report that you guys sent to us, that's all done by batch").

62.     The NCOA registry does not collect certain data, like date of birth, which would help election officials to link the NCOA data to registration records.  Meredith Decl. at 13.

63.     County boards do not have a means of distinguishing between a registrant and a family member who shares the same name of the registrant.  Meredith Decl. at 13.

64.     Correctly tracking which family members who share the same last name move away from an address, while others in the same family remain, is challenging and may also cause errors in the NCOA list.  Grayson Decl. ¶ 19.

65.     A single NCOA can apply to an entire family.  Meredith Decl. at 13.

66.     Not all registrants at a given address are necessarily members of the same family. Meredith Decl. at 13.

67.     Some New York registrants become inactive because they have unstable addresses, even though they reside at their address of registration on Election Day.  Meredith Decl. at 13.

68.     Young people in New York sometimes move in and out of their parents' home. Meredith Decl. at 13.

69.     New York requires a registered voter to be moved to inactive status following one piece of mail being returned as undeliverable; New York does not require that a second piece of mail also be returned as undeliverable or require any other procedure before a registration is moved from active to inactive.  Meredith Decl. at 12-13.

70.     Research shows that election administrators should not conclude that a registrant does not currently live at his or her address of registration when the administrator observes a second registration record for that person with a later registration date.  Meredith Decl. at 13.

71.     According to the 2016 Annual Statistical Report of the New York State Board of Elections, 176,089 confirmation notices sent by board of elections that year were not responded to by voters.  Meredith Decl. at 13-14.

72.     According to the 2016 Annual Statistical Report of the New York State Board of Elections, 121,205 confirmation notices sent to voters by county boards of elections that year were returned as undeliverable.  Meredith Decl. at 13-14.

73.     Voters may fail to fill out and return a confirmation notice when they have not moved because they misconstrue the notice as junk mail, misunderstand the notice, or fail to read it because they are busy.  Meredith Decl. at 13.

74.     The fact that previously active registrations remain inactive registrations when confirmation notices are unreturned in New York is likely to increase the number of registrants with an inactive registration despite continuing to reside at their address of registration. Meredith Decl. at 13.

75.     The process through which registrants are classified as inactive causes some registrants to become inactive even though they continue to reside at their address of registration. Meredith Decl. at 12-13.

### B.     Structural Problem 2: The Voter Check-In Process is Significantly Longer for Inactive Voters Because Poll Workers Cannot Find Their Names in Poll Books and Inactive Voters Must Complete the Affidavit Ballot Process

76.     Voter check-in in New York takes longer when an inactive registrant shows up to vote at their correct election district than it would if their registrations were included in the poll book.  Meredith Decl. at 21; Grayson Decl. ¶ 36; Ryan Dep. 51:12-19 (affidavit ballot process "does provide a level of inconvenience to the voter in that it causes their process to take longer…"); Valentine Testimony.

77.     It takes longer to cast an affidavit ballot than a regular ballot because more steps are needed to check in the voter before the voter may cast the affidavit ballot.  Grayson Decl. ¶ 36; Ryan Dep. 51:12-19.

78.     Several New York voters who attempted to vote at the correct polling place but whose names could not be located in the poll book have testified that their voting experiences were complicated, involved multiple and often redundant interactions with poll workers, and that casting an affidavit ballot took a relatively long time. *See, e.g.*, Holman Dep. 67:16-25 (voting an affidavit ballot took 15 to 20 minutes more than voting a regular ballot); Agro-Paulson Decl. ¶¶ 14, 16, 19, 27 (voting experience took approximately one hour because poll worker told her to

try to find her name in every election district); Goldberg Decl. ¶¶ 15, 19, 21-22, 27-28, 30-32

(voter attempted to vote multiple times and went back and forth from her car to try to ascertain

her registration status and contact election officials); Stewart Decl. ¶¶ 13, 16-21, 25, 27

(describing interaction with poll workers, poll worker attempt to make phone call "took a long

time," prompting her to call her board of elections); Wolfe Decl. ¶¶ 10-14 (voter describes being

redirected back and forth between two different polling places by poll workers); Goldblum Decl.

¶¶ 10-11 (voter went to a second table at the request of poll workers to attempt to find her name

in the poll book but was unsuccessful and had to cast an affidavit ballot).

79.     Voters on the active list face longer lines because of the extra time that inactive

voters require at check-in because of the absence of the inactive voter list in the precinct.

Grayson Decl. ¶ 43; *see also* Ryan Dep. 51:12-19.

80.     Voter check-in is usually a relatively quick task; a recent national-level study

found that voters in the 2016 election spent, on average, about 80 seconds between entering the

polling place and being checked in to vote.  Much of this time is spent locating the potential

voter in a poll book.  Meredith Decl. at 21.

81.     Most poll books in New York are paper books, with each page listing a few

registration records sorted in alphabetical order.  Meredith Decl. at 21.

82.     Determining that a registration record is not listed in one of these books is a more

complicated task than locating a registration record.  In both cases, poll workers conduct an

initial search for the record in the poll book.  Meredith Decl. at 21.

83.     In attempting to determine why a potential voter might not appear in the poll

book, poll workers and election administrators must consider at least five possibilities: (1) the

potential voter is not registered to vote; (2) the potential voter is registered and is at the correct

election district, but not in the poll book because of an error; (3) the potential voter is registered and is at the correct election district, but not in the poll book because he or she moved to a new residence within the same district after registering to vote; (4) the potential voter is registered and is at the correct election district, but not in the poll book because he or she has an inactive registration; and (5) potential voter is registered but is not at the correct election district. Meredith Decl. at 20.

84.     Poll workers who initially cannot find a registration record in a poll book may take additional steps before concluding that the record is not listed in the poll book. For example, poll workers may spend time ensuring that they are not missing a record in the poll book because of a misunderstanding of the spelling of the name or of a typographical error.  Meredith Decl. at 21.

85.     Once poll workers determine that an inactive registrant's registration record is not in a poll book, they must spend more time determining that the inactive registrant has showed up to vote in the correct election district.  Meredith Decl. at 21.

86.     Counties generally provide poll workers with some additional documentation or technology to help determine an unlisted registrant's election district.  The specific tool depends on the county and includes things like a list of inactive registrants, street listings, maps, electronic devices, or a hotline that poll workers can use to call election administrators, among others.  Meredith Decl. at 21.

87.     After a New York voter on the inactive list waits in line for a regular check-in, only to be told by a poll worker that his or her name cannot be found on the precinct roster, in most circumstances, the voter is supposed to be given the option to cast an affidavit ballot. Grayson Decl. ¶ 37.

**C.     Structural Problem 3: Poll Worker Bandwidth is Scarce in New York**

88.     Poll worker bandwidth is scarce in New York, particularly in jurisdictions that have trouble finding enough poll workers to staff all of their positions.  Meredith Decl. at 22.

89.     Somewhere between one and two million people serve as poll workers for a presidential election in the United States, which translates into roughly one out of every one hundred voters.  The New York City Board of Elections alone used 33,634 poll workers for the 2016 presidential election.  Meredith Decl. at 22.

90.     Nearly half of the jurisdictions nationally that responded to the 2016 Election Administration and Voting Survey reported either having a somewhat difficult or very difficult time recruiting poll workers.  In New York City, at least 3,000 poll worker positions went vacant.  Meredith Decl. at 22.

91.     Other counties in New York report struggling to find poll workers. Responding to the question of how easy or difficult is it to obtain poll workers for the general election, 46 of the 56 counties outside of New York City reported it was at least somewhat difficult, with 20 reporting it was very difficult.  Meredith Decl. at 22.

**D.     Structural Problem 4: Poll Workers Are Often Not Well Trained and Are Not Held Accountable When They Make Mistakes**

92.     Election administrators delegate to poll workers much of the responsibility for maintaining ballot accessibility and election integrity.  Meredith Decl. at 23.

93.     The challenge that jurisdictions face in filling their poll worker positions is one reason why issues arise when election administrators delegate to poll workers the responsibility of running elections.  Jurisdictions cannot be particularly selective about whether potential poll workers possess qualities that would help them do a more effective job when they cannot even find enough poll workers to fill all of their available positions.  Meredith Decl. at 23.

94.     The temporary nature of poll work also increases the likelihood of poll workers failing to adhere to proper protocols.  Meredith Decl. at 22.

95.     Poll workers are essentially volunteers, and typically only assemble for a small amount of training prior to Election Day.  Meredith Decl. at 23-24; Grayson Decl. ¶ 39; Ryan Dep. 159:24-160:15, 172:3-173:2 (addressing the number and length of trainings in New York City).

96.     An audit conducted by the City of New York Office of the Comptroller highlights the issues that election administrators face when screening and training poll workers.  Meredith Decl. at 24.

97.     The Comptroller's audit concluded that the length of training was too limited to cover all of the complexities of Election Day.  Meredith Decl. at 24; Ryan Dep. 172:3-173:2 (testifying that poll worker training has been shortened from six to four hours per year).

98.     The Comptroller's audit also concluded that the post-training exam was not structured in a way to appropriately test poll workers' knowledge of protocol: "The exam that poll workers and coordinators must pass includes 20 questions, of which participants are required to answer 17 questions correctly. It is an open book exam and next to each question is the specific page number in the manual that provides the test taker with the correct response to the question asked on the exam."  Meredith Decl. at 24.

99.     This limited training is particularly problematic given that in 2016 more than 7,000 of the poll workers used in New York City were first-time poll workers.  Meredith Decl. at 24; The City of New York Board of Elections Annual Report (2016), p. 36.

100.    The New York State Bar Association and others have called for poll worker training in New York to be lengthened throughout the state.  Meredith Decl. at 24.

101.    A final source of agency problems between election administrators and poll workers is the limited ability for election administrators to monitor or sanction poll workers. Meredith Decl. at 24.

102.    Election administrators often have a limited ability to monitor whether poll workers are following protocol because poll workers are spread out over a jurisdiction in order to make it as convenient as possible to vote.  Meredith Decl. at 24.

103.    Even when an election administrator observes that a poll worker fails to follow protocol, the administrator's ability to sanction the poll worker for their transgression is often limited because poll work is a temporary job.  Meredith Decl. at 24.

104.    It is common knowledge that not all poll workers follow correct practices. Grayson Decl. ¶ 39, Ryan Dep. 45:3-24 (acknowledging that New York City poll workers are "human beings" and "occasionally make mistakes").

105.    Manhattan voter Alison Matika observed overwhelmed poll workers at her polling place, Public School 163, making numerous mistakes during the November 2016 election. Matika Decl. ¶¶ 7, 10.  Ms. Matika waited for five hours in line, only to be forced to cast an affidavit ballot because poll books had not been delivered to the polling place.  *Id*. ¶¶ 21-22.

106.    Ms. Matika observed there were more than 100 people in a line that was not moving but the polling place supervisor apparently waited for hours before calling the New York City Board of Elections.  Matika Decl. ¶¶ 11, 13-14, 16-18.  The poll workers ultimately distributed affidavit ballots to hundreds of voters.  *Id*. ¶ 18.  Poll workers were very dismissive of voters who were waiting to vote and told voters simply to continue waiting, without providing information regarding the cause for the delay, the procedure and reason for casting an affidavit ballot, or whether their affidavit ballot would be counted.  *Id*. ¶ 23.

107. Michael Ryan, Executive Director of the New York City Board of Elections, acknowledges that significant problems can occur at polling places at times. He says that, in busy elections, "if something should become problematic at a particular poll site, once the backup starts, it's difficult to recover and get things back on track because now you have a large volume of voters in a highly attended election." Ryan Dep. 35:24-36:13. In circumstances "when there is a delay and there doesn't seem to be a ready fix" at a polling place or a "complete stoppage of progress, then people do get upset." Ryan Dep. 33:21-34:17.

108. Trey Grayson, former Kentucky Secretary of State, has discussed the fact that not all poll workers follow correct practices with election administrators around the country. Grayson Decl. ¶ 39; *see also* Ryan Dep. 45:3-24.

109. Excluding inactive registrants from poll books makes it harder for poll workers to determine whether potential voters are in the correct election district and increases the risk that an affidavit ballot will not be counted. Meredith Dec. at 20, 26-27; *see also* Grayson Decl. ¶ 39

110. For example, poll workers are unable to determine whether a potential voter is not listed in the poll book because he or she is in the wrong polling place, is an inactive voter who is eligible to vote at that polling place, is not registered at all and therefore cannot vote at any polling place, or for some other reason. Valentine Testimony. All voters who are not listed in the poll book – whether they are eligible voters in active status, inactive status, or not eligible to vote at all – are treated the same. *Id*.

111. Poll workers are therefore: (1) less likely correctly to offer an inactive potential voter who shows up to vote in the correct election district an affidavit ballot; and (2) more likely incorrectly to offer an affidavit ballot to any potential voter, active or inactive, who shows up to

vote in the wrong election district without warning them that a ballot cast in the wrong polling location is unlikely to count.  Meredith Decl. at 20, 23-24.

### E. Structural Problem 5: Poll Workers Often Fail to Offer an Inactive Registrant an Affidavit Ballot

112.    In New York City, poll workers are trained once a year on every aspect of the elections process.  Ryan Dep. 41:22-44:20 (testifying that poll workers in New York City are typically trained once a year and they have to be educated about "monumental changes" to election practices), 159:24-160:15.  That poll worker training session lasts four hours.  Ryan Dep. 159:24-160:15.

113.    The New York City Board of Elections scaled back its poll worker training several years ago.  Ryan Dep. 172:3-173:2.  Previously, the Board conducted a six-hour training designed "to cram all of the election law" into the session; the Board now conducts a four-hour training instead, which focuses on "prevalent issues" while emphasizing "teaching the poll workers how to navigate the poll worker manual" so they can research and find answers to questions that are beyond their knowledge.  *Id*.

114.    Poll workers do not generally receive extensive training on affidavit balloting. Meredith Decl. at 24-25; Ryan Dep. 166:21-167:18 (instructions regarding proper completion of the affidavit ballot "is an element of the training" but "I couldn't tell you how much it's stressed in the moment" during training).

115.    Poll workers are less likely to turn away an inactive registrant who is listed in the poll book than an inactive registrant who is not in the poll book.  Meredith Decl. at 25.

116.    Poll workers are more likely to make an error in assessing whether an inactive registrant is at the correct polling location if the potential voter's registration is omitted from the poll book than if his or her registration was included in the poll book.  Meredith Decl. at 25.

117.     An audit of poll worker training by the New York City Comptroller noted that: "Among other things, the training sessions we observed spent little time, if any, reviewing situations that poll workers may encounter on Election Day, such as what to do in instances where the poll worker cannot find a voter's name or signature in the registration book…" Meredith Decl. at 21-22; Marjorie Landa, 2017, "Audit Report on the Board of Elections' Controls over the Maintenance of Voters' Records and Poll Access," City of New York Office of the Comptroller technical paper (accessed from https://comptroller.nyc.gov/wp-content/uploads/documents/MG16_107A.pdf on April 19. 2019), p. 22.

118.     Omitting inactive registrants from the poll book increases the likelihood that poll workers will fail to offer an inactive registrant an affidavit ballot.  Meredith Decl. at 25.

119.     Michael Ryan, Executive Director of the New York City Board of Elections, acknowledges some voters attempting to vote in New York City polling places leave the poll site without casting an affidavit ballot (or any other kind of ballot).  Ryan Dep. 248:11-22.

120.     If a registrant shows up to vote at the correct polling location but is not offered an affidavit ballot, that is not the type of event that will generate an administrative record.  Meredith Decl. 25; Valentine Testimony; Ryan Dep. 248:11-17.

121.     The City of New York Office of the Comptroller observed that poll workers processed an affidavit or voided ballot incorrectly in 22 of the 156 polling places that were audited.  Meredith Decl. at 25; Marjorie Landa, 2017, "Audit Report on the Board of Elections' Controls over the Maintenance of Voters' Records and Poll Access," City of New York Office of the Comptroller technical paper (accessed from https://comptroller.nyc.gov/wp-content/uploads/documents/MG16_107A.pdf on April 19. 2019), p. 11-12.

122.    As an example of what would be classified as incorrect processing, the report

describes a case in which a poll worker failed to offer an affidavit ballot to a registrant who was

not listed on the poll book.  Meredith Decl. at 25-26.

