UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------------------------------------------

COMMON CAUSE/NEW YORK,
as an organization and on behalf of its members,

-Plaintiffs,

-against-

ROBERT A. BREHM, Co-Executive Director,
TODD D. VALENTINE, Co-Executive Director,
PETER S. KOSINSKI, Co-Chair,
DOUGLAS A. KELLNER, Co-Chair,
ANDREW J. SPANO, Commissioner, and
GREGORY P. PETERSON, Commissioner,
in their official capacities as Commissioner of the
NEW YORK STATE BOARD OF ELECTIONS,

-Defendants.

Case No. 1:17-cv-06770-AJN
Hon. Alison J. Nathan

-------------------------------------------------------------------------------------------------------------------

# *DEFENDANTS' POST-TRIAL MEMORADUM OF LAW*

-------------------------------------------------------------------------------------------------------------------

NEW YORK STATE BOARD OF ELECTIONS
Brian L. Quail
William J. McCann, Jr.
Nicholas R. Cartagena
*Counsel for Defendants*


*Office & PO Address:*
New York State Board of Elections
40 North Pearl Street, Suite 5
Albany, NY 12207
Tel: 518-474-6367 / Fax: 518-486-4068

# TABLE OF CONTENTS

Page

**Table of Authorities** ................................................................................... ii


**POST-TRIAL MEMORANDUM OF LAW**

**I.**    **Introduction** ................................................................................1

**II.**   **Background** ................................................................................3

        1. <u>Policy Rational for Requiring Inactive Voters to Vote Via an Affidavit Ballot</u> ........3

        2. <u>Policy for Not Including Inactive Voters' Names in the Poll Book</u> ..................5

**III.**  **Argument** ................................................................................6

    A. <u>New York's Voter Removal Process is Not Subject to Strict Scrutiny</u> ................6

        1. <u>Legal Standard</u> ................................................................6

        2. <u>Plaintiff Failed to Prove that New York's Voter Removal Process Imposes Severe Burdens on Inactive Voter</u> ................................................8

        3. <u>Plaintiff Failed to Prove that New York's Removal Process "Disenfranchises" Voters</u> ................................................9

        4. <u>Any Burden Imposed by New York's List Maintenance Process is Not Severe</u> ....12

        5. <u>Requiring Inactive Voters to Vote Via an Affidavit Ballot is Not Burdensome in Combination with Other Factors</u> ................................13

        6. <u>Plaintiff Fails to Prove that New York's Voter Removal Policy has a Disparate Impact on Minority Voters</u> ................................14

    B. <u>The Challenged Laws Pass the *Burdick* Framework</u> ................................15

        1. <u>*Anderson-Burdick* Legal Background</u> ................................16

        2. <u>The Challenged Laws Impose Little Burden on Voters</u> ................................19
            a.   New York's Removal Policy Passes the *Anderson-Burdick* Test ..............19
            b.   Voting Via an Affidavit Ballot ................................21
            c.   Ensuring Voters are Voting in the Correct Jurisdiction Prevents Voter Dilution ................................22

        d.  Defendants Do Not Need to Prove Voters are Voting at the
            Incorrect Poll Site .................................................................23
        e.  NVRA Contemplates Using Provisional Ballots for Inactive Voters ............24
        f.  Not Listing Inactive Voters in the Poll Book ................................25
        g.  Mitigation ................................................................................27
        h.  Legislative Prerogatives ...........................................................28

    C.    NVRA Claim .................................................................................29

        1.  Standard ...................................................................................29

        2.  Plaintiff Did Not Show Systematic Failure in New York's Election System .......30

    D.    Standing .......................................................................................34

IV.    **Conclusion** ...............................................................................................35

# TABLE OF AUTHORITIES

Page

**Statutes and Constitutional Provisions**

52 U.S.C. §§ 20501–11 (2017), NVRA Section 8, ECF 25 ........................................................2
52 U.S.C. § 20507(a) ...............................................................................................................3
52 U.S.C. § 20507(e)(3), ECF 58 at pgs.24-25..........................................................................4
New York Election Law § 8-302(3)(e)(ii). ................................................................................5
New York Election Law § 8-302(3)(e) .....................................................................................13
New York Election Law § 8-302(3-1) .......................................................................................14
New York Election Law § 8-104(1-a)(c)....................................................................................14
52 U.S.C. §§ 20501–11 (2017), NVRA Section 8, ECF 118, p. 23 ...........................................21
52 U.S.C. § 20507(e)(2)(B) ......................................................................................................24
52 U.S.C. §§ 20501–11 (2017), NVRA Section 8, ECF 118, p. 24-25 ......................................25
New York Election Law § 8-302(3)(e) .....................................................................................27
New York Election Law § 8-302(3-a) .......................................................................................27
New York Election Law § 8-104(1-a)(c)....................................................................................27
New York Election Law §§ 3-100 and 3-200). .........................................................................28
New York Election Law §§ 4-120(1), 4-120(2), 7-118, and 8-104). ........................................28
New York Election Law Article 16 ...........................................................................................28


**Federal Case Citations**

*Anderson v. Calebrezze*, 460 U.S. 780 (1983)................................................................8, 12, 17, 18
*Ayres-Schaffner v. DiStefano*, 37 F.3d 726 (1st Cir. 1994) ...........................................................7
*Burdick v Takushi*, 504 US 428 (1992)..............................................6, 7, 8, 12, 16, 17, 18, 19, 20
*Burson v. Freeman*, 504 U.S. 191 (1992) .......................................................................................19
*Bush v. Hillsborough Count Canvassing Board*, 123 F.Supp.2d 1305 (N.D. Fla. 2000)........10, 34
*City of Canton v. Harris*, 489 U.S. 378 (1989)........................................................................30, 31
*Clingman v. Beaver*, 544 U.S. 581 (2005) ................................................................................7, 12
*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ................................................6, 20
*Dunn v. Blumstein*, 405 U.S. 330 (1972) .........................................................................................7
*FEC v. National Right to Work Comm.*, 459 U.S. 197 (1982) .......................................................24
*Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir.2004).........................................................16, 22
*Hayden v. Pataki*, 2004 WL 1335921 (S.D. N.Y. 2004) ...............................................................15
*Hill v. Stone*, 421 U.S. 289 (1975), .................................................................................................7
*Husted v A. Philip Randolph Inst.,* 138 S Ct 1833 [2018]...................................................4, 20, 25
*League of Women Voters of Florida Inc. v. Detzner*, 314 F. Supp. 3d 1205 (2018) ....................19
*League of Women Voters v. Blackwell*, 340 F. Supp. 2d 823 (N.D. Ohio 2004).........................12
*Marston v. Lewis*, 410 U.S. 679 (1973) .........................................................................................20
*McDonald v. Bd. of Elections Comm'rs of Chicago*, 394 U.S. 802 (1969) ...................................20
*Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012)...................................17
*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000) ...................................................................23
*Norman v. Reed*, 502 U.S. 279, 289 (1992) ...................................................................................17
*Obama for Am. v. Husted,* 697 F.3d 423 (6th Cir. 2012)..............................................................17

*Ohio Council 8 Am. Fed. of State v. Husted*,
    F.3d -, 2016 WL 537398, at *3 (6th Cir. Feb. 11, 2016) ....................................................18, 19
*Paul v. Indiana Election Bd.*, 743 F.Supp. 616 (S.D. Ind. 1990) .................................................7
*Price v New York State Bd. of Elections*, 540 F3d 101 (2d Cir 2008)..........................................18
*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ........................................................................................19
*Rosario v. Rockefeller*, 410 U.S. 752 (1973) ............................................................................8, 9
*Smith v. Salt River Project Agricultural Improvement & Power District*
    109 F.3d 586 (9th Cir. 1997) ..................................................................................................15
*Stone v. Bd. of Election Comm'rs for Chicago*, 750 F.3d 678 (7th Cir. 2014) ............................18
*Storer v. Brown*, 415 U.S. 724 (1974) .........................................................................................13
*The Am. Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008) ..........8
*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ..................................................17
*U.S. v. Saylor*, 322 U.S. 385 (1994)............................................................................................22
*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)...............................................................................22
*Williams v. Rhodes*, 393 U.S. 23 (1968) .....................................................................................13

