UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------

COMMON CAUSE/NEW YORK, as an
organization and on behalf of its members,

                                          -Plaintiffs,

-against-

ROBERT A. BREHM, Co-Executive
Director, TODD D. VALENTINE,
Co-Executive Director, PETER S. KOSINSKI,
Co-Chair, DOUGLAS A. KELLNER, Co-Chair,
ANDREW J. SPANO, Commissioner, and
GREGORY P. PETERSON,
Commissioner, in their official capacities as
Commissioner of the NEW YORK STATE
BOARD OF ELECTIONS,

                                          -Defendants.
----------------------------------------------------------------

**Response to Plaintiff's Proposed
Findings of Fact and Defendants'
Proposed Findings of Fact**
Case No. 1:17-cv-06770-AJN
Hon. Alison J. Nathan

## Response to Common Plaintiff's Findings of Fact and Defendants' Proposed Findings of Fact

       Defendants New York State Board of Elections, Todd D. Valentine and Robert Brehm, in

their official capacities as Co-Executive Directors of the BOE (collectively, the "BOE

Defendants"), Peter S. Kosinski and Douglas A. Kellner, in their official capacities as Co-Chairs

of the New York State Board of Elections; Andrew J. Spano and Gregory P. Peterson, in their

official capacities as Commissioner of the New York State Board of Elections, respectfully

submits this Response to the Proposed Findings of Fact, and, submit the following proposed

findings of fact and conclusions of law under Fed. R. Civ. P. 52(a):

<u>Response to Plaintiff's Findings of Fact and Conclusions of Law</u>

1. FF 1 is accurate.

2. FF 2 is accurate.

3. FF 3 is accurate.

4. FF 4 is accurate.

5. FF 5 is accurate.

6. FF 6 is accurate.

7. FF 7 is incomplete as it does not contain the relevant statutory underpinning of list maintenance requirements.

Counter-cite 7:   The National Voter Registration Act of 1993 (NVRA) requires that states engage in list maintenance activities. Section 8(a) of the NVRA requires "each State" to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of ... a change in the residence of the registrant." 52 U.S.C. § 20507(a).  (Stipulated Law No. 3.)

8. FF 8 is accurate.

9. FF 9 is incomplete and misleading as it does not contain the relevant statutory citations for the annual mail check card, nor does I contain the fact that mail check cards are not forwardable.

Counter-cite 9:  Each year, the board of elections of each county or city sends out a "check of registrants and information notice by mail" pursuant to N.Y Election Law § 4-117.  These notices are sent as unforwardable by first class mail ( or with equivalent services to first class mail with regard to obtaining address forwarding information). As a result the post office will return any such mailing that cannot be delivered as addressed and provide back to the board

of elections "forwarding information" if any. This forwarding information is used to update the voter record addresses.  (Defendants' Trial Exhibit B, Connolly Decl. at 27).

10. FF 10 is incomplete and misleading as it does not contain the relevant statutory citations for confirmation notices, nor does I contain the fact that confirmation notices are forwardable.

Counter-cite 10: New York law provides that, upon the mailing of a confirmation notice, the voter is moved to "inactive" status N.Y. Elec. Law §5-213(1).  The registration poll records of all such voters must be removed from the poll ledgers and maintained at the offices of the board of elections in a file arranged alphabetically by election district. Election Law § 5-213(2).  If the board uses computer generated registration lists (as all New York Boards of Elections now do), the names of such voters may not be placed on such lists at subsequent elections other than lists prepared pursuant to the other provisions of the Election Law, but must be kept as a computer record at the offices of such board.  Id. (Stipulated Law No. 5.)

11. FF 11 is inaccurate, incomplete and misleading as it is vague in relation to when confirmation notices are sent.

Counter-cite 11: The confirmation notice is forwardable and is sent to voters when returned mail or when National Change of Address ("NCOA") information indicates no forwarding address. The notices are also sent to voters when information from the Department of Motor Vehicles or a NVRA agency or NCOA indicates an address change to outside of the jurisdiction of the board of elections.  (Defendants' Trial Exhibit B, Connolly Decl. at 35.)

12. FF 12 is accurate.

13. FF 13 is accurate.

14. FF 14 is inaccurate, incomplete and misleading, as it insinuates and concludes that voters are placed in inactive status of invalid reasons without evidentiary support.

Counter-cite: The New York process to place a voter on inactive status always requires an indication that the voter has moved (returned mail, NCOA, address information from DMV, etc.) which must be followed by the sending of a forwardable confirming mailing with a postage paid return to the voter for the purpose of enabling the voter to indicate any error or correction. The double check function of the confirmation notice is augmented by the blackout provisions of state and federal law that prevent confirmation notices from being sent when no forwarding address is provided by the post office. (Defendants' Trial Exhibit B, Connolly Decl. at 39-40.)

15. FF 15 is accurate.

16. FF 16 is accurate.

17. FF 17 is inaccurate, incomplete and misleading, as it does not list all the reasons an inactive voter could be moved to active status.

Counter-cite: New York law requires that an inactive voter be returned to "active" status if one of the following occur: the voter (i) responds to the confirmation notice, which includes a postage-paid return card; (ii) provides notice that he or she resides at the listed address; (iii) signs a designating or nominating petition that includes the listed address; (iv) votes with an affidavit ballot; (v) votes in a local election (such as a town or school district election), (vi) obtains a court order and presents said order at the polling place; or (vii) submit a new voter registration form. N.Y. Elec. Law § 5-213(3). (Stipulated Law No. 7.)

18. FF 18 is accurate.

19. FF 19 is inaccurate, incomplete and misleading, as it does not list all the reasons an
    inactive voter could be moved to active status.

Counter-cite: An voter in inactive status shall have their registration cancelled if the voter did
not vote in any election conducted by the relevant county board of elections during the period
ending with the second general election at which candidates for federal office are on the
ballot after their name was placed in inactive status and for whom the board of elections did
not, during such period, in any other way, receive any information that such voter still resides
in the same county or city.  Such information that the voter resides at the same location
includes when the voter: (i) responds to the confirmation notice, which includes a postage-
paid return card; (ii) provides notice that he or she resides at the listed address; (iii) signs a
designating or nominating petition that includes the listed address; (iv) votes with an affidavit
ballot; (v) votes in a local election (such as a town or school district election),  (vi) obtains a
court order and presents said order at the polling place; or (vii) submit a new voter
registration form.  (Election Law § 5-400.)

20. FF 20 is accurate.

21. FF 21 is accurate.

22. FF 22 is accurate.

23.  FF 23 is inaccurate and incomplete.  Statute provides how the registration list of inactive
    voters is to be maintained.

Counter-cite:  The registration poll records of all such voters must be removed from the poll
ledgers and maintained at the offices of the board of elections in a file arranged
alphabetically by election district. (Election Law § 5-213(2)).  If the board uses computer
generated registration lists (as all New York Boards of Elections now do), the names of such

voters may not be placed on such lists at subsequent elections other than lists prepared

pursuant to the other provisions of the Election Law, but must be kept as a computer record

at the offices of such board. (Id.)

24. FF 24 is inaccurate, incomplete and misleading, as the only non-hearsay evidence

    submitted by Plaintiff indicates that Columbia County places inactive voters on a

    challenge list.

Counter-cite: New York state law provides that a list of all voters whose eligibility has been

challenged must be maintained at the polling place on Election Day. Relevant sections of the

New York Election Law include sections 5–220(2) and 8-508.  Columbia County election

officials provide a list of challenged voters to each polling place on Election Day.

Irrespective of State Election Law, For approximately the past eight years and perhaps

longer, the Columbia County Board of Elections has included inactive voters along with

challenged voters on the supplemental list that is maintained at polling places on Election

Day. (Cite Martin Decl. 13-17.)

25. FF 25 is inaccurate, incomplete and misleading, as it insinuates that an affidavit ballot is

    not a "regular" ballot.  There is no difference between the ballots that are cast in a ballot

    scanner and cast in an affidavit ballot envelope.

Counter-cite:  Voters must vote by affidavit ballot or obtain a court order to vote on the

voting machine when the voter is at the correct election district and the voter's name does not

appear in the poll book for the election, primary special or general. (Defendants' Trial Exhibit

B, Connolly Declaration at 51.)

26. FF 26 is inaccurate, incomplete and misleading, as it contains a conclusion without evidentiary support. The questioned asked in the testimony cited stated that judges are "usually" not at poll sites; not "never" at poll sites.

Counter-cite: The alternative to an affidavit ballot is a court order. The voter may apply for a court order requiring that the voter be permitted to vote in the regular manner on a voting machine. The procedures for this are provided in New York Election Law§ 16-108. Such court applications are made by voters directly to a judge. There is no filing fee to make these applications and determinations are decided promptly on election day or, in many instances, in the days leading up to an election day. In the most populous areas of the state, state law requires the duty judges to hear applications at the offices of the board of elections, and this is common practice in many other counties. (Defendants' Trial Exhibit B, Connolly Decl. at 79-82).

27. FF 27 is accurate.

28. FF 28 is inaccurate, incomplete and misleading, as this paragraph characterizes the utilization of court order ballots inaccurately. Evidence submitted actually shows court ordered ballots are used with high frequency.

Counter-cite: During the 2016 General Election, 2,549 Court Order requests were processed. *See* Defendants' Trial Exhibit 5, 2016 Annual Statistical Report at pgs 100-101).

29. FF 28 is inaccurate, incomplete and misleading as it attempts to quantify how many court ordered ballots were ordered to vote via an affidavit ballot through antidotal evidence

(e.g. Plaintiff is unable to show how many of the 2,549 court ordered ballots were ordered to vote via an affidavit ballot).

30. FF 30 is inaccurate, incomplete and misleading as it mischaracterizes the affidavit ballot process.

Counter-cite:  Inactive voters must vote by affidavit ballot or obtain a court order to vote on the voting machine when the voter is at the correct election district and the voter's name does not appear in the poll book for the election, primary special or general.  (Defendants' Trial Exhibit B, Connolly Decl. at 51).

31. FF 31 does not accurately reflect New York's affidavit ballot process.

Counter-cite: Under New York's process, when a voter appears to vote and his or her name does not appear in the poll book, poll workers are required to ascertain whether the voter is at the correct polling place. Specifically, the statute requires the poll worker to consult a map, street finder (listing of street addresses that indicates the election district and polling place for each address range on the street) or other description of all of the polling places and election districts. If necessary, the poll workers will contact the board of elections to obtain the relevant information and inform the voter of the voter's correct polling place for the voter's residence address.  If a voter who does not appear in the poll book does live in the election district, New York provides the voter with two options that are detailed on the notice to voter, vote by affidavit ballot or seek a court order.  (*See* Defendants' Trial Exhibit B, Connolly Decl. at 53-56).

32. FF 32 is accurate.

33. FF 33 is accurate.

34. FF 34 does not accurately reflect New York's affidavit ballot process.

Counter-cite:  The affidavit voter then takes the ballot and the affidavit ballot envelope and goes to a private area, often a privacy booth, to complete the ballot and places it in the completed affidavit envelope. (Defendants' Trial Exhibit B, Connolly Decl. at 59).

35. FF 35 does not accurately reflect New York's affidavit ballot process.

36. FF 36 is accurate.

37. FF 25 is inaccurate, incomplete and misleading, as it insinuates that an affidavit ballot is not a "regular" ballot.  There is no difference between the ballots that are cast in a ballot scanner and cast in an affidavit ballot envelope.

38. FF 38 is accurate.

39. FF 39 does not accurately reflect New York's voter removal process.

Counter-cite: The New York process to place a voter on inactive status always requires an indication that the voter has moved (returned mail, NCOA, address information from DMV, etc.) which must be followed by the sending of a forwardable confirming mailing with a postage paid return to the voter for the purpose of enabling the voter to indicate any error or correction.  (Defendants' Trial Exhibit B, Connolly Decl. at 39).