123.    During the 2016 presidential primary, the New York Attorney General's office

received complaints concerning voters who attempted to vote in counties around the state – such

as Albany, Clinton, Erie, Niagara, Ontario, Suffolk, and Westchester Counties – but were denied

the opportunity to cast an affidavit ballot.  Meredith Decl. at 25.  *See also, e.g.*, ==P242,== (email

complaint from Schenectedy County voter R.T. [redacted] reporting they were not offered an

affidavit ballot during April 2016 election); P244 (email complaint from K.D. [redacted]

reporting husband Queens County voter C.G. [redacted] was denied an affidavit ballot during

April 2016 election); P245 (email complaint from Bronx County voter G.D. [redacted] reporting

they were initially refused an affidavit ballot during April 2016 election); P246 (email complaint

from New York voter K.O. [redacted] reporting they were denied their right to an affidavit ballot

at poll site number 10962 during April 2016 election); P247 (email complaint from Fulton

County voter D.L. [redacted] reporting they were told they were not entitled to cast an affidavit

ballot by Board of Elections employee during April 2016 election); P161 (email complaint from

Queens County voter L.C. [redacted] reporting they were offered a voter registration form but

were not offered an affidavit ballot during April 2016 election); P248 (email complaint from

Albany County voter E.G. [redacted] reporting they were denied an affidavit ballot during April

2016 election). *See also* P151 (email complaint from poll watcher A.W. [redacted] reporting

large number of Ulster County voters not offered or denied affidavit ballots during April 2016

election); P158 (email complaint from volunteer canvasser C.S. [redacted] reporting voters

denied right to affidavit ballots in Ulster County during April 2016 election); P150 (email

complaint from P.D. [redacted] reporting Clinton County voters refused affidavit ballots during April 2016 election); P243 (email complaint from K.A. [redacted] reporting Ulster County Board of Elections Commissioners instructing poll workers to refuse to provide affidavit ballots to voters not listed in poll book during April 2016 election).

124.    The New York State Board of Elections has also received reports of poll workers failing or refusing to offer affidavit ballots to voters who are not listed in the poll books during recent elections.  *See, e.g.*, Lovullo Dep. 159:11-161:23 (discussing reports that Ulster County poll workers were refusing to provide affidavit ballots during the November 2018 election).

125.    When a poll worker turns away an inactive voter who is not found on the precinct roster and does not offer that voter an affidavit ballot, the voter is disenfranchised.  Grayson Decl. ¶ 39; Meredith Decl. at 23-25.

126.    The emails sent between Stephanie Goldberg and info@elections.ny.gov on the day of the 2018 general election illustrate how an inactive registrant can be disenfranchised when a poll worker fails to offer an affidavit ballot.  Meredith Decl. at 25; Goldberg Decl. ¶¶ 19, 23, 29, 40-42.

127.    Stephanie Goldberg was "turned away from voting" in the November 2018 election because she "was not listed as a registered voter" at her correct polling place in Orange County.  Meredith Decl. at 25; Goldberg Decl. ¶¶ 15, 19-20, 29.

128.    A search of Stephanie Goldberg's registration record in the 2019 NYS voter registration database confirms that she was an inactive registrant, and that there is no record of her casting a ballot in the 2018 general election.  Meredith Decl. at 25-26; *see also* Goldberg Decl. ¶¶ 22-25, Ex. A.

129.    Had a poll worker provided her an affidavit ballot, Stephanie Goldberg would have cast a ballot that should have counted in the 2018 general election.  Meredith Decl. at 26. Goldberg Decl. ¶¶ 41, 47.

130.    The following voters reported that they were not offered affidavit ballots and/or disenfranchised - and therefore functionally removed from the list of registered voters – all in recent elections:

a.    Inactive voter Stephanie Goldberg attempted to vote at the correct polling place but was not offered an affidavit ballot in the November 2018 general election.  *See* Goldberg Decl. ¶¶ 15-21.

b.    Inactive voter Denise Roberts attempted to vote at the correct polling place but her affidavit ballot was rejected in the November 2016 general election. *See* Denise Roberts Dep. 10:16-12:5, 46:16-47:12 & Decl. ¶¶ 15-21.

c.    Inactive voter Angela Roberts attempted to vote at the correct polling place but her affidavit ballot was rejected in the November 2016 general election. *See* Angela Roberts Decl. ¶¶ 16-34.

d.    Inactive voter Lakemia Deleston attempted to vote at the correct polling place but her affidavit ballot was rejected in the November 2016 general election. P259.

e.    Inactive voter David Rose attempted to vote at the correct polling place but her affidavit ballot was rejected in the November 2016 general election. P260.

f.   Voter Sandra Copps attempted to vote at the correct polling place but was not offered an affidavit ballot by poll workers in the September 2018 primary election.  *See* Copps Decl. ¶¶ 8, 13-20, 22.

g.   Voter Lauren Wolfe attempted to vote at the correct polling place but was not offered an affidavit ballot and instead re-directed to the wrong polling place at least twice during the November 2016 general election.  Eventually, Ms. Wolfe cast an affidavit ballot, but it was not counted because she had voted at the wrong location.  *See* Wolfe Decl.  ¶¶ 11-20.

h.   Inactive voter Susan Stewart attempted to vote at the correct polling place but was not offered an affidavit ballot by poll workers in the September 2018 primary elections.  Instead, she was forced to call county election officials in order to cast an affidavit ballot.  Ms. Stewart has never learned whether her affidavit ballot was counted.  *See generally* Stewart Decl. ¶¶ 13-31.

i.   While attempting to vote in the November 2018 election at the Police Athletic League Wynn Center on 495 Gates Avenue, Brooklyn voter Allison Agro-Paulson observed "approximately twelve other voters who were not listed in the poll book" and that "[s]everal of these voters left without casting an affidavit ballot."  Agro-Paulson Decl. ¶¶ 27-29.

j.   The voter from Westbury listed in row 31 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

k.      The voter from Geneva listed in row 41 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

l.      The voter from Geneva listed in row 42 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

m.     The New York voter listed in row 66 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

n.      The New York voter listed in row 130 of the New York Attorney General's complaint spreadsheet who observed poll workers telling voters that they could not fill out an affidavit ballot in the April 2016 election.  P235.

o.      The voter from Brooklyn listed in row 136 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

p.      The New York voter listed in row 197 of the New York Attorney General's complaint spreadsheet who attempted to vote in the April 2016 election and reported "[v]otes consistently, names wasn't in the books this year.  Did not vote."  P235.

q.      The New York voter listed in row 216 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

r.      The voter(s) in Niagara County listed in rows 229 and 230 of the New York Attorney General's complaint spreadsheet who overheard poll workers refusing to offer affidavit ballots to other voters at the polling place.  P235.

s.      The voter from Onondaga County listed in row 233 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election because her name was not listed in the poll book and she was turned away from the polling place.  P235.

t.      The voter from Albany County listed in row 247 of the New York Attorney General's complaint spreadsheet observed poll workers turning people away from the polls in the April 2016 election.  P235.

u.      The voter from Manhattan listed in row 267 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

v.      The voter from Clinton County listed in rows 304 and 305 of the New York Attorney General's complaint spreadsheet whose husband was refused an affidavit ballot and was told that provisional ballots do not exist.  P235.

w.      The Westchester County voter listed in row 331 of the New York Attorney General's complaint spreadsheet who reported that her husband and child attempted to vote in the April 2016 election and were turned away without being offered an affidavit ballot.  P235.

x.      The New York voter listed in row 374 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

y.      The New York voter listed in row 408 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

z.      The New York voter listed in row 413 of the New York Attorney General's complaint spreadsheet who was unable to vote.  P235.

aa.     The Westchester County voter listed in row 408 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

bb.     The voter from Schenectady listed in row 1009 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

cc.     The voter from Westchester listed in row 1011 of the New York Attorney General's complaint spreadsheet was denied an affidavit ballot in the April 2016 election and was turned away from the polling place.  P235.

dd.     The voter from Brooklyn listed in row 1075 of the New York Attorney General's complaint spreadsheet was not offered an affidavit ballot in the April 2016 election.  P235.

ee.     The New York voter listed in row 1083 of the New York Attorney General's complaint spreadsheet who attempted to vote in the April 2016 election and observed poll workers not letting voters cast a ballot.  P235.

ff.     The New York voter listed in row 1086 of the New York Attorney General's complaint spreadsheet who attempted to vote in the April 2016 election and

whose "name wasn't in the books, tried to vote via affidavit and was sent away."  P235.

gg.    The New York voter listed in row 1087 of the New York Attorney General's complaint spreadsheet who attempted to vote in the April 2016 election and whose name "wasn't in the book," and "did not vote & thinks she won't be able to vote in November."  P235.

hh.    The New York voter listed in row 1088 of the New York Attorney General's complaint spreadsheet who attempted to vote in the April 2016 election and reported "[n]ame not in any books was not able to vote."  P235.

ii.    Kings County voter N.S. [redacted] who attempted to vote in the November 2016 election and reported their "name wasn't on the list," they were told by poll workers they could not vote because they were not registered in New York, and that the poll workers could not check to confirm whether they were registered to vote and at the correct polling place.  P254

jj.    Ulster County voter F.O. [redacted] who attempted to vote in the November 2016 election but was told she was not registered and was not offered an affidavit ballot.  P257.

kk.    Ulster County voter S.S. [redacted] who attempted to vote in the November 2016 election but was told he was not registered and was not offered an affidavit ballot.  P255.

ll.    Ulster County voter A.A. [redacted] who attempted to vote in the November 2016 election but was told he was not on the list and was not offered an affidavit ballot.  P256.

mm.   Queens County voter Z.W. [redacted], who attempted to vote in the November 2016 election but was told, through an interpreter, that she was not listed in the poll book, was directed to a second polling location, was then directed to return to the first location, where she was again turned away without being offered an affidavit ballot.  P141.

**F.    Structural Problem 6: Poll Workers Often Offer Affidavit Ballot to Voters Appearing at the Wrong Polling Location**

131.    Another failure of protocol is when poll workers offer affidavit ballots to potential voters who show up to vote in the incorrect polling location without informing them that their vote will not count.  Meredith Decl. at 26.

132.    In response to an email from Herkimer County election administrators about what to do when people registered too late to be eligible to vote, New York State Board of Elections Co-Executive Director Todd Valentine noted: "I agree that at the poll site, they should work through the affidavit and notice to voters process.  The poll workers are not in a position to look up voters who are not in the poll book.  But for people who are calling on the telephone before the election checking their registration, which was the question asked, it would seem more honest to tell them the facts."  Meredith Decl. at 26; Valentine Testimony.

133.    In his deposition, Valentine added that increased backlogs would be a factor to consider if poll workers were expected to make contact with the county board of elections every time that a potential voter showed up to vote who was not on the poll book.  Meredith Decl. at 26; Valentine Testimony.

134.    Poll workers cannot discern unregistered potential voters from a registered potential voter who has showed up to vote in the wrong election district without looking up potential voters who are not in the poll book.  Meredith Decl. at 26.

135.    Poll workers are sometimes unable to determine whether potential voters who are not listed in the poll book are in the correct election district.  Meredith Decl. at 18-19, 26.

136.    Poll workers at St. Francis College in Brooklyn offered voter Lauren Wolfe an affidavit ballot even though that was not her polling place for the November 2016 election. Wolfe Decl. ¶¶ 14-18.  Ms. Wolfe's affidavit ballot was ultimately rejected because she voted at the incorrect location.  *Id*. ¶ 20.

137.    Practical impediments would hamper the enforcement of any county protocol requiring that poll workers call election administrators to establish whether an unlisted potential voter is in the correct polling location.  Meredith Decl. at 26-27.

138.    Not only may election administrators not be immediately available by phone, but some polling places in New York lack phone access.  Meredith Decl. at 26; Valentine Testimony.

139.    There is no assurance that polling sites will have Wi-Fi or a cellular signal, if access to either is necessary to determine whether an unlisted potential voter is in the correct polling location.  Meredith Decl. at 26-27.

140.    Poll workers could incorrectly assume that potential voters who are not listed in the poll book are at the correct election district.  Meredith Decl. at 18-19, 27.

141.    Previous research demonstrates that poll workers do not always apply policies evenly, especially when the policy is ambiguous.  Consistent with research showing that people update their expectation about what is likely to happen next based on the sequence of events that they previously observed, a poll worker who interacts with a series of unlisted potential voters who are revealed to be in the correct polling location may come to believe that more unlisted potential voters are in the correct polling location than is actually the case.  Meredith Decl. at 27.

142.    Excluding inactive registrants from the poll book decreases the likelihood that a poll worker will redirect registrants who show up to vote in the wrong election district to the correct election district.  Meredith Decl. at 27.

143.    The additional time poll workers spend checking in inactive registrants is taking away time that poll workers could be spending on assisting registrants who show up to vote at the incorrect election district.  Meredith Decl. at 27.

G.    **Structural Problem 7: The NY Voter Lookup Tool is not an Adequate Backstop due to the "Exact Match" Requirement and Other Shortcomings**

144.    The New York State Board of Elections maintains a web-based lookup tool (NYSVoter lookup) that either the registrant or poll worker can use to find a registered voter's polling place.  But this requires a poll worker to engage with a tool they may not be familiar with, use infrequently, or receive little training on how to use.  Meredith Decl. at 21.

145.    While NYSVoter lookup is a resource for registrants trying to determine where to vote, it is not a substitute for listing inactive registrants in the poll book.  Meredith Decl. at 27; Connolly Testimony; *see also* Ancarrow Decl. ¶¶ 11-12, 15, 20; Blake Decl. ¶¶ 9-12.

146.    After Orange County voter Stephanie Goldberg attempted to vote at her correct polling place in the November 2018 general election and was initially turned away, she looked up her registration status using the NYSVoter lookup tool, which showed that she was in inactive status.  Goldberg Decl. ¶¶ 21-23.  She went back in to her polling place and showed a screenshot of her NYSVoter information to poll workers, but they still turned her away without offering her an affidavit ballot.  *Id.* ¶¶ 25-29.

147.    Potential voters and poll workers need to be able to answer quickly the question of whether a potential voter is at the correct polling location.  Meredith Decl. at 27.

148.    Not every registrant and poll worker will possess a device that could be used to access the NYSVoter lookup from a polling place, and not every polling location is going to provide such a device with the necessary connectivity.  Meredith Decl. at 27.

149.    The NYS Voter lookup is extremely rigid, employing an "exact match" criterion requiring that every character of the voter's first name, last name, date of birth, and zip code exactly match the voter's information as contained in the statewide voter registration database. Meredith Decl. at 27; Connolly Testimony.  This can make it harder to find someone's record in the lookup than in a poll book, particularly when someone uses a nickname, has a hyphen or special character in their name, or has a typo in their registration record.  *Id.*; *see also* Ancarrow Decl. ¶¶ 11-12, 20 (voter's name includes a special character), 15, 20; Agro-Paulson Decl. ¶ 35 (hyphen).

150.    Requiring an exact match between the information entered into the lookup tool and the voter registration database can often cause problems because voter registration data often contains typos or otherwise incorrect biographical information.  *See*, *e.g.*, Agro-Paulson Decl.  ¶ 35 (noting NYSVoter recorded her name incorrectly without a hyphen); Ancarrow Decl. ¶ 20 (noting NYSVoter recorded his name incorrectly as "Walter C. Ancarrow" instead of Walter C. Ancarrow *IV*.") (emphasis added).

151.    Poll workers implicitly do more flexible matching when they look up registrants in poll books.  Meredith Decl. at 27.

152.    The fact that the NYSVoter lookup tool has previously been inaccessible for portions of Election Day calls into question whether it can be counted on to be available. Meredith Decl. at 27; Connolly Testimony; Lovullo Dep. 170:23-171:10; 171:22-172:15.

153.    County Boards of Elections, which are responsible for updating the voter registration information contained in the statewide voter registration database, process and transmit updates to voter registration information at their own pace, which is determined by staff availability.  Valentine Testimony.  The capacity of the New York State Board of Elections to review NYSVoter and monitor county boards of elections is limited.  Valentine Testimony.

154.    New York voters have complained that their registration information was not updated, or was updated incorrectly.  *See, e.g.*, P145 (email complaint from New York City voter M.V. [redacted] reporting they were not listed in the poll book during the November 2016 election despite casting an affidavit ballot in the April 2016 election and subsequently updating her voter registration address); P146 (email complaint from Nassau County voter J.S. [redacted] reporting they were not listed in the poll book during the November 2016 election despite voting at the same location in numerous prior elections, and reply from the New York Attorney General's Office to stating that the County Board of Elections confirmed their record was incorrectly updated).

155.    County boards of elections' computers are sometimes not connected to the statewide voter registration database because the virtual tunnel between the county and the statewide registration database is disrupted.  Valentine Testimony.  This can happen if the county board of elections' IT department has made upgrades or changes to their firewall or other events that can disrupt the virtual connection.  *Id*. 29:22-30:11.  This happened recently, for example, when the New York City Board of Elections "were not transmitting the [voter registration] information correctly to us [the New York State Board of Elections]."  *Id*. 32:17-33:2, 36:7-37:14.

156.     The information contained in the statewide and county voter registration lists do not always match.  Valentine Testimony.