**Other Case Citations**

*Alvarez v. Espinoza*, 844 S.W.2d 238, 249 (Tex. App.,1992) .....................................................10
*State ex rel. Bonzon v. Weinstein*, 514 S.W.2d 357 (Mo.App. 1974)...........................................10
*McMillan v. Ashtabula County Bd. of Elections*, 1993 WL 150420, 7 (Ohio App. 11 Dist.,1993) ....10

**Miscellaneous References**

Chapter 659 of the Laws of 1994 (NY) ...........................................................................................3
Chapter 659 of the Laws of 1994 (NY) ...........................................................................................5
H.R. REP. 103-9, 17-18, 1993 U.S.C.C.A.N. 105ECF 118,  Page 23.........................................25
Chapter 3 of the Laws of 2019 (NY) .............................................................................................28

## I.      Introduction

When regulating elections, States may prescribe reasonable, nondiscriminatory rules. And that is precisely what this case involves: reasonable, nondiscriminatory rules for placing voters in inactive status when there is evidence that the voter has moved.  Under New York Election Law, when there is evidence that a voter has moved (e.g. when a local board of elections receives returned mail from a voter), the voter is sent a confirmation card and placed in "inactive" status. For various policy reasons, such as protecting the integrity of the election and enhancing the efficiency of the poll site, when inactive voters do not respond to confirmation cards and have not previously updated their registration records, they are required to vote via an affidavit ballot.  New York State chose to effectuate its legitimate policy goal of having inactive voters vote via an affidavit ballot by requiring that inactive voters names **not be** included in poll books.  Under New York State Law, if a voter is not listed in a poll book, the voter is offered an affidavit ballot.

Plaintiff is challenging two aspects of New York's voter removal process: 1) that inactive voters are required to vote via an affidavit ballot; and 2) that inactive voters are not listed in poll books.

Plaintiff has not shown that requiring inactive voters to vote via an affidavit ballot unconstitutionally burdens inactive voters.  The reason voters are placed in inactive status is because the State has received credible evidence that the voter has moved.  Requiring additional steps to ensure that the voter resides at the same address is constitutionally permissible.  Nor was Plaintiff able to prove that not listing inactive voters in poll books unconstitutionally burdens voters.  Not listing inactive voters in poll books has the effect of providing such voters with an affidavit ballot.  This enhances the efficiency at the poll site because it gives poll workers, who

have limited bandwidth, a binary choice when a voter votes: 1) the voter is on the list; give them a ballot to vote on the machine; or 2) the voter is not on the list; ensure they are in the correct poll site and, if so, offer them an affidavit ballot.

With regard to the National Voter Registration Act of 1993 (NVRA) claim, Plaintiff has not proven their case.  In its initial Complaint, Plaintiff alleged that New York's voter removal process violates the NVRA both facially and "as applied."  This Court struck down the facial challenge, holding that  New York's removal policy facially complies with Section 8 of the NVRA.  The Court noted, however, "if New York failed to enforce (safeguards for inactive voters in the Election Law) as written—for example, by failing to provide "inactive" voters with affidavit ballots—its conduct could rise to a violation of the NVRA."  *See* ECF 58 at 25.

In its decision, this Court indicated that an "as applied" claim of the NVRA may be had if "(1) state poll workers 'routinely' informed inactive voters that they were not registered to vote; (2) state poll workers failed to inform inactive voters that they may vote by affidavit ballot; (3) state poll workers failed to offer inactive voters affidavit ballots; (4) state poll workers offered voters affidavit ballots only at their 'insistence'." *Id.*  As such, in order to prevail, Plaintiff had to show, by a preponderance of the evidence, systemic, rather than localized, problems. Plaintiff's evidence regarding voter problems, which principally includes testimony of 19 declarants, many of which whose problems were not a result of New York's removal process, is simply not sufficient to show systemic issues at poll sites.

## II.     Background

As indicated in the Introduction, Plaintiff is challenging two aspects of New York's list maintenance process: 1) that inactive voters are required to vote via an affidavit ballot; and 2) that inactive voters are not listed in poll books.[1]

### 1.   Policy Rational for Requiring Inactive Voters to Vote Via an Affidavit Ballot

The NVRA requires that states engage in list maintenance activities. Section 8(a) of the NVRA requires "each State" to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of ... a change in the residence of the registrant." 52 U.S.C. § 20507(a). The purpose of this requirement is to ensure that accurate and current voter registration rolls are maintained.[2]

In enacting legislation to comply with the NVRA, Chapter 659 of the Laws of 1994, the Legislature thought it appropriate that when boards of elections receive credible evidence that a voter has moved, either through a change of address form or returned mail, then the voter should reaffirm that they are continuing to live at the same address via an affidavit ballot.[3]  This ensures that voters are voting in the correct jurisdiction.[4]  Most significantly, as some voters will continue to vote at their former poll sites after moving, affidavit ballots ensures that voters are voting in the correct jurisdiction.[5]  As New York City Board of Elections Executive Director Michael Ryan has testified, and Susan Lerner, Executive Director of Plaintiff, has confirmed, voters often will go back to their old polling sites after they have moved.[6]  As such, in a

---

[1] *See* Trial Tr. (Vol. 4) 40:20-27.
[2] *See* Brehm Decl. at 2.
[3] *Id*. at 3.
[4] *Id*.; *see also* Ryan Dep.,89:23- 27, stating "(t)hat's actually, in my opinion, the best function of the affidavit process, because people do move around and they should vote at their new location."
[5] *Id*. at 6 and 7.
[6] *See* Ryan Dep.,89:23-43; see also Trial Tr. (Vol. 2) 221:20-27.

representative democracy, ensuring that voters are voting at the correct jurisdiction is an appropriate policy goal.

In *Husted v A. Philip Randolph Inst.,* 138 S Ct 1833 [2018], the Supreme Court reasoned that the NVRA permits states to treat failure to respond to notice cards sent because of a failure to engage in voter activity as sufficiently "reliable evidence that a registrant has moved." *Husted*, 138 S. Ct. at 1845--46.  Further, there are over one million inactive voters in New York.[7]  Of that one million, Plaintiff's expert estimates that roughly 30,000 still living in the same address.[8] Given these figures, roughly three percent of inactive voters reside at the same address, indicating that New York's method of determining who has moved is reliable.  This evidence is bolstered by the fact that when Plaintiff texted tens of thousands of voters, informing them that they are in inactive status and asking if they have moved, no one responded that they had not moved, but only 284 voters responded that they had, in fact, moved.[9]

As such, placing voters who have had mail returned, and who have failed to respond to a confirmation cards in inactive status is permissible.  Further, as this Court has noted on Defendants' Motion to Dismiss, "where New York's removal process "follows subsection (d) to the letter," *Husted*, 13 8 S. Ct. at 184 2, and its affidavit ballot practices fall safely within the realm contemplated by 52 U.S.C. § 20507(e)(3), the Court cannot find that the State has facially violated § 20507(d)."  *See* ECF 58 at pgs.24-25.

---

[7] *See* Connolly Decl. at 41.
[8] *See* Trial Tr. (Vol. II) 324:16-325:9 (M. Meredith).
[9] *See* Defendant's Trial Exhibit 8 and 9.