40.  FF 40 is accurate.

41.  FF 41 is inaccurate.

Counter-cite: In February, 2019, there were 1,019,497 inactive voters in New York State. (Defendants Trial Exhibit 24).

42.  FF 42 is inaccurate, incomplete and misleading as the term "routinely" insinuates that inactive frequently do not move from their address of registration which is contrary to evidence submitted at trial, which shows most inactive voters have, in fact, moved.

Counter-cite:   Sometimes New York voters are moved from active to inactive status even though they have not moved and continue to reside at their address of registration; however, a clear majority of inactive voters have, in fact, moved.  Trial Tr. (Vol. II) 289:22-290:3 (T. Valentine) ("THE COURT: "[T]here has been some evidence here of voters who went to long-term polling places, hadn't moved, but were wrongly identified as inactive, returned mail check documents apparently as a result of post office error or otherwise. Are you familiar with this phenomenon? A: I have seen a few of those."); (Defendants' Trial Exhibit A, Brehm Decl. at 18-26.)

43. FF 43 is accurate.

44. FF 44 is accurate.

45. FF 45 is accurate.

46. FF 46 is accurate.

47. FF 47 is accurate.

48. FF 48 is accurate.

49.  FF 49 is inaccurate, incomplete and misleading.  Plaintiff references evidence (e.g. call logs from the Attorney General's Office), which cannot be used for the truth of the statements contained within.  It is impossible to know if the voters in such logs were, in fact, inactive voters.

50. FF 50 mischaracterizes how Robert Holman was placed into inactive status.

Counter-cite:  The Erie County Board of Elections placed Robert Holman in inactive status on July 11, 2016 as a result of an official postcard mailed by the Erie County Board of Elections being returned by the United States Postal Service as not deliverable as addressed;

that on said date, the Erie County Board of Elections additionally mailed, forwarding service requested, an address confirmation notice directed to the address indicated on Robert Holman's most recent voter registration form, being the same address as the postcard previously sent, notifying the voter that he was placed in inactive status; that the Erie County Board of Elections received no response to such address confirmation final notice. Robert Holman casted an affidavit ballot during the 2017 General Election. The affidavit ballot was deemed valid and was counted. (Defendants' Trial Exhibit D, Mohr Decl. at 17 and 18).

51. FF 51 mischaracterizes how Jacques Fages was placed into inactive status.

Counter-cite:  Voter registration records show that Jacques Fages is a registered voter who resides at 100 W 105th St Apt E2 New York, NY 10025.  In the summer of 2017, Jacques Fages was placed in inactive status because his mail check card was returned to the NYC BOE as undeliverable. Jacques Fages casted an affidavit ballot during the 2017 General Election. The affidavit ballot was deemed valid and was counted.  (Defendants' Trial Exhibit A, Brehm Decl. at 55-57.)

52. FF 52 mischaracterizes "undeliverable" mail sent by boards of elections, as Plaintiff has not submitted any evidence suggesting that mail sent by boards of elections are returned as "undeliverable" and a higher rate than mail sent by other senders.

Counter-cite: There are over one million inactive voters in New York.  Plaintiff's expert estimates that roughly 30,000 still living in the same address.  Given these figures, roughly three percent of inactive voters reside at the same address, indicating that New York's method of determining who has moved is reliable.  (Defendant's Trial Exhibit 8 and 9.)  As indicated in the 2016 report, a total of 10,386,353 mail check notices were sent in 2016.  A

total of 400,843 of those cards were returned to boards of elections, and they were reported

by boards of elections into five categories:

a.  85,288 reflected "in-county" transfers

b.  61,753 reflected out of county moves

c.  181,798 reflected they were undeliverable

d.  64,971 were returned for miscellaneous reasons that do not fit other categories

e.  1,719 cards were returned marked "deceased."  (Defendants' Trial Exhibit B, Connelly

Decl. at 30.)

53.  FF 53 is inaccurate, incomplete and misleading.  Mr. Ryan did not testify that he

"investigated" the practices of the US Postal Service.  Further, as Mr. Ryan is not an

expert on postal services, his opinion of the quality of work performed by the post office

is of limited value.

54.  FF 54 is inaccurate, incomplete and misleading for the same reasons as stated in

paragraph 53 of this response.

55.  FF 55 is inaccurate, incomplete and misleading for the same reasons as stated in

paragraph 53 of this response.

56.  FF 56 is inaccurate, incomplete and misleading for the same reasons as stated in

paragraph 53 of this response.

57.  FF 57 is inaccurate, incomplete and misleading for the same reasons as stated in

paragraph 53 of this response.

58.  FF 55 is inaccurate, incomplete and misleading for the same reasons as stated in

paragraph 53 of this response.

59. FF 59 is accurate.

60. FF 60 is inaccurate, incomplete, and misleading, as it attributes statistics to New York, where the statistics really relate to Florida and California.

Counter-cite: Thirty to fifty percent of registrants in California and Florida who had at least one piece of mail sent to their registration address returned as undeliverable either immediately before or after an election voted in that same election. (Plaintiff's Trial Exhibit 264, Meredith Decl., at 12-13.)

61. FF 61 is misleading as it subjectively qualifies the amount of mail that is returned to a board of elections for reasons other than a registrant has moved.

Counter-cite:  A vast majority of inactive voters are inactive because the voter has moved or changed residence.  (Defendants' Trial Exhibit A, Brehm at 18-26).

62.  FF 62 is accurate.

63.  FF 63 is misleading as there was little evidence submitted on the frequency of the NCOA incorrectly classifying "temporary" changes of addresses as permanent.

64. FF 64 is accurate.

65. FF 65 is accurate.

66. FF 66 is accurate.

67. FF 67 is inaccurate, incomplete, and misleading, as the fact asserted cannot reasonably be elicited from the cited evidence (Meredith Decl. at 13.)

68. FF 68 is inaccurate, incomplete, and misleading, as there is no basis for this conclusion in the Grayson expert report.

69.  FF 69 is inaccurate, incomplete, and misleading, as there is no basis for this conclusion in the Meredith expert report.

70. FF 70 is accurate.

71. FF 71 is misleading as the term "unstable" is vague and ambiguous.

72. FF 72 is accurate.

73. FF 73 is accurate.

74. FF 74 is inaccurate, incomplete, and misleading, as cancelling a voter's registration because they registered someplace else is not being contested in this litigation.

75. FF 75 is accurate.

76. FF 76 is accurate.

77. FF 77 is accurate.

78. FF 78 is inaccurate, incomplete, and misleading, as misrepresents the actual time it takes a voter to vote via an affidavit ballot as was presented at trial.

Counter-cite:  The time to complete an affidavit ballot is approximately two to three minutes. (Trial Tr. (Vol. 3) 316:20-37; see also Trial Tr. (Vol. 2) 285:7-13.)

79.  FF 79 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 78 of this response.

80. FF 80 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 78 of this response.

81. FF 81 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 78 of this response, at it misrepresents voting waiting times in New York, in general.

Counter-cite: The average voter wait time nationwide is over 8.6 minutes. (Plaintiff's Trial Exhibit 67.)

82. FF 82 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 81 of this response.

83. FF 83 is inaccurate, incomplete and misleading as, beginning in 2019, local boards of elections are authorized to use electronic poll books.

Counter-cite: Staring in 2019, some counties are staring to use electronic poll books. (Trial Tr. (Vol. 1) 62:7-18; Trial Tr. (Vol. 2) 268:18-23.)

84. FF 84 is inaccurate, incomplete and misleading as, it is based upon speculation in the expert report of Marc Meredith.

85. FF 85 is inaccurate, incomplete and misleading as it misrepresents the check in process for a voter under the New York State Election Law.

Counter-cite: When a voter who is not in the poll book presents themselves to a poll worker, Election Law § 8-302(3)(e) requires the poll worker to "consult a map, street finder or other description of all of the polling places and election districts within the political subdivision in which said election district is located and if necessary, contact the board of elections to obtain the relevant information and advise the voter of the correct polling place and election district for the residence address provided by the voter to such poll clerk or election inspector." (Election Law § 8-302(3)(e)).

86. FF 86 is accurate.

87. FF 87 is inaccurate for the same reasons as stated in paragraph 85 of this response.

88. FF 88 is accurate.

89. FF 89 is inaccurate, incomplete and misleading as it misrepresents how voters not listed in the poll book are processed under the New York State Election Law.

Counter-cite: Election Law § 8-302(3-a) requires that poll workers must give a copy of a notice, in a form prescribed by the New York State Board of Elections, "to every person whose address is in such election district for whom no registration poll record can be found and, in a primary election, to every voter whose registration poll record does not show him to be enrolled in the party in which he wishes to be enrolled…advising such person of his right to, and of the procedures by which he may, cast an affidavit ballot or seek a court order permitting him to vote.." (Election Law § 8-302(3-a))

90. FF 90 is misleading as it misrepresents why poll workers "bandwidth" is limited.

Counter-cite: Poll workers only work one to three times a year. (Trial Tr. (Vol. 2) at 191:21-40; see also Ryan Dep.,174: 3-71; Defendants' Trial Exhibit B, Connolly Decl. at 114-118.)

91. FF 91 is accurate.

92. FF 92 is misleading as it subjectively qualifies the number of poll workers New York City used in the 2016 presidential election.

Counter-cite: The New York City Board of Elections used 33,634 poll workers for the 2016 presidential election. (Meredith Decl., at 22.)

93. FF 93 is accurate.

94. FF 94 is accurate.

95. FF 95 is accurate.

96. FF 96 is misleading as it subjectively qualifies evidence that was submitted.

Counter-cite: The duration of poll worker training sessions ranges from one and half hours to six hours, depending on the county. The duration in the five counties comprising New York City is four hours, and poll workers are paid to attend training. In 2016, the class sizes ranged from two persons to 100, and statewide the total number of poll worker classes held was 5,974.

97. FF 97 is misleading as it subjectively qualifies evidence that was submitted.

98. FF 98 is accurate.

99. FF 99 is inaccurate, incomplete and misleading as the Election Law specifically permits poll workers to call local county boards of elections when they are attempting to ascertain a voter's poll site location.

Counter-cite: When a voter who is not in the poll book presents themselves to a poll worker, Election Law § 8-302(3)(e) requires the poll worker to "consult a map, street finder or other description of all of the polling places and election districts within the political subdivision in which said election district is located and if necessary, contact the board of elections to obtain the relevant information and advise the voter of the correct polling place and election district for the residence address provided by the voter to such poll clerk or election inspector.

100.  FF 100 is inaccurate, incomplete and misleading as it attempts to generalize other county boards of election training materials with the training materials of the Erie County Board of Elections.

101.  FF 101 is inaccurate, incomplete and misleading as this testimony is irrelevant to the basis of this case, e.g. whether inactive voters are disenfranchised.

102.  FF 102 is inaccurate, incomplete and misleading as it contains hearsay as the New York City Comptroller was not called as a witness in this matter.

103.  FF 103 is inaccurate, incomplete and misleading, as it ignores New York City Board of Elections rebuttal, which is also contained in the Comptroller's report.

Counter-cite: While the Comptroller's audit concluded that the length of training was too limited to cover all of the complexities of Election Day, the New York City Board of Elections stated that it disagrees with the Comptrollers assessments.  Notably, the Board's training strategy was developed for specific jobs; Basic Poll Worker, coordinator, accessibility clerk, interpreter, and AD Monitor.  A detailed curriculum was developed for each job group with a timed agenda and PowerPoint presentation.  Sessions are timed to provide reasonable learning capabilities for each job group based on reviewing by the professional trainers of over 100 individual sessions.  It was determined that the maximum that could be done given individual attention spans was four hours for Basic Poll Worker and six hours for Coordinator and AD monitors.  Given inherent constraints, the board stressed familiarity with the poll worker manual, which covers every detail from the beginning to end of the Election Day.  (Plaintiff's Exhibit 57 at 49.)

104.  FF 104 is inaccurate, incomplete and misleading, as it ignores New York City Board of Elections rebuttal, which is also contained in the Comptroller's report.