157.     New York voters Katherine Baldus and Walter Ancarrow were unable to look up or "find" their voter registration information when using the NYSVoter tool on or around Election Day, only to find that they could locate their registration status several days or weeks later, after the election, when they entered the same exact information into the lookup tool. Ancarrow Decl.  ¶¶ 11, 16, 18-19; Baldus Decl. ¶¶ 23-24, 27-28.

158.     Not being able to find their voter registration status in NYSVoter caused these voters, as well as Allison Agro-Paulson, to doubt whether or not they would be able to cast a vote that would actually count.  *See*, *e.g.*, Ancarrow Decl.  ¶¶ 10-20; Baldus Decl. ¶¶ 23-28 (voter could not look up her registration status after casting an affidavit ballot in the September 2018 primary and therefore believed it did not count), Agro-Paulson Decl.  ¶¶ 9-10, 30-36 (used NYSVoter before Election Day to successfully look up her registration status, then looked again on Election Day after casting an affidavit ballot and could not find her registration status, causing her to think that "my voter registration status was changed before the [] election…").

159.     New York voters Walter C. Ancarrow IV and Keoma Blake both checked their registration status using the NYSVoter lookup tool on September 12, 2018, one day before the September 2018 primary election.  Ancarrow Decl.  ¶ 11; Blake Decl.  ¶ 9.  NYSVoter indicated that there was no record of either Mr. Ancarrow's or Ms. Blake's registration, causing them to think that they were not eligible to vote.  Ancarrow Decl.  ¶¶ 12-13; Blake Decl.  ¶¶ 10-12.

160.     Mr. Ancarrow did not know that he could cast an affidavit ballot, thought that he would not be able to vote, and therefore did not go to the polls in the September 2018 primary election.  Ancarrow Decl. ¶¶ 14-15.  On September 26, Ancarrow checked his registration status

again using NYSVoter, which still indicated that there was no registration record for him. *Id*. ¶¶ 16-17. On October 3, 2018, however, Ancarrow entered the same biographical information into NYSVoter, but this time NYSVoter indicated that he was registered and provided his registration information. *Id.* ¶¶ 18-20.

161.    Ms. Blake made multiple attempts to use NYSVoter to look up her registration information but was never successful. Blake Decl. ¶¶ 9-10, 16-17, 29-30. Ms. Blake was very confused as to why she was not registered to vote and did not plan on voting in the September 13, 2018 primary election until she learned about the nonpartisan Election Protection hotline from a friend, called in, and was informed by an Election Protection volunteer about the possibility of casting an affidavit ballot. Blake Decl. ¶¶ 14-20. That conversation caused Ms. Blake to go to the polls, where she ultimately found that she was in fact listed in the poll book and able to cast a regular ballot. *Id.* ¶¶ 21-24.

162.    Mr. Ancarrow's and Ms. Blake's experiences with the NYSVoter lookup tool undermined their faith in the integrity of New York elections. Ancarrow Decl. ¶ 27; Blake Decl. ¶ 38.

163.    The complaint in intervention filed on behalf of the People of the State of New York in *Common Cause New York v. Board of Elections in the City of New York*, No. 1:16-cv-06122-NGG, Dkt. 27-1 (E.D.N.Y. Jan. 26, 2017), states "[u]pon information and belief, voters who cannot find their registration using the state's online voter database often fail to go to their local poll sites and cast affidavit ballots because either they do not believe their vote will count or they think they are no longer eligible to vote." *Id.* ¶ 127.

164.    Lauren Wolfe's experiences voting in the November 2016 election highlight that people will not always trust the information provided by the NYSVoter lookup tool if it is not

backed up by what poll workers say and what they observe in the poll book. Meredith Decl. at 27; Wolfe Decl. ¶¶ 9-11, 15-16, 19. Ms. Wolfe reported finding her correct polling place, Brooklyn Borough Hall, in the NYSVoter lookup prior to Election Day and attempted to vote at the right place. Wolfe Decl. ¶¶ 9-11. Once she got to Brooklyn Borough Hall, however, poll workers could not find her name in the poll book and told her to go to a different polling place at St. Francis College. *Id.* ¶¶ 11-12. Ultimately, Ms. Wolfe left Brooklyn Borough Hall, her correct polling place according to NYSVoter, twice without casting a ballot and ultimately cast a ballot at St. Francis College, which was not counted. Meredith Decl. at 27; Wolfe Decl. ¶¶ 13-16, 19.

## IV.   NEW YORK'S PROCEDURES FOR PROCESSING INACTIVE VOTERS AT THE POLLING PLACE BURDEN SEVERAL DISCRETE GROUPS OF VOTERS

### A.   Statistical Information Concerning the Characteristics and Demographic Makeup of Active and Inactive Voters in New York

165.   Of the 11,376,256 active registrants in New York as of August 13, 2018, approximately 5,996,638 cast a ballot that counted in the November 2018 general election. Meredith Decl. at 9 n.33.

166.   Of the 1,116,298 inactive registrations in New York as of August 13, 2018, approximately 42,579 cast a ballot that counted in the November 2018 general election. Meredith Decl. at 9 n.33.

167.   Of all active registrants eligible to vote in the November 2016 election in New York, approximately 15.6 percent were between the ages of 18 and 29, 23.4 percent were between the ages of 30 and 44, 27.4 percent were between the ages of 45 and 59, 22.3 percent were between the ages of 60 and 74, and 11.3 percent were greater than 74 years of age. Meredith Decl. at 10.

168.     Of all inactive registrants eligible to vote in the November 2016 election in New York, approximately 16.2 percent were between the ages of 18 and 29, 34.7 percent were between the ages of 30 and 44, 23.0 percent were between the ages of 45 and 59, 15.6 percent were between the ages of 60 and 74, and 10.5 percent were greater than 74 years of age. Meredith Decl. at 10.

169.     Of the active registrants who cast a ballot in the November 2016 election in New York, approximately 12.5 percent were between the ages of 18 and 29, 21.5 percent were between the ages of 30 and 44, 29.7 percent were between the ages of 45 and 59, 25.6 percent were between the ages of 60 and 74, and 10.6 percent were greater than 74 years of age. Meredith Decl. at 10.

170.     Of the inactive registrants who cast a ballot in the November 2016 election in New York, approximately 20.7 percent were between the ages of 18 and 29, 36.6 percent were between the ages of 30 and 44, 25.7 percent were between the ages of 45 and 59, 12.8 percent were between the ages of 60 and 74, and 4.3 percent were greater than 74 years of age.  Meredith Decl. at 10.

171.     Inactive voters in the 2016 presidential election were substantially younger than active voters in that election.  Meredith Decl. at 10.

172.     Of all active registrants eligible to vote in the November 2016 election in New York, approximately 64.6 percent were white, 13.0 percent were Black, 14.2 percent were Hispanic, 6.1 percent were Asian, and 2.2 percent were of another race or ethnicity.  Meredith Decl. at 11.

173.     Of all inactive registrants eligible to vote in the November 2016 election in New York, approximately 61.8 percent were white, 14.8 percent were Black, 16.0 percent were

Hispanic, 5.0 percent were Asian, and 2.4 percent were of another race or ethnicity.  Meredith Decl. at 11.

174.    Of the active registrants who cast a ballot in the November 2016 election in New York, approximately 69.6 percent were white, 11.8 percent were Black, 12.5 percent were Hispanic, 5.3 percent were Asian, and 2.1 percent were of another race or ethnicity.  Meredith Decl. at 11.

175.    Of the inactive registrants who cast a ballot in the November 2016 election in New York, approximately 59.4 percent were white, 16.7 percent were Black, 16.5 percent were Hispanic, 4.9 percent were Asian, and 2.4 percent were of another race or ethnicity.  Meredith Decl. at 11.

176.    Inactive voters in the 2016 presidential election were disproportionately non-white.  Meredith Decl. at 11.

177.    Of all active registrants eligible to vote in the November 2016 election in New York, approximately 31.4 percent reside in census tracts with a low proportion of owner-occupied housing, 33.3 percent reside in census tracts with a medium proportion of owner-occupied housing, and 35.4 percent reside in census tracts with a high proportion of owner-occupied housing.  Meredith Decl. at 11.

178.    Of all inactive registrants eligible to vote in the November 2016 election in New York, approximately 43.6 percent reside in census tracts with a low proportion of owner-occupied housing, 32.1 percent reside in census tracts with a medium proportion of owner-occupied housing, and 24.2 percent reside in census tracts with a high proportion of owner-occupied housing.  Meredith Decl. at 11.

179.    Of the active registrants who cast a ballot in the November 2016 election in New York, approximately 27.8 percent reside in census tracts with a low proportion of owner-occupied housing, 33.8 percent reside in census tracts with a medium proportion of owner-occupied housing, and 38.4 percent reside in census tracts with a high proportion of owner-occupied housing.  Meredith Decl. at 12.

180.    Of the inactive registrants who cast a ballot in the November 2016 election in New York, approximately 44.1 percent reside in census tracts with a low proportion of owner-occupied housing, 32.6 percent reside in census tracts with a medium proportion of owner-occupied housing, and 23.2 percent reside in census tracts with a high proportion of owner-occupied housing.  Meredith Decl. at 12.

181.    Inactive voters disproportionately reside in census tracts with less owner-occupied housing.  Meredith Decl. at 11-12.

182.    Inactive registrants and inactive registrants who cast a valid ballot in the 2016 presidential election are disproportionately young, minority, and reside in census tracts with less owner-occupied housing.  Meredith Decl. at 9-12.

183.    In New York City, problems with the postal service delivery process, causing mail to be incorrectly categorized as being "returned undeliverable," disproportionately affect people that live in multi-unit buildings or a high-rise apartment building, as opposed to voters who live in single-family homes.  Ryan Dep. 100:7-23, 102:2-17.

184.    Because there is a correlation between race and housing status in New York, such that minority voters are more likely to live in multi-unit housing than are white voters, postal service errors disproportionately impact non-white voters in New York.  *Id.*; Meredith Decl. at 11-12.

185.     Minority voters Allison Agro-Paulson, Denise Roberts, and Angela Roberts testified that the experience of not being found on the voter rolls and being forced to vote an affidavit ballot was triggering for them in light of other life experiences, prompting them to worry that they might have fallen victim to foul play or discrimination. *See*, *e.g.*, Agro-Paulson Decl. ¶¶ 14, 37-40 (voter went to vote with her children and had explained the importance of minority voting rights before the election, and struggled to explain to them why she could not cast a regular ballot); Angela Roberts Decl. ¶¶ 42-49 (voter had been subjected to racism in Tioga County and could not understand why the prior residents at her address, who were white, were listed in the poll book while she was not); Johnson Decl. ¶ 15 (voter, now deceased, testified that "[t]he absence of my name from the poll books on November 8, 2016, confirmed my worst fears that I would be targeted for disenfranchisement"); Denise Roberts Dep. 23:3-5, 31:17-35:14.

### B.     New York's Procedures for Processing Inactive Voters at Polling Places Reduce the Number of Valid Ballots Cast at Polling Places

186.     Excluding inactive registrants from poll books places additional burdens on two groups of potential voters: inactive registrants who continue to reside at their address of registration; and all registrants who show up to vote in the wrong polling place.  Meredith Decl. at 1; Grayson Decl. ¶¶ 35, 50; *see also* Section IV(C), "All Voters are Burdened and at Increased Risk of Reneging due to Lengthier Check-In, Less Accurate Voter Rolls, and Expenditure of Scarce Poll Worker Resources," *infra*.

187.     The burdens imposed on these populations reduce the number of valid ballots cast in New York.  Meredith Decl. at 1.

188.     This conclusion is based on both the size of the burdened populations and the extent of the burden imposed upon these populations.  Meredith Decl. at 1.

189.    Administrative records demonstrate that many potential voters belong to the groups particularly burdened by this policy: tens of thousands inactive registrants continued to reside at their address of registration and approximately registrants showed up to vote in the wrong election district for the 2016 presidential election.  Meredith Supp. Decl. at 2.

190.    Affidavit ballots can be rejected for many reasons, including because eligible voters fill out the affidavit ballot envelopes incorrectly.  Ryan Dep. 55:18-56:11 (voters sometimes fill out and return laminated instruction cards instead of the affidavit ballot envelope).

191.    Affidavit ballots can also be rejected when voters fill out portions of the affidavit ballot envelope incorrectly or leave them blank.  Ryan Dep. 56:12-57:9.  For example, in New York City, if voters fail to indicate their political party in Section A of the affidavit ballot envelope but check a party in Section C of that document, the affidavit will be rejected.  Ryan Dep. 57:10-25.

192.    The costs imposed on voting and poll worker resources further supports the conclusion that excluding inactive registrants from poll books imposes burdens on these groups that reduce the number of valid ballots cast in New York both in the 2016 presidential election and subsequent elections.  Meredith Decl. at 1.

193.    Providing a list containing inactive voters' names in each precinct would mean faster check-ins and shorter lines for all New York voters.  Grayson Decl. ¶ 50.

194.    Providing a list containing inactive voters' names in each precinct and permitting them to cast a regular ballot would mean that voters on the inactive list would leave the precinct with greater certainty that their vote will count.  Grayson Decl. ¶ 50; Holman Dep. 53:6-54:8; Roberts Dep. 55:25-57:16.

**C.**     **All Voters are Burdened and at Increased Risk of Reneging due to Lengthier Check-In, Less Accurate Voter Rolls, and Expenditure of Scarce Poll Worker Resources**

195.     All potential voters, including active voters, are burdened when inactive registrants are excluded from poll books because doing so uses scarce poll worker resources. Meredith Decl. at 1, 20-22; Grayson Decl. ¶ 43.

196.     Excluding inactive registrants from poll books increases the cost of voting for everyone, because it uses up poll worker resources.  Meredith Decl. at 1, 20-22.

197.     Using poll worker time to process inactive voters' names who are not listed in poll books uses up poll worker bandwidth that could be spent assisting other potential voters, including active voters.  Meredith Decl. at 22; Grayson Decl. ¶ 43.

198.     It is especially time-consuming to determine whether an unlisted registrant is at the correct precinct because a poll worker must reach an election administrator by phone to do so.  Meredith Decl. at 22.  For example, one voter declaration noted that it was taking the poll worker so long to place a phone call that she just did it herself.  Stewart Decl. ¶ 18.

199.     Having poll workers unnecessarily spending time determining whether an inactive registrant's registration record is in a poll book and whether an inactive registrant is in the correct election district risks reducing the number of valid ballots cast.  Meredith Decl. at 22.

200.     Any increase in the amount of time it takes to check in a potential voter increases the likelihood that that potential voter will "renege," which is defined as leaving the polling place without casting any kind of ballot, in the current election, and/or will abstain from voting in subsequent elections.  Meredith Decl. at 22.

201.     If the voter registration list is more accurate by including inactive registrants, voter check-ins will be faster because the voter's eligibility can be more easily be determined, leading to shorter lines.  Grayson Decl. ¶ 46.

202.    Shorter lines mean fewer voters – active and inactive – deciding to leave the precinct without voting because of time constraints.  Grayson Decl. ¶ 46.

203.    By not having the list of eligible, but inactive, voters at each polling place, New York law requires election officials to provide a less accurate voter registration that omits eligible voters from poll books.  Grayson Decl. ¶ 47.

204.    The consequences of this reduced accuracy – such as longer lines – increase the burdens on all New York voters.  Grayson Decl. ¶ 47.

205.    The ability to have a smooth check-in is an important concern in election administration.  In Trey Grayson's time as a member of the Presidential Commission on Election Administration, he and fellow commissioners traveled the country to listen to the concerns of election administrators, academics, voters, and advocates.  In discussions about long lines and other voting problems, concerns about the need to maintain an accurate voter registration list were paramount.  Grayson Decl. ¶¶ 45-46.

**D.    Statistical Evidence Shows New York's Policies Burden and Disenfranchise Inactive Registrants Who Continue to Reside at their Address of Registration**

206.    While there is no database that can be queried to learn a registrant's current address of residence, the subset of the inactive registrants who vote generates an administrative record showing their address of residence as of Election Day.  Quantifying the number of affidavit ballots inactive registrants cast at their address of registration provides information on the minimum number of inactive registrants who reside at their address of registration.  Meredith Decl. at 14.

207.    Tens of thousands of inactive registrants continued to reside at their address of registration when voting in the 2016 presidential election based on administrative records. Meredith Decl. at 14-15; Meredith Supp. Decl. at 2.

208.    According to the 2016 annual statistical report from the New York State Board of Elections, 17,500 affidavit ballots were cast by inactive voters living at their registration address in 56 counties – all New York counties outside of Nassau County and the five counties making up New York City.  Meredith Decl. at 15.

209.    Dr. Meredith also analyzed the almost 98,000 inactive registrants who voted in the 2016 presidential election by examining whether their address was the same in the 2016 and 2019 NYS databases.  More than 40,000 of the roughly 98,000 inactive voters have the same registration address in the 2016 and 2019 NYS databases.  Meredith Decl. at 15.