2.  <u>Policy for Not Including Inactive Voters' Names in the Poll Book</u>

Not including inactive voters names in a poll book is meant to be a vehicle to get an inactive voter to vote via affidavit ballot. *See* Election Law § 8-302(3)(e)(ii).  As stated in the Legislative Bill Memorandum for Chapter 659 of the Laws of 1994, "any voters in inactive status who appear, are permitted to vote by affidavit ballot.  If the person is eligible, the ballot will be counted and the voter's name restored to active status.  The voter will be notified of the action."[10]  As stated above, the State has justifiable reasons for requiring inactive voters to vote via an affidavit ballot (e.g. to ensure inactive voters are voting in the correct jurisdiction).[11]  The method of getting inactive voters an affidavit ballot is by not listing such voters in the poll book, as anyone not listed in the poll book is offered a notice to voter and/or an affidavit ballot.[12]  As evidence has shown, poll workers typically only work once to three times a year.[13]  The legislature wanted to give poll workers a binary choice; either provide a "regular" ballot that will be canvassed by the voting machine to voters listed in the poll book, or provide an "affidavit" ballot to persons not listed in the poll book.[14]  This enhances the efficiency of the poll site.[15]

Further, as Michael Ryan has testified, and Susan Lerner, Executive Director of Plaintiff, has confirmed, voters often will go back to their old polling sites after they have moved.[16]  Policy concern for including the names of voters in inactive status in poll books is that if a voter had a choice to go to their former poll site, where their name is in the poll book, or go to their new poll site, where their name would not be in the poll book (because they have moved and not

---

[10] *See* Defendants Trial Exhibit 1 at pg. 10.
[11] See Brehm Decl. at 3.
[12] *See* Connolly Decl. at 50-55; *see also* Mohr Decl. at 10-12.
[13] *Id*. at 17.
[14] *See* Brehm at 17.
[15] *Id.*
[16] *See* Ryan Dep.,89: 23-43; see also Trial Tr. (Vol. 2) 221:20-27.

updated their records), the voter may choose to vote at their former poll site.[17]  There, they might be voting on several offices that do not actually represent them at their new address. This would compromise the integrity of the election.[18]

## III.  Argument

A. New York's Voter Removal Process is Not Subject to Strict Scrutiny

Plaintiff argues that New York's voter removal process is subject to strict scrutiny because it imposes "severe burdens" on inactive voters.  Again, there are two elements of New York's voter removal process that Plaintiff is challenging; a) not listing inactive voters in poll books; and b) requiring inactive voters to vote via an affidavit ballot.[19]  As discussed below, New York's voter removal process does not impose "severe burdens" on inactive voters.

1.  Legal Standard

The Supreme Court has squarely rejected "the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny." *Burdick v Takushi*, 504 US 428, 432, (1992); see *also Crawford v. Marion Cnty. Election Bd*., 553 U.S. 181, 190

---

[17] *See* Brehm at 7; *see also* Ryan Dep.,89: 23-43.
[18] Plaintiff characterizes Defendants' assertion of its rationale for New York's voter removal policy as "belated" and "contrived", indicating that Defendants did not state the rationale until after the Deposition of Robert Brehm in April, 2019.  In fact, Defendants relied on New York's removal rationale at the very beginning of this litigation, for Defendants' motion to dismiss.  Defendant's Reply Memorandum in Support of its Motion to Dismiss states: "As evidenced by the legislative history, New York opted to remove inactive voters' names from poll books in order to guarantee that inactive voters are able to vote at the poll site embracing the voters' current addresses via an affidavit ballot. Moreover, the legislature wanted to give election inspectors a binary choice, either provide a 'regular' ballot that will be canvassed by the voting machine to voters listed in the poll book, or provide an "affidavit" ballot to persons not listed in the poll book. Given that election inspectors only work two to three times a year, it is reasonable to believe that providing additional duties upon election inspectors (e.g. making determinations related to inactive voter's eligibility or determining which ballots a voter is eligible to cast) would bog down the voting process. Historical abuse of challenge and oath processes in poll sites that bogged down voting, for example, lead the legislature to criminalize obstruction and hinderance of voters moving through the election process. *See* Election Law § 17-130 (3)."  *See* ECF 51 Pg 3-4.  As such, Defendants' assertions cannot be described as "belated" nor "contrived;" a more apt description would be legitimate and consistent.
[19] *See* Trial Tr. (Vol. 4) 40:20-27.

(2008) (Stevens, J., plurality). Indeed, *Burdick* states, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections" even though "[e]lection laws will invariably impose some burden upon individual voters." *Burdick,* 504 U.S. at 432; *see also Clingman v. Beaver*, 544 U.S. 581, 593 (2005) ("[I]t is beyond question that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.") (internal quotations omitted). "Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433.

Because of the need for election regulation, strict scrutiny applies only to rare restrictions that severely burden the right to vote. *See Burdick*, 504 U.S. at 434; *Clingman*, 544 U.S. at 593 ("To deem ordinary and widespread burdens like [membership registration for party primaries] severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes.").   Not listing inactive voters in the poll book and requiring inactive voters to vote via an affidavit ballot is hardly a restriction on the level of "severe burdens" that have historically been overturned, such as a one-year residency requirement (*see Dunn v. Blumstein*, 405 U.S. 330 (1972)), a property-ownership requirement (*see Hill v. Stone*, 421 U.S. 289 (1975)), a prior-participation requirement (*see Ayres-Schaffner v. DiStefano*, 37 F.3d 726 (1st Cir. 1994)), or even a ban on write-in voting (*see Paul v. Indiana Election Bd.*, 743 F.Supp. 616, 623 (S.D. Ind. 1990)).

Non-severe restrictions that place only some burden on the right to vote are subject to the "flexible standard" of review outlined in *Anderson v. Calebrezze*, 460 U.S. 780 (1983) and *Burdick*; *see also The Am. Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313, 1322 (10th Cir. 2008) ("Restrictions that are generally applicable, even-handed, politically neutral, and which protect the reliability and integrity of the election process are generally not considered severe restrictions and are upheld.") (internal quotations omitted). Most election regulations fall into the latter *Anderson-Burdick* approach.

Further, in *Rosario v. Rockefeller*, 410 U.S. 752, 762 (1973), the Court expressly distinguished between inherently suspect voter-qualification laws - laws disenfranchising soldiers, creating special electorates, and imposing durational residency requirements - and benign procedural rules. *Rosario*, 410 U.S. at 757. Voter-qualification laws have been problematic because those laws "totally denied the electoral franchise to a particular class of residents, and there was no way in which the members of that class could have made themselves eligible to vote." *Id.* at 757. But with procedural rules, responsibility lies with voters: "[I]f their plight can be characterized as disenfranchisement at all, it was not caused by [the law], but by their own failure to take timely steps to effect their enrollment." *Id.* at 758.

2. <u>Plaintiff Failed to Prove that New York's Voter Removal Process Imposes Severe Burdens on Inactive Voter</u>

Plaintiff argues that it "proved" that New York's voter removal process imposes a severe burden at trial.[20]  In summary, Plaintiff backs up this argument by relying on limited evidence purportedly showing deficiencies in poll worker performance and training and that voters in

---

[20] *See* Plaintiff's Post-Trial Brief at 4.

inactive status, who have not in fact moved, are disenfranchised and dissuaded to vote in the future.[21]

As noted above, the Supreme Court has distinguished procedural rules related to voting with voter-qualification laws. *Rosario v. Rockefeller*, 410 U.S. 752, 762 (1973). The conduct described by Plaintiff, even if true, cannot result in New York's voter removal process to be subject to strict scrutiny.

Further, Plaintiff mischaracterizes the "proof" it purports to have shown. For example, while the "check-in and voting process" does take longer for inactive voters, testimony, including testimony from Plaintiff's own expert witness, elicited that it only takes "two to three" minutes longer[22] and that voter wait times in New York are under the national average.[23]

Additionally, Plaintiff states that it proved that poll workers are not well trained and are not held accountable, but the evidence shows the opposite.[24] In regards to the voter look up, testimony was given regarding the purpose of the look up,[25] and why the two declarants had difficulty navigating the voter lookup.[26]

Given the nature of the proof that Plaintiff asserts in its post-trial memorandum, a fair weight of this proof cannot lead to the conclusion that New York's voter removal process imposes a severe burden on inactive voters.

    3. <u>Plaintiffs Failed to Prove that New York's Voter Removal Process</u>
        <u>"Disenfranchises" Voters</u>

---

[21] *Id.*
[22] *See* Trial Tr. (Vol. 3) 316:20-37; *see also* Trial Tr. (Vol. 2) 285:7-13.
[23] *See* Trial Tr. (Vol. 3) 321:7-13; *see also* Plaintiff's Trial Exhibit 67.
[24] *See* Trial Tr. 100: 21-28.
[25] *See* Connolly Decl. at 85-109.
[26] *See* Brehm Decl. at 81-85.