Counter-cite: While the Comptroller's audit also concluded that the post-training exam was not structured appropriately to test poll workers' knowledge of protocol, the New York City Board of Elections stated that it disagrees with the Comptrollers assessments.  Notably, the exams were designed to force participants to use the poll worker manual.  The exam was

designed with input from lead trainers about the most important dimensions of the responsibilities for each position.  (Plaintiff's Exhibit 57 at 49-50.)

105.  FF 105 is inaccurate, incomplete and misleading, as it is overly vague and ambiguous. It is not clear what delegating "much of the responsibility for maintaining ballot accessibility and election integrity" means.

106.  FF 106 is accurate.

107.  FF 107 is accurate.

108.  FF 108 is accurate.

109.  FF 109 is inaccurate, incomplete and misleading, is it summarily concludes that poll workers only receive a small amount of training, which is not supported by the evidence presented.  (Defendants' Trial Exhibit B, Connolly Decl. at 16.)

110.  FF 110 is inaccurate and misleading as it is based on speculation on the part of Plaintiff's expert witness Marc Meredith.

111.  FF 111 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 110 of this response.

112.  FF 112 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 110 of this response.

113.  FF 113 is inaccurate, incomplete and misleading as it misrepresents the declaration of Alison Matika.

Counter-cite:  In her declaration, Alison Matika testified that during the 2016 General Election, there were no poll books at her poll site, and she was forced to vote via an affidavit

ballot.  (See generally Matika Decl.)  The allegations in this declaration do not relate to the issues in this case; that New York's implementation of its Removal Policy violates section 8 of the NVRA.  While this declaration may show New York's election officials are not infallible, such standard cannot reasonably used for NVRA violations.  (Plaintiff's Trial Exhibit 198, Matika Decl.)

114. FF 114 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 113 of this response.

115.  FF 115 is accurate.

116.  FF 116 is is inaccurate, incomplete and misleading, as it contains conclusory assertions without any evidentiary support and ignores the current process poll workers undertake to ascertain a voter's correct election district.

Counter-cite:  Under New York's process, when a voter appears to vote and his or her name does not appear in the poll book, poll workers are required to ascertain whether the voter is at the correct polling place.  Specifically, New York requires the poll worker to consult a map, street finder (listing of street addresses that indicates the election district and polling place for each address range on the street) or other description of all of the polling places and election districts.  (Defendants' Trial Exhibit B, Connolly Decl. at 53.)

117.  FF 117 is accurate.

118.  FF 118 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 116 of this response.

119.  FF 119 is accurate.

120.  FF 120 is accurate.

121.  FF 121 is inaccurate and misleading as it distorts evidence in the record.  Mr. Ryan did not testify that poll workers receive "limited" training on affidavit balloting; rather, he stated that it is an element of the training, but could not state "how much" at the time of the deposition.

122.  FF 122 is inaccurate and misleading.  This assertion is based solely on Plaintiff's expert Marc Meredith's speculation.

Counter-cite:  122.      If a voter who does not appear in the poll book, but does live in the election district, New York provides the voter with two options that are detailed on a "notice to voter" which must be provided to the voter.  (Defendants' Trial Exhibit B, Connolly Decl. at 56.)

123.  FF 123 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 122 of this response.

124.  FF 124 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 103 of this response.

Counter-cite: Counter-cite: While the Comptroller's audit concluded that the length of training was too limited to cover certain issues, the New York City Board of Elections stated that it disagrees with the Comptrollers assessments.  Notably, the Board's training stresses familiarity with the poll worker manual, which covers every detail from the beginning to end of the Election Day.  (Plaintiff's Exhibit Trial 57 at 49.)

125.  FF 125 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 122 of this response.

126.  FF 121 is inaccurate and misleading as it is based on speculation and distorts evidence in the record.

Counter-cite: 266,369 affidavit ballots in New York were submitted in New York at the 2016 General Election.  That well more than a quarter-million New Yorkers were provided affidavit ballots by poll workers in 2016's General Election and submitted them demonstrates that the process of distributing affidavit ballots is widely adhered to by poll workers. (Defendants' Trial Exhibit B, Connolly Decl. at 74-75).

127.  FF 127 is accurate.

128.  FF 128 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 103 of this response.  Further, it distorts the evidence in record, as the Comptroller's report indicates that there was only one instance of a voter not being offered an affidavit ballot.

Counter-cite: The City of New York Office of the Comptroller observed only one instance of a voter not being offered an affidavit ballot in its observance of 156 polling places. (Plaintiff's Trial Exhibit 55, Audit Report, at 11-12.)

129.  FF 129 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 128 of this response.

130.  FF 130 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 49 of this response.

Counter-cite: The Attorney General maintained a hotline for voter complaints during the 2016 Presidential Primary.  It is impossible to know the veracity of the underlying claims given the evidence submitted.

131.  FF 131 is inaccurate and misleading as it distorts testimony that was given.

Counter-cite: The State Board rarely receives complaints about inactive voters not being offered an affidavit ballot.  To the extent the Board receives such complaints it is not a systemic issue; rather, such issues are localized.  (Defendants' Trial Exhibit C, Valentine Decl. at 12-13.)

132.  FF 132 is accurate.

133.  FF 133 is accurate.

134.  FF 134 is accurate.

135.  FF 135 is accurate.

136.  FF 136 is accurate.

137.  FF 137 is inaccurate, incomplete and misleading as it distorts evidence in the record.  It also contains records from the Attorney General's office and certain county boards of elections that contain hearsay and double-hearsay, and cannot be considered in ascertaining the truth of those complaints.

Counter-cite: Counter-cite can be found in Defendants Proposed Findings of Fact, located in paragraphs 65-93.

138: FF 138 is inaccurate, incomplete and misleading as it is unclear what "protocol" the paragraph is referencing.

139: FF 139 is inaccurate, incomplete and misleading as it takes the email in question out of context.  Notably, the email itself is not submitted into evidence.

140: FF 140 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 139.

141: FF 141 is inaccurate, incomplete and misleading as it ignores the process a poll worker must take in ascertaining a voter's correct poll site (e.g. using a map or street finder, or calling the local board of elections).

Counter-cite:  Poll workers have the ability to determine if a voter is in the correct poll site by utilizing tools provided to them (e.g. the street finder or map) or by calling the County Board of Elections.  (Defendants' Trial Exhibit B, Connolly Decl. at 53-56.)

142: FF 142 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 141.

143: FF 143 is inaccurate, incomplete and misleading as it distorts evidence in the record.

Counter-cite: Lauren Wolfe testified that she went to vote at her poll site in Brooklyn Borough Hall for the 2016 General Election, but was told that she was not in the poll book and that she was in the wrong poll site.  (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 10-11.) She was told that she had to go to St. Francis College.  (*Id*. at 12.)  The poll site in St. Francis college told her that she was not in the poll book, and that her correct poll site was Borough Hall.  (*Id.* at 13.)  After going back and forth, Lauren Wolf voted in St. Francis college.  (*Id.* at 14.)  Lauren Wolfe was in active status prior to the 2016 General Election.   (Defendants' Trial Exhibit A, Brehm Decl. at 59.)  Election records show that the proper poll site for Lauren Wolfe is Brooklyn Borough Hall. It is unclear why poll workers were unable to find

Lauren Wolfe's name in the poll book. It is also unclear why poll workers directed Ms. Wolfe to a different poll site per her testimony.   Lauren Wolfe's affidavit ballot was determined to be invalid because she voted at the wrong poll site, St. Francis College.  (*Id.* at 62.)

144: FF 144 is inaccurate, incomplete and misleading as, it is based upon speculation in the expert report of Marc Meredith.

145: FF 145 is accurate.

146: FF 146 is accurate.

147: FF 147 is inaccurate, incomplete and misleading as, it is based upon speculation in the expert report of Marc Meredith.

148: FF 148 is inaccurate, incomplete and misleading as, it is based upon speculation in the expert report of Marc Meredith.

149: FF 149 is inaccurate, incomplete and misleading as, it is based upon speculation in the expert report of Marc Meredith.

150: FF 150 is inaccurate, incomplete and misleading as, it is based upon speculation in the expert report of Marc Meredith.

151: FF 151 is inaccurate and misleading as it misrepresents the purpose of New York's voter lookup tool.

Counter-cite: There are many ways a voter in New York can determine where the voter's poll site is located.  For example, prior to each election, poll site information is required to be published by each board of elections as a matter of law in a newspaper of general circulation in every county.  (Defendants' Trial Exhibit B, Connolly Decl. at 85-90.)  The New York

State Board of Elections has a poll site lookup feature on its website which can be used statewide to determine whether a voter is registered, their party enrollment what their voter status is (active or inactive) and where the voter's poll site is located. The form of the look up has not materially changed since before the 2016 elections.  (Defendants' Trial Exhibit B, Connolly Decl. at 91-92.)

152:  FF 152 is inaccurate, incomplete and misleading as it fails to state why the look up tool has certain privacy features.

Counter-cite:  To effectuate a look-up, the voter must provide their Last Name, Date of Birth, Zip code, First Name and County or residence. The reason for the specificity of the information required is to provide some measure of privacy for the voter so the voter look up feature cannot be readily used as a generic online address look-up for non-election purposes. Election Law § 3-105 (5) prohibits the use of voter information on the statewide voter list for non-election related use.  (Defendants' Trial Exhibit B, Connolly Decl. at 93.)

153: FF 153 is inaccurate, incomplete and misleading as it vague and ambiguous.

154: FF 154 is inaccurate, incomplete and misleading as the look up tool is not designed to be a substitute for a registration list; however, it is a resource that can be used, in conjunction with a street finder, maps, or calling the local county boards of elections, in determining a correct poll site.

155: FF 155 is accurate.

156: FF 156 is accurate.

157: FF 157 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 152.

158: FF 158 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 152.

159: FF 159 is accurate.

160: FF 160 is inaccurate, incomplete and misleading as, other than a reference Plaintiff's expert report, there is no direct evidence that the voter lookup is inaccessible during Election Day.

161:  FF 161 is inaccurate, incomplete and misleading and distorts the evidence in the record.

Counter-cite: Katherine Baldus testified that she was not listed in the poll book and voted via an affidavit ballot in the September 2018 primary.   (Plaintiff's Trial Exhibit 187, Baldus Decl. at 13-18.)  However, election records show that she was in active status.  (Defendants' Trial Exhibit A, Brehm Decl. at 47.)  Katherine Louise Baldus' affidavit ballot was deemed valid and was counted.    (*Id.* at 49.)

162: FF 162 is inaccurate, incomplete and misleading as it is irrelevant to the claims of this case.

163: FF 163 is inaccurate, incomplete and misleading as it is irrelevant to the claims of this case.

Counter-cite: Keoma Blake and Walter Ancarrow, IV.  Keoma Blake and Walter Ancarrow, IV both testified that they had issues with the online NYS voter lookup page.  Their testimony is presumably meant to show that NYS online voter lookup is unreliable.  The

New York City Board of Elections entered Keoma Blake's date of birth incorrectly, preventing the look up from making a match until it was corrected.  (Defendants' Trial Exhibit A, Brehm Decl. at 74.)  It is unclear why Walter Ancarrow, IV had a problem with the voter lookup, whether it was a system failure or user error.  Regardless, the declaration of two individuals having issues with the voter lookup is insufficient to show a systemic problem with the voter lookup.

164: FF 164 is inaccurate, incomplete and misleading as it is irrelevant to the claims of this case.  Further, it is not alleged that Mr. Ancarrow was an inactive voter for the September 2018 primary.

165: FF 165 is inaccurate, incomplete and misleading as it is irrelevant to the claims of this case.  Further, it is not alleged that Ms. Blake was an inactive voter during the September 2018 primary.

166: FF 166 is inaccurate, incomplete and misleading as it is irrelevant to the claims of this case.

167: FF 165 is inaccurate, incomplete and misleading as the issues raised in the paragraph do not reasonably relate to New York's Voter Lookup tool.

168: FF 168 is accurate.