**E.    Statistical Evidence Demonstrates How New York's Policies Burden and Disenfranchise Registrants Appearing at the Wrong Polling Place**

210.    Every registrant in New York is assigned to an election district, a geographical subdivision akin to a voting precinct in other states.  Meredith Decl. at 16 n.44.

211.    All registrants in a given election district are assigned to vote at the same polling location.  Meredith Decl. at 16 n.44.

212.    Sometimes registrants from multiple election districts are assigned to vote at the same polling location, with registrants from different election districts directed to different stations within the same polling location.  Meredith Decl. at 16 n.44.

213.    Affidavit ballots cast in incorrect election districts but in correct polling locations are supposed to be counted.  Meredith Decl. at 16 n. 44.

214.    An "inactive" voter who moves to a new precinct within the same jurisdiction and congressional district may not be allowed to vote at his or her former polling place.  *See* N.Y. Elec. Law §§ 8-302(3)(e)(ii), 9-209(2)(E)(iii).

215.     Data from the 2016 Election Administration and Voting Survey (EAVS) show that the number of affidavit ballots rejected in New York is high relative to every other state. Meredith Decl. at 16.

216.     The EAVS reports the number of provisional ballots rejected in each state in 2016.  Meredith Decl. at 16.  In the November 2016 election, a total of 120,778 affidavit ballots were rejected in New York.  Meredith Decl. at 17.

217.     According to the 2016 EAVS post-election-survey, only approximately half of the affidavit ballots cast in New York were counted in the November 2016 election.  Grayson Decl. ¶ 42; Meredith Decl. at 15-16.

218.     In the November 2016 election, a total of 7,793,078 votes were cast in New York. Meredith Decl. at 17.

219.     New York has the highest rate of rejected affidavit ballots in the country at 1.55 percent, and is one of only three states with a rate above 1 percent.  Meredith Decl. at 17.

220.     Approximately 35,500 affidavit ballots were rejected in the November 2016 general election in New York because they were cast in the wrong polling location.  Meredith Supp. Decl. at 2.

221.     The rate at which affidavit ballots are rejected in New York because the voter cast it at the wrong polling place is higher than the overall provisional ballot rejection rate in any other state in the United States, when compared to the number of valid ballots.  Meredith Decl. at 17.

222.     Even considering only the affidavit ballots that were rejected in New York because they were cast in the wrong polling location, New York would still rank as one of the ten states with the most rejected provisional ballots per capita.  Meredith Decl. at 17.

223.    One of the primary reasons that an affidavit ballot is rejected in New York is that it is cast in an incorrect polling location.  Meredith Decl. at 16.

224.    Inactive registrants who attempt to vote in the wrong polling place are disproportionately burdened by New York's policy of excluding inactive registrants from poll books, because they rely on poll workers to redirect them to the correct election district. Meredith Decl. at 16.

225.    Without having access to the list of inactive voters, poll workers are less able to determine whether a potential voter is at the correct election district.  Meredith Decl. at 16.

226.    This reduces the likelihood that poll workers will correctly offer an inactive voter who is in the right place an affidavit ballot, and also increases the likelihood that they will incorrectly offer a potential voter who is in the wrong polling location an affidavit ballot without warning him or her that it is unlikely to count.  Meredith Decl. at 15.

227.    In 2014, most counties and New York City provided enough information to determine the exact number of affidavit ballots rejected for being cast in the wrong polling location.  About 80 percent of affidavit ballots rejected for an unlisted reason were cast in the wrong polling location in New York.  Meredith Decl. at 19.

228.    Data from the counties that provided more detailed information as to why affidavit ballots were rejected in 2016 show, if anything, that a higher share of affidavits rejected for an unlisted reason in 2016 were rejected for being cast in the wrong polling location than in 2014.  Meredith Decl. at 19.

229.    Administrative records of rejected affidavit ballots show that at least 35,500 potential voters attempted to vote in the wrong polling place in the 2016 presidential election. Meredith Decl. at 16, 19; Meredith Supp. Decl. at 2.

230.    The 35,500 potential voters who attempted to vote in the wrong polling place does not include any additional registrants who showed up to vote in the wrong election district but did not cast an affidavit ballot.  Meredith Decl. at 19; Meredith Supp. Decl. at 2.

231.    Tens of thousands of inactive registrants showed up to vote in the wrong polling place in the 2016 presidential election.  Meredith Decl. at 16, 19; Meredith Supp. Decl. at 2.

232.    Poll workers in New York routinely encounter potential voters who are not listed in the poll book.  Meredith Decl. at 14-20.

### F.    Inactive Voters Do Not Know If Their Affidavit Ballot Counts and are Less Confident in the Integrity of the Electoral Process

233.    Excluding inactive registrants from poll books and forcing them to cast an affidavit ballot makes New York's inactive registrants who reside at their address of registration less certain that their votes count.  Meredith Decl. at 22-23; Grayson Decl. ¶ 40; Holman Dep. 51:23-53:5; *see also* Ryan Dep. 87:20-89:3 (describing mistakes in the processing of affidavit ballots).

234.    Ballots cast by eligible voters on the active list in New York who have had their eligibility confirmed at check-in will definitely be counted.  Grayson Decl. ¶ 40.

235.    In contrast, eligible voters on the inactive list do not have their eligibility confirmed in their presence on Election Day in New York.  Grayson Decl. ¶ 40.

236.    Inactive voters' eligibility is determined in their absence, after Election Day, at the county board of elections offices in New York.  They also look to see if the vote was cast in the voter's correct polling place.  Only when those conditions are met, is the sealed envelope opened, and the affidavit ballot counted.  Grayson Decl. ¶ 40.

237.    It would be more efficient for eligible voters on the inactive list to be identified as such at the polling place, to sign the roster (or e-pollbook) and to cast a regular ballot.  Grayson Decl. ¶ 26; Valentine Testimony; Ryan Dep. 82:7-19.

238.    Inactive New York voters do not place a ballot in a scanner like a regular voter. Grayson Decl. ¶ 41.

239.    When a New York voter scans their ballot and see the text "thank you for voting," that improves public confidence that the voter's ballot is in the system and will be counted. Ryan Dep. 69:7-16.

240.    An inactive voter must cast an affidavit ballot and leave the precinct without knowing whether the affidavit ballot will count.  Grayson Decl. ¶ 41.

241.    Interactions with poll workers affect a registrant's confidence that their vote will count.  Meredith Decl. at 22-23; Holman Dep. 30:6-31:16; 54:9-13; Stewart Decl. ¶¶ 16, 18, 30 (poll workers appeared "confused and overwhelmed" and were having trouble calling the county election office, and voter was worried her affidavit ballot was not going to count); Agro-Paulson Decl. ¶¶ 21-22, 34 (poll workers were "frustrated" and "arguing with each other" and she does not know whether or not her affidavit ballot was counted).

242.    Poll workers can be clearer about the conditions under which an inactive voter's affidavit ballot will count if they know why the affidavit ballot was required.  Meredith Decl. at 23; Holman Dep. 34:24-35:25.

243.    Some inactive voters, like Robert Holman, are never informed one way or the other whether or not their affidavit ballots are counted.  Holman Dep. 49:14-16, 50:14-51:22.

244. New York law requires county board of elections to inform voters that their affidavit ballots were rejected; county boards are not required to inform those whose affidavit ballots were counted.  Grayson Decl. ¶ 42; Connolly Testimony.

245. New York voters Robert Holman, Allison Agro-Paulson, Katherine Baldus, and Susan Stewart are not sure whether or not their affidavit ballot actually counted.  Holman Dep. 51:11-53:5, 54:9-13 (no confidence that his affidavit ballot was counted); Agro-Paulson Decl. ¶ 34 (does not know whether her affidavit ballot was counted); Baldus Decl. ¶ 25 (same); Stewart Decl. ¶ 38.

246. Ulster County voter Susan Stewart, who was in inactive status at the time she attempted to vote in the September 2018 primary, remains concerned that her affidavit ballot may not have been counted.  Stewart Decl. ¶¶ 38, 43-44.  Ms. Stewart believes that, even if her affidavit ballot was counted, it was not equal to other votes because it was not counted on Election Day.  *Id.* ¶ 45.

247. New York voters Tracey Goldblum, Alison Matika, and Mitchell Lavnick reported being unsure whether their affidavits ballots would be counted at the time they left the polling place and not receiving notice for many months after the election that whether or not their affidavit ballot counted.  Goldblum Decl. ¶¶ 15, 17 (did not receive notice of whether her vote counted until about 3-4 months after the election); Lavnick Decl. ¶¶ 13-14, 17 (did not receive notice until about five months after the election); Matika Decl. ¶¶ 22, 24 (did not receive notice until more than four months after the election).

248. Informing an inactive voter via mail that their affidavit ballot counted is not a substitute for having a poll worker provide this information on Election Day because information provided by mail may not be read or understood by the inactive voter.  Meredith Decl. at 23.

249.     Political communication scholars highlight the possibility of "belief echoes," a term describing the phenomenon where people continue to take actions based on misinformation, even once that misinformation has been corrected.  Meredith Decl. at 23.

250.     Making potential voters less certain that their ballots will count makes it less likely that they will vote both in the current election and future elections.  The calculus of voting predicts that inactive potential voters may be more likely renege if they do not perceive sufficient benefits from casting affidavit ballots after failing to observe their names in the poll book. Meredith Decl. at 23.

251.     Some inactive voters who appear at the correct polling place incorrectly believe that their vote will not count because their name is not on the polling list.  Meredith Decl. at 22-23; *see also* Johnson Decl. ¶ 15.

252.     Even if inactive voters cast affidavit ballots, people who believe that their votes may not count are less likely to express interest in voting.  Meredith Decl. at 23; *see also* Roberts Dep. 51:5-13, 52:4-53:25.

253.     New York voters Denise Roberts, Allison Agro-Paulson, Katherine Baldus, Mara Wilson, and James Johnson testified that the experience of their names not being in the poll book and having to cast an affidavit ballot reduced their confidence about the integrity of elections in New York, or negatively impacted their perceptions of the fairness of New York elections.  *See*, *e.g.*, Denise Roberts Dep. 34:4-35:14, 58:25-59:14 (believes that her civil rights were violated); Agro-Paulson Decl. ¶ 40 (her experience has caused her to question the integrity of the electoral process); Baldus Decl.  ¶ 38 (same); Wilson Decl.  ¶¶ 21-22 (concerned that her information had been compromised and worried about the security of New York's voter registration database); *see also* Johnson Decl.  ¶¶ 15-16.

254.    Voters Angela Roberts and Lauren Wolfe are concerned that they may be disenfranchised again in future elections.  Angela Roberts Decl.  ¶ 49; Wolfe Decl.  ¶¶ 28-29.

255.    Ulster County voter Susan Stewart is concerned that her name may not appear in the poll book and her vote may not count in a future election.  *Id.* ¶ 46.

256.    Voter Stephanie Goldberg is concerned her name will not be listed in the poll book in future elections.  Goldberg Decl.  ¶¶ 47-48.

257.    Potential voters who are less certain that their ballot will count report less interest in voting in New York.  Meredith Decl. at 7-8.

258.    For example, James W. Johnson, Jr. says that poll workers' failure to locate his name in the poll book on November 8, 2016, caused him to feel extremely discouraged about exercising his constitutional right to vote in future elections.  Johnson Decl.  ¶ 16.

259.    Voter Angela Roberts is not confident her vote will be counted in a future election in Tioga County, and expects to have a better experience voting in Texas.  Angela Roberts Decl. ¶¶ 49-51.

260.    People who do not think their vote will count because their name is not in the poll book will be less likely to vote in the next election.  Meredith Decl. at 23.

## V.    THE COST OF VOTING AND THE IMPACT OF BARRIERS TO THE BALLOT

### A.    Even Minor Impediments to Voting Prevent Non-Habitual or "Marginal" Voters from Casting a Ballot

261.    Voting costs are not limited to monetary costs.  Voting costs include the opportunity costs of the time that citizens spend registering to vote, acquiring information that is needed to vote, and finally actually voting.  Meredith Decl. at 5-6.

262.    Even relatively small changes in voting costs can determine whether someone votes or abstains.  Meredith Decl. at 5-6.

263.     Costs imposed by less accessible polling places can be consequential to turnout. A citizen is less likely to vote the farther a polling place is located from home and when their polling place changes from the previous election.  Meredith Decl. at 5.

264.     The additional cost of requiring voter registration reduced turnout by three, five, and two percentage points in New York, Ohio, and Wisconsin, respectively, in 2004.  Meredith Decl. at 5.

265.     More people vote when states engage in policies, like outreach, that reduce the cost of voter registration.  Meredith Decl. at 5.

266.     Potential voters who wait longer to vote are more likely to renege.  Meredith Decl. at 6-7.

267.     A study found that 1.87 percent of potential voters reneged in a sample of 11,858 potential voters observed in 30 polling places during the 2008 California presidential primary. Meredith Decl. at 7.

268.     A study of 7,579 potential voters in 528 polling locations, including 1,086 potential votes in 100 polling locations in New York, showed that the length of line is associated with reneging within a county.  Meredith Decl. at 7.

269.     Recent research indicates that potential voters who wait longer in line are less likely to vote in future elections.  Meredith Decl. at 7.

270.     Voting is a persistent act, in that voting in one election causes people to be more likely to vote in subsequent elections by reducing the cost of future participation.  Meredith Decl. at 7.

271.     Increasing the amount of time that it takes a potential voter to cast a ballot reduces turnout both in current and future elections.  Meredith Decl. at 6-7.

272.    Voters' experiences with poll workers and voting machines have been demonstrated to affect voters' confidence about electoral integrity and perceptions of the fairness of elections.  Meredith Decl. at 7.

273.    Increases in the cost of voting do not affect all citizens equally.  Meredith Decl. at 8.

274.    Voters can be sorted into three groups: (1) habitual voters, who vote in almost every election and would likely continue to do so even if the costs of voting were substantially higher; (2) habitual non-voters, who would likely continue to abstain from voting even if the costs of voting were negligible; and (3) marginal voters, for whom the benefits from voting are sometimes greater than, and other times less than, the costs of voting.  Meredith Decl. at 8.

275.    For marginal voters, even relatively small changes in the cost of voting can affect whether they vote.  Meredith Decl. at 8.

276.    Marginal voters disproportionately come from groups that were historically excluded from voting or are otherwise less likely to vote.  Meredith Decl. at 8.

277.    A comparison of turnout in presidential and non-presidential elections shows that minorities and young people are more likely to be marginal voters than whites and older people, respectively.  Meredith Decl. at 8.

278.    Increases in the time required to cast a ballot are likely to disproportionately reduce minority turnout.  Increases in the cost of voting cause minority turnout to decline more than white turnout.  Meredith Decl. at 8.

279.    Minority voters face longer wait times than white voters.  Meredith Decl. at 8.

280.    Waiting to vote becomes increasingly costly the longer that a voter has already spent waiting in line.  Meredith Decl. at 8.  Because minority voters face longer wait times than

white voters, this creates a compounding problem where increasing wait times is disproportionately costlier for minority voters than for white voters. *Id.*

281.    Increases in the cost of voting risk perpetuating inequality in voter turnout, as marginal voters tend to belong to groups that already turnout at a below average rate. Meredith Decl. at 8.

### B.    New York is an Exemplar of How the Cost of Voting Works

282.    One reason why the voter turnout rate in New York has not kept pace with the national turnout rate in recent years is that many other states have more aggressively adopted policies to reduce voting costs. Meredith Decl. at 6.

283.    The voting-eligible population turned out at a higher rate in New York than in the country as a whole as recently as the 2000 presidential election. Meredith Decl. at 6.

284.    Between 2000 and 2016, New York did not keep pace with many other states in the rest of the country in adopting election reforms, such as no-excuse absentee or early voting, automatic voter registration, or Election Day voter registration, that make it easier to vote. Meredith Decl. at 6.

285.    New York ranked 42 of 51 on the 2016 Elections Performance Index, a summary measure of the quality of election administration by state produced by the Massachusetts Institute of Technology Election Data Science Lab. Meredith Decl. at 6.

286.    Because other states did more between 2000 and 2016 to reduce voting costs than New York, the calculus of voting would predict that the difference between the national and New York turnout rate would increase. Meredith Decl. at 6.

287.    New York's voter turnout has ranked among the bottom ten states in most elections over the last decade. Meredith Decl. at 6.

**VI.   NEW YORK'S PROCEDURES FOR PROCESSING INACTIVE VOTERS AT POLLING PLACES HAMPER POLL WORKERS' AND ELECTION ADMINISTRATOR'S CONDUCT OF ELECTIONS**

    **A.   Excluding Inactive Registrants from Poll Books Does Not Help Election Administrators Determine Where Inactive Registrants Reside**

288.   New York's policies with respect to processing inactive voters at polling places do not further the goals of promoting list maintenance efforts or increasing the accuracy of the voter rolls.  Grayson Decl. ¶ 47.