Plaintiff argues that New York's voter removal process is a severe burden because if "disenfranchises" voters.  To back up this argument, Plaintiff points to three instances; Denise Roberts and Angela Roberts, where Tioga County failed to count their affidavit ballot during the 2016 General Election; and Stephanie Goldberg, where poll workers failed to provide an affidavit ballot during the 2018 General Election in Orange County.[27]

Respectfully, these three examples are insufficient to show that New York's process "disenfranchises" inactive voters.  In fact, if state law had been followed in their circumstances, the problem complained of would not have happened.  While unfortunate, these three instances are not sufficient to show systemic error.  In evaluating election systems, Courts generally recognize that the system must be fair, but nothing obligates that the system be perfect. *See, e.g., Bush v. Hillsborough Count Canvassing Board*, 123 F.Supp.2d 1305, 1317 (N.D. Fla. 2000) ("The court recognizes that much can be done to guarantee - fair election; but no matter how hard we try, regrettably we may never be able to guarantee a perfect election."); *McMillan v. Ashtabula County Bd. of Elections*, 1993 WL 150420, 7 (Ohio App. 11 Dist.,1993) ("A less than perfect election will not permit the judiciary to invade the political branch of government."); *Alvarez v. Espinoza*, 844 S.W.2d 238, 249 (Tex. App.,1992) ("We recognize that elections are seldom perfect, and that courts do not order new elections because of errors that did not affect the outcome."); *State ex rel. Bonzon v. Weinstein*, 514 S.W.2d 357, 364 (Mo.App. 1974) ("No candidate expects nor will he receive a perfect election; he can expect a fair and open one in which the electorate may freely express their will.").

---

[27] *See* Plaintiff's Post-Trial Brief at 6.

While any error is unfortunate, and while the State strives to make an election as perfect as possible, no election can possibly be perfect.  As noted in Director of Election Operations for the New York State Board of Elections Thomas Connolly's declaration, there are approximately 5,300 poll sites, 15,083 election districts and 61,790 poll workers who staff an election.[28]  With such large numbers, it is unavoidable that complaints will be made and that errors occasionally occur.[29]

Irrespective of the errors referenced above, the evidence does show that the affidavit process is followed by poll workers and election administrators.   At the General Election in 2016, 268,964 affidavit ballots were cast statewide.[30]  Of those, 141,293 affidavits were found valid for various reasons specified in the report, although not every jurisdiction provided a full breakdown.[31]  Of the 124,933 found invalid, 69,472 were persons found not to be registered in the county (55.6%).[32]  As noted by Director of Elections Operations of the New York State Board of Elections, Thomas Connolly, "(t)hat well more than a quarter-million New Yorkers were provided affidavit ballots by poll workers in 2016's General Election and submitted them demonstrates that the process of distributing affidavit ballots is widely adhered to by poll workers."[33]

Contrary to Plaintiff's arguments, the evidence does not show that New York's list maintenance process disenfranchises voters; rather, the evidence shows that the affidavit process works as designed to enfranchise them.

---

[28] *See* Connolly Dec. at 12.
[29] *Id.*
[30] *See* Defendants Trial Exhibit 43; *see also* Connolly Decl. at 69.
[31] *Id.*
[32] *Id.*
[33] *See* Connolly Decl. at 75.

### 4.  Any Burden Imposed by New York's List Maintenance Process is Not Severe

Plaintiff argues that the evidence demonstrates that New York's voter removal process imposes a "myriad" of burdens and inconveniences, which subject the process to strict scrutiny.[34] Plaintiff lists the following examples:  (1) two declarants who experienced  confusion of not being found in the poll book; (2) one witness who stated that she had to argue with poll workers and call the board of elections when poll workers fail to offer affidavit ballots;  (3) taking a "much longer period of time" to vote and complete the ballot (as discussed before, Plaintiff's own expert witness agreed that the extra time equates to two to three minutes);  (4) four declarants who left the poll site, not confident that their vote counted; and (5) two declarants making calls to election officials to ascertain what happened with their ballot.[35]

Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects - at least to some degree - the individual's right to vote and his right to associate with others for political ends."  *Burdick*, 504 U.S. at 433 (emphasis added) (*quoting Anderson*, 460 U.S. at 788).  Because state regulation is necessary to ensure that voting is fair and honest, "[s]tate election laws are, generally, not subject to strict scrutiny review." *League of Women Voters v. Blackwell*, 340 F. Supp. 2d 823, 829 (N.D. Ohio 2004) (*citing Burdick*, 504 U.S. at 433).

The examples listed by Plaintiff cannot reasonably be considered "severe" in determining the appropriate level of constitutional review.  At most, they represent ordinary burdens requiring nominal effort.  *Clingman* at 591.  Burdens are severe if they go beyond the merely

---

[34] *See* Plaintiff's Post-Trial Brief at 7.
[35] *Id.*

inconvenient. *See Storer v. Brown*, 415 U.S. 724, 728–729, (1974) (characterizing the law in *Williams v. Rhodes*, 393 U.S. 23, (1968), as "severe" because it was "so burdensome" as to be " 'virtually impossible' " to satisfy).  The examples cited by Plaintiff, such as being confused in not being in the poll book, taking two extra minutes in filling out an affidavit ballot, or not leaving a poll site one hundred percent sure a vote will count is more akin to an inconvenience, not a severe burden to voting.

5. <u>Requiring Inactive Voters to Vote Via an Affidavit Ballot is Not Burdensome in Combination with Other Factors</u>

Plaintiff argues that requiring inactive voters to vote via an affidavit ballot in New York constitutes a severe burden because there are additional components that increase this burden. To back up this assertion, Plaintiff asserts the following additional components:  (a) that the alternative method of voting (via court order) is also burdensome; (b) that there is no mechanism at poll sites to ascertain an inactive voters status; and (c) that one county commissioner testified that "sometimes," without quantifying, poll workers fail to offer an affidavit ballot to voters not in the poll book.[36]

What Plaintiff fails to mention is that there are numerous protections in place designed to mitigate any burden associated with not being listed in the poll book.  When a voter who is not in the poll book presents themselves to a poll worker, Election Law § 8-302(3)(e) requires the poll worker to "consult a map, street finder or other description of all of the polling places and election districts within the political subdivision in which said election district is located and if necessary, contact the board of elections to obtain the relevant information and advise the voter of the correct polling place and election district for the residence address provided by the voter to

---

[36] *See* Plaintiff's Post-Trial Brief at 10; *see also* Trial Tr. (Vol. 1) 90:9-12.

such poll clerk or election inspector." Election Law § 8-302(3-a) requires that poll workers must give a copy of a notice, in a form prescribed by the New York State Board of Elections, "to every person whose address is in such election district for whom no registration poll record can be found and, in a primary election, to every voter whose registration poll record does not show him to be enrolled in the party in which he wishes to be enrolled…advising such person of his right to, and of the procedures by which he may, cast an affidavit ballot or seek a court order permitting him to vote.." Election Law § 8-104(1-a)(c) further provides that information be conspicuously posted in the polling place related to instructions on how to cast an affidavit ballot. In its current form, such posting is located in the voter's bill of rights, which clearly states: "(w)henever your name does not appear in the poll ledger or the voter registration or enrollment list, or you do not provide identification when required, you will be offered an affidavit ballot."

These mitigation protections outweigh any contributing components Plaintiff outlines

6. <u>Plaintiff fails to prove that New York's Voter Removal Policy has a Disparate Impact on Minority Voters</u>

Plaintiff argues that New York's policy has a disparate impact on minority voters and, as such, subjects the policy to the strict scrutiny standard.[37]  Initially, the statistics from Plaintiff's expert report purporting to show a disparate impact are, at best, slight.

According to Table 3 of Marc Meredith's report, in 2016, 35.5% of active registered voters were non-white, while 38.2% of inactive voters are non-white.[38]  In regards to people who voted in the 2016 general election, Marc Meredith estimates that 31.7% of active voters were

---

[37] *See* Plaintiff's Post-Trial Brief at 11.
[38] *See* Meredith Decl. at pgs. 10-11.

nonwhite, while 40.5% of inactive voters were nonwhite.[39]  Such deviation cannot reasonably be considered a disparate impact.  To the extent there is an impact, it appears the affidavit process is enfranchising.