169:  FF 169 is accurate.

170:  FF 170 is accurate.

171: FF 171 is accurate.

172: FF 172 is accurate.

173: FF 173 is accurate.

174: FF 174 is misleading as it is a subjective conclusionary statement.

175: FF 175 is inaccurate, incomplete, and misleading, as the data was compiled using estimates based on census data.  (*See* Meredith Decl. at 10, fn 37.)  It is unclear whether these estimates are accurate.

176: FF 176 is inaccurate, incomplete, and misleading, as the data was compiled using estimates based on census data.  (*See* Meredith Decl. at 10, fn 37.)  It is unclear whether these estimates are accurate.

177: FF 177 is inaccurate, incomplete, and misleading, as the data was compiled using estimates based on census data.  (*See* Meredith Decl. at 10, fn 37.)  It is unclear whether these estimates are accurate.

178: FF 178 is inaccurate, incomplete, and misleading, as the data was compiled using estimates based on census data.  (*Se*e Meredith Decl. at 10, fn 37.)  It is unclear whether these estimates are accurate.

179: FF 179 is misleading as it is a subjective conclusionary statement.

180: FF 180 is accurate.

181: FF 181 is accurate.

182: FF 182 is accurate.

183: FF 183 is accurate.

184: FF 184 is misleading as it is a subjective conclusionary statement.

185: FF 185 is misleading as it is a subjective conclusionary statement.

186: FF 186 is inaccurate, incomplete, and misleading , as Mr. Ryan is not an expert on postal services, his opinion of the quality of work performed by the post office is of limited value.

187: FF 187 is misleading as it is a subjective conclusionary statement.

188: FF 188 is inaccurate, incomplete and misleading as this testimony is irrelevant to the basis of this case, e.g. whether inactive voters are disenfranchised.

189: FF 189 is misleading as it is a subjective conclusionary statement.

190: FF 190 is misleading as it is a subjective conclusionary statement.

191: FF 191 is inaccurate, incomplete and misleading as Plaintiff's expert report contains an estimate of such voters.

Counter-cite: It is estimated that 30,000 inactive voters, out of over one million inactive voters, continue to reside at their address of registration.  (Trial Tr. (Vol. I) 324:16-325:9 (M. Meredith).)

192: FF 192 is accurate.

193: FF 193 is accurate.

194: FF 194 is inaccurate, incomplete and misleading as it distorts the evidence in the record.

Counter-cite: The legislature enacted legislation (which is awaiting the signature of the Governor) that liberalizes how affidavit ballots are canvassed. (A.1320-A(Cahill)/S.3045-

B(Comrie )). Under this legislation, when a voter substantially complies with the Election Law, the affidavit ballot will be counted.  (Defendants' Trial Exhibit A, Brehm at 33.)

195:  FF 195 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 194 of this response.

196: FF 196 is misleading as it is a subjective conclusionary statement.

197: FF 197 is misleading as it is a subjective conclusionary statement.

198: FF 198 is misleading as it is a subjective conclusionary statement.

199: FF 199 is misleading as it is a subjective conclusionary statement.

200: FF 200 is misleading as it is a subjective conclusionary statement.

201: FF 201 is inaccurate, incomplete and misleading as it is a subjective conclusionary statement and there is little to no evidence that other voters are not being adequately assisted.

202: FF 202 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 116 of this response.

203: FF 203 is misleading as it is a subjective conclusionary statement.

204: FF 204 is inaccurate, incomplete and misleading as Plaintiff has failed to establish the New York has an unduly burdensome voter lines.

205: FF 205 is misleading as it is a subjective conclusionary statement and for the same reasons as stated in paragraph 204 of this response.

206: FF 206 is misleading as it is a subjective conclusionary statement and for the same reasons as stated in paragraph 204 of this response.

207: FF 207 is misleading as it is a subjective conclusionary statement.

208: FF 208 is misleading as it is a subjective conclusionary statement and for the same reasons as stated in paragraph 204 of this response.

Counter-cite: As New York is below the national average work voter wait times, there is no evidence that not listing voters in the poll book increases lines at poll sites.

209: FF 209 is misleading as it is a subjective conclusionary statement and for the same reasons as stated in paragraph 204 of this response.

210: FF 210 is inaccurate, incomplete and misleading as Plaintiff's expert report contains an estimate of such voters.

Counter-cite: Between 30,000 and 37,000 inactive registrants continued to reside at their address of registration when voting in the 2016 presidential election based on administrative records.  (Trial Tr. (Vol. I) 324:16-325:9 (M. Meredith).)

211:  FF 211 is inaccurate, incomplete and misleading as it contradicts Plaintiff's supplemental expert report.

212: FF 211 is inaccurate, incomplete and misleading as it contradicts Plaintiff's supplemental expert report.

213: FF 213 is accurate.

214: FF 214 is accurate.

215: FF 215 is accurate.

216: FF 216 is accurate.

217: FF 217 is inaccurate, incomplete and misleading as it ambiguous and vague.

Counter-cite: 217. An "inactive" voter who moves to a new election district within the same jurisdiction and congressional district may not be allowed to vote at his or her former election district. (N.Y. Elec. Law §§ 8-302(3)(e)(ii), 9-209(2)(E)(iii)).

218: FF 218 is misleading as it is ambiguous and vague.

Counter-cite: 141,293 affidavit ballots were counted in New York in the 2016 General Election.  (Defendant's Trial Exhibit 5 at 47.)

219: FF 219 is misleading as it is ambiguous and vague.

Counter-cite: More affidavit ballots were counted in the State of New York than any other state except for California.  (Trial Tr. (Vol. I) 332:4-16 (M. Meredith)).

220: FF 220 is inaccurate and misleading as it misstates the number of affidavit ballots counted in 2016.

Counter-cite: According the 2016 Annual Statistical Report, approximately 55% of affidavit ballots casted were counted during the 2016 General Election.  (Defendants' Trial Exhibit 5, at pg 47).

221: FF 221 is accurate.

222: FF 222 is misleading and inaccurate as it subjectively qualifies New York's affidavit ballot process.

Counter-cite: In the November 2016 election, 268,946 affidavit ballots were processed. (Defendants' Trial Exhibit 5, at pg. 47).  Of that, it is estimated that 35,500 of those ballots

are rejected due to being in the wrong poll site.  (Ex. P264, Meredith Decl., at 16, 19; Ex.
P265, Meredith Supp. Decl., 5. )  It is unclear how many of these voters are in inactive status.

223: FF 223 is accurate.

224: FF 224 is inaccurate, incomplete and misleading as Marc Meredith's expert report does
not conclude that the rate at which affidavit ballots are rejected higher than the overall
provisional ballot rejection rate in any other state, when compared to the number of valid
ballots.

225: FF225 is accurate.

226: FF226 is accurate.

227: FF 227 is inaccurate and misleading as it is a subjective conclusionary statement.

228:  FF 228 is inaccurate, incomplete and misleading as it ignores the check in process for a
voter under the New York State Election Law (e.g. when a voter who is not in the poll book
presents themselves to a poll worker, Election Law § 8-302(3)(e) requires the poll worker to
"consult a map, street finder or other description of all of the polling places and election
districts within the political subdivision in which said election district is located and if
necessary, contact the board of elections to obtain the relevant information and advise the
voter of the correct polling place and election district for the residence address provided by
the voter to such poll clerk or election inspector."

229: FF 229 is inaccurate and misleading as it is a subjective conclusionary statement.

230: FF230 is misleading as it appears to imply that 80% of the rejected affidavit ballots
were rejected because the voter voted at the incorrect polling place.

Counter-cite: In 2014, approximately 36% of rejected affidavit ballots were rejected because the voter voted at the incorrect poll site.  (Ex. P264, Meredith Decl. at 19.

231: FF 231 is misleading, inaccurate and irrelevant.  According to Plaintiff expert witness' report at table 9, affidavit ballots rejected for voting at the incorrect polling site represents approximately 29% of all rejected affidavit ballots (35,500 estimated rejected ballots rejected for voting at the incorrect poll site vs. 120,778 rejected ballots overall).   Suggesting that this rate is higher than the 2014 36% rate is false.

232:  FF 232 is accurate.

233: FF 233 is accurate.

234: FF 234 is misleading and irrelevant, as an estimate of the number of inactive voters who voted the incorrect poll site has already been provided.  Characterizing that number as "tens of thousands" is misleading.

235: FF 235 is accurate.

236:  FF 236 is misleading and irrelevant, as there is scant evidence of the mindset of voters when they vote via an affidavit ballot.

237: FF 237 is inaccurate and incomplete as it is impossible to assert that a ballot will "definitely be counted" given the variables of issues that potentially could happen on election day.

Counter-cite: Ballots cast by voters in active status are typically cast via a ballot scanner. (Election Law 8-300.)

238: FF 238 is inaccurate and misleading as, as it ignores the procedures in the Election Law of notifying voters of their right to vote if they are not listed in the poll book.

Counter-cite:  Election Law § 8-302(3-a) requires that inspectors must give a copy of a notice, in a form prescribed by the New York State Board of Elections, "to every person whose address is in such election district for whom no registration poll record can be found and, in a primary election, to every voter whose registration poll record does not show him to be enrolled in the party in which he wishes to be enrolled…advising such person of his right to, and of the procedures by which he may, cast an affidavit ballot or seek a court order permitting him to vote.."

Election Law § 8-104(1-a)(c) further provides that information be conspicuously posted in the polling place related to instructions on how to cast an affidavit ballot.  In its current form, such posting is located in the voter's bill of rights, which clearly states: "(w)henever your name does not appear in the poll ledger or the voter registration or enrollment list, or you do not provide identification when required, you will be offered an affidavit ballot."

239:  239 is inaccurate and incomplete as it misrepresents the process of reviewing and canvassing an affidavit ballot.

Counter-cite: Election Law § 9-209 provides that, when canvassing an affidavit ballot, if the voter is found to be registered and has not voted in person, an inspector must compare the signature on the affidavit envelope with the signature on the computer generated list of registered voters.  If the signatures are found to correspond, absent objection, the inspectors must canvass such ballot.  Election Law § 9-209(2)(a)(i)(C). If no challenge is made, or if a challenge made is not sustained, the envelope must be opened and the vote canvassed.

Election Law § 9-209(2)(a)(i)(D).  Further, if the board of inspectors determines that a person was entitled to vote at such election, it must cast and canvass such ballot if such board finds that ministerial error by the board of elections or any of its employees caused such ballot envelope not to be valid on its face.  (Election Law § 9-209(2)(a)(ii).)

240:  FF 240 is inaccurate and misleading as it is a conclusory statement, at it ignores New York's policy for having inactive voters vote via an affidavit ballot (e.g. there is evidence that inactive voters have moved and to ensure that inactive voters are voting in the correct jurisdiction).

241: FF 241 is misleading as it implies that inactive voters are not "regular" voters.  The term "regular is vague and ambiguous.

Counter-cite:  Ballots cast by voters in active status are typically cast via a ballot scanner. Election Law 8-300.  Inactive voters are required to vote via an affidavit ballot.  (*See* Defendants' Exhibit 1.)

242: FF 242 is inaccurate, incomplete and misleading as, other than the testimony of one elections administrator, there is no evidence related to public confidence related to text displayed on ballot scanners.

243:  FF 243 is misleading and irrelevant, as there is scant evidence of the mindset of voters when they vote via an affidavit ballot.

244: FF 244 is misleading and irrelevant, as there is scant evidence of the mindset of voters when they vote via an affidavit ballot.

245: FF 245 is misleading and irrelevant, as it ignores the many reasons why a voter may not be in a poll book, including not being registered, not being registered in a party for a primary, spelling error of a voter's name, etc.

246: FF 246 is misleading as it misrepresents the testimony of Robert Brehm, who stated that including inactive voted "may" increase voter confidence. It also ignores other testimony, including whether such additional information is beneficial when balancing it out with other requirements of the election process. (e.g. "I think you have to look at the -- how it interacts with the other requirements of statute... So if you want to just change one part of it, it all depends on how the other parts are adjusted to deal with it.") (Trial Tr. (Vol. 2) 264:20-265:5 (Brehm).)