289.   By precluding county boards of elections from providing the roster of inactive, but eligible voters, in each precinct, New York law imposes an unnecessary burden on election administrators.  Grayson Decl. ¶¶ 25, 48.

290.   Requiring all eligible voters on the inactive list to vote an affidavit ballot increases administrative burdens.  Grayson Decl. ¶ 26; Ryan Dep. 82:7-19.

291.   For each voter casting an affidavit ballot, election administrators must manually determine each voter's eligibility before his or her ballot can be counted.  Grayson Decl. ¶ 26; Ryan Dep. 69:17-23.  Then they must count all such affidavit ballots determined to be validly cast.  Grayson Decl. ¶ 26.

292.   The affidavit voting process in New York, like all other states, is lengthy and involves many steps.  Grayson Decl. ¶¶ 27, 37; Ryan Dep. 69:17-73:12, 76:9-77:21, 82:7-19, 86:3-16; Valentine Testimony.

293.   Staff for the New York City Board of Elections employs an intricate system for processing and counting affidavit ballots.  On Election Day, poll workers should place affidavit ballot envelopes in an envelope, which is "sealed and turned over to the custody of the New York City Police Department, which transmits the ballots to the board of elections.  Ryan Dep. 200:8-17.  Then, staff members begin to sort the affidavit ballots and place them on baker's

racks, where they are organized by assembly district and election district so that borough officers can begin processing them.  Ryan Dep. 72:4-16.  In New York City, the process of initially attempting to determine voter eligibility takes place in specially designated areas, where representatives of both the Democratic and Republican Parties must simultaneously open a door to a "double-locked room" to ensure the integrity of the process.  Ryan Dep. 69:24-70:11, 74:3-20.  Later, affidavit ballot envelopes are opened and the board of elections counts the affidavit ballots in a public proceeding.  Ryan Dep. 72:17-73:4

294.    Staff for the New York City Board of Elections often works during and through the weekend after the election to complete the initial review of affidavit ballots, when they are sorted into separate categories of "presumptively valid affidavit ballots" and "presumptively invalid affidavit ballots."  Ryan Dep. 73:5-12.  That process begins the evening of Election Day and continues through 10 am on the Wednesday that occurs eight days after Election Day, at which point the process of holding public proceedings in which the board of elections opens affidavit ballot envelopes and counts ballots begins.  *Id*. 74:21-76:8.

295.    In New York City alone, multiple employees from each borough work on the affidavit ballot sorting process throughout the roughly weeklong period – including dozens in Brooklyn alone.  Ryan Dep. 78:16-79:11, 81:16-23.  New York City Board of Elections calls the process of reviewing and sorting affidavit ballot envelopes as an "all hands on deck" period in which the borough chiefs and deputies are involved.  Ryan Dep. 76:9-77:2.

296.    Processing affidavit ballots cast by New York City voters is such a large and challenging task that the New York City Board of Elections re-purposed and remodeled existing warehouse space in Manhattan and is considering allocating additional space in Brooklyn solely for the purpose of processing affidavit ballots.  Ryan Dep. 78:16-80:21.  The New York City

Board of Elections rents higher quality chairs and tables during the review process so employees who are reviewing ballots "aren't having their backs or other parts broken for the hours they have to spend there and do it." *Id*. 80:22-81:11.

297.     New York's policy of prohibiting inactive voters from casting regular ballots creates a greater risk of ballots being lost as they are returned to the county board of elections for eligibility determination and counting, because affidavit ballots must be segregated from regular ballots.  Grayson Decl. ¶ 28; Ryan Dep. 87:20-88:19 (discussing how poll workers sometimes do not put affidavit ballots in the correct envelope, which required recertifying the results of a recent election).

298.     Unlike regular ballots, affidavit ballots may not count; the eligibility of voters who cast the affidavit ballots has yet to be determined.  Grayson Decl. ¶ 28.

299.     Segregating ballots increases the challenge of keeping track of ballots in each precinct.  Grayson Decl. ¶ 28.  After almost every election, the media reports on election administrators losing or misplacing absentee or provisional ballots.  *Id*.  For example, 500 absentee ballots that should have been counted in the November 2017 election were delivered to New York City Board of Elections six months after the election had passed.  *Id*. & n. 8; Ryan Dep. 87:20-89:3 (acknowledging that "mistakes will happen" in the context of processing affidavit ballots).

300.     The need to segregate affidavit ballots cast by eligible but inactive voters, as opposed to having those voters cast regular ballots, increases the odds of ballots being misplaced or lost.  Grayson Decl. ¶ 28.

301.    The administrative burdens of provisional ballots include the extra work required to train poll workers, provide materials in each precinct, and determine a provisional voter's eligibility, relative to the small number of such ballots actually counting.  Grayson Decl. ¶ 31.

302.    Affidavit ballots also become easy targets in post-election litigation, especially given questions about eligibility determination and the increased potential for them being misplaced en route to the local board of elections.  Grayson Decl. ¶¶ 33-34 (discussing conversations with Secretary of State colleagues at national election meetings).

303.    Disputed affidavit ballots were at the center of the recent recount in the Queens district attorney race.  P252 (Adwait Patil, *How Affidavit Ballots Ended Up At The Center Of The Queens DA Recount*, Gothamist, July 12, 2019, https://gothamist.com/news/how-affidavit-ballots-ended-up-at-the-center-of-the-queens-da-recount); P251 (Tom McParland, *Cabán Campaign Eyes 114 Disputed ballots Ahead of Queens DA Recount*, N.Y.L.J., July 8, 2019, https://www.law.com/newyorklawjournal/2019/07/08/caban-campain-eyes-114-disputed-ballots-ahead-of-queens-da-recount/).

304.    Due to litigation and less formal disputes, among other reasons, the counting of affidavit ballots can delay final election results.  Grayson Decl. ¶ 32.

305.    The public wants election results as quickly as possible.  Grayson Decl. ¶ 32. Michael Ryan, Executive Director of the New York City Board of Elections, observes that "quick, accurate results also are an element of public confidence" in elections.  Ryan Dep. 68:20-69:6.

306.    If the inactive list were provided in each precinct and inactive registrants were permitted to cast a regular ballot, the number of affidavit ballots issued in New York would be reduced.  Fewer affidavit ballots would mean less work for election administrators and reduced

opportunities for misplaced ballots and postelection challenges.  Grayson Decl. ¶ 49; Ryan Dep. 69:17-73:12, 76:9-77:21, 82:7-19, 86:3-16, 87:20-89:3.

307.    Inactive registrants who are properly voting at their address of registration will not provide better information to election administrators about the current address because they are not in the poll books.  Meredith Decl. at 28.

308.    The information in the poll book is not unique.  All of the information that could be learned in the poll book in New York, except a registrant's signature, is already available online through the NYS lookup.  Meredith Decl. at 28.

309.    The poll book does not provide all of the information necessary for the affidavit, as people must provide either their New York driver's license number or the last four digits of their social security number, even though neither is contained in the poll book.  Meredith Decl. at 28.

310.    There are ways of dealing with the concern that poll books provide information necessary for improper affidavit ballots to be cast that place less burden on inactive registrants who reside at their address of registration.  For example, some of the information about inactive registrants could be redacted from the poll book.  Meredith Decl. at 28.

311.    Excluding inactive registrants from poll books does not help election administrators determine where a registrant resides.  Meredith Decl. at 28.

312.    E-poll books or supplemental poll books could be used if the concern is that larger poll books make it hard for poll workers to locate active registrants on Election Day.  Meredith Decl. at 29; Grayson Decl. ¶ 29.

     **B.**    **New York has Previously Confirmed That Omitting Inactive Voters' Names does not Enhance the Integrity of Elections**

313.     The State of New York has acknowledged in an amicus brief to the United States Supreme Court that "[v]oters whose information is missing from the rolls . . . require the time and attention of officials," resulting in "a bottleneck at the check-in table that will slow the processing of voters and begin to cause back-ups and lines.  These costs can be tremendous and unduly burdensome for both voters and states and local officials."  Brief for the States of New York et al. as *Amici Curiae* Supporting Respondents, *Husted v. A. Philip Randolph Institute*, —— U.S. ——, 138 S.Ct. 1833 (2018) at 30-31 (citing Republican Nat'l Lawyers Ass'n Report at 10 (April 2014)).  This is because "[v]oters whose information is missing from the rolls . . . require the time and attention of officials."  Brief for the States of New York et al. at 30-31 (citing Presidential Comm'n on Election Admin., *The American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration* at 25 (Jan. 2014)).

314.     The complaint in intervention filed on behalf of the People of the State of New York in *Common Cause New York v. Board of Elections in the City of New York*, No. 1:16-cv-06122-NGG, Dkt. 27-1 (E.D.N.Y. Jan. 26, 2017), states "upon information and belief, voters who cannot locate their names in the poll book of their poll site often choose to leave without casting an affidavit ballot" because they are "deterred" by "inaccurate information."  *Id.* ¶ 127.

315.     The Co-Executive Directors of the New York State Board of Elections cited as the primary benefit of excluding inactive voters from the poll books and forcing them to cast affidavit ballots was that doing so complied with state election law.  *See* Brehm Testimony; Valentine Testimony.

316.     Mr. Brehm could not identify any other state interest supposedly served by New York's procedures for inactive voters.  Brehm Testimony.

317.    The only other state interest identified by Mr. Valentine was that "inactive voters have a question about their residency.  So it raises the question as to what ballot they're eligible to vote for.  So it serves the purpose of confirming that the voter is actually given the correct ballot for the offices which they're eligible to vote for.  So it takes an additional step before that ballot is issued."  Valentine Testimony.

318.    Michael Ryan, Executive Director of the New York City Board of Elections, is concerned that New York's processing for determining inactivity is founded upon "the quality of information that we get from the post office," in which he has "little faith," and erroneously reports that voters in predominantly multi-unit housing have moved when that is not in fact the case.  Ryan Dep. 101:21-102:17.  Mr. Ryan notes that there is a negative impact on the public's confidence in their vote when voters cannot cast and scan a regular ballot.  *Id.* 69:7-16.

319.    To the extent New York has a state interest in confirming the residency of inactive voters, that interest can be met with alternatives far less onerous than excluding inactive voters from poll books and forcing them to vote an affidavit ballot.  *See*, *e.g.*, Grayson Decl. ¶¶ 29, 47; Meredith Decl. at 28-29; Martin Decl. ¶¶ 15-16, 23-24.

### C.    At Least Three New York Counties and Other States Appear to Use Supplemental Lists Containing Inactive Voters' Names at Polling Places

320.    There are ways of dealing with any concerns that poll workers will not administer ballots as effectively if inactive registrants are listed in the poll book.  For example, Connecticut, Kentucky, and Columbia, Nassau, and Schoharie Counties in New York, appear to have separate poll books for active and inactive registrants.  Meredith Decl. at 28-29; Grayson Decl. ¶ 29; Martin Decl. ¶¶ 16, 29-30; *see also* Meredith Decl. at 21 n. 54; Schoharie County Board of Elections, 2018, "Election Day Guide", p. 13; Nassau County Board of Elections, 2015, "Reference Guide for Inspectors", p. 25 of PDF (p. 19 of document).

321.    At least one county in New York – Columbia County, which has approximately 44,628 active registered voters and 50 precincts – currently includes inactive voters along with challenged voters on the supplemental list that is maintained at polling places on Election Day. Martin Decl. ¶¶ 9-10, 16, 29-30.

322.    The fact that Columbia County includes inactive voters along with challenged voters on the supplemental "Challenge List" that is maintained at polling places on Election Day is reflected in the county's poll worker manual, which is routinely provided, as per request, to the New York State Board of Elections, at the beginning of each year.  Martin Decl. ¶¶ 18-22.

323.    In Columbia County, poll workers are instructed that if a voter's name is not on the active voter list (and therefore is not in the poll book), poll workers should check to see if they have a supplemental Challenge List (or inactive list) at the polling place.  Martin Decl. ¶ 18.

324.    The poll worker manual further provides that if a voter is on the supplemental Challenge List, poll workers should ask the voter to swear that s/he does reside at such address or does otherwise qualify to vote, as may be appropriate.  Martin Decl. ¶ 19.  Poll workers should then provide the voter an affidavit ballot envelope and instruct the voter on how to fill out an affidavit ballot.  *Id*.  This instruction is given on the understanding that the Challenge List is in reality a list of inactive, but not challenged, voters.  *Id*.

325.    The Columbia County Board of Elections instructs poll workers to offer affidavit ballots to inactive voters, as well as to advise them that they have the alternative of requesting a court order, because that is what is required by New York state law.  Martin Decl. ¶ 20.  If permitted by law, Columbia County Election Commissioner Virginia Martin would instruct poll workers to offer regular ballots to inactive voters who appear at the correct polling place on Election Day and are otherwise eligible to vote.  *Id*.

326.     In her capacity as Election Commissioner, Ms. Martin receives phone calls from poll workers who are assisting inactive voters located on the Challenge/Inactive List and asking what they should do next.  Martin Decl. ¶¶ 23-24.  Ms. Martin instructs the poll workers to provide the Notice to Voters form, which details the two options available to the voter – requesting a court order or voting by affidavit ballot.  *Id.* ¶ 24.  These phone calls are quick, and poll workers have not expressed confusion about the proper next steps.  *Id.*

327.     In the approximately eight years Ms. Martin has observed Columbia County engaging in the practice of including inactive voters along with challenged voters on the supplemental list that is maintained at polling places on Election Day, she is not aware of any complaints from voters, poll workers, election officials, or anyone else about that practice. Martin Decl. ¶¶ 16, 25.

328.     Nassau County's 2015 poll inspector manual provides that "if the voter belongs in your Election District, but their name is not in your Election District, they can vote by Affidavit only if: a. Voter's name appears on Inactive List in the back of the poll ledger book and they have not moved from the address listed. (BOE will notify the voter that their record will be reinstated as Active);* …"  *See* Meredith Decl. at 21 n. 54; Nassau County Board of Elections, 2015, "Reference Guide for Inspectors", p. 25 of PDF (p. 19 of document).  Nassau County's 2015 poll inspector manual further provides that "If a voter on the inactive list comes to vote and has not moved, they may vote by <u>affidavit ballot </u>- **not on the machine**."  *Id.*, p. 27 of PDF (p. 21 of document).

329.     Schoharie County's 2018 poll worker manual provides, "[i]f the voter's name is not in your Poll Book, check the inactive list."  *See* Meredith Decl. at 21 n. 54; Schoharie County Board of Elections, 2018, "Election Day Guide", p. 13.

**D.      Including Inactive Voters' Names in Poll Books Would Not Impose a Burden on the Resources of County Election Offices**

330.    New York would not meaningfully increase its costs or administrative burden by providing the inactive list to each precinct.  Grayson Decl. ¶ 29; Martin Decl. ¶¶ 23-26.

331.    A simple programming update could add all eligible voters – active and inactive – to the database query producing each precinct's printed roster, with each voter's status (active or inactive) clearly marked.  Alternatively, a similar programming update would allow New York to produce a supplemental roster containing the names of voters on the inactive list.  Grayson Decl. ¶ 29.

332.    In Columbia County, New York, the cost of printing the supplemental Challenge/Inactive List, which contains inactive voters' names and is provided to polling places for use on Election Day, is not a significant strain on county resources.  The approximate cost of printing the lists for the 2018 election was less than $20.  Martin Decl. ¶¶ 16, 26.

333.    In the approximately eight years Ms. Martin has observed Columbia County engaging in the practice of including inactive voters along with challenged voters on the supplemental list that is maintained at polling places on Election Day, she is not aware of any complaints regarding the cost of that practice.  Martin Decl. ¶¶ 16, 25.

334.    Columbia County's overall election budget for fiscal year 2018 was approximately $639,984, and for 2019 it was approximately $654,355.  Martin Decl. ¶¶ 27-28.

335.    According to the 2016 annual statistical report produced by the New York State Board of Elections, Columbia County had an election budget of approximately $515,888 in 2017.  P239, Annual Statistical Report of the New York Board of Elections (2016), Report 1a.

336.     According to the 2016 annual statistical report, the New York City Board of Elections and 32 other counties had 2017 election budgets larger than that of Columbia County, while 24 counties had 2017 election budgets smaller than that of Columbia County.  P239.

337.     According to the 2016 annual statistical report, the Hamilton County Board of Elections had the smaller 2017 election budget of approximately $200,803.  P239, Annual Statistical Report of the New York Board of Elections (2016), Report 1a.

338.     According to the 2016 annual statistical report, the New York City Board of Elections had the largest 2017 election budget of approximately $128,534,307.  P239, Annual Statistical Report of the New York Board of Elections (2016), Report 1a.