Additionally, Plaintiff does not allege that the purpose of New York's voter removal process is discriminatory.  Plaintiff is required to allege elements similar to an Equal Protection claim related to disenfranchisement (e.g. alleging that Elec. Law § 5-213 was enacted by the legislature with racially discriminatory motives).  See *Hayden v. Pataki*, 2004 WL 1335921 (S.D. N.Y. 2004) (holding that N.Y. Elec. Law § 5-106(2), disenfranchising felons during incarceration and parole, were not enacted with discriminatory intent).  In *Smith v. Salt River Project Agricultural Improvement & Power District*, 109 F.3d 586 (9th Cir. 1997), the Ninth Circuit upheld a "one acre, one vote" rule for voting in elections of a special purpose district. The Ninth Circuit distilled from previous § 2 cases the principles that "a bare statistical showing of disproportionate impact on a racial minority" is insufficient, and that there must be a "causal connection" between the challenged practice and the discriminatory result.  *Id.* at 595.  Here, there is no proof of a causal connection.

B.  The Challenged Laws Pass the *Anderson-Burdick* Framework

Plaintiff incorrectly contends that New York's list maintenance process unconstitutionally burdens inactive voters; specifically, in that inactive voters are not listed in poll books and inactive voters must vote via an affidavit ballot.

---

[39] *Id.*

This contention invokes the well-established *Anderson-Burdick* framework. The challenged laws meet this flexible balancing test because they impose little burden on voting and serve various legitimate interests.

### 1. *Anderson-Burdick* Legal Background

As mentioned in the introduction, state laws regulating elections take place at a unique crossroad. It is undeniable that "voting is of the most fundamental significance under our constitutional structure." *Burdick v Takushi*, 504 US 428, 433, (1992) (internal quotation omitted). But the States must also play a significant role in regulating elections and, by extension, voting: "The Constitution provides that States may prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections." Id. In analyzing election laws, therefore, courts must reconcile the often competing objectives of (i) protecting the right to vote and (ii) allowing "the states broad authority to regulate the conduct of elections ...." *Griffn v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004).

And the States retain authority to impose election rules even when such rules ultimately disallow some attempted ballots. *Griffin*, 385 F.3d at 1130. As *Griffin* aptly explained, any voting restriction "is going to exclude, either de jure or de facto, some people from voting ...." *Id.*; see also Burdick, 504 U.S. at 434 (acknowledging that "all election regulations" "have an impact on the right to vote"). But "state legislatures may [still] without transgressing the Constitution impose extensive restrictions on voting." *Griffin*, 385 F.3d at 1130 (rejecting argument that the Constitution mandates absentee voting for working mothers).

The Supreme Court has created a unique approach for determining whether an election law unconstitutionally burdens the right to vote. *Burdick*, 504 U.S. at 434; *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Applying the Anderson-Burdick framework, federal courts apply a sliding scale of review; the less severe the burden, the less rigorous the review. *Burdick*, 504 U.S. at 434. Put differently, the level of scrutiny that applies to an election law "depends upon the extent to which a challenged regulation burdens [voting] rights." Id.

In evaluating the constitutionality of laws that impose no burden on the fundamental right to vote, courts apply rational basis review. *Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012). On the other hand, a law that " 'severely' burdens the fundamental right to vote," such as a poll tax, triggers strict scrutiny, *Obama for Am.*, 697 F.3d at 429 (quoting Burdick, 504 U.S. at 434), and must be "narrowly drawn to advance a state interest of compelling importance," *Norman v. Reed*, 502 U.S. 279, 289 (1992). And "[fo]r the majority of cases falling between these extremes, [courts] apply "the 'flexible' *Anderson-Burdick* balancing test." *Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d at 592 (*quoting Burdick*, 504 U.S. at 434).

In other words, as the Second Circuit has stated:

> If the plaintiffs' rights are severely burdened, the statute is subject to strict scrutiny. Burdick, 504 U.S. at 435, 112 S.Ct. 2059. If the burden is minor, but non-trivial, Burdick's balancing test is applied. Under this balancing test, the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests. Id. Review in such circumstances will be quite deferential, and we will not require "elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons*, 520 U.S. at 364, 117 S.Ct. 1364. Nonetheless, … where the burden imposed by the law is non-trivial, we must weigh the State's justification against the burden imposed. See Burdick, 504 U.S. at 439, 112 S.Ct. 2059; see also *Timmons*, 520 U.S. at 364, 117 S.Ct. 1364.

*Price v New York State Bd. of Elections*, 540 F3d 101, 109 [2d Cir 2008](emphasis added)

A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

Even within this flexible middle tier, *Anderson-Burdick* is not the same as traditional intermediate scrutiny (e.g., gender classifications): rather, Anderson-Burdick remains a sliding scale based on the extent of the burden. *See Burdick,* 504 U.S. at 434. The less severe a burden the more deferential the review (closer to rational basis); the more severe a burden the more rigid the review (closer to strict scrutiny). *See id*. As the Sixth Circuit recently explained, when regulations are minimally burdensome "a less-searching examination closer to rational basis applies ...." *Ohio Council 8 Am. Fed. of State v. Husted*, - F.3d -, 2016 WL 537398, at *3 (6th Cir. Feb. 11, 2016).

And critically, the presumption under the *Anderson-Burdick* middle tier is that reasonable, neutral requirements will pass: "when a state election law provision imposes only reasonable, nondiscriminatory restrictions ... the state's important regulatory interests are generally sufficient to justify the restrictions." *Id*.; *Stone v. Bd. of Election Comm'rs for Chicago*, 750 F.3d 678, 681 (7th Cir. 2014) ("If the burden is merely 'reasonable' and 'nondiscriminatory,' by contrast, the government's legitimate regulatory interests will generally carry the day."). The Sixth Circuit has specifically held that application of Anderson-Burdick to "minimally burdensome and nondiscriminatory election law[s]" is "a form of review akin to

rational-basis review." *Ohio Council 8 Am. Fed. of State*, 2016 WL 537398, at *7. Under this standard, "plaintiffs bear[] a heavy constitutional burden to demonstrate that a state's election law is unconstitutional." Id. (emphasis added, internal quotations omitted).

### 2.   The Challenged Laws Impose Little Burden on Voters

The first step under *Anderson-Burdick* is to measure the burden, so that the Court can tell what relative level of scrutiny to apply. *See Burdick*, 504 U.S. at 434. Here, any burdens the challenged laws impose are minimal, and should lead to rational basis review or, at most, lenient middle-tier review (well towards the deferential end of the spectrum).

### a.   New York's Removal Policy Passes the *Anderson-Burdick* Test

*Anderson-Burdick* test, which, again, is a "sliding-scale balancing analysis" whereby courts weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against "the precise interests put forward by the State as justifications for the burden imposed by its rule." *League of Women Voters*, 314 F. Supp. 3d at 1219 (quoting in part Burdick at 434).

As previously discussed, a strict standard would be inappropriate in a case such as this, in which the right to vote is on both sides of the ledger. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam); *cf. Burson v. Freeman*, 504 U.S. 191, 198, 206, 211 (1992). New York's voter removal process is not like a poll tax, where on one side is the right to vote and on the other side the state's interest in defraying the cost of elections or in limiting the franchise to people who really care about voting or in excluding poor people or in discouraging people who are black.

Deference is generally given to the state in such an analysis.  *See Burdick*, 504 U.S. at 434 (stating that when "a state election law provision imposes only 'reasonable,

nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions.'")  Many commonplace election regulations that may exclude some otherwise legitimate voters are permissible under this standard. For example, requiring voters to register in advance of elections helps to prevent fraud, but it also undoubtedly excludes otherwise qualified and willing voters who forget to register or who do not have access to voter registration personnel or materials. Similarly, requiring voters to vote in public at a specified polling place acts, among other things, as a means to prevent fraud. Yet there may well be a class of people who do not qualify to vote absentee but for whom the burden of getting to the polls to vote is simply too much. For them, requiring ballots to be cast at a specific polling place operates as a disenfranchisement.