247: FF 247 is inaccurate, incomplete and misleading, as Election Law statue requires notice be sent to a voter if their ballot did not count. (Election Law 5-403).

248: FF 248 is accurate.

249: FF 249 is accurate.

250: FF 250 is accurate.

251: FF 251 is accurate.

252: FF 252 is inaccurate and misleading as it is a subjective conclusionary statement.

253: FF 253 is inaccurate and misleading as it is a subjective conclusionary statement.

254: FF 255 is inaccurate and misleading as it is a subjective conclusionary statement.

255: FF 255 is inaccurate and misleading as it is a subjective conclusionary statement.

256: FF 256 is inaccurate and misleading as it is a subjective conclusionary statement.

257: FF 257 is irrelevant to the claim of disenfranchisement.

258: FF 258 is irrelevant to the claim of disenfranchisement.

259: FF 259 is irrelevant to the claim of disenfranchisement.

260: FF 260 is irrelevant to the claim of disenfranchisement.

261: FF 261 is irrelevant to the claim of disenfranchisement.

262: FF 262 is irrelevant to the claim of disenfranchisement.

263: FF 263 is irrelevant to the claim of disenfranchisement.

264: FF 254 is inaccurate and misleading as it is a subjective conclusionary statement.

265: FF 265 is accurate.

266: FF 266 is accurate.

267: FF 267 is accurate.

268: FF 268 is accurate.

269: FF 269 is accurate.

270: FF 270 is accurate.

271: FF 271 is accurate.

272: FF 272 is accurate.

273: FF 273 is accurate.

274: FF 274 is accurate.

275: FF 275 is accurate.

276: FF 276 is irrelevant to Plaintiff's claims.

277:  FF 277 is irrelevant to Plaintiff's claims.

278: FF 278 is irrelevant to Plaintiff's claims.

279: FF 279 is irrelevant to Plaintiff's claims.

280: FF 280 is irrelevant to Plaintiff's claims.

281: FF 281 is irrelevant to Plaintiff's claims.

282: FF 282 is irrelevant to Plaintiff's claims.

283: FF 283 is irrelevant to Plaintiff's claims.

284: FF 284 is irrelevant to Plaintiff's claims.

285: FF 285 is inaccurate, incomplete and misleading as it ignores election law reforms passed in New York in 2019.  (e.g. *see* Defendants' Trial Exhibit A, Brehm Decl. at 30-35.)

286: FF 286 is irrelevant to Plaintiff's claims.

287: FF 287 is inaccurate, incomplete and misleading as it ignores election law reforms passed in New York in 2019.  (e.g. *see* Defendants' Trial Exhibit A, Brehm Decl. at 30-35.)

288: FF 288 is inaccurate, incomplete and misleading as it ignores election law reforms passed in New York in 2019.  (e.g. *see* Defendants' Trial Exhibit A, Brehm Decl. at 30-35.)

289: FF 289 is inaccurate, incomplete and misleading as it ignores election law reforms passed in New York in 2019.  (e.g. *see* Defendants' Trial Exhibit A, Brehm Decl. at 30-35.)

290: FF 290 is irrelevant to Plaintiff's claims.

291: FF 291 is inaccurate, incomplete and misleading as it contradicts evidence in the record. (e.g. *see* Defendants' Trial Exhibit A, Brehm Decl. at 30-35.)

292: FF 292 is inaccurate, incomplete and misleading as it contradicts evidence in the record. (e.g. *see* Defendants' Trial Exhibit A, Brehm Decl. at 30-35.)

293: FF 293 is inaccurate, incomplete and misleading as it contradicts evidence in the record. (e.g. *see* Defendants' Trial Exhibit A, Brehm Decl. at 30-35.)

294: FF 294 is accurate.

295: FF 295 is irrelevant to Plaintiff's claims.

296: FF 296 is irrelevant to Plaintiff's claims.

297: FF 297 is irrelevant to Plaintiff's claims.

298: FF 298 is irrelevant to Plaintiff's claims.

299: FF 299 is irrelevant to Plaintiff's claims.

300: FF 300 is inaccurate, incomplete and misleading as there is no evidence submitted of affidavit ballots "being lost."

301: FF 301 is inaccurate, incomplete and misleading as the term "regular" ballot is ambiguous and vague.  Further, given potential issues that could happen during an election, it cannot be asserted that ballots cast via a ballot scanner definitely counts.

302: FF 302 is inaccurate, incomplete and misleading as there is no evidence submitted of difficulty of keeping track of affidavit ballots.

303:  FF 303 is inaccurate, incomplete and misleading as there is no evidence submitted of affidavit ballots "being lost."

304: FF 304 is irrelevant to Plaintiff's claims.

305: FF 305 is inaccurate, incomplete and misleading as there is no evidence submitted of affidavit ballots being "easy targets" during post-election litigation.

306: FF 306 is irrelevant to Plaintiff's claims.

307: FF 307 is irrelevant to Plaintiff's claims.

308: FF 308 is irrelevant to Plaintiff's claims.

309: FF 309 is inaccurate, incomplete and misleading as it contradicts evidence in the record. (e.g. Brehm Decl. at 6-8; Ryan Dep. 83:18-21 "That's actually in my opinion the best function of the affidavit process because people do move around and they should vote at their new location.)

310: FF 310 is irrelevant to Plaintiff's claims.

311: FF 311 is inaccurate, incomplete and misleading for the same reasons as stated in paragraph 78 of this response, at it misrepresents voting waiting times in New York, in general.

312:  FF 312 is inaccurate, incomplete and misleading as it contradicts the declaration of Robert Brehm.  (Defendants' Trial Exhibit A, Brehm Decl. at 3-9, 17.)

313: FF 313 is inaccurate, incomplete and misleading as it contradicts the declaration of Robert Brehm.  (Defendants' Trial Exhibit A, Brehm Decl. at 3-9, 17.)

314: FF 314 is irrelevant to Plaintiff's claims.

315: FF 315 is irrelevant to Plaintiff's claims.

316: FF 316 is inaccurate, incomplete and misleading as it ignores other testimony, including whether such additional information is beneficial when balancing it out with other requirements of the election process. (e.g. "I think you have to look at the -- how it interacts with the other requirements of statute...  So if you want to just change one part of it, it all depends on how the  other parts are adjusted to deal with it.")  (Trial Tr. (Vol. 2) 264:20-265:5 (Brehm).)

317: FF 317 is inaccurate and misleading as it is a subjective conclusionary statement.

318: FF 318 is irrelevant to Plaintiff's claims.

319: FF 319 is inaccurate as evidence shows that Columbia County places inactive voters on a challenge list.

320: FF 320 is accurate.

321: FF 321 is accurate.

322: FF 322 is accurate.

323: FF 323 is accurate.

324: FF 324 is accurate.

325: FF 325 is accurate.

326: FF 326 is accurate.

327: FF 327 is accurate.

328: FF 328 is inaccurate and misleading as it is a subjective conclusionary statement.

329: FF 329 is inaccurate and misleading as it is a subjective conclusionary statement.

330: FF 330 is inaccurate and misleading as it is a subjective conclusionary statement.

331: FF 331 is inaccurate and misleading as it is a subjective conclusionary statement.

332: FF 332 is accurate.

333: FF 333 is accurate.

334: FF 334 is accurate.

335: FF 335 is accurate.

336: FF 336 is accurate.

337: FF 337 is accurate.

338: FF 338 is inaccurate and misleading as it is a subjective conclusionary statement.

339: FF 339 is inaccurate and misleading as it is a subjective conclusionary statement.

340: FF 340 is accurate.

341: FF 341 is accurate.

342: FF 342 is accurate.

343: FF 343 is inaccurate and misleading as it is a subjective conclusionary statement.

344:  FF 344 is accurate.

345:  FF 345 is accurate.

346: FF 346 is accurate.

347: FF 347 is inaccurate and misleading as it is a subjective conclusionary statement.

348: FF 348 is accurate.

349: FF 349 is accurate.

350: FF 317 is inaccurate and misleading as it subjectively characterizes Plaintiff's mission statement.

351: FF 351 is accurate.

352: FF 352 is accurate.

353: FF 353 is accurate.

354: FF 354 is accurate.

355: FF 355 is accurate.

356: FF 356 is accurate.

357: FF 357 is accurate.

358: FF 358 is inaccurate and misleading as it is a subjective conclusionary statement.

359: FF 359 is inaccurate and misleading as it is a subjective conclusionary statement.

360: FF 360 is accurate.

361: FF 361 is inaccurate and misleading as it is a subjective conclusionary statement.

362: FF 362 is accurate.

363: FF 363 is inaccurate and misleading as it is a subjective conclusionary statement.

364: FF 364 is contrary to testimony given by Susan Lerner, as she testified that Common Cause/New York does not operate a hotline.  (Trial Tr. 189:1-190-13; 192:12-195:8)

365:  FF 365 is inaccurate and misleading as it is a subjective conclusionary statement.

366: FF 366 is inaccurate and misleading as it is a subjective conclusionary statement.

367: FF 367 is inaccurate and misleading as it is a subjective conclusionary statement.

368: FF 368 is inaccurate and misleading as it is a subjective conclusionary statement.

369: FF 369 FF 358 is inaccurate and misleading as it is a subjective conclusionary statement.

370: FF 370 is inaccurate and misleading as it is a subjective conclusionary statement.

371: FF 371 is inaccurate and misleading as it is a subjective conclusionary statement.

372: FF 372 is accurate.

373:  FF 373 is inaccurate and misleading as it is a subjective conclusionary statement.

374: FF 374 is inaccurate and misleading as it is a subjective conclusionary statement.

375: FF 375 is inaccurate and misleading as it is a subjective conclusionary statement.

376: FF 376 is inaccurate and misleading as it is a subjective conclusionary statement.

377: FF 377 is accurate.

378:  FF 378 is inaccurate and misleading as it is a subjective conclusionary statement.

Defendants Findings of Fact and Conclusion of Law

New York's Voter Removal Process

1.      The NVRA requires that states engage in list maintenance activities.  Section 8(a) of the
NVRA requires "each State" to "conduct a general program that makes a reasonable effort to
remove the names of ineligible voters from the official lists of eligible voters by reason of … a
change in the residence of the registrant." 52 U.S.C. § 20507(a).  The purpose of this
requirement is to ensure that accurate and current voter registration rolls are maintained.
(Defendants' Trial Exhibit A, Brehm Decl. 2.)

2.      To reach this policy goal, Chapter Law 659 of the Laws of 1994 was enacted.  Under this
Chapter Law, the removal process begins under certain circumstances (e.g. when any mail sent
to such voter is returned as undeliverable by the postal service without any indication of a
forwarding address; receipt of a change of address notification; etc.).  (Defendants' Trial Exhibit
A, Brehm Decl. at 3.)

3.      Each year, the board of elections of each county or city sends out a "check of registrants
and information notice by mail" pursuant to N.Y. Election Law § 4-117.   These notices are sent
as unforwardable by first class mail (or with equivalent services to first class mail with regard to
obtaining address forwarding information).  As a result the post office returns any such mailing
that cannot be delivered as addressed and provides back to the board of elections any
"forwarding information."  This forwarding information is used to update the voter record
addresses.  (Defendants' Trial Exhibit B, Connolly Decl. at  27.)

4.      Every board of elections certifies to the New York State Board of Elections that they mailed the notices required by Election Law.  (Defendants' Trial Exhibit B, Connolly Decl. at 28.)

5.      As indicated in the 2016 report, a total of 10,386,353 mail check notices were sent in 2016.  A total of 400,843 of those cards were returned to boards of elections, and they were reported by boards of elections into five categories:

a.      85,288 reflected "in-county" transfers

b.      61,753 reflected out of county moves

c.      181,798 reflected they were undeliverable

d.      64,971 were returned for miscellaneous reasons that do not fit other categories

e.      1,719 cards were returned marked "deceased"  (Defendants' Trial Exhibit B, Connolly Decl. at 30.)