339.     According to the 2016 annual statistical report, the Nassau County Board of Elections had a 2017 election budget of approximately $19,254,454, and the Schoharie County Board of Elections had a 2017 election budget of approximately $373,261.  P239, Annual Statistical Report of the New York Board of Elections (2016), Report 1a.

340.     Concerns that inactive registrants should be excluded from the poll book to reduce the cost of printing or to make it easier for poll workers to locate active registrants in the poll book do not justify the disenfranchisement that is caused by omitting inactive registrants from the poll book.  Meredith Decl. at 29.

341.     While printing costs might be a relevant consideration if essentially no inactive registrants voted, it is not a relevant consideration given that tens of thousands of inactive registrants voted in the 2016 presidential election.  Meredith Decl. at 29.

## VII.   PLAINTIFF'S EXPERT WITNESSES ARE QUALIFIED TO OFFER OPINION TESTIMONY

342.     Dr. Marc Meredith is a tenured associate professor in the Department of Political Science at the University of Pennsylvania.  He holds a courtesy appointment in the Business

Economics group at the Wharton School of Business at the University of Pennsylvania. Prior to starting his position at the University of Pennsylvania in 2009, he was a visiting lecturer at the Massachusetts Institute of Technology Department of Political Science. In 2002, he earned a B.A. in Economics and Mathematical Methods in the Social Sciences and an M.A. in Economics from Northwestern University. In 2006, he earned an M.A. in Political Science from Stanford University, and in 2008 he earned a Ph.D. in Business Administration from the Political Economics group in the Stanford Graduate School of Business. Meredith Decl. at 2.

343.    While a professor at the University of Pennsylvania, Dr. Meredith has received highly-competitive visiting scholar appointments at the Institute for Advanced Study in Toulouse, Nuffield College at Oxford University, and the Center for the Study of Democratic Politics at Princeton University. Dr. Meredith also recently presented my research on voter identification laws before the Michigan Advisory Committee to the U.S. Commission on Civil Rights. Dr. Meredith regularly provides his expertise in evaluating conference and peer-review submissions, and also in vetting candidates for tenure. Since the start of 2017, Dr. Meredith has reviewed 65 journal articles and 7 external promotion cases. Meredith Decl. at 2.

344.    In the last year, Dr. Meredith's views and research related to criminal disenfranchisement laws in relation to American elections have appeared in numerous leading media outlets including *The New York Times*, *Newsweek*, *The Wall Street Journal*, and *The Washington Post*. In addition, the NPR program This American Life did a segment on his research on voter fraud as part of an episode entitled "Things I Mean To Know." Dr. Meredith also consults for the NBC News Decision Desk, where, as a senior analyst, he generates statistical models and applies them to determine NBC's projections of election winners on election nights. Meredith Decl. at 3.

345.     Dr. Meredith is qualified to offer the opinions within his field of expertise that potential voters are burdened when inactive registrants are excluded from poll books because doing so uses scarce poll worker resources; excluding inactive registrants from poll books places additional burdens on inactive registrants who continue to reside at their address of registration and all registrants who show up to vote in the wrong election district; the burdens imposed on these populations reduce the number of valid ballots cast in New York; and that omitting inactive registrants from poll books does not make it easier for election administrators to determine where inactive registrants reside, particularly given that inactive registrants cast affidavit ballots.

346.     Trey Grayson served as the Secretary of State of the Commonwealth of Kentucky from January 2004 to January 2011.  Kentucky's chief elections official under federal and state law during that time, he chaired the Kentucky State Board of Elections, which administers Kentucky election laws and supervises voter registration in Kentucky.  As Secretary of State, he worked with the General Assembly and the county clerks to develop and pass election legislation, reviewed and revised proposed election administration regulations, regularly engaged with Kentucky county clerks and other local election administrators at conferences and training sessions, and interacted with the media about Kentucky election administration.  Grayson Decl. ¶¶ 2-3.

347.     Mr. Grayson was elected President of the National Association of Secretaries of State (NASS) from 2009-10 and as Chair of the Republican Association of Secretaries of State from 2005-07.  In 2012, President Barack Obama appointed Mr. Grayson to the bipartisan Presidential Commission on Election Administration (PCEA), where he traveled the country to speak to election administrators, academics, advocates, and the general public about how to

improve America's elections, and presented recommendations to President Obama and Vice President Biden during a January 2014 meeting in the White House.  Grayson Decl. ¶¶ 4-5.

348.    Mr. Grayson is a founding board member of two national non-profits working to improve elections – Democracy Works and the Center for Election Innovation and Research. Mr. Grayson has also served as Director of Harvard University's Institute of Politics (2011-14) and as President & CEO of the Northern Kentucky Chamber of Commerce (2014-17).  He is currently a member of the law firm of Frost Brown Todd LLC in the firm's Florence, Kentucky office (2017-present).  Mr. Grayson graduated from Harvard College with an A.B. in 1994, with a government concentration, and from the University of Kentucky with a J.D. / M.B.A. in 1998. Grayson Decl. ¶¶ 6-8.

349.    Mr. Grayson is qualified to offer the opinions within his field of expertise that New York's policy of not making the inactive voter list available in each polling place and of not permitting inactive voters to cast a regular ballot places an undue burden on its voters and its election administrators.  He is qualified to conclude that, for New York election administrators, providing the inactive list would mean less work, reduced risks of misplaced ballots, and fewer post-election challenges.  He is also qualified to conclude that, for New York voters, it would mean faster check-ins, shorter lines, and greater certainty when leaving the precinct that their votes were going to count.  Grayson Decl. ¶ 1.

## VIII. COMMON CAUSE/NEW YORK HAS BEEN INJURED BY NEW YORK'S PROCEDURES FOR PROCESSING INACTIVE VOTERS AT POLLING PLACES

350.    Plaintiff Common Cause/New York ("Common Cause") is the New York chapter of Common Cause, a 501(c)(4) not-for-profit corporation.  Common Cause/New York's principal place of business is located in New York, New York.  Lerner Decl. ¶ 1.

351.    Susan Lerner has been the executive director of Common Cause/New York since December of 2007.  Lerner Decl. ¶ 3.

352.    Common Cause is a nonpartisan grassroots organization whose mission mirrors that of the National Voter Registration Act and the Fourteenth Amendment.  Lerner Decl. ¶ 4, 19.  Specifically, Common Cause is dedicated to upholding the core values of American democracy.  *Id.*  It works to create open, honest, and accountable government that serves the public interest; to promote equal rights, opportunity, and representation for all; and to empower all people to make their voices heard in the political process.  *Id.*

353.    Common Cause/New York has more than 60,000 activists and members in New York State, which includes more than 25,000 activists and members in New York City.  Lerner Decl. ¶ 5.

354.    Common Cause/New York maintains its own advisory board.  Lerner Decl. ¶ 5. The advisory board participates in Common Cause/New York's annual strategic review process in which Common Cause/New York sets its priorities, advises the staff of Common Cause/New York, and supports Common Cause/New York through fundraising and other means.  *Id.*

355.    Common Cause/New York engages in its own fundraising efforts.  Lerner Decl. ¶ 7.  Common Cause/New York raises all of its own funds for its operations.  *Id.*

356.    Common Cause/New York proposes its own budget, which is developed by its Executive Director.  Lerner Decl. ¶ 7.  The Common Cause Governing Board approves a final state budget for Common Cause/New York.  *Id.*

357.    Common Cause/New York's budget for the current fiscal year is approximately $550,000.  Lerner Decl. ¶ 7.

358.     Common Cause/New York raises its own dedicated funding and receives grants. Lerner Decl. ¶ 7.  Common Cause/New York has received grants for the current fiscal year related to researching automatic voter registration options for New York City, educating voters statewide regarding in-person early voting options, and promoting rank choice voting in New York City.  *Id*.

359.     Common Cause/New York has committed and continues to commit time and personnel to conducting voter registration, voter assistance, election protection, and to ensuring that eligible citizens remain registered to vote in New York State.  The purpose of Common Cause/New York's activities in this vein is to increase the level of voter registration and thereby increase the level of voter participation in our democracy.  Lerner Decl. ¶ 8.

360.     Common Cause/New York has committed, and continues to commit, time and resources to advocating for reforms that improve election administration in New York City and New York State, monitoring polling places on Election Day, documenting and analyzing voters' problems at polling places, conducting voter registration efforts, facilitating a coalition of groups that work on election administration and reform, and issuing reports and recommendations for the reform of New York election law and election administration practices.  Lerner Decl. ¶ 3.

361.     Common Cause/New York has traditionally spent a considerable amount of time and resources directed to voter registration efforts.  Lerner Decl. ¶ 8.  The organization conducted voter registration drives in New York City that resulted in hundreds of new registrants in 2016 and in 2018.  *Id*.

362.     During and after the 2016 election cycle, Common Cause/New York staff spent substantial staff time and resources reaching out to, educating, and assisting voters who complained that they were not listed in the poll book on Election Day.  Lerner Decl. ¶ 10.

363.    For example, Ms. Lerner created a survey to send to New York State residents to learn about their experiences attempting to vote in 2016.  Lerner Decl. ¶ 14.

364.    Ms. Lerner personally spoke with voters who said that they were not listed in the poll book on Election Day.  Lerner Decl. ¶ 14.  Ms. Lerner provided assistance to affected voters by contacting county and state election officials to try to ascertain their voter registration status and whether or not their affidavit ballot might be counted.  *Id*.

365.    Common Cause/New York has devoted significant resources to addressing the concerns about New York's list maintenance procedures by assisting individual voters, testifying at hearings, conducting press conferences, and discussing the issue with the staff of the NYS BOE.  Lerner Decl. ¶ 15.

366.    During and after the 2016 election cycle, Ms. Lerner developed a public information campaign to raise awareness and educate voters concerning the circumstances faced by the many voters who arrived at the polling place on Election Day but whose names were not listed in the rolls.  Lerner Decl. ¶ 13.  Common Cause/New York worked to find other voters who needed help and to ensure that they will be able to vote in future elections.  *Id*.  Common Cause/New York's efforts included alerting voters to potential problems at the polls and encouraging them to be proactive if they experienced problems with voting or their registration status.  *Id*.

367.    Ms. Lerner's work assisting voters and educating the public about problems related to voters who did not appear in the poll book on Election Day during and after the 2016 election cycle took time away from various other activities she would otherwise have been working on as the Executive Director of Common Cause/New York.  Lerner Decl. ¶ 18.  Ms. Lerner was forced to spend less time preparing for year-end fundraising, engaging in advocacy

efforts and promoting reforms with the New York State Legislature, and responding to and strategizing around issues unrelated to elections.  *Id.*

368.    If it were not for New York's laws, procedures, and policies that are the subject of the current litigation, Common Cause/New York would not have had to spend its limited resources assisting affected voters and educating the public and could instead focus on its central priorities.  Lerner Decl. ¶ 24.

369.    During the 2018 election cycle, Common Cause/New York hired a contractor, Katherine Hawkland, who was primarily devoted to voter engagement.  Lerner Decl. ¶ 16.  Ms. Hawkland reached out to inactive voters, as well as other voters at risk of being disenfranchised in the upcoming elections.  *Id.*

370.    Ms. Hawkland's job was to recruit and train volunteers to send peer-to-peer text messages to young voters to remind them to register and to vote, in an attempt to increase voter turnout among young voters.  Lerner Decl. ¶ 16.  Ms. Hawkland's work recruiting volunteers for Get Out The Vote work, however, was interrupted to assist voters at risk of being improperly disenfranchised in the September 2018 primary election.  *Id.* ¶ 17.

371.    Ms. Hawkland was compensated a total of/at a rate of $5,000 per month.  Lerner Decl. ¶ 16.

372.    Ms. Lerner's own time was also diverted during the 2018 election cycle.  *Id.* ¶ 18. Ms. Lerner spent approximately two to three hours per day on supervising, reviewing and organizing Common Cause/New York's efforts to minimize the number of voters who would be improperly disenfranchised during the 2018 election cycle.  *Id.*

373.    Common Cause/New York members include individuals who have received or may in the future receive a confirmation notice from New York State and may not respond to

that notice.  Lerner Decl. ¶ 21.  These individuals face removal from the official list of "active"

voters to an "inactive" registration status under which their names would not appear in the poll

books on Election Day.  *Id.*  They would not be permitted to vote a regular ballot, may not be

offered an affidavit ballot, and, to the extent that they do vote an affidavit ballot, the affidavit

ballot may not be counted.  *Id.*

374.    Ensuring that all eligible voters, including inactive voters, are listed in poll books

at New York polling places is germane to Common Cause/New York's mission to increase the

level of voter registration and thereby increase the level of voter participation in our democracy.

Lerner Decl. ¶ 19.

375.    Inactive voters, including members of Common Cause/New York, are uniquely

harmed by New York's prohibition on placing inactive voters' names in poll books.  Lerner

Decl. ¶ 22.

376.    Common Cause/New York sent an NVRA notice letter to the New York State

Board of Elections on November 2, 2016.  Lerner Decl. ¶ 25; *see also* P258 (NVRA notice letter,

Dkt. 1-3).

377.    The relief requested in the instant litigation is prospective and applicable to all

inactive voters whose rights have been or will be harmed by New York's prohibition on placing

inactive voters' names in poll books.  Participation of individual members of Common

Cause/New York is not necessary to obtain relief.

## PROPOSED CONCLUSIONS OF LAW

I.     **COMMON CAUSE/NEW YORK HAS STANDING**

378.    Common Cause/New York has a private right of action under the NVRA as "a person who is aggrieved by a violation" of the NVRA.  52 U.S.C. § 20510(b)(1).  The NVRA requires that, prior to bringing an action to enforce the NVRA, an aggrieved person must give written notice to the "chief State election official" to identify the violation(s) and to provide the State with an opportunity to cure the violation(s) prior to the commencement of an action.  *Id.*  Common Cause/New York complied with that requirement in the instant case by sending an NVRA notice letter to the New York State Board of Elections on November 2, 2016.  *See* P258, NVRA Notice Letter, Dkt. 1-3.

379.    Organizational Plaintiff Common Cause/New York has standing in this case.  *See* Opinion & Order, Dkt. 58, at 6-10.

380.    Common Cause/New York has devoted significant resources to addressing its concerns about New York's list maintenance procedures.  Lerner Decl. ¶ 15.  This includes assisting individuals testifying at hearings, conducting press conferences, and discussing the issue with the staff of the BOE.  *Id.*  As a result, Common Cause/New York has had to divert resources from its efforts to register and mobilize voters, which is essential to its mission, in order to assist voters who have been improperly placed on 'inactive' status and/or removed from the voter rolls.  *Id.* ¶ 23.  Work caused by responding to these complaints consumes a significant amount of Common Cause/New York's time and resources.  *See id.* ¶¶ 10, 15, 20, 23.  This has particularly been the case following the 2016 primary election, with the overall effect that the organization has therefore had less time to devote to other core aspects of its mission.  *See id.* ¶¶ 10, 12, 13, 17-18.  Common Cause/New York has suffered a "consequent drain on the

organization's resources" that represents "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Ragin v. Harry Macklowe Real Estate Co*., 6 F.3d 898, 905 (2d Cir. 1993).

381.    Second Circuit precedent confirms that Common Cause/New York has standing to bring the instant lawsuit.  The Second Circuit held that Common Cause/New York had standing to bring an election-related case.  *See Lopez Torres v. New York State Bd. Of Elections*, 462 F.3d 161, 169-70 n. 1 (2d Cir. 2006), *rev'd on other grounds*, 552 U.S. 196 (2008) (holding that Common Cause New York possessed associational standing because there was a clear likelihood that its members – 20,000 voters from across New York State – had suffered a concrete injury to their First Amendment rights that was fairly traceable to defendants' conduct and could be remedied by court action).

382.    Since standing is jurisdictional in nature, it is probative that federal courts around the country have routinely held that Common Cause's state affiliates have standing to bring voting rights cases in federal court.  *See*, *e.g.*, *Common Cause/Indiana v. Lawson*, 327 F. Supp. 3d 1139, 1151-52 (S.D. Ind. 2018) (holding that "Common Cause has standing to pursue its claim for declaratory and injunctive relief"); *Common Cause/Georgia. v. Kemp*, 347 F. Supp. 3d 1270, 1288-91 (N.D. Ga. 2018) (holding that "Common Cause Georgia" has both organizational and associational standing); *Common Cause/Indiana v. Ind. Sec'y of State*, 60 F. Supp. 3d 982, 987-88 (S.D. Ind. 2014) (holding that "Common Cause has standing to prosecute this action"); *Common Cause of Colorado v. Buescher*, 750 F. Supp. 2d 1259, 1270-72 (D. Colo. 2010) (holding that Common Cause has both organizational and associational standing).  Indeed, courts have permitted Common Cause state affiliates to bring suits, many of which have been successful or resulted in consent decrees, in various federal courts.  *See*, *e.g.*, *Common Cause*

*New York v. Bd. of Elections in the City of New York*, No. 1:16-cv-06122-NGG, Dkt. 65

(E.D.N.Y. Dec. 14, 2017); *Common Cause/Indiana v. Individual Members of the Ind. Election

Comm'n* , 800 F.3d 913 (7th Cir. 2015); *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th

Cir. 2009); *Common Cause/Indiana v. Marion County Election Bd.*, 311 F. Supp. 3d 949 (S.D.