The Supreme Court has upheld a wide array of election rules, including many far more burdensome than the laws challenged here. For example, the Court has upheld regulations: prohibiting write-in voting, *Burdick v. Takushi*, 504 U.S. 428 (1992); mandating that voters register to vote fifty days before an election, *Marston v. Lewis*, 410 U.S. 679 (1973); omitting pretrial inmates, still eligible to vote, from the list of people who could receive absentee ballots, *McDonald v. Bd. of Elections Comm'rs of Chicago*, 394 U.S. 802 (1969); and requiring all in-person voters to present government-issued identification, C*rawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008). Most significantly here, the Supreme Court upheld Ohio's voter removal process, where the Court reasoned that the NVRA permits states to treat failure to respond to notice cards sent because of a failure to engage in voter activity as sufficiently reliable evidence that a registrant has moved. *Husted*, 138 S. Ct. at 1845-46. It is worth noting that this Court has already held that this same logic applies to New York's removal process, stating: "

(t)he same logic extends to failure to respond to a notice card sent because mail was returned as undeliverable." ECF 118 Page 23.

### b. Voting Via an Affidavit Ballot

Again, the purpose of the New York's voter removal law is: 1) compliance with the NVRA; 2) to ensure voters are voting in the correct jurisdiction; and 3) enhance the efficiency of the poll site.[40]

On one side of the balance in this case is the effect of requiring an inactive voter to vote via an affidavit ballot.[41]  That effect, so far as the record reveals, is slight.  For example, the extra time to complete an affidavit ballot is two to three extra minutes.[42]  Further, Plaintiff was unable to demonstrate disenfranchisement, other than two declarants, whose votes were not counted due to administrative error in Tioga County during the 2016 General Election, and one voter was not offered an affidavit ballot in Orange County during the 2018 General Election.[43]  Plaintiff also argues that some voters are not confident that their voted counted, when voting via an affidavit ballot, when they leave the poll site.[44]

On the other side of the balance is ensuring that voters are voting in the correct poll site.[45] Again, the reason voters are placed in inactive status is because the State has received credible evidence that the voter has moved.  Requiring inactive voters to vote via an affidavit ballot causes the inactive voter to affirm that they are living at the same address and gives election administrators an opportunity to validate the voter's information.  According to New York City

---

[40] *See* Trial Tr. (Vol. 4) 40:20-27.
[41] *See* Connolly Decl. at 50-55; *see also* Brehm Decl. at 5.
[42] *See* Trial Tr. (Vol. 3) 316:20-37; *see also* Trial Tr. (Vol. 2) 285:7-13.
[43] *See* Plaintiff's Post-Trial Brief at 6.
[44] *Id.* at 7.
[45] *See* Ryan Dep.,89: 23-43; see also Trial Tr. (Vol. 2) 221:20-27.

Board of Elections Executive Director Michael Ryan, this is one of the best features of the

affidavit process.

> That's actually, in my opinion, the best function of the affidavit
> process, because people do move around and they should vote at
> their new location. Unfortunately, people, being creatures of habit
> often don't vote at their new location and go back to their old
> voting location and vote by scanner where they're actually in the
> poll book. There's nothing that we can do one way or the other to
> police that

*Id.*

> c.   Ensuring Voters are Voting in the Correct Jurisdiction Prevents Voter
>       Dilution

It is axiomatic, but no less critical to understand, that "[n]o right is more precious in a

free country than that of having a voice in the election of those who make the laws under which,

as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). It is equally critical

to understand, however, that the right to vote is not simply the right to cast a ballot, but also the

right to have one's vote counted. *U.S. v. Saylor*, 322 U.S. 385, 387 (1994). To protect that right,

states must undertake reasonable efforts to ensure that those who cast ballots are actually entitled

to do so. Without such safeguards, the right to vote, and to have one's vote counted, would

become increasingly diluted amidst a pool of fraudulent ballots. *Id.*

Generally, preventing voter fraud is considered a compelling state interest. As the

Supreme Court has observed:

> It cannot be doubted that these comprehensive words [of Article I
> § 4] embrace authority to provide a complete code for
> congressional elections, not only as to times and places, but in
> relation to ... prevention of fraud and corrupt practices ... to enact
> the numerous requirements as to procedure and safeguards which
> experience shows as necessary in order to enforce the fundamental
> right involved. Smiley v. Holm, 285 U.S. 355, 366, 52 S.Ct. 397,
> 76 L.Ed. 795 (1932) (emphasis added).  Moreover, in examining
> an election regulation aimed at combating fraud, courts are well

> advised to pay additional deference to the legislative judgment
> because "the striking of the balance between discouraging fraud
> and other abuses and encouraging turnout is quintessentially a
> legislative judgment with which we judges should not interfere
> unless strongly convinced that the legislative judgment is grossly
> awry."

*Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir.2004).

Requiring inactive voters, where the state has received credible evidence that someone has moved, to affirm their address, and have election administrators verify that information, is justifiable when balanced with any potential burdens.

> d.   Defendants Do Not Need to Prove Voters are Voting at the Incorrect
>      Poll Site

Plaintiff argues that the State's justification of ensuring that voters are voting in the correct jurisdiction is inadequate because there is no proof that voters vote at the incorrect poll site.   But Plaintiff's brief does not cite any cases for the proposition that a state must wait until it has proof of fraud before enacting measures to shore up weak points in whatever prevention scheme already exists.

The Supreme Court has been quite clear that, at least with respect to highly plausible justifications such as the existence of election fraud, the opposite is true. *See Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390-91 (2000). In *Nixon*, which upheld Missouri's campaign-contribution limits, the plaintiffs and the court of appeals "[took] the State to task ... for failing to justify the invocation of those interests with empirical evidence of actually corrupt practices or of a perception among Missouri voters that unrestricted contributions must have been exerting a covertly corrosive influence." *Id*. The law was valid regardless of empirical evidence demonstrating a problem, the Court concluded, because "the quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with

the novelty and plausibility of the justification raised." Id. at 391.  Courts should be careful not to "second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *FEC v. National Right to Work Comm.*, 459 U.S. 197, 210 (1982).

       e.   NVRA Contemplates Using Provisional Ballots for Inactive Voters

The NVRA provides several different options for inactive voters, and permits states latitude in implementation. Under the NVRA, inactive voters who have moved in the same jurisdiction and congressional district may vote at their former voting place; however, voting at a former polling place need not be allowed if State Law provides that a voter may vote at the new polling place upon oral or written affirmation by the registrant of the new address. 52 U.S.C. § 20507(e)(2)(B). The New York legislature opted for the second option, and the affidavit ballot process is how it implements that option.

Further, the legislative history of the NVRA indicates that the use of "provisional ballots" were contemplated for voters who did not respond to change of address cards. In discussing paragraph (e), subdivision 8 of the NVRA, the House Report states:

> If the registration records incorrectly indicate that a registrant has changed his or her residence, the registrant shall be permitted to vote upon oral or written affirmation that the registrant continues to reside at the same address. This section of the bill attempts to incorporate an underlying purpose of the Act; that once registered, a voter should remain on the list of voters so long as the individual remains eligible to vote in that jurisdiction. This section ensures that if a registered voter moves within the jurisdiction of the same registrar, he or she should be permitted to vote. However, while this section sets out where an individual may vote, it is silent as to how that individual may be permitted to vote. Under certain circumstances it would be appropriate, and in compliance with the requirements of this Act, to require that such a person vote by some form of provisional ballot. It is not the intent of this provision to pre-empt any State requirement that a person whose eligibility to vote is challenged may be required to vote by a

> special ballot that is subject to post election rejection, where the
> challenge is sustained.

H.R. REP. 103-9, 17-18, 1993 U.S.C.C.A.N. 105, 121-22 (emphasis added).

Also, as noted by this Court in its decision on Defendants' motion to dismiss, "(b)ut here, where New York's removal process "follows subsection (d) to the letter," *Husted*, 13 8 S. Ct. at 184 2, and its affidavit ballot practices fall safely within the realm contemplated by 52 U.S.C. § 20507(e)(3), the Court cannot find that the State has facially violated§ 20507(d)." *See* ECF 58 at pgs.24-25.