6.      The 85,288 cards indicating the voter moved to a new address within the county or city should have resulted in those voters' addresses being updated to the new address and a "transfer notice" would be sent to the voter giving the voter an opportunity to indicate on a postage-prepaid form that the transfer should not in fact occur if the voter remains at the original registration residence.  The 61,752 cards returned in 2016 indicating a new address outside of the county should have resulted in these voters being made inactive with a notice sent to them postage paid to indicate that the updated address information is incorrect and a voter registration form the voter could use to register in the new jurisdiction.  (Defendants' Trial Exhibit B, Connolly Decl. at 31.)

7.    Owing to a change in state law in 2019, out of county movers no longer need to affirmatively register to vote in the new county they moved to.  These voters are inactivated in the original county, placed on the voter rolls in the new county as an active voter unless returned information from the voter indicates otherwise.  Once the voter is on the rolls in the new county, statewide voter duplicate management will result in the cancellation of the prior registration in the county from which they moved.  Should an error occur, as with any active or inactive voter, the voter would remain eligible to cast a valid affidavit ballot at the correct poll site for the voter's residence.   (Defendants' Trial Exhibit B, Connolly Decl. at 32.)

8.    Mail check cards returned undeliverable could result in the voter being placed in inactive status and a forwardable confirmation notice being sent to the voter.  (Defendants' Trial Exhibit B, Connolly Decl. at 34.)

9.    The forwardable confirmation notice includes a postage paid card on which the voter can confirm that he or she still resides at the address to which the notice was sent, or can notify the board of elections of any change of address.  The confirmation notice is forwardable and is sent to voters when returned mail or when National Change of Address ("NCOA") information indicates no forwarding address.  The notices are also sent to voters when information from the Department of Motor Vehicles or a NVRA agency or NCOA indicates an address change to outside of the jurisdiction of the board of elections.  (Defendants' Trial Exhibit B, Connolly Decl. at 35.)

10.    Upon mailing a confirmation notice the registered voter is moved to inactive status.  If at any time the voter responds to the notice by sending it back indicating the voter is at the address of original registration – and the return card is provided with return postage paid -- the voter will be restored to active status.  (Defendants' Trial Exhibit B, Connolly Decl. at 38.)

11.     The New York process to place a voter on inactive status thus always requires an indication that the voter has moved (returned mail, NCOA) which must be followed by the sending of a forwardable confirming mailing with a postage paid return to the voter for the purpose of enabling the voter to indicate any error or correction.  (Defendants' Trial Exhibit B, Connolly Decl. at 39.)

12.     Confirmation notices, as a matter of state law, are not to be sent between June 1 and the general election or within ninety days of a federal election unless the returned mail is an acknowledgement notice (which is sent to a voter when they register to vote) OR the mail returned indicates a change of address to an address not in the county.  (Defendants' Trial Exhibit D, Valentine Decl. at 4.)

13.     If the mail returned indicates a different address in the county, then the voter is sent a transfer notice and the address is simply updated in the county and state systems.  Now, as of the changes in law in 2019, if the address change is to an address in another county, the county inactivates the voter at the "old address" by sending a confirmation notice, but the county also sends the new address information to the "new" county, and the voter is added to the voter rolls there.  (Defendants' Trial Exhibit D, Valentine Decl. at 4.)

14.     Additionally, county board of elections must complete not later than 90 days prior to the date of a primary or general election for federal office any program the purpose of which is to systemically remove the names of ineligible voters from the lists of eligible voters.  (Defendants' Trial Exhibit D, Valentine Decl. at 5.)

15.    Moving a voter to inactive status does not remove the voter as a registered voter.  The consequence is that the voter will not appear in the poll book and must vote by affidavit ballot. (Defendants' Trial Exhibit D, Valentine Decl. at 9.)

16.    In 2018, 405,036 confirmation notices were sent.  The total number of New York voters in inactive status as of November 1, 2016 was 1,016,817.  As of November 1, 2018 the total number of voters in inactive status was 1,131,828.  (Defendants' Trial Exhibit B, Connolly Decl. at  41.)

17.    When a voter is placed in inactive status there is a significant reason to believe, based on address information received by the board of elections, typically in some way from the United States Postal Service, that the voter is no longer residing at the voter registration address on record.  (Defendants' Trial Exhibit B, Connolly Decl. at  45.)

18.    Pursuant to New York Election Law, on Election Day, a voter can only vote in one poll site, which is associated with the voter's residence.  Pursuant to the New York Election Law, the political unit that is the basis for all elections is the Election District. Election Law 4-100.  An Election District is a geographically defined and distinct area. Id.  All of the residents of an Election District are entitled to vote at single polling place designated for that Election District. Election Law 4-104.

19.    In addition to the initial notification that the voter does not appear to be at the address of record, to be functionally in "inactive" status, the voter has not responded to the forwardable confirmation notice (or that notice too was returned to the board of elections sender). (Defendants' Trial Exhibit B, Connolly Decl. at 46.)

20.     The registration poll records of all such voters must be removed from the poll ledgers and maintained at the offices of the board of elections in a file arranged alphabetically by election district.  If the board uses computer generated registration lists (as all New York Boards of Elections now do), the names of such voters may not be placed on such lists at subsequent elections other than lists prepared pursuant to the other provisions of the Election Law, but must be kept as a computer record at the offices of such board.  (Defendants' Trial Exhibit A, Brehm Decl. at 3.)

21.     The effect of not being in the poll book is that the voter has to vote via an affidavit ballot. An inactive voter is a registered voter.  If at any time the voter responds to the notice by sending it back indicating the voter is at the address of original registration – and the return card is provided with return postage paid, the voter will be restored to active status.  (Defendants' Trial Exhibit A, Brehm Decl. at 5.)

22.     In addition to maintaining an accurate voting record, the purpose of this process is to ensure that voters are voting in the correct jurisdiction.  (Defendants' Trial Exhibit A, Brehm Decl. at 6.)

23.     A policy concern for including the names of voters in inactive status in poll books is that if a voter had a choice to go to their former poll site, where their name is in the poll book, or go to their new poll site, where their name would not be in the poll book (because they have moved and not updated their records), the voter may choose to vote at their former poll site. (Defendants' Trial Exhibit A, Brehm Decl. at 7.)  As noted by New York City Board of Elections Executive Director Michael Ryan, " Unfortunately, people, being creatures of habit often don't vote at their new location and go back to their old voting location and vote by scanner where they're actually in the poll book."  (Ryan Depo. at pg. 83.)

24.     Moreover, the legislature wanted to give election inspectors a binary choice, either provide a "regular" ballot that will be canvassed by the voting machine to voters listed in the poll book, or provide an "affidavit" ballot to persons not listed in the poll book, enhancing efficiency at the poll site.  (Defendants' Trial Exhibit A, Brehm Decl. at 17.)

25.     As election inspectors only work one to three times a year, providing additional duties upon election inspectors could bog down the voting process.  (Defendants' Trial Exhibit A, Brehm Decl. at 17.)

Affidavit Ballot Process

26.     Affidavit voting in New York is the process whereby a voter does not vote on the voting machine but rather marks a regular ballot with his or her choices and places it inside an envelope that contains an "affidavit" that states the voter's entitlement to have the ballot cast and counted. (Defendants' Trial Exhibit B, Connolly Decl. at 50.)

27.     Voters must vote by affidavit ballot, or obtain a court order to vote on the voting machine, when the voter is at the correct election district and the voter's name does not appear in the poll book for a primary, special, or general election.  (Defendants' Trial Exhibit B, Connolly Decl. at 51.)

28.     Under New York's process, when a voter appears to vote and his or her name does not appear in the poll book, poll workers are required to ascertain whether the voter is at the correct polling place.  Specifically, New York requires the poll worker to consult a map, street finder (listing of street addresses that indicates the election district and polling place for each address range on the street) or other description of all of the polling places and election districts. (Defendants' Trial Exhibit B, Connolly Decl. at 53.)

29.     If necessary, the statute provides the poll workers will contact the board of elections to obtain the relevant information and inform the voter of the voter's correct polling place for the voter's residence address.  (Defendants' Trial Exhibit B, Connolly Decl. at 54.; Defendants' Trial Exhibit 11 and 12.)

30.     Some boards of elections require poll workers to contact the board of elections before issuing an affidavit ballot.  The State Board of Elections has issued guidance that this consultation process cannot delay the timely issuance of an affidavit ballot.  (Defendants' Trial Exhibit B, Connolly Decl. at 55.)

31.     If a voter who does not appear in the poll book, but does live in the election district, New York provides the voter with two options that are detailed on a "notice to voter" which must be provided to the voter.  (Defendants' Trial Exhibit B, Connolly Decl. at 56.)

32.     The form of the actual ballot provided to an affidavit voter is in the same form as the ballot provided to all other voters.  (Defendants' Trial Exhibit B, Connolly Decl. at 57.)

33.     The affidavit voter then takes the ballot and the affidavit ballot envelope and goes to a private area, often a privacy booth, to complete the ballot and places it in the completed affidavit envelope.  (Defendants' Trial Exhibit B, Connolly Decl. at 59.)

34.     When the voter has completed the affidavit ballot, the voter returns it to the appropriate poll workers who will return it to the board of elections.  (Defendants' Trial Exhibit B, Connolly Decl. at 61.)

35.     The board of elections will open the affidavit ballot and count the ballot if the board's research determines that the voter was eligible.  (Defendants' Trial Exhibit B, Connolly Decl. at 62.)

36.     Prior to 2019, a voter who moved across county lines and cast an affidavit ballot would have his affidavit ballot rejected. But in 2019 the law changed. An affidavit ballot from a voter who is registered to vote anywhere in New York can cast a valid affidavit for the poll site of their new residence anywhere in New York.  (Defendants' Trial Exhibit B, Connolly Decl. at 63.)

37.     The board of elections will send the voter a notice indicating whether the affidavit ballot was not counted.   It is common for boards of elections to send a notice to all affidavit voters indicating whether the ballot was or was not counted. (Defendants' Trial Exhibit B, Connolly Decl. at 64.)

38.     The alternative to an affidavit ballot is a court order.  The voter may apply for a court order requiring that the voter be permitted to vote in the regular manner on a voting machine. (Defendants' Trial Exhibit B, Connolly Decl. at 79.)

39.     Such court applications are made by voters directly to the judges.    There is no filing fee to make these applications and determinations are decided promptly on election day or, in many instances, in the days leading up to an election day.  (Defendants' Trial Exhibit B, Connolly Decl. at 81-82.)

40.     In the most populous areas of the state, state law requires the duty judges to hear applications at the offices of the board of elections, and this is common practice in most counties. (Defendants' Trial Exhibit B, Connolly Decl. at 83.)

<u>Poll Workers</u>

41.     As of the General Election in 2016, New York had approximately 5,300 poll sites, 15,083 election districts and 61,790 poll workers who staffed the election.  The poll worker numbers fluctuate from year.  (Defendants' Trial Exhibit B, Connolly Decl. at 12.)

42.     At the election district table, poll workers, known as election inspectors, distribute ballots for that election district to voters presenting themselves to vote who are listed in the poll book (a list of active voters for the election district with signature exemplars which the voter signs to receive a ballot).  These inspectors also typically administer the affidavit balloting process.  (Defendants' Trial Exhibit B, Connolly Decl. at 15.)

43.     Most poll workers work only one to three times a year, but many poll workers work the polls year to year.  Generally, county boards of elections make efforts to staff poll sites so there are experienced poll workers at every site.  (Defendants' Trial Exhibit B, Connolly Decl. at 17.)

Training of Poll Workers

44.     Pursuant to section 3-412(1-a) of the Election Law, the State Board has established a mandatory core curriculum for poll worker training.  The State Board has issued this training to county boards of elections.  Id.  County boards of elections may augment the core curriculum with local procedures not inconsistent with the core curriculum.  (Defendants' Trial Exhibit A, Brehm Decl. at 42.)