Ind. 2018).

383.    Common Cause/New York is a chapter of the incorporated entity "Common

Cause."  Lerner Dep. 8:5-8.  Common Cause New York may therefore bring the instant case

under Federal Rule of Civil Procedure 17(b)(2), which provides that a corporation's capacity to

sue or be sued is determined by the law under which it was organized.  The New York Supreme

Court, Appellate Division has held that "where there is shown to be an appropriate delegation of

authority, an unincorporated division of a corporation can sue on behalf of the jural entity of the

corporation of which it is a part."  *Maranatha Assocs. Inc. v. Titan Grp. Inc.*, 202 A.D.2d 846

(N.Y. App. Div. 1994) (*citing Matter of Orange County Publ. Div. of Ottaway Newspapers–

Radio v. White*, 284 N.Y.S.2d 293, 296-97 (N.Y. Sup. Ct. 1967); *American Jerex Co. v.

Universal Aluminum Extrusions*, 340 F. Supp. 524, 527-28 (E.D.N.Y. 1972)).

384.    Rule 17(a)(3) of the Federal Rules of Civil Procedures provide "[t]he court may

not dismiss an action for failure to prosecute in the name of the real party in interest until, after

an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be

substituted into the action.  After ratification, joinder, or substitution, the action proceeds as if it

had been originally commenced by the real party in interest."  *See also American Jerex Co.*, 340

F. Supp. at 527-28 (denying Defendant's motion for summary judgment, which alleged that

American Jerex Company did not have capacity to sue because it was a division of Chatham Corporation).[1]

385.    When, as here, a plaintiff has made clear in its complaint that it is suing as a division of a corporation, *see* Dkt. 1 ¶ 12, Dkt. 72 ¶ 15 ("Plaintiff Common Cause/New York is the New York chapter of Common Cause, a 501(c)(4) not-for-profit corporation"), any challenge to the plaintiff's right to sue on the basis that the parent corporation is not a named party is mere "surplusage and is not prejudicial to respondents in this proceeding." *Orange Cty. Publications Div. of Ottaway Newspapers-Radio, Inc. v. White*, 284 N.Y.S.2d 293, 296 (Sup. Ct. 1967); *see also Country Set Div. of Evan-Picone v. Interstyle, Inc.*, No. 78 CIV. 3459, 1978 WL 1443, at *1 (S.D.N.Y. Nov. 22, 1978) (same).

386.    Evidence obtained through discovery confirms that Common Cause/New York is Common Cause's proper division or chapter in the State of New York.  *See*, *e.g.*, About Us, Common Cause New York, *available at* https://www.commoncause.org/new-york/about-us/ (noting "[w]ith chapters in 35 states nationwide…" and that "Common Cause New York continues to be one of the most active state chapters in the country…").  For example, Common Cause/New York has its own advisory board, Lerner Dep. 8:9-15, proposes its own budget, *id.* 7:15-19, raises its own dedicated funding and receives grants, *id.* 9:12-10:8, and has its own membership group, to whom Common Cause/New York staff issue surveys and receive feedback.  *Id.* 11:11-21.

---

[1] If the national branch of Common Cause is technically the more appropriate name for the organizational plaintiff in this case, Common Cause/New York is amenable to substituting "Common Cause" in the caption of the complaint.

387.     Alternatively, even if Common Cause/New York were not considered to be a division or chapter of Common Cause, it still would have standing as an unincorporated association.  The United States Supreme Court has held that unincorporated organizations may have standing to bring suit in federal court.  *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669-70, 678, 689-90 (1973) (observing that SCRAP was an "unincorporated association formed by five law students" and affirming denial of motion to dismiss on the basis of failure to allege sufficient standing).  Indeed, "it is well-settled that, under certain circumstances, an unincorporated association may premise standing upon injuries suffered by some or all of its members."  *United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992) (*citing UAW v. Brock*, 477 U.S. 274, 281-82 (1986); *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 342-43 (1977); *Warth v. Seldin*, 422 U.S. 490, 511 (1975)); *see also Int'l Woodworker v. Ga.-Pacific Corp.*, 568 F.2d 64, 66 (8th Cir. 1977).

388.     Federal district courts in New York have routinely held the same.  *See*, *e.g.*, *Socialist Workers Party v. Attorney General of U.S.*, 463 F. Supp. 515, 517, 525 & n.10 (S.D.N.Y. 1978) (holding that the Socialist Workers Party and Young Socialist Alliance, an unincorporated party and association, respectively, have "a right of action" to bring suit, noting that "[i]t is clear that an unincorporated association has standing to assert damage claims for injury to itself"); *see also Center for Bio-Ethical Reform, Inc. v. Black*, 234 F. Supp. 3d 423, 432 (W.D.N.Y. 2017) (holding that Plaintiff UB Students for Life, an unincorporated association, has sufficiently alleged standing); *Employees Committed for Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 426, 434-35 (W.D.N.Y. 2005) (Employees Committee for Justice, "an unincorporated organization comprised of approximately one thousand past and present African

American employees of Kodak who have claims of racial discrimination against Kodak," had

standing to seek injunctive relief in a Title VII suit for the benefit of its membership).[2]

389.    Pursuant to Fed. R. Civ. P. 17(b)(3)(A), courts have allowed unassociated labor

unions, environmental groups, and student government associations to sue in federal court for

injuries arising under federal law or the Constitution even if they would be unable to sue in their

own names under state law.  *See Local 4076, United Steelworkers of Am. v. United Steelworkers*

*of Am., AFL-CIO*, 327 F. Supp. 1400, 1403 (W.D. Pa. 1971) (labor unions); *Comm. for Idaho's*

*High Desert v. Yost*, 881 F. Supp. 1457, 1469 (D. Idaho 1995) (environmental group), *aff'd in*

*part, rev'd in part sub nom. Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir.

1996); *Associated Students of Univ. of California at Riverside v. Kleindienst*, 60 F.R.D. 65, 66–

68 (C.D. Cal. 1973) (student government association).

390.    Whether an entity is an unincorporated association under Rule 17(b) is a matter of

federal law.  *See In re Magnetic Audiotape Antitrust Litig.*, 2000 WL 1855119, at *1 (S.D.N.Y.

Dec. 19, 2000) (internal quotations and citations omitted); *Associated Students of Univ. of*

*California at Riverside v. Kleindienst*, 60 F.R.D. 65, 67 (C.D. Cal. 1973) (citing cases).  *See also*

*Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir. 1996) ("for purposes of

Rule 17(b)(1), the determination of what constitutes an 'unincorporated association' is a question

of federal law.").  "For the purposes of Rule 17(b) an unincorporated association is a voluntary

group of persons, without a charter, formed by mutual consent for the purpose of promoting a

common objective."  *In re Magnetic Audiotape Antitrust Litig.*, 2000 WL 1855119, at *1

(internal quotations and citations omitted); *see also Prescription Containers, Inc. v. Cabiles,*

---

[2] Similarly, unincorporated associations may be held liable in civil litigation.  *See, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 931 (1982); *see also Jund v. Town of Hempstead*, 941 F.2d 1271, 1279 (2d Cir. 1991).

2014 WL 1236919, at *4–5 (E.D.N.Y. Feb. 14, 2014), *report and recommendation adopted,* 2014 WL 1237098 (E.D.N.Y. Mar. 25, 2014) ("Federal courts have used various definitions for an unincorporated association including, 'a body of persons acting together and using certain methods for prosecuting a special purpose or common enterprise' and 'a collection of persons created and formed by the voluntary action of a number of individuals in associating themselves together under a common name for the accomplishment of some lawful purpose.'").

391.    Common Cause/New York meets the federal definition of "unincorporated association" because it is a membership organization, oriented around promoting inclusive, democratic processes in New York State – an undoubtedly lawful purpose.  *See Cabiles,* 2014 WL 1236919, at *5 (finding an entity was not an "unincorporated association" because there was insufficient evidence that members were joining together to accomplish a lawful purpose).

## II.    NEW YORK'S PROCEDURES FOR PROCESSING INACTIVE VOTERS AT POLLING PLACES IMPOSE BURDENS ON THE FUNDAMENTAL RIGHT TO VOTE IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS

### A.    The Legal Standard for Claims Alleging a Burden on the Fundamental Right to Vote

392.    Plaintiff Common Cause/New York is bringing an as-applied claim under the First and Fourteenth Amendments to the United States Constitution challenging New York's procedures for processing inactive voters at polling places.

393.    Voting is a fundamental constitutional right, implicated by the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 670 (1966); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). Indeed, the right to vote is "preservative of all other rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  "Other rights, even the most

basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

394.    The Constitution prohibits any encumbrance on the right to vote that is not adequately justified by the State's asserted interests.  *See Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983); *Burdick*, 504 U.S. at 433-34.

395.    The Supreme Court, first in *Anderson*, then in *Burdick*, and more recently in *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008), has endorsed a flexible, balancing test to accommodate citizens' constitutional right to vote with States' interests in regulating elections.  That test requires that courts "weigh 'the character and magnitude of the asserted injury to the . . . rights that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788-89); *see also Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419 (2d Cir. 2004).

396.    The *Anderson-Burdick* framework is flexible insofar as the state's asserted rationales for instituting a restriction that imposes burdens on voters are subject to a sliding scale of scrutiny; "the rigorousness of [the court's] inquiry" increases with the severity of the burden. *Burdick*, 504 U.S. at 434.  At one extreme, strict scrutiny is applied to severe restrictions on the right to vote.  *See Crawford*, 553 U.S. at 190, 202 (controlling opinion); *see also Green Party of N.Y. State*, 389 F.3d at 419.  If the burdens imposed are not "severe," the reviewing court "must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule." *Crawford*, 553 U.S. at 190; *see also Burdick* 504 U.S. at 434.  The First and Fourteenth Amendment rights involved, and the consequent requirement to conduct a close

review of a challenged voting practice, make the balancing test distinct from ordinary "rational basis" review, especially if the practice imposes a substantial burden on the right to vote. *See*, *e.g.*, *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 & n. 6 (4th Cir. 1995).

397.     In his lead opinion in *Crawford*, Justice Stevens emphasized that "[h]owever slight that burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation" on voting.  553 U.S. at 191 (citation and internal quotation marks omitted); *see also League of Women Voters of Fla. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) (holding that the regulation at issue failed the *Anderson-Burdick* test "because it disparately impose[d] significant burdens on Plaintiffs' rights weighted against imprecise, insufficiently weighty government interests").

398.     When assessing the severity of the burden on the right to vote, courts must focus on the restriction's impact on voters who are actually affected by it.  *See*, *e.g.*, *Crawford*, 553 U.S. at 198, 201 (controlling opinion) (in assessing severity of burdens imposed by voter ID law, holding that relevant burdens "are those imposed on persons who are eligible to vote but do not possess a current photo identification" and "indigent voters"); *Anderson*, 460 U.S. at 793-94 (ballot access burden "that falls unequally on new or small political parties or on independent candidates . . . discriminates against those candidates and—of particular important—against those voters whose political preferences lie outside the existing political parties"); *Harper*, 383 U.S. at 666 (observing that poll taxes, even if not burdensome for the average voter, violate the Fourteenth Amendment because of burdens they impose on poor voters); *Green Party of N.Y.*, 389 F.3d at 420-21 (focusing analysis of 50,000 vote requirement's impact on the Green Party and other "smaller, less developed—and hence less financially established parties").

399.     Thus, a law that affects a subgroup of voters that constitute only a relatively

modest percentage of total voters may nevertheless be sufficient to trigger heightened scrutiny.

*See Anderson*, 460 U.S. at 784-86; *League of Women Voters of N.C. v. North Carolina*, 769 F.3d

224, 244 (4th Cir. 2014) (observing that "even one disenfranchised voter—let alone several

thousand—is too many"); *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 593 (6th Cir.

2012) (law likely unconstitutional even though it affected only 0.248% of total ballots cast).

Where, as here, plaintiffs challenge a voting restriction with multiple, simultaneously-imposed

components—in this case, omitting inactive voters' names from poll books and requiring that

they cast affidavit ballots—the effects must be measured cumulatively and in the context of the

state's statutory regime, not in isolation, and must be justified with evidence of correspondingly

weighty interests.  *See, e.g.*, *Green Party of N.Y. State*, 389 F.3d at 415-16 (discussing New

York's closed primary system and observing that "[a] number of unique benefits accrue to a

Party in New York"); *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) ("[W]e evaluate the

combined effect" of ballot access rules).

**B.     New York's Policies of Omitting Inactive Voters' Names from Poll Books and Forcing Them to Cast Affidavit Ballots Impose Severe Burdens on the Right to Vote**

400.     Plaintiffs have established that the challenged provisions of New York's law of

omitting inactive voters' names from poll books and forcing them to cast affidavit ballots,

independently and cumulatively, impose severe burdens on the right to vote in New York,

warranting strict scrutiny under the *Anderson-Burdick* test.

401.     Omitting inactive voters' names from the poll books and forcing them to vote by

affidavit ballot results in the complete disenfranchisement of inactive voters who have not

moved from their address of registration and who have attempted to vote at the correct polling

place, such as Denise Roberts and Angela Roberts. *See e.g.*, ¶¶ 44, 128, *supra*. Disenfranchising eligible voters who appear at the correct polling place on Election Day constitutes a severe burden on the right to vote.

402.    Other inactive voters who have not moved from their address of registration and attempted to vote at the correct polling place, such as Robert Holman and Susan Stewart, have never learned whether or not their affidavit ballot was counted, even years later.  Many of these voters have made substantial and repeated efforts to figure out why they moved to inactive status or what happened with their ballot, including reaching out to election officials, going to post offices, and contacting Election Protection volunteers.  These experiences cause eligible inactive voters such as Holman and Stewart to believe their affidavit ballot did not count or may not have counted, which has decreased their confidence in the electoral process.  *See* ¶¶ 240-42, *supra*. Preventing eligible inactive voters who have cast an affidavit ballot in the correct polling place from knowing whether or not their absentee ballot was counted imposes a substantial burden on their right to vote.

403.    The unrebutted expert testimony of Dr. Marc Meredith proves that these voters' experiences are not merely isolated incidents.  Dr. Meredith demonstrates that tens of thousands inactive registrants continued to reside at their address of registration and at least 35,500 registrants cast affidavit ballots that were rejected because they showed up to vote in the wrong election district for the 2016 presidential election; a total of approximately 120,000 affidavit ballots were rejected in the 2016 presidential election alone.  Meredith Supp. Decl. at 2.  New York's policies of omitting inactive voters' names from poll books and forcing them to cast affidavit ballots increases the cost of voting for affected individuals.  The total universe of disenfranchised and impacted voters is even larger; as Dr. Meredith acknowledges, his

calculations do not include inactive registrants who show up to vote at the correct polling location but are not offered an affidavit ballot, since that interaction does not generate an administrative record.  By needlessly disenfranchising inactive voters and causing them to question their eligibility to vote and the validity of their own ballots, New York's policies make it less likely that many of these voters, particularly "marginal voters," will participate in future elections.

404.    The unrebutted testimony of Dr. Meredith demonstrates that New York's policies impact all voters who appear at the polls on Election Day because they cause increased wait times and require the expenditure of scarce poll worker resources.  Forcing poll workers to go through the process of failing to find inactive voters' names in poll books and assisting them with the affidavit ballot process exacerbate congestion on Election Day, especially in higher turnout presidential years, which is a particularly substantial obstacle for voters with inflexible work schedules and other time-consuming responsibilities such as child care or helping a sick relative.  These increased costs on voting and wait times are significant.  *See*, *e.g.*, *Florida v. United States*, 885 F. Supp. 2d 299, 328-2 (D.D.C. 2012) (reducing early voting period from 12-14 days to 8 days constitutes a "materially increased burden on African-American voters' effective exercise of the electoral franchise," which "would impose a sufficiently material burden to cause some reasonable minority voters not to vote").

405.    The evidentiary record shows that the burdens imposed are not mere accidents or the result of an isolated mistake, but the result of widespread structural problems in the manner in which list maintenance processes are conducted and the way in which elections are run in New York.  At the front end of the process, New York City Board of Elections Executive Director Michael Ryan testified at length regarding how he and his colleagues have discovered significant

problems with the accuracy of the information provided by the postal service regarding whether or not voters allegedly continue to reside at their address of registration.  The NYC BOE has such "little faith" in the reliability of the information provided by the postal service that the organization intentionally limits the number of mailings it sends to voters each year because he wants to avoid inadvertently triggering the list maintenance for eligible voters who have not moved.