### f.   Not Listing Inactive Voters in the Poll Book

The method of getting inactive voters an affidavit ballot is by not listing such voters in the poll book.[46]  The New York State Election Law provides that anyone not listed in the poll book is offered a notice to voter and/or an affidavit ballot.[47]  There are many reasons why a voter may not be listed in a poll book.  For example: the voter may not be registered to vote;[48] the voter may not be registered in a political party in a primary;[49] the poll worker may have mistakenly missed the voter's name;[50] the voter's name could have been misspelled; the voter's name may be missing due to a printing error; etc.

As evidence has shown, poll workers typically only work one to three times a year.[51]  The legislature wanted to give poll workers a binary choice; either provide a "regular" ballot that will be canvassed by the voting machine to voters listed in the poll book, or provide an "affidavit"

---

[46] *See* Connolly Decl. at 50-55.
[47] *See* Connolly Decl. at 50-55; *see also* Mohr Decl. at 10-12.
[48] *See* Trial Tr. (Vol. 2) 191:18-20.
[49] *See id.* at 191:21-40; *see also* Ryan Dep.,174: 3-71; Connolly Decl. at 114-118; .
[50] *See* Ryan Dep.,48: 8-39; 49:14-44.
[51] *See* Connolly Decl. at 17.

ballot to persons not listed in the poll book.[52]  Given this limited bandwidth, it is reasonable for

the legislature to determine that not including inactive poll workers names in the poll book is an

effective way to get a ballot to the inactive voter.  The alternative would add an additional step in

the check in process.  Rather than "a voter is in the poll book, given them a ballot, vote on the

machine," or "voter is not in the poll book, give them an affidavit ballot" rubric, the alternative

would be: "a voter is in the poll book, given them a ballot, vote on the machine," or "the voter is

not in the poll book, check a separate list.  If the voter is on the sperate list, give them an

affidavit ballot", or "the voter is not in the poll book, check a separate list.  If the voter is not on

the additional list, give them an affidavit ballot anyway."  The binary choice model appears to be

more elegant.  Further, it is reasonable to assume that the more decision points you give poll

workers, who, again, have limited bandwidth, the more likely mistakes would occur.[53]

Further, as Executive Director of the New York City Board of Elections Michael Ryan

has testified, and Susan Lerner, Executive Director of Plaintiff,  has confirmed, voters often will

go back to their old polling sites after they have moved.[54]  Another policy concern for including

the names of voters in inactive status in poll books is that if a voter had a choice to go to their

former poll site, where their name is in the poll book, or go to their new poll site, where their

name would not be in the poll book (because they have moved and not updated their records), the

voter may choose to vote at their former poll site.[55] There, they would be voting on several

offices outside their jurisdiction. This would compromise the integrity of the election.[56]  As

discussed above, preventing voter dilution is a compelling state interest.

---

[52] *See* Brehm Decl. at 17.
[53] *See* Trial Tr. (Vol. 3) 350:14-20.
[54] *See* Ryan Dep.,89: 23-43; *see also* Trial Tr. (Vol. 2) 221:20-27.
[55] *See* Brehm Decl. at 7; *see also* Ryan Dep.,89: 23-43
[56] *Id.*

g.   Mitigation

The Election Law provides for safeguards that are designed to mitigate any potential burdens that may be associated with the voting process, such as New York's removal process. For instance, Election Law § 8-302(3)(e) provides:

> (w)henever a voter presents himself or herself and offers to cast a ballot, and he or she claims to live in the election district in which he or she seeks to vote…(but is not listed in the poll book)…, a poll clerk or election inspector shall consult a map, street finder or other description of all of the polling places and election districts within the political subdivision in which said election district is located and if necessary, contact the board of elections to obtain the relevant information and advise the voter of the correct polling place and election district for the residence address provided by the voter to such poll clerk or election inspector.

Additionally, Election Law § 8-302(3-a) requires that poll workers must give a copy of a notice, in a form prescribed by the New York State Board of Elections, "to every person whose address is in such election district for whom no registration poll record can be found and, in a primary election, to every voter whose registration poll record does not show him to be enrolled in the party in which he wishes to be enrolled…advising such person of his right to, and of the procedures by which he may, cast an affidavit ballot or seek a court order permitting him to vote.."

Election Law § 8-104(1-a)(c) further provides that information be conspicuously posted in the polling place related to instructions on how to cast an affidavit ballot.  In its current form, such posting is located in the voter's bill of rights, which clearly states: "(w)henever your name does not appear in the poll ledger or the voter registration or enrollment list, or you do not provide identification when required, you will be offered an affidavit ballot."

Other safeguards include, but are not limited to: the bi-partisan check of election administration (Election Law §§ 3-100 and 3-200); the posting and publishing of candidates and sample ballots (Election Law §§ 4-120(1), 4-120(2), 7-118, and 8-104); judicial supervision (Article 16 of the Election Law); and nine days of early voting (Chapter 3 of the Laws of 2019).

### h.   Legislative Prerogatives

This trial is not a legislative debate. When crafting voting laws and procedures, lawmakers and executive officials must consider and balance a cavalcade of important interests, interests that often compete with one another. These interests include, but are not limited to:[57]

- Encouraging voting and ensuring that all eligible voters are able to vote;[58]

- Making sure election officials are able to effectively and efficiently identify voters and screen out ineligible ballots (whether intentionally or unintentionally cast);

- Drafting rules and procedures that are intricate enough to account for the many situations officials face when processing millions of voters;

- Drafting rules and procedures that are simple (and uniform) enough so that both voters and officials can understand and apply them and ensure that they fit into federally required mandates;

- Allowing all voters many convenient opportunities to vote;

- Ensuring quick and accurate election results;

- Reducing the administrative burdens on election officials as well as the overall costs of elections;

- Registering eligible, but unregistered voters; and

---

[57] *See* Trial Tr. (Vol. 3) 311:2-17; 312:1-3; 313:11-22.
[58] *See* Brehm Decl. at 2-7; *see also* Connolly Decl. 3-6 and 12-17.

o   Protecting the public's overall confidence in the electoral process.

The Constitution leaves this complex tight-rope walk to the States. It recognizes there is no perfect answer.  Notably, the legislative process in enacting New York's removal process was contentious.[59]  The Legislature considered different approaches, including the approach offered by Plaintiff.[60]  Ultimately, the Legislature and Governor opted for a different approach.  The question in this trial, therefore, is not whether New York has balanced these interests perfectly (a standard no State could ever meet). Nor is it whether Plaintiffs' preferred approach would be better. The only question this Court must answer is whether New York's voting laws comply with federal law. The answer is yes, they do.

## C.  NVRA Claim

In addition to its Constitutional Claims, Plaintiff alleges that New York's " inconsistent implementation" of its removal policy violates Section 8 of the NVRA.

### 1. Standard

As noted in this Court's decision in relation to Defendants' motion to dismiss, New York's removal policy facially complies with Section 8 of the NVRA. However, "if New York failed to enforce (safeguards for inactive voters in the Election Law) as written—for example, by failing to provide "inactive" voters with affidavit ballots—its conduct could rise to a violation of the NVRA."  See ECF  at pg. In its decision, this Court indicated that an "as applied" claim of the NVRA may be had if "1) state poll workers 'routinely' informed inactive voters that they were not registered to vote; (2) state poll workers failed to inform inactive voters that they may

---

[59] *See* Brehm Decl. at 16; *see also* Defendants' Trial Exhibit 4.
[60] *See* Brehm Decl. at 15; *see also* Defendants' Trial Exhibit 1 at pgs. 81-83.

vote by affidavit ballot; (3) state poll workers failed to offer inactive voters affidavit ballots; (4) state poll workers offered voters affidavit ballots only at their 'insistence'."

Plaintiff argues that it need only show one violation to prevail in its NVRA claim, pointing to the NVRA's private right of action section.[61]  Notably, there are no individual voters named as a plaintiff in this action.  Further, one violation would undercut Plaintiff's organizational standing argument (that it had to divert resources to investigate complaints from many individuals).  Additionally, the relief Plaintiff is seeking would be disproportionate if only one violation was found (requiring that all inactive voters vote on voting machines due to one violation).