45.     Included in the training is a section of what happens when a voter is not listed in a poll book.  This section is attached as Defendants' Trial Exhibit 10.    First, the training directs the poll worker to determine if the voter is in the correct polling site and/or sign in table.  If the voter assures the worker that they are in the correct polling site, the poll worker is then directed to check the map, street guide, or other tools provided by the county board.  If the voter is in the correct district, then the poll worker is directed to provide the voter with a "Notice to Voter."  If the poll worker is unsure if the voter is in the correct district, the poll worker is directed to call

the county board.  The training goes on to say that the voter is entitled to vote by "affidavit ballot or obtain a court order from a judge."  (Defendants' Trial Exhibit A, Brehm Decl. at 37.)

46.     The training of these poll workers is provided at the county level and is informed by the New York State Election Law which requires annual poll worker training and testing.  As reflected in the aforesaid Report 1(e):  The duration of poll worker training sessions ranges from one and half hours to six hours, depending on the county.  The duration in the five counties comprising New York City is four hours, and poll workers are paid to attend training.  In 2016, the class sizes ranged from two persons to 100, and statewide the total number of poll worker classes held was 5,974.   (Defendants' Trial Exhibit B, Connolly at 16.)

Oversight of Local County Officials

47.     The major responsibilities of the New York State Board of Elections include the oversight and support of New York State's 62 county Boards of Elections.  In relation to the facts in this case, the State Board engages in the following activities.  (Defendants' Trial Exhibit B, Connolly Decl. at 111.)

48.     The State Board has drafted and provided a "Guide to Operating a County Board of Elections" for the benefit of local county election administrators.  *Id.* at. 66.  *See also* Defendants' Trial Exhibit "41."  This Guide details the responsibilities a county board must undertake, including, how Affidavit Ballots are processed, how voter list maintenance is performed, and information on how to run a poll site. (Defendants' Trial Exhibit B, Connolly Decl. at 111.)

49.     In response to a letter from the Attorney General's office expressing concern about New York's affidavit ballot process, the State Board issued guidance to local boards, outlining the

proper procedure of issuing and processing notice to voters, including the issuance of affidavit

ballots.  (Defendants' Trial Exhibit A, Brehm Decl. at 39-43; see also Defendants' Trial Exhibits

11 and 12.)

50.     The Guidance reminds local county election officials that affidavit ballots must be

provided to voters who assert they live in the election district and who claim to be entitled to

vote.  (*See* Defendants' Trial Exhibits 11 and 12.)  The Guidance states that: "(w)hile it is

acceptable for poll workers to call the board of elections to confirm the residency of an affidavit

voter in an effort to provide the affidavit voter with accurate information, the furnishing of an

affidavit ballot should not be delayed, and a voter who requests an affidavit should be provided

an affidavit ballot promptly."  *Id.*  The Guidance goes on to  outline the process a voter who is

not listed in the poll book, including, giving such voters a Notice of Voters.  (Defendants' Trial

Exhibit A, Brehm Decl. at 39-43.)  The Guidance provides for a process for providing affidavit

ballots, which is also found in the Model Training Manual, created by the State Board.  (*Id.; see

also* Defendants' Trial Exhibit 10.)

51.     The State Board of Elections provides County Boards of Elections with oversight and

support through; phone calls, conference calls, e-mails, customized workshops and site visits

tailored to individual counties, informative conference presentations, participation in and

appearances at Election Commissioners Association regional meetings, topical memorandums,

and the provision of extensive procedural documents and forms for implementation at the local

level.  (Defendants' Trial Exhibit B, Connolly Decl., at 111.)

52.     The State Board of Elections also provides National Change of Address (NCOA)

information to all of New York State's county Boards of Elections. NCOA services are a

required component of New York State's statutory voter registration list maintenance

procedures, and help to ensure that voter addresses are synchronized with information on file

with the U.S. Postal Service. (Defendants' Trial Exhibit B, Connolly Decl. at 112.)

Voter Poll Site Lookup

53.    There are several ways a voter in New York can determine where the voter's poll site is

located.  (Defendants' Trial Exhibit B, Connolly Decl. at 112.)

54.    The annual mail check card sent to all active voters indicates the voter's poll site, and if

the information as to where the voter votes changes subsequent to that mailing, the board of

elections must send a poll site change notification by mail.  (Defendants' Trial Exhibit B,

Connolly Decl. at 86.)

55.    When a voter first registers to vote, the voter is also sent a card indicating the voter is

registered to vote and indicating where the voter's poll site is located.  (Defendants' Trial Exhibit

B, Connolly Decl. at 87.)

56.    A voter can call the board of the elections at any time to find out where the voter's poll

site is located.  (Defendants' Trial Exhibit B, Connolly Decl. at 89.)

57.    Prior to each election, poll site information is published in a newspaper of general

circulation in every county.  (Defendants' Trial Exhibit B, Connolly Decl. at 90.)

58.    The New York State Board of Elections has a poll site lookup feature on its website

which can be used statewide to determine whether a voter is registered, their party enrollment

what their voter status is (active or inactive) and where the voter's poll site is located.

(Defendants' Trial Exhibit B, Connolly Decl. at 91.)

59.     To effectuate a look-up, the voter must provide their Last Name, Date of Birth, Zip code, First Name and County.  The reason for the specificity of the information required is reasonable as it provides privacy for the voter so the voter look up feature cannot be readily used as a generic online address look-up for non-voter purposes.  (Defendants' Trial Exhibit B, Connolly Decl. at 93.)

60.     If the search does not result in a match, the system generates a response of "No Matches Found   Please contact your County Board of Elections."  (Defendants' Trial Exhibit B, Connolly Decl. at 96.)

61.     The instruction to the voter to "Please contact your County Board of Elections," is a hyperlink to the relevant contact information for the board of elections.  When the voter clicks on the hyperlink, the voter is brought to a contact page that provides the specific contact information for the voter's local board of elections.  In addition to the phone number, fax number and address of the board of elections, the board of election's email address, webpage information and the names of the county commissioners and deputy commissioner are provided.  (Defendants' Trial Exhibit B, Connolly Decl. at 98.)

62.     In 2016, the number of users accessing the voter look-up page was over 2.5 million with over 13.4 million page views.  And in 2018 the number of users accessing the voter look-up page was over 1.3 million with over 5.7 million page views.  While these traffic numbers do not indicate a precise number of look-ups performed, the look-up feature page experiences considerable traffic.   (Defendants' Trial Exhibit B, Connolly Decl. at 10.)

63.     New York law requires that each poll site be equipped with information in the form of maps or street finders to enable poll workers to direct wayward voters to their correct polling

locations.  A street finder is a look up tool that generally consists of a listing of all streets in a jurisdiction and lists the election district or election districts that the street is a part of by address range.  It enables poll workers to direct a voter to the correct poll site by simply looking up the voter's address.   (Defendants' Trial Exhibit B, Connolly Decl. at 108.)

64.    All of the website voter look-up and poll site finder tools work as well for both active and inactive voters.  (Defendants' Trial Exhibit B, Connolly Decl. at 109.)

No Systemic Failure in New York's Systemic Failure in New York's Election System

65.  As of February 1, 2019, New York had 12,695,762 voters.  Of that number 11,676,265 are in "active" status, and 1,019,497 are voters listed in "inactive" status.  A voter in active status is a voter whose poll record would appear in a poll book on election day, and an inactive voter is a voter believed to no longer reside at the address of record based on information received by the board of elections.  Inactive voters are registered voters but their names do not appear in the poll book, they must vote by affidavit ballot or pursuant to court order.  (Defendants' Trial Exhibit B, Connolly Decl. at 2.)

66.    As of November 1, 2018, New York had 12,706,050 voters.  Of that number 11,574,222 are in active status, and 1,131,828 are voters listed in inactive status.  (Defendants' Trial Exhibit B, Connolly Decl. at 4.)

67.    As of November 1, 2016, New York had 12,493,250 voters.  Of that number 11,476,433 are in active status, and 1,016,817 are voters listed in inactive status.  (Defendants' Trial Exhibit B, Connolly Decl. at 6.)

68.    The voter turnout in 2016 was 7,801,985.  (Defendants' Trial Exhibit B, Connolly Decl. at 20.)

69.     At the 2018 General Election, 125,920 affidavit ballots were cast statewide.  Of that number 73,922 were valid.  (Defendants' Trial Exhibit B, Connolly Decl. at 68.)

70.     In the 2018 General Election Annual Statistical Report, New York City did not provide data indicating voters reactivated as a result of casting an affidavit ballot. For the jurisdictions that did provide this information, reactivated voters (voters moving from inactive to active status as a result of casting an affidavit ballot) were 10,444 of the 53,250 affidavits processed (19.6%) and 10,444 of the 33,852 valid affidavits cast in those jurisdictions (30.85%).  (Defendants' Trial Exhibit B, Connolly Decl. at 71.)

71.     At the General Election in 2016, 268,964 affidavit ballots were cast statewide.  Of those, the 141,293 affidavits found valid for various reasons specified in the report, although not every jurisdiction provided a full breakdown. Of the 124,933 found invalid, 69,472 were persons found not to be registered in the county (55.6%).  (Defendants' Trial Exhibit B, Connolly Decl. at 69.)

72.     In the 2016 General Election Annual Statistical Report, New York City and Nassau County did not provide data indicating voters reactivated as a result of casting an affidavit ballot. For the jurisdictions that did provide this information, reactivated voters (voters moving from inactive to active status as a result of casting an affidavit ballot) were 17,511 of the 81,379 affidavits processed (21.5%), and 17,511 of the 45,379 valid affidavits cast in those jurisdictions (38%).  (Defendants' Trial Exhibit B, Connolly Decl. at 72.)

Nancy Feldman

73.     The reason Ms. Feldman was not because she was in inactive status, but because she was not registered.  (Plaintiff's Trial Exhibit 192, Feldman Decl. at 16).

Alison Matika

74.     In her declaration, Alison Matika testified that during the 2016 General Election, there were no poll books at her poll site, and she was forced to vote via an affidavit ballot.  (Plaintiff's Trial Exhibit 198, Matika Decl.)  The allegations in this declaration do not relate to the issues in this case; that New York's implementation of its Removal Policy violates section 8 of the NVRA.  While this declaration may show New York's election officials are not infallible, such standard cannot reasonably used for NVRA violations.

Susan Stewart

75.     The Ulster County Board of Elections placed Susan Stewart in "inactive status" in 2018 as a result of a postcard mailed by the Board of Elections having been returned by the United States Postal Service as "not deliverable as addressed."   (Defendants" Trial Exhibit 179.)   A confirmation notice notifying the voter she was placed in inactive status was mailed to the same address, to which there was no response.  (Defendants" Trial Exhibit 179.)

Ellen Edelman

76.     Election records indicate that Ellen Edelman went to the correct poll site, but wrong election district table.  (Defendants' Trial Exhibit A, Brehm Decl. at 66.)  Because the poll workers could not find her name in the poll book, Ellen Edelman was offered an affidavit ballot, which she submitted. (Defendants' Trial Exhibit A, Brehm Decl. at 67.)  Ellen Edelman's affidavit ballot was determined to be valid and was counted.  (Defendants' Trial Exhibit A, Brehm Decl. at 68.)

Mitchell Lavnick

77.     Poll workers provided Mitchell Lavnik with an affidavit, which he submitted.  (Plaintiff's Trial Exhibit 197, Lavnick Decl. 11-12.)  Mitchell Lavnick's affidavit ballot was determined to be valid and was counted.  (Defendants' Trial Exhibit A, Brehm Decl. at 72)

Robert Holman

78.     Robert Holman also testified that he was not listed in the poll book and was offered an affidavit ballot.   (Plaintiff's Trial Exhibit 195, Holman at 14 and 17-18.)  The Erie County Board of Elections placed Robert Holman in "inactive status" in 2016 as a result of a postcard mailed by the Board of Elections having been returned by the United States Postal Service as "not deliverable as addressed."  (Defendants' Trial Exhibit D, Mohr Decl. at 17.)  A confirmation notice notifying the voter he was placed in inactive status was mailed to the same address, to which there was no response.  (Defendants' Trial Exhibit D, Mohr Decl. at 17.)