406.     Mr. Ryan also acknowledges the downwind effects of these problems in New York City, where poll workers sometimes fail to offer affidavit ballots and voters who appear at polling places sometimes leave without voting, *see* Ryan Dep. 248:11-22, which is corroborated by the New York City Comptroller's report, as described in Dr. Meredith's declaration.  The report produced by the New York Attorney General's Office, also addressed in Dr. Meredith's report, acknowledges that the office received complaints from potential voters in Albany, Clinton, Erie, Niagara, Ontario, Suffolk, and Westchester counties that they were denied the opportunity to cast an affidavit ballot, demonstrating that issues related to poll worker error are not limited to New York City.  Meredith Decl. at 25.  This is not the result of happenstance; as Dr. Meredith mentions and Michael Ryan acknowledges, some election offices devote little time to training poll workers on what to do when a voter's name does not appear in the poll book.

407.     Other issues hamper the processing of voters at the polling place on Election Day and the subsequent counting of affidavit ballots.  At the polling place on Election Day, all voters who are not listed in the poll book are generally treated in an undifferentiated manner, regardless of their actual registration status, because poll workers are not instructed to ascertain voters' eligibility at the polling place, and state policy discourages poll workers from attempting to contact overwhelmed county election officials.  Some voters may not fill out affidavit ballot

envelopes completely or with complete precision, resulting in a situation where county election officials have to exercise broad discretion when making determinations about voter eligibility.

408.    The unrebutted testimony of Dr. Meredith demonstrates that inactive registrants and inactive voters are disproportionately Black and Hispanic, disproportionately young, and disproportionately live in neighborhoods with less owner-occupied housing.  Courts have observed that "[d]isparate impact matters" when evaluating the burden under the *Anderson-Burdick* test.  *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1216-17 (observing that "[a] majority of the *Crawford* Court determined that "[i]t 'matters' in the *Anderson-Burdick* analysis ... whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups.").

**C.    New York's Procedures for Processing Inactive Voters do not Advance Any Legitimate State Interest and Undermine the Integrity of New York Elections**

409.    The record evidence establishes that New York's prohibition on the inclusion of inactive voters' names in poll books and its requirement that inactive voters cast affidavit ballots are so unnecessary to advance any state interest that they would not pass the *Anderson-Burdick* test, even under the most lenient scrutiny.  *See Burdick*, 504 U.S. at 434; *see also Crawford*, 553 U.S. at 191 (holding that even where the regulation creates a slight burden, the state must show it is justified by a relevant state interest).

410.    The State of New York has taken inconsistent positions on whether removing names from the voter rolls enhances or undermines the efficiency and integrity of the electoral process.  *See* Opinion & Order, Dkt. 58, at 22 n. 2.

411.    While the New York State Board of Elections has argued that removing inactive voter names from poll books enhances efficiency, *see* Def. Reply in Support of Motion to Dismiss, Dkt. 51 at 3-4, and allows election officials to assess the eligibility of inactive voters,

*see* Valentine Testimony, the State of New York has also argued in an amicus brief in Husted

that "[v]oters whose information is missing from the rolls ... require the time and attention of

officials," resulting in "a bottleneck at the check-in table that will slow the processing of voters

and begin to cause back-ups and lines.  These costs can be tremendous and unduly burdensome

for both voters and states and local officials."  Brief for the States of New York et al. as *Amici*

*Curiae* Supporting Respondents, *Husted v. A. Philip Randolph Institute*, ⸺ U.S. ⸺, 138

S.Ct. 1833 (2018) at 30-31 (citing Republican Nat'l Lawyers Ass'n Report at 10 (April 2014)).

412.    New York's stated justifications for its procedures for processing inactive voters

at polling places do not withstand scrutiny because they are not accurate and because New

York's existing election laws already protect those interests.

413.    Unrebutted testimony from experts Dr. Meredith and former Kentucky Secretary

of State Trey Grayson confirms the obvious, which is that, instead of promoting "efficiency,"

omitting inactive voters' names from poll books makes the check-in process longer, creates

bottlenecks in the voting process, and lengthens voter wait times.  Moreover, Mr. Grayson and

Michael Ryan emphasize that, the more additional affidavit ballots there are, the greater the

burdens on county election officials, who have to individually review each affidavit ballot

envelope and make determinations about the eligibility of each affidavit voter before opening

and processing their ballots.  Affidavit ballots, as Mr. Grayson points out, may get lost or

become the subject of controversy or litigation.  Finally, poll workers, election officials, and the

New York Attorney General's office have to respond to inquiries from inactive voters such as

Robert Holman or Denise Roberts seeking to find out whether or not their affidavit ballots

counted.  Ultimately, Mr. Grayson concludes that "for New York election administrators,

providing the inactive list would mean less work, reduced risks of misplaced ballots, and fewer post-election challenges."  Grayson Decl. ¶ 1.

414.    The gatekeeping role mentioned by Mr. Valentine in his deposition is illusory—under current New York law, if an inactive voter has not moved and appears at the correct polling place, he or she is entitled to cast a ballot that will count.  Therefore, forcing that inactive voter to cast an affidavit ballot is unnecessary surplusage.  On the other hand, if an inactive voter appears at the incorrect polling place, he or she will not be listed in the poll book anyway and cannot cast a ballot that counts there, so the state law is doing nothing to fence out ineligible voters.

415.    The State's interest in the continuation of the current state laws with respect to processing inactive voters at polling places would be greater if every New York county was currently implementing them.  Columbia County Election Commissioner Virginia Martin has testified that Columbia County provides supplemental lists containing inactive voters' names to polling places on Election Day, and the poll worker manuals from Nassau and Schoharie Counties indicate that they employ the same practice.  Ms. Martin's testimony confirms that employing supplemental inactive voter lists has not imposed whatsoever on the administration of elections, has been cost-efficient, and has resulted in the quick and efficient processing of inactive voters at Columbia County polling places on Election Day.  Ms. Martin is not aware of any complaints about the supplemental poll lists from election officials, poll workers, voters, or anyone else.  Mr. Grayson similarly testified that Kentucky has long employed the same policy and that he is not aware of any complaints from county election officials or poll workers about the burden or cost of having an inactive roster in each polling place.

**III.   NEW YORK'S PROCEDURES FOR PROCESSING INACTIVE VOTERS AT POLLING PLACES VIOLATE THE NATIONAL VOTER REGISTRATION ACT AS APPLIED**

**A.      The Text and Basic Requirements of the National Voter Registration Act**

416.    The NVRA, 52 U.S.C. § 20501 et seq., was adopted with widespread bipartisan support as part of an effort to make voter registration more widely available and accessible. Congress sought to prevent the improper removal of registered voters from the voter registration rolls, thereby increasing the number of properly registered eligible voters for federal elections. *See* 52 U.S.C. § 20501(a)–(b).  The statute also reflects Congress' intent to combat the disproportionate harm to voter participation "by various groups, including racial minorities," caused by "discriminatory and unfair registration laws and procedures."  52 U.S.C. § 20501(a)(3); H.R. Rep. No. 103-9, at 106-07 (1993).

417.    Indeed, the NVRA has as its principal purpose "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1).  The NVRA also seeks to "protect the integrity of the elec[tion] process" and to "ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b)(3), (4).

418.    The NVRA further prescribes the procedures a state must follow before it can remove the name of a registrant from the official list of registered voters on the ground that the registrant has changed residence.  52 U.S.C. § 20507.  Specifically, Section 8(d) of the NVRA, titled "Removal of Names from Voting Rolls," provides:

> (1)  A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—
> (A)   confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
> (B)

(i)   has failed to respond to a notice described in paragraph (2); and

(ii)   has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

(2)   A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

(A)   If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B)   If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

52 U.S.C. § 20507(d).

419.    The NVRA requires that if a voter moves "from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district," he or she "shall be permitted to correct the voting records and vote at the registrant's former polling place…."  52 U.S.C. § 20507(e)(2)(A).

420.    New York State is subject to the requirements of the NVRA. The NVRA applies to all states except a select few who qualify for one of the limited exclusions contained in the Act.  *See* 52 U.S.C. § 20503(b).  New York State does not qualify for any of the exclusions.  Def's Answer to Amended Complaint, Dkt. 73, ¶ 47.

**B. New York's Procedures for Processing Inactive Voters at Polling Places
are so Deficient as to Amount to the Functional Equivalent of Removing
the Voter from the Voter Registration List**

421.     Plaintiff Common Cause/New York is bringing an as-applied claim under Section

8 of the National Voter Registration Act of 1993 challenging New York's procedures for

processing inactive voters at polling places.

422.     This Court has already found that "de facto removal" claims are cognizable under

Section 8 of the National Voter Registration Act of 1993.  Opinion & Order, Dkt. 58, at 25-28.

The evidence at trial not only supports that finding, but compels the conclusion that the

application of New York law has led to innumerable violations of the NVRA.

423.     Courts have already confronted de facto removal claims under the NVRA in the

context of approving Department of Justice consent decrees.  In *United States v. Board of

Election Commissioners for the City of St. Louis*, for example, the district court approved a

consent decree in which the United States charged that the St. Louis BOE had designated voters

"inactive" based on mail returned undelivered, omitted such voters from the list of eligible voters

provided to precinct judges, and permitted voters whose names did not appear on the precinct-

level list to cast a ballot only if they obtained authorization from an official at the BOE's

headquarters or appeared in person there. Dkt. No. 46-2, Stipulation of Facts and Consent Order,

*United States v. Bd. of Election Comm'rs for the City of St. Louis*, No. 02-CV-1235 (CEJ), Dkt.

No. 1, ¶¶ 6–8 (E.D. Mo. Aug. 14, 2002). Under these procedures, voters attempted to report to

the BOE's headquarters, but "there were insufficient phone lines, staff, and other infrastructure"

to process their votes. *Id.* ¶¶ 12–18.  The consent decree concluded that "in combination," lack of

notice, the approval requirement, and insufficient communication infrastructure and resources to

process inactive voters resulted in a "de facto removal under the NVRA." *Id.* at *8. Similarly, in

*United States v. Cibola County*, the district court approved a consent decree that found Cibola

County had, in addition to classifying voters as "inactive," "fail[ed] to ensure that provisional ballots were available in all polling places" and "failed to provide some provisional voters with the voter identification/affirmation envelope," as well as that voters "did not receive provisional ballots until more than two hours after the polls opened," that this practice resulted in prospective voters being "turned away without being offered a provisional ballot," and finally that the County failed to properly train election officials to ensure that qualified voters received provisional ballots in violation of HAVA's provisional voting requirements. Dkt. No. 46-1, Stipulation of Facts and Consent Order, *United States v. Cibola County*, No. 1:93-CV-1134 (LH), Dkt. No. 89, at *6 (D.N.M. Jan. 34).

424.    New York's procedures for processing inactive voters at polling places are so deficient as to amount to the functional equivalent of removing the voter from the voter registration list, or "de facto removal" from the voter registration list, in violation of the National Voter Registration Act.  This is because affected voters are often processed at polling places without the procedures required by Section 8.  *See* Opinion & Order, Dkt. 58, at 4.

425.    Placing voters in inactive status, and then failing to comply with the NVRA's provisional ballot protections, constitutes de facto removal from the official list of eligible voters.  *See* Opinion & Order, Dkt. 58, at 28.

426.    Michael Ryan has acknowledged that, in New York City, poll workers sometimes fail to offer affidavit ballots and voters appear at polling places and sometimes leave without voting.  Ryan Dep. 248:11-22.  Mr. Ryan's testimony is consistent with the New York City Comptroller's report, as described in Dr. Meredith's declaration.

427.    The widespread evidence of New York voters not being offered affidavit ballots is reflected in the reports of the New York City Comptroller and the New York Attorney General.

Meredith Decl. at 25; *see generally* Section II.B *supra*.  The report produced by the New York Attorney General's Office, also addressed in Dr. Meredith's report, acknowledge that, in 2016 alone, the office received complaints from potential voters in Albany, Clinton, Erie, Niagara, Ontario, Suffolk, and Westchester counties that they were denied the opportunity to cast an affidavit ballot, demonstrating that issues related to poll worker error are not limited to New York City.  Meredith Decl. at 25.  This is not the result of happenstance; as Dr. Meredith mentions and Michael Ryan acknowledges, some election offices devote little time to training poll workers on what to do when a voter's name does not appear in the poll book.

428.   These failures have a very real impact on real people, as evidenced by affected voter Stephanie Goldberg.  Her declaration demonstrates how, despite making myriad efforts and offering proof of her registration to poll workers, she was nonetheless refused an affidavit ballot and was ultimately disenfranchised in the November 2018 election.  Brooklyn voter Lauren Wolfe is another example of a voter who attempted to vote at the correct polling place, was not listed in the poll book, and was re-directed by poll workers to the wrong polling place, where she cast an affidavit ballot that was ultimately rejected.

429.   Even if an inactive voter appears at the correct polling place and casts an affidavit ballot, that ballot may be rejected and the voter may be disenfranchised.  Voters' affidavit ballots may be rejected for specious reasons, such as those case by Angela and Denise Roberts or certain voters in the Queens DA primary race in 2019, or affidavit ballots may be lost or misplaced, like the 500 absentee ballots that were delivered to New York City Board of Elections six months after the election had passed.  Where inactive voters' affidavit ballots have been rejected, like those of Angela and Denise Roberts, those voters have been functionally removed from the voter

registration list and disenfranchised in violation of Section 8 of the National Voter Registration Act.

430.    The record is replete with evidence of inactive voters who attempted to vote at the right polling place and were disenfranchised – and therefore functionally removed from the list of registered voters – in violation of Section 8 of the National Voter Registration Act.  The Findings of Fact identify dozens of voters who were not offered absentee ballots and/or disenfranchised - and therefore functionally removed from the list of registered voters - in violation of Section 8 of the National Voter Registration Act.  *See generally* Section II.B, *supra*.

431.    New York's prohibition on including inactive voters' names in poll books and forcing them to cast affidavit ballots contravenes not only the express requirements of Section 8 of the National Voter Registration Act, but also the NVRA statutory purposes of "establish[ing] procedures that will increase the number of eligible citizens who register to vote" and "enhanc[ing] the participation of eligible citizens as voters."  52 U.S.C. § 20501(b)(1)-(2).  New York's procedures for processing inactive voters at polling places are burdensome, confusing, and inconsistently enforced.  The evidence at trial supports that finding.  The unrebutted testimony of Dr. Meredith confirms that New York's practices produce burdens on voters that ultimately reduce the number of valid ballots cast at polling places on Election Day in the November 2016 election and in subsequent elections.  Meredith at 1.  This constitutes the mass denial of a fundamental right and has a chilling effect, dissuading those who try to vote and fail to vote, cast a vote that does not count, or who do not know whether or not their affidavit ballot counted from voting in the future.  New York's procedures had precisely that chilling effect on voter Denise Roberts, who was so upset after learning her affidavit ballot in the November 2016 election had been rejected that she did not want to ever vote again for a period of time after she

received the news.  This is consistent with Dr. Meredith's credible testimony more broadly that New York's policies have downwind effects on voting because individuals who are unable to vote successfully are less likely to vote in the future.

432.    Finally, while the NVRA's other express statutory purposes are "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(3)-(4), neither goal is furthered by New York's prohibition on including inactive voters' names in poll books and requirement that they cast affidavit ballots.  Consider the unrebutted testimony of former Kentucky Secretary of State, Trey Grayson, who is a Republican.  He testified that "[w]hile I am a strong proponent of list maintenance efforts and worked as Secretary of State to increase the accuracy of Kentucky's voter rolls, New York's policies do not advance these goals," and observed that "New York is intentionally providing a less accurate voter registration list" at polling places, which has the effect of "increas[ing] the burden on New York voters."  Grayson Decl. ¶ 47.  Similarly, the unrebutted testimony of Dr. Meredith is that New York's procedures do not help poll workers or election officials determine where inactive voters reside.  Meredith Decl. at 1, 28.  Dr. Meredith establishes that New York's procedures, to the contrary, decrease voters' confidence in the integrity of the electoral process due to increased wait times and because inactive voters leave the polling place without knowing whether or not their affidavit ballots count.  Meredith Decl. at 1, 7-8.

Dated: September 25, 2019

Respectfully submitted,


By:/s/ Neil Steiner
Neil Steiner (*pro hac vice*)
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036-6797

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2019, a true and correct copy of the foregoing

document was served via the Court's ECF system to all counsel of record.


<u>/s/ Neil Steiner</u>

Neil Steiner
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036-6797
neil.steiner@dechert.com

5310279.7.ADMINISTRATION