Respectfully, to succeed, alleged injury must result from a systemic failure to train, not from the actions of a particular individual who might have benefitted from more training. *City of Canton v. Harris*, 489 U.S. 378 (1989). In other words, Plaintiffs must show systemic, rather than localized, problems.

### 2.   Plaintiff Did Not Show Systematic Failure in New York's Election System

Plaintiff alleges that it proved that the State "routinely" fails to offer inactive voters affidavit ballots during elections.[62]  To back up this assertion, Plaintiff points to reports by the New York City Comptroller and New York Attorney General's Office, which contain hearsay and hearsay within hearsay; Plaintiff's expert witness Marc Meredith who reviewed the reports; testimony from Commissioner Virginia Martin from the Columbia County Board of Elections and Executive Director Michael Ryan, who both testified that voters may leave the poll site without voting an affidavit ballot, and Plaintiff Executive Director Susan Lerner, who testified

---

[61] *See* Plaintiff's Post-Trial Brief at 28-29.
[62] *See* Plaintiff's Post-Trial Brief at 30.

that she has had "conversations" with people, but did not identify who, that were not offered an affidavit ballot.  Additionally, Plaintiff states that roughly 40 percent of complaints it receives relates to not being in the poll book via direct complaints and an e-mail survey of its members.  Notably, no records of this survey or e-mail complaints were presented at trial.

Further, Plaintiff also argues that inactive voters are routinely not offered affidavit ballots.  However, out of all the evidence presented, Plaintiff was only able to provide one instance of a voter that was not offered an affidavit ballot.[63]  Indeed, "(t)hat well more than a quarter-million New Yorkers were provided affidavit ballots by poll workers in 2016's General Election and submitted them demonstrates that the process of distributing affidavit ballots is widely adhered to by poll workers."[64]

To succeed, alleged injury must result from a systemic failure to train, not from the actions of a particular individual who might have benefitted from more training. *City of Canton v. Harris*, 489 U.S. 378 (1989).  In other words, Plaintiffs must show systemic, rather than localized, problems.

The testimony of Commissioner Virginia Martin, and Executive Director Michael Ryan, that some voters may leave a poll site without voting an affidavit ballots is vague and imprecise.  This testimony cannot reasonably show systemic failure of New York's electoral system.  Likewise, Executive Director Susan Lerner's testimony, that 40% of the complaints she received via e-mail, and via a survey of her members, cannot reasonably be relied upon.  There was no evidence submitted of these purported e-mail complaints or survey, and it is unclear how many complaints Ms. Lerner received.

---

[63] Goldberg Decl., ¶¶ 15-21.
[64] See Connolly Decl. at 75.

Plaintiff produced 19 declarations that purport to show deficiencies in New York's electoral system.  To the extent that these 19 declarations do show deficiencies, they are not enough to show systemic failure on part of New York's election system.  They are localized issues.

Notably, of these 19 declarations, some of them show no poll site error at all.  For instance, eight declarations merely show that the voter was not listed in the poll book, the voter was offered an affidavit ballot, and the affidavit ballot counted.  *See* Katherine Baldus; Jacques Fages; Mitchell Lavnick; Mara Wilson; James W. Johnson; Tracey Glodblum; Susan Stewart; and Robert Holman.  That is precisely how the process is supposed to work.  Most of these declarations state that the voter was concerned about the affidavit process, or that they were unsure that their vote would count, either on the day of the election, or subsequent to the day of the election.  As this Court has noted in its decision to Defendants' motion to dismiss, inactive voters voting via provisional ballot is contemplated in the NVRA.[65]  As such, these declarations do not show a violation of either the NVRA nor the Constitution.

Further, six of these declarations do not relate to New York's removal process.  For instance, Sandra Patricia Copps was not in the poll book for the 2018 September Democratic primary because she was not enrolled in the Democratic party.  Her issue of not being in the poll book does not relate to New York's removal process.  It is unclear why Lauren Wolfe was not in the poll book in the 2016 General Election as she was in active status.  The reason her affidavit ballot did not count was because she voted at the incorrect poll site.  Per her affidavit, Alison Matika voted via an affidavit ballot because her poll site did not have poll books.[66]  Walter

---

[65] *See* ECF 118, Decision on Defendants Motion to Dismiss.
[66] Matika Decl. at 17-18.

Ancarrow, IV and Keoma Blake's declarations relate to the voter-look up system, not their voter status or whether they voted via an affidavit ballot.  Ellen Edleman was an active voter who went to the correct poll site, but wrong table.  She was given an affidavit ballot, which was counted.[67] The issues raised in these five declarations would not be addressed by this litigation.

Plaintiff does submit three declarations where there was clear error; the declarations of Angela Roberts and Denise Roberts.[68]  In two of these instances, the voter's affidavit ballots should have counted.  Both events happened at the same poll site in Tioga County.  The Plaintiff's own expert witness, Marc Meredith, indicated listing Denise Roberts in the poll book probably would not have changed anything as the problem was "more of an administrative error that happened later in the process."[69]  Additionally, the declaration of Stephanie Goldberg, where poll workers failed to provide an affidavit ballot during the 2018 General Election in Orange County, was another error.[70]  While unfortunate, these three instances are not sufficient to show systemic error.

The other evidence proffered by the Plaintiff are various documents from local counties and the Attorney General's office.[71]  This evidence includes the various e-mails as well as notes taken from the Attorney General's Election Hotline from the 2016 Presidential Primary.  Plaintiff provides Plaintiff Exhibits 129-134, 151, and 158, which includes hearsay within hearsay observations from poll watchers in Ulster County stating that voters were not being provided affidavit ballots.

---

[67] Brehm Decl. at 64-68.
[68] D. Roberts Decl. at 11 and 14; A. Roberts Decl. at 34.
[69] Trial Tr.(Vol.3) 358:12-17.
[70] Goldberg Decl., ¶¶ 15-21.
[71] Plaintiff's Trial Exhibits 114-171.

Additionally, Plaintiff provides records from the Attorney General's election hotline from the April 2016 presidential primary election.[72]  Some of these instances include hearsay within hearsay, e.g. "overheard poll workers telling voters they didn't have provisional ballots"; or "Husband was told 'provisional ballots' did not exist."[73]  Further, it is unclear that these voters were in inactive status, as voters not being registered in a primary appeared to be a significant driver of these calls.

Even assuming, arguendo, that all of these examples happened as stated in the documents, it cannot reasonably be construed as systemic failure on part of the Defendants.  As noted in Director Thomas Connolly's declaration, there are approximately 5,300 poll sites, 15,083 election districts and 61,790 poll workers who staff an election.[74]  While any error is unfortunate, and while the State strives to make any election as perfect as possible, no election can possibly be perfect.  With such large numbers, it is unavoidable that complaints will be made and that errors occasionally occur.  However, as noted earlier, there are several protections in the Election Law that mitigates errors that may occur.  Ultimately, while Plaintiff is able to point to some errors, it does not prove systemic problems.  As noted in *Bush v Hillsborough County Canvassing Bd.*, the court recognized "that much can be done to guarantee a fair election; but no matter how hard we try, regrettably we may never be able to guarantee a perfect election."  123 F Supp 2d 1305, 1317 [ND Fla 2000].

D. Standing

Defendants rely on their prior briefing on standing.

---

[72] Plaintiff's Trial Exhibit 235 and 239.
[73] *Id.*
[74] Connolly Decl. at 12.

34

**IV. Conclusion**

For the reasons set forth above, Defendants respectfully request that the Court reject

Plaintiff's claims in their entirety and deny relief.

Albany, New York

November 21, 2019

Respectfully submitted,

/s/ Brian Lee Quail

**Brian Lee Quail**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
Brian.quail@elections.ny.gov

**Nicholas Robert Cartagena**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
Nicholas.cartagena@elections.ny.gov

**William J. McCann, Jr.**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
William.mccann@elections.ny.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2019 a true and correct copy of the foregoing

document was served via the Court's ECF system to all counsel of record.

/s/ Brian Lee Quail

**Brian Lee Quail**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
Brian.quail@elections.ny.gov