Sandra Copps

79.     Sandra Copps testified that in the September 2018 primary, she went to her local poll site, but was not listed in the poll book despite being an active voter.  (Plaintiff's Trial Exhibit 189, Copps Decl.  at 13.)   Sandra Copps testified that she did was not offered an affidavit ballot.  (Plaintiff's Trial Exhibit 189, Copps Decl. at 18.)   Voter registration records show that Sandra Copps is an active voter registered in the Independence Party.  (Defendants' Trial Exhibit A, Brehm Decl. at 50.)  There were no Independence Primary races in Sandra Patricia Copps' election district on September 2018.  (Defendants' Trial Exhibit A, Brehm Decl. at 51.)   Because there is no primary, there was no Independence Party poll book that would have listed Sandra Copps' name.  There was a Democratic Primary in September 2018 that listed Democratic voters.

Sandra Patricia Copps would not have been listed in that book, as she is not a registered Democrat.   (Defendants' Trial Exhibit A, Brehm Decl. at 52.)

Denise Roberts and Angela Roberts

80.     Both Denise Roberts and Angela Roberts testified that during the 2016 General Election they were not listed in the poll book and were offered an affidavit ballot.  (Plaintiff's Trial Exhibit, 201, D. Roberts Decl. at 11 and 14.)  Denise Roberts testified that her vote did not count.  The Tioga County Board of Elections should have counted the vote.  The State Board followed up with the Tioga County Board of Elections to ensure that the board counts such affidavit ballots in the future.  (Defendants' Trial Exhibit B, Connolly Decl. at 110.)

Katherine Baldus

81.     Katherine Baldus testified that she was not listed in the poll book and voted via an affidavit ballot in the September 2018 primary.   (Plaintiff's Trial Exhibit 187, Baldus Decl. at 13-18.)  However, election records show that she was in active status.  (Defendants' Trial Exhibit A, Brehm Decl. at 47.)  Katherine Louise Baldus' affidavit ballot was deemed valid and was counted.   (*Id*. at 49.)

Mara Wilson

82.     Mara Wilson testified that she was not listed in the poll book and voted via an affidavit ballot in the September 2018 primary.   (Plaintiff's Trial Exhibit 203, Wilson Decl. at 10 and 17-20.)  Mara Wilson received a letter from the New York City Board of Elections that her voted counted.  (Plaintiff's Trial Exhibit 203, Wilson Decl. at 23.)  Election records show that Mara Wilson was in active status during the 2016 General Election.  (Defendants' Trial Exhibit A, Brehm Decl. at 74.)

Keoma Blake and Walter Ancarrow, IV

83.     Keoma Blake and Walter Ancarrow, IV both testified that they had issues with the online

NYS voter lookup page.  The New York City Board of Elections entered Keoma Blake's date of

birth incorrectly, preventing the look up from making a match until it was corrected.

(Defendants' Trial Exhibit A, Brehm Decl. at 74.)  It is unclear why Walter Ancarrow, IV had a

problem with the voter lookup, whether it was a system failure or user error.  Regardless, the

declaration of two individuals having issues with the voter lookup is insufficient to show a

systemic problem with the voter lookup.

Jacques Fages

84.     Jacques Fages testified that he was not listed in the poll book and voted via an affidavit

ballot in the 2017 General Election.  (Plaintiff's Trial Exhibit 191, Fages Decl. at 10 and 13-23.)

Jacques Fages affidavit ballot was deemed valid and was counted.  (Plaintiff's Trial Exhibit 191,

Fages Decl. at 24.)

Lauren Wolfe

85.     Lauren Wolfe testified that she went to vote at her poll site in Brooklyn Borough Hall for

the 2016 General Election, but was told that she was not in the poll book and that she was in the

wrong poll site.  (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 10-11.)  She was told that she had

to go to St. Francis College.  (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 12.)  The poll site in

St. Francis college told her that she was not in the poll book, and that her correct poll site was

Borough Hall.  (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 12.)    After going back and forth,

Lauren Wolf voted in St. Francis college.  (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 12.)

Lauren Wolfe was in active status prior to the 2016 General Election.   (Defendants' Trial Exhibit

A, Brehm Decl. at 59.)  Election records show that the proper poll site for Lauren Wolfe is Brooklyn Borough Hall. It is unclear why poll workers were unable to find Lauren Wolfe's name in the poll book. It is also unclear why poll workers directed Ms. Wolfe to a different poll site per her testimony.   Lauren Wolfe's affidavit ballot was determined to be invalid because she voted at the wrong poll site, St. Francis College.  (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 62.)

Allison Agro-Paulson

86.     Allison Agro-Paulson testified that she was not listed in the poll book and voted via an affidavit ballot in the 2016 General Election.  (Plaintiff's Trial Exhibit 186, Agro-Paulson Decl. at 18-24.)  Allison Agro-Paulson's affidavit ballot was deemed valid and was counted. (Plaintiff's Trial Exhibit 186, Agro-Paulson Decl. at 10.)

Tracey Goldblum

87.     Tracey Goldblum testified that she was not listed in the poll book and voted via an affidavit ballot in the 2016 General Election.  (Plaintiff's Trial Exhibit 194, Goldblum decl. 10-14.)  Voter registration records show was in active status prior to the 2016 General Election. (Defendants' Trial Exhibit A, Brehm Decl. at 78.)  Tracey Goldblum's affidavit ballot was determined to be valid and was counted.  (Defendants' Trial Exhibit A, Brehm Decl. at 80.)

James Johnson

88.     James Johnson testified that he was not listed in the poll book and voted via an affidavit ballot in the 2016 General Election.  (Plaintiff's Trial Exhibit 196, Johnson Decl. 10-14.)  He testified that he received a letter stating that his affidavit ballot counted.  (Plaintiff's Trial Exhibit 196, Johnson Decl. 10-14.)

Stephanie Goldberg

89.    Ms. Goldberg was an Orange County voter in inactive status at the time of the November 2018 general election.  Ms. Goldberg went to vote at the correct polling place but was turned away from the polls without being offered an affidavit ballot because her name was not in the poll book. (Plaintiff's Trial Exhibit 193, Goldberg Decl. at 19 and 29.)

90.    Ms. Goldberg attempted to call the Orange County Board of Elections but could not get through.  She then emailed the NYS BOE.  By the time the State Board responded to Ms. Goldberg's email, she was already on her way to New York City for work and class, and did not have enough time to cast a ballot before the polls closed.  (Plaintiff's Trial Exhibit 193, Goldberg Decl.)

91.    This Court has already determined that requiring voters in inactive status to vote via an affidavit ballot is compliant with the NVRA.  (ECF 118.)  As such, declarations where an affidavit ballot was deemed valid cannot show a systematic failure of New York's Election system.

92.    Out of the 19 declarations filed, only three would have been impacted by this lawsuit: Denise Roberts, Angela Robert, and Stephanie Goldberg.  In relation to Denise and Angela Roberts, the State Board has already taken action in correcting the issue that arose in Tioga County.  (Defendants' Trial Exhibit B, Connolly Decl. at 110.)

93.    Given the above, the 19 declarations submitted by Plaintiff cannot reasonably show systemic failure on the part of the Defendants.

Attorney General List and County Boards of Elections Complaints

94.     Other evidence Plaintiff relies upon are records from the Attorney General's office and other documents from local county boards of election.  (Plaintiff's Trial Exhibits 115-172.) These records include various emails and/or notes of complaints from the Attorney General Election Day hotline or from the County Boards of Election.  All of these documents contain hearsay, and are, thus, weighed appropriately.

95.     Given the above, the Attorney General List fails to reasonably show systemic failure on part of the Defendants.  (Plaintiff's Trial Exhibits 115-172.)   The Attorney General's emails and complaint reports details complaints which are inevitable in election events involving millions of voters.

<u>Expert Witness Marc Meredith</u>

96.     Generally, as outlined in Marc Meredith's report, "voting costs" can depress voter turnout.  (Meredith Decl. at 4-5.)   Marc Meredith does concede that most voter laws, rules, and regulations, including requiring voters to register, have some quantifiable voting cost.  (Trial Tr. 315:3-316:4).

97.     In his report, Marc Meredith states that one of the voter costs includes longer wait times, which could lead to voters deciding not to vote.  (Meredith Decl. at 6-7.)   However, Marc Meredith does not quantify an increase in wait time related to inactive voters using affidavit ballots, and has not performed any observational studies related to the same.  (Trial Tr. 317:13-25).

98:     Marc Meredith estimates that 30,000-37,000 inactive voters are still residing at the same address of their registration.  (Trial Tr. 324:16-325:9).

99: In context, in November 2016, there were 12,493,250 registered voters in New York State. See (Defendants' Trial Exhibit B, Connolly Decl. at 6.)  Using the 30,000, that would represent 0.24% of all New York State voters.  In the 2016 General election, 7,801,985 ballots were canvassed in New York.   (Defendants' Trial Exhibit B, Connolly Decl. at 10.)  Using the 30,000 figure, that would represent 0.38% of all the ballots.  Further, on November 2016, there were 1,016,817 inactive voters.  (Defendants' Trial Exhibit B, Connolly Decl. at 6.)  Using the 30,000 figure, that would constitute 2.9% of inactive voters.  Given these figures, this Court cannot reasonably find that 30,000 inactive voters living at the same address is such a large deviation where it systematically disenfranchises voters.

100: Marc Meredith speculates that "tens of thousands, if not more, additional inactive voters likely reneged either because it was taking too long to vote, the poll worker failed to offer an affidavit ballot, or they did not believe their vote would count."  (Meredith Decl. at 29.) Notably, Plaintiff fails to point to one example of an inactive voter not receiving an affidavit ballot, or leaving a poll site because the affidavit process was taking too long.

Expert Report of Trey Grayson

101: Trey Greyson opines that requiring inactive voters to fill out an affidavit ballot is a burden because it takes more time to fill out an affidavit ballot.  However, he does not quantify the purported extra time.  (Grayson Rep. at 36.)

102: It takes approximately two to three minutes for fill out an affidavit ballot.  (Trial Tr. (Vol. 3) 316:20-37; Trial Tr. (Vol. 2) 285:7-13.)

103: Trey Greyson notes that it is New York policy for the poll worker to give information to the voter about how to find out whether the affidavit ballot will be counted.  (Grayson Rep. at 37.)

However, Trey Greyson opines that inactive voters being unsure if their vote counted, or if they are eligible to vote when leaving a poll site is another burden.  (Grayson Rep. at 40 and 41.)

104.  Additionally, Trey Greyson opined that New York's process increases voter wait times, however, he does not provide quantify such wait times, or provide any analysis of how he came to that conclusion.  (Grayson Rep. at 43.)

105: The average voter wait time nationwide is over 8.6 minutes.  (Plaintiff's Trial Exhibit 67.) New York's average wait time is below the national average, at 8.6 minutes.  (Plaintiff's Trial Exhibit 67; Trial Tr. (Vol. 3) 321:7-13.)

Albany, New York
November 21, 2019

Respectfully submitted,

/s/ Brian Lee Quail                    

**Brian Lee Quail**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
Brian.quail@elections.ny.gov

**Nicholas Robert Cartagena**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
Nicholas.cartagena@elections.ny.gov

**William J. McCann, Jr.**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367

Fax: 518-486-4068
William.mccann@elections.ny.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2019 a true and correct copy of the foregoing

document was served via the Court's ECF system to all counsel of record.

/s/ Brian Lee Quail

**Brian Lee Quail**
New York State Board of Elections
40 North Pearl Street
Albany, NY 12207
Telephone: 518-474-6367
Fax: 518-486-4068
Brian.quail@elections.ny.gov