# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**COMMON CAUSE/NEW YORK, as an organization and on behalf of its members,**

      Plaintiff,

    v.

**ROBERT A. BREHM**, Co-Executive Director, **TODD D. VALENTINE**, Co-Executive Director, in their official capacities as Co-Executive Directors of the **NEW YORK STATE BOARD OF ELECTIONS**; and **PETER S. KOSINSKI,** Co-Chair, **DOUGLAS A. KELLNER,** Co-Chair, **ANDREW J. SPANO,** Commissioner, and **GREGORY P. PETERSON**, Commissioner, in their official capacities as Commissioners of the **NEW YORK STATE BOARD OF ELECTIONS,**

      Defendants.

CIVIL ACTION NO.

1:17-cv-06770-AJN

_____

**<u>PLAINTIFF'S POST-TRIAL COUNTERSTATEMENT OF FACTS</u>**

Plaintiff Common Cause/New York respectfully submits the following responses to Defendants' proposed Findings of Fact.

**New York's Voter Removal Process**

**DEF FOF 1:**    The NVRA requires that states engage in list maintenance activities. Section 8(a) of the NVRA requires "each State" to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of ... a change in the residence of the registrant." 52 U.S.C. § 20507(a). The purpose of this requirement is to ensure that accurate and current voter registration rolls are maintained. (Defendants' Trial Exhibit A, Brehm Decl. 2.)

          <u>Plaintiff's Response</u>: Admitted.

**DEF FOF 2:**    To reach this policy goal, Chapter Law 659 of the Laws of 1994 was enacted. Under this Chapter Law, the removal process begins under certain circumstances (e.g. when any mail sent to such voter is returned as undeliverable by the postal service without any indication of a forwarding address; receipt of a change of address notification; etc.). (Defendants' Trial Exhibit A, Brehm Decl. at 3.)

          <u>Plaintiff's Response:</u> Denied as to the first sentence. Mr. Brehm testified that he does not know the legislative intent and could only testify that the legislature's "decision resulted in the process that we have now[.]"  Trial Tr. (Vol. I) 243:7-244:7.  Admitted as to the rest.

**DEF FOF 3:**    Each year, the board of elections of each county or city sends out a "check of registrants and information notice by mail" pursuant to N.Y. Election Law § 4-117. These notices are sent as unforwardable by first class mail (or with

1

equivalent services to first class mail with regard to obtaining address forwarding

information). As a result the post office returns any such mailing that cannot be

delivered as addressed and provides back to the board of elections any

"forwarding information." This forwarding information is used to update the voter

record addresses. (Defendants' Trial Exhibit B, Connolly Decl. at 27.)

> Plaintiff's Response: Admitted.

**DEF FOF 4:** Every board of elections certifies to the New York State Board of Elections that

they mailed the notices required by Election Law. (Defendants' Trial Exhibit B,

Connolly Decl. at 28.)

> Plaintiff's Response: Admitted.

**DEF FOF 5:** As indicated in the 2016 report, a total of 10,386,353 mail check notices were sent

in 2016. A total of 400,843 of those cards were returned to boards of elections,

and they were reported by boards of elections into five categories:

> a.     85,288 reflected "in-county" transfers
>
> b.     61,753 reflected out of county moves
>
> c.     181,798 reflected they were undeliverable
>
> d.     64,971 were returned for miscellaneous reasons that do not fit
>
> other categories
>
> e.     1,719 cards were returned marked "deceased" (Defendants' Trial
>
> Exhibit B, Connolly Decl. at 30.)

> Plaintiff's Response: Assuming that "the 2016 report" refers to Ex. D34,
>
> these facts are admitted.

**DEF FOF 6:**    The 85,288 cards indicating the voter moved to a new address within the county or city should have resulted in those voters' addresses being updated to the new address and a "transfer notice" would be sent to the voter giving the voter an opportunity to indicate on a postage-prepaid form that the transfer should not in fact occur if the voter remains at the original registration residence. The 61,752 cards returned in 2016 indicating a new address outside of the county should have resulted in these voters being made inactive with a notice sent to them postage paid to indicate that the updated address information is incorrect and a voter registration form the voter could use to register in the new jurisdiction. (Defendants' Trial Exhibit B, Connolly Decl. at 31.)

> <u>Plaintiff's Response</u>: Admitted that the above describes the steps that *should* have been taken with respect to voters who moved within the county or city and voters who moved outside of the county respectively. There is no evidence whether these procedures were, in fact, followed.

**DEF FOF 7:**    Owing to a change in state law in 2019, out of county movers no longer need to affirmatively register to vote in the new county they moved to. These voters are inactivated in the original county, placed on the voter rolls in the new county as an active voter unless returned information from the voter indicates otherwise. Once the voter is on the rolls in the new county, statewide voter duplicate management will result in the cancellation of the prior registration in the county from which they moved. Should an error occur, as with any active or inactive voter, the voter would remain eligible to cast a valid affidavit ballot at the correct

poll site for the voter's residence. (Defendants' Trial Exhibit B, Connolly Decl. at 32.)

> <u>Plaintiff's Response</u>: Admitted that the above describes what *should* happen. There is no evidence whether these procedures are, in fact, followed. As Mr. Connolly explained, "[w]hen the conduct of an election involves a one-day work force of over 60,000 people administering an election at which, in the case of the 2016 election, 7.8 million people participate, there will inevitably be problems to address." Ex. B, T. Connolly Decl., ¶ 21. Additionally, Mr. Valentine testified that the State Board of Elections received complaints about inactive voters not being offered affidavit ballots. Ex. C, Valentine Decl., ¶ 12.

**DEF FOF 8:** Mail check cards returned undeliverable could result in the voter being placed in inactive status and a forwardable confirmation notice being sent to the voter. (Defendants' Trial Exhibit B, Connolly Decl. at 34.)

> <u>Plaintiff's Response</u>: Admitted.

**DEF FOF 9:** The forwardable confirmation notice includes a postage paid card on which the voter can confirm that he or she still resides at the address to which the notice was sent, or can notify the board of elections of any change of address. The confirmation notice is forwardable and is sent to voters when returned mail or when National Change of Address ("NCOA") information indicates no forwarding address. The notices are also sent to voters when information from the Department of Motor Vehicles or a NVRA agency or NCOA indicates an address

change to outside of the jurisdiction of the board of elections. (Defendants' Trial

Exhibit B, Connolly Decl. at 35.)

<u>Plaintiff's Response</u>: Admitted.

**DEF FOF 10:** Upon mailing a confirmation notice the registered voter is moved to inactive

status. If at any time the voter responds to the notice by sending it back indicating

the voter is at the address of original registration – and the return card is provided

with return postage paid -- the voter will be restored to active status. (Defendants'

Trial Exhibit B, Connolly Decl. at 38.)

<u>Plaintiff's Response</u>: Admitted.

**DEF FOF 11:** The New York process to place a voter on inactive status thus always

requires an indication that the voter has moved (returned mail, NCOA) which must

be followed by the sending of a forwardable confirming mailing with a postage paid

return to the voter for the purpose of enabling the voter to indicate any error or

correction. (Defendants' Trial Exhibit B, Connolly Decl. at 39.)

<u>Plaintiff's Response</u>: Denied.  New York state law causes voters to be

placed in inactive status whenever the Board of Elections receives a piece

of undeliverable mail, which does not "always requires an indication that

the voter has moved."  Rather, as Michael Ryan testified, the information

received from the United States Postal Service is often inaccurate and

unreliable.  *See* Ex. P263, Ryan Dep. at 105:4-9 ("[The] information [we

get from the post office] is insufficient for our purposes to swear that it's

all good. And I am very concerned for the voters on the quality of the

information that we get from the post office") (emphasis added); *id.*

5

101:23-25 ("[We] have little faith in the overall reliability of the quality of information that we get from the post office.").  Also, voters may be moved to inactive status based on a discrepancy resulting from a voter's interaction with the DMV or information from the National Change of Address registry, *see* Trial Tr. (Vol. I) 143:13-144:8 (T. Valentine), which do not necessarily indicate that a voter has moved.

**DEF FOF 12:** Confirmation notices, as a matter of state law, are not to be sent between June 1 and the general election or within ninety days of a federal election unless the returned mail is an acknowledgement notice (which is sent to a voter when they register to vote) OR the mail returned indicates a change of address to an address not in the county. (Defendants' Trial Exhibit D, Valentine Decl. at 4.)

<u>Plaintiff's Response</u>: Admitted that the above describes what *should* happen.  There is no evidence whether these procedures are, in fact, always followed.  For example, voter Susan Stewart was moved to inactive status shortly before the September 2018 primary election based on a mail check card sent between August 19 and August 22, 2018 –within 90 days of the November 2018 general election date.  *See* Ex. P231 at 2-3; Ex. P202, Stewart Decl., ¶¶ 7-11, 20-23 (discussing transferring registration in July 2018 and receiving registration card in August 2018, then moved to inactive status before the September 2018 primary). Moving a voter to inactive status between August 19, 2018, and the November 2018 election violates New York State Board of Election policy.  Trial Tr. (Vol. I) 170:21-171:22 (T. Valentine),

6

**DEF FOF 13:** If the mail returned indicates a different address in the county, then the voter is sent a transfer notice and the address is simply updated in the county and state systems. Now, as of the changes in law in 2019, if the address change is to an address in another county, the county inactivates the voter at the "old address" by sending a confirmation notice, but the county also sends the new address information to the "new" county, and the voter is added to the voter rolls there. (Defendants' Trial Exhibit D, Valentine Decl. at 4.)

<u>Plaintiff's Response</u>: Admitted.

**DEF FOF 14:** Additionally, county board of elections must complete not later than 90 days prior to the date of a primary or general election for federal office any program the purpose of which is to systemically remove the names of ineligible voters from the lists of eligible voters. (Defendants' Trial Exhibit D, Valentine Decl. at 5.)

<u>Plaintiff's Response</u>: Admitted.

**DEF FOF 15:** Moving a voter to inactive status does not remove the voter as a registered voter. The consequence is that the voter will not appear in the poll book and must vote by affidavit ballot. (Defendants' Trial Exhibit D, Valentine Decl. at 9.)

<u>Plaintiff's Response</u>: Admitted.

**DEF FOF 16:** In 2018, 405,036 confirmation notices were sent. The total number of New York voters in inactive status as of November 1, 2016 was 1,016,817. As of November 1, 2018 the total number of voters in inactive status was 1,131,828. (Defendants' Trial Exhibit B, Connolly Decl. at 41.)

<u>Plaintiff's Response</u>: Admitted.

**DEF FOF 17:** When a voter is placed in inactive status there is a significant reason to believe,

based on address information received by the board of elections, typically in some

way from the United States Postal Service, that the voter is no longer residing at

the voter registration address on record. (Defendants' Trial Exhibit B, Connolly

Decl. at 45.)

> <u>Plaintiff's Response</u>: Denied.  Mr. Connolly admitted that he "personally
>
> do[es] not know" whether an inactive voter is at his or her address of
>
> record."  Trial Tr. (Vol. I) 115:9-11 (T. Connolly).  In fact, (i) only five
>
> percent of the ~308,000 voters who received confirmation notices in 2016
>
> confirmed that they had moved; (ii) six percent confirmed that they had
>
> not moved; (iii) 33% percent of the notices were returned as
>
> undeliverable; and (iv) 60% of the notices were neither "returned as
>
> undeliverable" nor "responded to by anyone in the household."  *Id.* at
>
> 115:24-117:11 (T. Connolly).  Further, there is ample evidence in the
>
> record regarding Post Office error.  *See, e.g.*, Ex. P263, Ryan Dep.,
>
> 101:23-25 ("[We] have little faith in the overall reliability of the quality of
>
> information that we get from the post office."); *see also* Trial Tr. (Vol. II)
>
> 289:22-292:5 (R. Brehm).  Typos in a registration database or mistakes by
>
> the post office can cause mail sent to a correct address of registration
>
> nonetheless to be returned as "undeliverable."  *See*, *e.g*., Trial Tr. (Vol. I)
>
> 48:1-8 (T. Grayson) ("You would assume that if something were returned
>
> once it would be returned again, but know that the postal service isn't
>
> perfect and especially in urban areas where you have tall buildings and

floors and apartment numbers and things like that there is more likely to

be errors…"); Ex. P263, Ryan Dep. at 96:17:20 ("[T]he quality of the

information that we get from the United States Post office is the linchpin

to the success or failure of this inactivity process."); *id.* 105:4-9 ("[The]

information [we get from the post office] is insufficient for our purposes to

swear that it's all good. And I am very concerned for the voters on the

quality of the information that we get from the post office.")

**DEF FOF 18:** Pursuant to New York Election Law, on Election Day, a voter can only vote in

one poll site, which is associated with the voter's residence. Pursuant to the New

York Election Law, the political unit that is the basis for all elections is the

Election District. Election Law 4-100. An Election District is a geographically

defined and distinct area. *Id.* All of the residents of an Election District are

entitled to vote at single polling place designated for that Election District.

Election Law 4-104.

> Plaintiff's Response: Admitted.

**DEF FOF 19:** In addition to the initial notification that the voter does not appear to be at the

address of record, to be functionally in "inactive" status, the voter has not

responded to the forwardable confirmation notice (or that notice too was returned

to the board of elections sender). (Defendants' Trial Exhibit B, Connolly Decl. at

46.)

> Plaintiff's Response: Denied.  A voter is moved to inactive status
>
> immediately upon the mailing of the confirmation notice, without waiting
>
> any period of time for the voter to respond to the confirmation notice or

for the confirmation notice to be returned as undeliverable.  Trial Tr. (Vol.

I) 143:9-12 (T. Valentine) ("Q. Mr. Valentine, it's true that upon mailing a

confirmation notice a voter is immediately moved to inactive status,

correct? A. Yes."); Trial Tr. (Vol. I) 113:15-114:11 (T. Connolly); *id.*

132:20-22 (T. Connolly) (Q: But once a confirmation notice is sent, that

voter is immediately moved to inactive status per the statute, right? A:

That is correct.").  Several voters have testified in this case that they did

not move from their address of registration and were moved to inactive

status without receiving any notification of that change.  *See*, *e.g.*, Ex.

P195, Holman Decl., ¶¶ 19-22; Ex. P202, Stewart Decl., ¶ 24.

**DEF FOF 20:** The registration poll records of all such voters must be removed from the poll

ledgers and maintained at the offices of the board of elections in a file arranged

alphabetically by election district. If the board uses computer generated

registration lists (as all New York Boards of Elections now do), the names of such

voters may not be placed on such lists at subsequent elections other than lists

prepared pursuant to the other provisions of the Election Law, but must be kept as

a computer record at the offices of such board. (Defendants' Trial Exhibit A,

Brehm Decl. at 3.)

> Plaintiff's Response: Admitted that New York Election Law requires this
>
> procedure.

**DEF FOF 21:** The effect of not being in the poll book is that the voter has to vote via an affidavit

ballot. An inactive voter is a registered voter. If at any time the voter responds to

the notice by sending it back indicating the voter is at the address of original

registration – and the return card is provided with return postage paid, the voter

will be restored to active status. (Defendants' Trial Exhibit A, Brehm Decl. at 5.)

<u>Plaintiff's Response</u>: Admitted that the above describes what *should*

happen.  Voters may fail to fill out and return a confirmation notice when

they have not moved because they misconstrue the notice as junk mail,

misunderstand the notice, or fail to read it because they are busy.  Ex.

P264, Meredith Decl., at 13.

**DEF FOF 22:** In addition to maintaining an accurate voting record, the purpose of this process is

to ensure that voters are voting in the correct jurisdiction. (Defendants' Trial

Exhibit A, Brehm Decl. at 6.)

<u>Plaintiff's Response</u>: Denied.  Mr. Brehm testified that he does not know

the legislative intent and that he could only state that the legislature's

"decision resulted in the process that we have now[.]"  Trial Tr. (Vol. I)

243:7-244:7.  Moreover, New York's existing regime, which includes the

affidavit process for inactive voters, does an incredibly poor job of helping

voters to cast ballots at the correct place.  Approximately 35,500 affidavit

ballots were rejected in New York in the 2016 general election for being

cast in the incorrect polling location.  Ex. P265, Meredith Supp. Decl., ¶ 5.

**DEF FOF 23:** A policy concern for including the names of voters in inactive status in poll books

is that if a voter had a choice to go to their former poll site, where their name is in the poll

book, or go to their new poll site, where their name would not be in the poll book

(because they have moved and not updated their records), the voter may choose to vote at

their former poll site. (Defendants' Trial Exhibit A, Brehm Decl. at 7.) As noted by New

York City Board of Elections Executive Director Michael Ryan, "Unfortunately, people,
being creatures of habit often don't vote at their new location and go back to their old
voting location and vote by scanner where they're actually in the poll book." (Ryan Depo.
at pg. 83.)

> Plaintiff's Response: With respect to the first sentence, Plaintiff
> incorporates by reference Plaintiff's response to Defendants' Finding of
> Fact No. 22.  Plaintiff admits Mr. Ryan stated the second sentence, with
> the note that the correct citation for the quoted portion of Mr. Ryan's
> deposition is Ex. P236, Ryan Dep. 90:2-6.  However, Mr. Ryan's
> testimony relates to (1) active voters and (2) voters who recently moved
> and are casting affidavit ballots at polling places that are not associated
> with their address of registration, neither of whom will be affected by this
> case.  *See* Ex. P263, Ryan Dep. 89:15-22, 90:2-16.  Poll workers already
> ask voters where they live under current law, and the evidence does not
> include a single example where the affidavit ballot process prevented
> someone from voting at an incorrect location.  Trial Tr. (Vol. III) 366:20-
> 367:8, 367:9-18 (M. Meredith).

**DEF FOF 24:** Moreover, the legislature wanted to give election inspectors a binary choice, either
provide a "regular" ballot that will be canvassed by the voting machine to voters
listed in the poll book, or provide an "affidavit" ballot to persons not listed in the
poll book, enhancing efficiency at the poll site. (Defendants' Trial Exhibit A,
Brehm Decl. at 17.)

<u>Plaintiff's Response</u>: Denied.  Plaintiff incorporates by reference Plaintiff's response to Defendants' Finding of Fact No. 22.  The uncontroverted evidence is that New York's process does not enhance efficiency at the polling place and actually increases voter wait times.  Ex. P238, Grayson Decl., ¶¶ 36-38, 43; Ex. P263, Ryan Dep., 51:12-19; Trial Tr. (Vol. III) 350:5-351:12 (M. Meredith); Ex. P264, Meredith Decl., at 1, 20-22.  Because minority voters face longer wait times than white voters, this creates a compounding problem where increasing wait times is disproportionately costlier for minority voters than for white voters.  *Id.* at 8.

**DEF FOF 25:** As election inspectors only work one to three times a year, providing additional duties upon election inspectors could bog down the voting process. (Defendants' Trial Exhibit A, Brehm Decl. at 17.)

<u>Plaintiff's Response</u>: Admitted that election inspectors only work one to three time a year, and otherwise denied.  While it is true that "providing additional duties upon election inspectors *could* bog down the voting process," the evidence in the record does not support such a conclusion here.  Specifically, in the approximately eight years that Dr. Martin—a Columbia County Election Commissioner, Ex. P236, Martin Decl., ¶ 2 — has observed Columbia County engaging in the practice of including inactive voters along with challenged voters on the supplemental list that is maintained at polling places on Election Day, she is not aware of any complaints from voters, poll workers, election officials, or anyone else

13

about that practice, *Id.* ¶¶ 16, 25; *see also* Trial Tr. (Vol. I) 163:24-164:1 (V. Martin).  Moreover, the absence of an inactive voter list does bog down the voting process, *see, e.g.*, Trial Tr. (Vol. III) 350:5-351:12 (M. Meredith) ("Q. Do you have an opinion as to whether excluding inactive voters' names from poll books affects voter wait times? A. I do. Q. And what is that? A. My opinion is that it increases the wait times for -- potentially increases the wait times for anyone who shows up to vote in New York.").

**Affidavit Ballot Process**

**DEF FOF 26:** Affidavit voting in New York is the process whereby a voter does not vote on the voting machine but rather marks a regular ballot with his or her choices and places it inside an envelope that contains an "affidavit" that states the voter's entitlement to have the ballot cast and counted. (Defendants' Trial Exhibit B, Connolly Decl. at 50.)

> Plaintiff's Response: Admitted.

**DEF FOF 27:** Voters must vote by affidavit ballot, or obtain a court order to vote on the voting machine, when the voter is at the correct election district and the voter's name does not appear in the poll book for a primary, special, or general election. (Defendants' Trial Exhibit B, Connolly Decl. at 51.)

> Plaintiff's Response: Admitted.

**DEF FOF 28:** Under New York's process, when a voter appears to vote and his or her name does not appear in the poll book, poll workers are required to ascertain whether the voter is at the correct polling place.  Specifically, New York requires the poll

worker to consult a map, street finder (listing of street addresses that indicates the election district and polling place for each address range on the street) or other description of all of the polling places and election districts. (Defendants' Trial Exhibit B, Connolly Decl. at 53.)

> Plaintiff's Response: Denied.  This may be the State's policy, but the record establishes that poll workers do not ascertain whether every voter whose name is not in the poll book is in the correct polling place. When Ms. Angela Roberts' name was not listed in the poll book during the 2016 General Election, the poll workers did not contact the county board of elections to ascertain her correct polling location nor did they direct her to a different polling location.  Ex. P200, A. Roberts Decl., ¶¶21-29. Likewise, Ms. Lauren Wolfe attempted to vote at the correct polling place but was not offered an affidavit ballot and instead re-directed to the wrong polling place at least twice during the November 2016 general election. *See* Ex. P204, Wolfe Decl., ¶¶ 11-20.  Ex. P238, Grayson Decl., ¶ 39, Ex. P263, Ryan Dep., 45:3-24 (acknowledging that New York City poll workers are "human beings" and "occasionally make mistakes"); Ex. B, Connolly Decl., ¶ 5 (admitting that "there will inevitably be problems to address"); Trial Tr. (Vol. III) 98:8-17 (R. Mohr); *see* Trial Tr. (Vol. I) 106:24-107:3, 107:13-108:7, 111:2-112:6, 120:15-17 (T. Connolly). Indeed, more than 35,000 voters who were not listed in the poll books in the 2016 presidential election cast ballots in the wrong polling location. Ex. P265, Meredith Supp. Decl., ¶5. Furthermore, county boards of

elections sometimes provide incorrect information to poll workers in their training materials. Trial Tr. (Vol. III) 404:21-406:2 (R. Mohr); Ex. D, Mohr Decl., ¶¶ 10-11.

**DEF FOF 29:** If necessary, the statute provides the poll workers will contact the board of elections to obtain the relevant information and inform the voter of the voter's correct polling place for the voter's residence address. (Defendants' Trial Exhibit B, Connolly Decl. at 54.; Defendants' Trial Exhibit 11 and 12.)

> Plaintiff's Response: Denied. Mr. Valentine confirmed there is no requirement that poll workers call election officials to verify their registration status and cannot ascertain why voters are not in the poll book. Trial Tr. (Vol. I) 150:22-151:18 (T. Valentine). Moreover, when Ms. Angela Roberts' name was not listed in the poll book during the 2016 General Election, the poll workers did not contact the county board of elections nor did they direct her to a different polling location. Ex. P200, A. Roberts Decl., ¶¶ 21-29. Further, not all poll workers have access to a phone—whether a landline or a cell phone—while at their respective polling places. Ex. P264, Meredith Decl., at 26; Trial Tr. (Vol. I) 92:12-20 (V. Martin); *see* Trial Tr. (Vol. I) 122:25-123-2 (T. Connolly). There is likewise no guarantee that poll workers have access to the internet at their respective places. Ex. P264, Meredith Decl., at 26-27.

**DEF FOF 30:** Some boards of elections require poll workers to contact the board of elections before issuing an affidavit ballot. The State Board of Elections has issued

guidance that this consultation process cannot delay the timely issuance of an

affidavit ballot. (Defendants' Trial Exhibit B, Connolly Decl. at 55.)

> Plaintiff's Response: Admitted as to the second sentence.  As to the first
>
> sentence, admitted that some counties may have this policy.  However,
>
> several voters testified that they were issued affidavit ballots without poll
>
> workers contacting local boards of elections.  *See*, *e.g.*, Ex. P195, Holman
>
> Decl., ¶¶ 13-18; Ex. P192, Feldman Decl., ¶¶ 10-15.

**DEF FOF 31:** If a voter who does not appear in the poll book, but does live in the election

district, New York provides the voter with two options that are detailed on a

"notice to voter" which must be provided to the voter. (Defendants' Trial Exhibit

B, Connolly Decl. at 56.)

> Plaintiff's Response: Admitted that the process described is what *should*
>
> happen under current New York law.  However, none of the voters who
>
> testified in this case who cast an affidavit ballot reported being given a
>
> notice to voter form.  *See*, *e.g.*, Ex. P186, Agro-Paulson Decl.; Ex. P187,
>
> Baldus Decl.; Ex. P189, Copps Decl.; Ex. P190, Edelman Decl.;  Ex.
>
> P191, Fages Decl.; Ex. P193, Goldberg Decl.; Ex. P194, Goldblum Decl.;
>
> Ex. P195, Holman Decl.; Ex. P196, Johnson Decl.; Ex. P197, Lavnick
>
> Decl.; Ex. P198, Matika Decl.; Ex. P200, A. Roberts Decl.; Ex. P201, D.
>
> Roberts Decl.; Ex. P202, Stewart Decl.; Ex. P203, Wilson Decl.; Ex.
>
> P204, Wolfe Decl.

**DEF FOF 32:** The form of the actual ballot provided to an affidavit voter is in the same form as the ballot provided to all other voters. (Defendants' Trial Exhibit B, Connolly Decl. at 57.)

> Plaintiff's Response: Admitted.

**DEF FOF 33:** The affidavit voter then takes the ballot and the affidavit ballot envelope and goes to a private area, often a privacy booth, to complete the ballot and places it in the completed affidavit envelope. (Defendants' Trial Exhibit B, Connolly Decl. at 59.)

> Plaintiff's Response: Admitted.

**DEF FOF 34:** When the voter has completed the affidavit ballot, the voter returns it to the appropriate poll workers who will return it to the board of elections. (Defendants' Trial Exhibit B, Connolly Decl. at 61.)

> Plaintiff's Response: Admitted that the process described is what *should* happen under current New York law.  Segregating ballots increases the challenge of keeping track of ballots in each precinct. Ex. P238, Grayson Decl., ¶ 28; Trial Tr. (Vol. I) 51:4-24 (T. Grayson) ("Having to keep track of more things and keep them separate because affidavit ballots are contained in an envelope and kept in a separate place than the traditional, the ballots that are not cast, the blank ballots, the spoiled ballots, and the regular ballots, it is just more work for poll workers. And so, it is not surprising that when you have to separate things like that that items tend to be misplaced or lost for short periods of time or longer periods of time."). The need to segregate affidavit ballots cast by eligible but inactive voters,

as opposed to having those voters cast regular ballots, increases the odds

of ballots being misplaced or lost. Ex. P238, Grayson Decl., ¶ 28.

**DEF FOF 35:** The board of elections will open the affidavit ballot and count the ballot if the

board's research determines that the voter was eligible. (Defendants' Trial Exhibit

B, Connolly Decl. at 62.)

> Plaintiff's Response: Admitted that the process described is what *should*
>
> happen under current New York law. But the record evidence establishes
>
> that not all affidavit ballots that are eligible to be counted are actually
>
> counted. Ex. P230, Toombs Decl., ¶¶ 10, 12 (County Election
>
> Commissioner admitting "error" in failing to count affidavit ballot); Trial
>
> Tr. (Vol. I) 110:20-111:1 (T. Connolly) (admitting that the affidavit
>
> ballots of Denise and Angela Roberts should have been counted but were
>
> not). Affidavit ballots are subject to later litigation or controversy such as
>
> in the recent case involving the recount in the Queen District Attorney's
>
> race. Trial Tr. (Vol. III) 361:1-25 (M. Meredith); *see also* Ex. P238,
>
> Grayson Decl., ¶¶ 33-34 (state officials express concern at national
>
> election meetings about provisional ballots).

**DEF FOF 36:** Prior to 2019, a voter who moved across county lines and cast an affidavit ballot

would have his affidavit ballot rejected. But in 2019 the law changed. An affidavit

ballot from a voter who is registered to vote anywhere in New York can cast a

valid affidavit for the poll site of their new residence anywhere in New York.

(Defendants' Trial Exhibit B, Connolly Decl. at 63.)

> Plaintiff's Response: Admitted.

**DEF FOF 37:** The board of elections will send the voter a notice indicating whether the affidavit ballot was not counted. It is common for boards of elections to send a notice to all affidavit voters indicating whether the ballot was or was not counted.

(Defendants' Trial Exhibit B, Connolly Decl. at 64.)

> Plaintiff's Response: Admitted that the process described is what *should* happen under current New York law.  But the record evidence establishes voters who cast affidavit ballots are frequently *not* informed whether or not their votes were counted.  Ex. P262, Holman Dep., 49:14-16, 50:14-51:22, 54:12-13 (no confidence that his affidavit ballot was counted); Ex. P186, Agro-Paulson Decl., ¶ 34 (does not know whether her affidavit ballot was counted); Ex. P187, Baldus Decl., ¶ 25 (same); Ex. P202, Stewart Decl., ¶ 38.

**DEF FOF 38:** The alternative to an affidavit ballot is a court order. The voter may apply for a court order requiring that the voter be permitted to vote in the regular manner on a voting machine. (Defendants' Trial Exhibit B, Connolly Decl. at 79.)

> Plaintiff's Response: Admitted that under New York law, a New York voter can apply for a court order that would permit him/her to vote by a regular ballot.  But, as Messrs. Brehm and Mohr admitted, in practice, few voters, if any, seek or obtain such court orders.  Trial Tr. (Vol. II) 238:22-239:6 (R. Brehm); Trial Tr. (Vol. III) 409:17-19 (R. Mohr).  Moreover, even those voters have been forced to vote affidavit ballots. Trial Tr. (Vol. II) 239:1-6 (R. Brehm); Trial Tr. (Vol. III) 409:17-20 (R. Mohr ("As a practical matter, there has only been two court orders issued in the 26-plus

years that I have been Election Commissioner [of Erie County], and both

times they've been directed to vote an affidavit ballot.").

**DEF FOF 39:** Such court applications are made by voters directly to the judges. There is no

filing fee to make these applications and determinations are decided promptly on

election day or, in many instances, in the days leading up to an election day.

(Defendants' Trial Exhibit B, Connolly Decl. at 81-82.)

Plaintiff's Response: Admitted.

**DEF FOF 40:** In the most populous areas of the state, state law requires the duty judges to hear

applications at the offices of the board of elections, and this is common practice in

most counties. (Defendants' Trial Exhibit B, Connolly Decl. at 83.)

Plaintiff's Response: Admitted.

**Poll Workers**

**DEF FOF 41:** As of the General Election in 2016, New York had approximately 5,300 poll sites,

15,083 election districts and 61,790 poll workers who staffed the election. The

poll worker numbers fluctuate from year. (Defendants' Trial Exhibit B, Connolly

Decl. at 12.)

Plaintiff's Response: Admitted.

**DEF FOF 42:** At the election district table, poll workers, known as election inspectors, distribute

ballots for that election district to voters presenting themselves to vote who are

listed in the poll book (a list of active voters for the election district with signature

exemplars which the voter signs to receive a ballot). These inspectors also

typically administer the affidavit balloting process. (Defendants' Trial Exhibit B,

Connolly Decl. at 15.)

<u>Plaintiff's Response</u>: Admitted.

**DEF FOF 43:** Most poll workers work only one to three times a year, but many poll workers work the polls year to year. Generally, county boards of elections make efforts to staff poll sites so there are experienced poll workers at every site. (Defendants' Trial Exhibit B, Connolly Decl. at 17.)

<u>Plaintiff's Response</u>: Admitted as to the first sentence. With respect to the second sentence, admitted except to the extent that poll worker resources in New York are scarce. *See* Ex. P264, Meredith Decl., at 1, 20-22; Ex. P238, Grayson Decl., ¶ 43; Trial Tr. (Vol. III) 350:4-20 (M. Meredith); *see also* Trial Tr. (Vol. I) 100:21-101:3 (V. Martin) (noting "[t]here are some [poll workers] that are not that good but we do have trouble recruiting").

**<u>Training of Poll Workers</u>**

**DEF FOF 44:** Pursuant to section 3-412(1-a) of the Election Law, the State Board has established a mandatory core curriculum for poll worker training. The State Board has issued this training to county boards of elections. *Id.* County boards of elections may augment the core curriculum with local procedures not inconsistent with the core curriculum. (Defendants' Trial Exhibit A, Brehm Decl. at 42.)

<u>Plaintiff's Response</u>: Admitted.

**DEF FOF 45:** Included in the training is a section of what happens when a voter is not listed in a poll book. This section is attached as Defendants' Trial Exhibit 10. First, the training directs the poll worker to determine if the voter is in the correct polling site and/or sign in table. If the voter assures the worker that they are in the correct

polling site, the poll worker is then directed to check the map, street guide, or other tools provided by the county board. If the voter is in the correct district, then the poll worker is directed to provide the voter with a "Notice to Voter." If the poll worker is unsure if the voter is in the correct district, the poll worker is directed to call the county board. The training goes on to say that the voter is entitled to vote by "affidavit ballot or obtain a court order from a judge." (Defendants' Trial Exhibit A, Brehm Decl. at 37.)

> Plaintiff's Response: Admitted that this describes what should happen pursuant to New York Law.  Plaintiff also incorporates by reference its response to Defendants' Finding of Fact No. 29.

**DEF FOF 46:** The training of these poll workers is provided at the county level and is informed by the New York State Election Law which requires annual poll worker training and testing. As reflected in the aforesaid Report 1(e): The duration of poll worker training sessions ranges from one and half hours to six hours, depending on the county. The duration in the five counties comprising New York City is four hours, and poll workers are paid to attend training. In 2016, the class sizes ranged from two persons to 100, and statewide the total number of poll worker classes held was 5,974. (Defendants' Trial Exhibit B, Connolly at 16.)

> Plaintiff's Response: Admitted.

## Oversight of Local County Officials

**DEF FOF 47:** The major responsibilities of the New York State Board of Elections include the oversight and support of New York State's 62 county Boards of Elections. In

23

relation to the facts in this case, the State Board engages in the following

activities. (Defendants' Trial Exhibit B, Connolly Decl. at 111.)

> Plaintiff's Response: Admitted that the major responsibilities of the New
>
> York State Board of Elections include oversight and support of New
>
> York's 62 county Board of Elections.

**DEF FOF 48:** The State Board has drafted and provided a "Guide to Operating a County Board

of Elections" for the benefit of local county election administrators. Id. at. 66. See

also Defendants' Trial Exhibit "41." This Guide details the responsibilities a

county board must undertake, including, how Affidavit Ballots are processed,

how voter list maintenance is performed, and information on how to run a poll

site. (Defendants' Trial Exhibit B, Connolly Decl. at 111.)

> Plaintiff's Response: Admitted.

**DEF FOF 49:** In response to a letter from the Attorney General's office expressing concern about

New York's affidavit ballot process, the State Board issued guidance to local

boards, outlining the proper procedure of issuing and processing notice to voters,

including the issuance of affidavit ballots. (Defendants' Trial Exhibit A, Brehm

Decl. at 39-43; *see also* Defendants' Trial Exhibits 11 and 12.)

> Plaintiff's Response: Admitted.

**DEF FOF 50:** The Guidance reminds local county election officials that affidavit ballots must be

provided to voters who assert they live in the election district and who claim to be

entitled to vote. (See Defendants' Trial Exhibits 11 and 12.) The Guidance states

that: "(w)hile it is acceptable for poll workers to call the board of elections to

confirm the residency of an affidavit voter in an effort to provide the affidavit

voter with accurate information, the furnishing of an affidavit ballot should not be delayed, and a voter who requests an affidavit should be provided an affidavit ballot promptly." *Id.* The Guidance goes on to outline the process a voter who is not listed in the poll book, including, giving such voters a Notice of Voters. (Defendants' Trial Exhibit A, Brehm Decl. at 39-43.) The Guidance provides for a process for providing affidavit ballots, which is also found in the Model Training Manual, created by the State Board. (*Id.*; see also Defendants' Trial Exhibit 10.)

Plaintiff's Response: Admitted.

**DEF FOF 51:** The State Board of Elections provides County Boards of Elections with oversight and support through; phone calls, conference calls, e-mails, customized workshops and site visits tailored to individual counties, informative conference presentations, participation in and appearances at Election Commissioners Association regional meetings, topical memorandums, and the provision of extensive procedural documents and forms for implementation at the local level. (Defendants' Trial Exhibit B, Connolly Decl., at 111.)

Plaintiff's Response: Denied.  As Mr. Connolly himself admitted, the State Board of Elections does not assess whether county boards of elections comply with the training materials provided by the State Board of Elections.  Trial Tr. (Vol. I) 123:13-16 (T. Connolly).

**DEF FOF 52:** The State Board of Elections also provides National Change of Address (NCOA) information to all of New York State's county Boards of Elections. NCOA services are a required component of New York State's statutory voter registration list maintenance

Plaintiff's Response: Admitted.

**Voter Poll Site Lookup**

**DEF FOF 53:** There are several ways a voter in New York can determine where the voter's poll

site is located. (Defendants' Trial Exhibit B, Connolly Decl. at 112.)

Plaintiff's Response: Admitted.

**DEF FOF 54:** The annual mail check card sent to all active voters indicates the voter's poll site,

and if the information as to where the voter votes changes subsequent to that

mailing, the board of elections must send a poll site change notification by mail.

(Defendants' Trial Exhibit B, Connolly Decl. at 86.)

Plaintiff's Response: Admitted.

**DEF FOF 55:** When a voter first registers to vote, the voter is also sent a card indicating the

voter is registered to vote and indicating where the voter's poll site is located.

(Defendants' Trial Exhibit B, Connolly Decl. at 87.)

Plaintiff's Response: Admitted.

**DEF FOF 56:** A voter can call the board of the elections at any time to find out where the voter's

poll site is located. (Defendants' Trial Exhibit B, Connolly Decl. at 89.)

Plaintiff's Response: Admitted.

**DEF FOF 57:** Prior to each election, poll site information is published in a newspaper of general

circulation in every county. (Defendants' Trial Exhibit B, Connolly Decl. at 90.)

Plaintiff's Response: Admitted.

**DEF FOF 58:** The New York State Board of Elections has a poll site lookup feature on its

website which can be used statewide to determine whether a voter is registered,

their party enrollment what their voter status is (active or inactive) and where the voter's poll site is located. (Defendants' Trial Exhibit B, Connolly Decl. at 91.)

<u>Plaintiff's Response</u>: Admitted.

**DEF FOF 59:** To effectuate a look-up, the voter must provide their Last Name, Date of Birth, Zip code, First Name and County. The reason for the specificity of the information required is reasonable as it provides privacy for the voter so the voter look up feature cannot be readily used as a generic online address look-up for non-voter purposes. (Defendants' Trial Exhibit B, Connolly Decl. at 93.)

<u>Plaintiff's Response</u>: Admitted that the look-up tool employs "exact match criterion" that requires every character of the voter's first name, last name, date of birth, and zip code to exactly match the voter's information as entered in the statewide voter registration database. Ex. P264, Meredith Decl., at 27. Denied that the reason for the specificity of the information being required is reasonable.

**DEF FOF 60:** If the search does not result in a match, the system generates a response of "No Matches Found Please contact your County Board of Elections." (Defendants' Trial Exhibit B, Connolly Decl. at 96.)

<u>Plaintiff's Response</u>: Admitted.

**DEF FOF 61:** The instruction to the voter to "Please contact your County Board of Elections," is a hyperlink to the relevant contact information for the board of elections. When the voter clicks on the hyperlink, the voter is brought to a contact page that provides the specific contact information for the voter's local board of elections. In addition to the phone number, fax number and address of the board of

elections, the board of election's email address, webpage information and the names of the county commissioners and deputy commissioner are provided. (Defendants' Trial Exhibit B, Connolly Decl. at 98.)

  Plaintiff's Response: Admitted.

**DEF FOF 62:** In 2016, the number of users accessing the voter look-up page was over 2.5 million with over 13.4 million page views. And in 2018 the number of users accessing the voter look-up page was over 1.3 million with over 5.7 million page views. While these traffic numbers do not indicate a precise number of look-ups performed, the look-up feature page experiences considerable traffic. (Defendants' Trial Exhibit B, Connolly Decl. at 10.)

  Plaintiff's Response: Admitted.

**DEF FOF 63:** New York law requires that each poll site be equipped with information in the form of maps or street finders to enable poll workers to direct wayward voters to their correct polling locations. A street finder is a look up tool that generally consists of a listing of all streets in a jurisdiction and lists the election district or election districts that the street is a part of by address range. It enables poll workers to direct a voter to the correct poll site by simply looking up the voter's address. (Defendants' Trial Exhibit B, Connolly Decl. at 108.)

  Plaintiff's Response: Admitted.

**DEF FOF 64:** All of the website voter look-up and poll site finder tools work as well for both active and inactive voters. (Defendants' Trial Exhibit B, Connolly Decl. at 109.)

  Plaintiff's Response: Denied to the extent that Defendants contend the website voter look-up or poll site finder tools "work well."  New York's

existing regime, which includes the affidavit process for inactive voters, often fails to help voters cast ballots at the correct place. Approximately 35,500 affidavit ballots were rejected in New York in the 2016 general election for being cast in the incorrect polling location. Ex. P265, Meredith Supp. Decl. ¶ 5. That number is greater than the total number of provisional ballots rejected in that election in North Carolina (33,756), Arizona (23,959), Ohio (22,978), and most other states. See Ex. P264, Meredith Decl., at 17. Moreover, requiring an exact match between the information entered into the lookup tool and the voter registration database causes problems because voter registration data often contains typos or otherwise incorrect biographical information. See, e.g., Ex. P186, Agro-Paulson Decl., ¶ 35 (noting NYSVoter recorded her name incorrectly without a hyphen); Ex. P199, Ancarrow Decl., ¶ 20 (noting NYSVoter recorded his name incorrectly as "Walter C. Ancarrow" instead of Walter C. Ancarrow IV").

**No Systemic Failure in New York's Systemic Failure in New York's Election System**

**DEF FOF 65:** As of February 1, 2019, New York had 12,695,762 voters. Of that number 11,676,265 are in "active" status, and 1,019,497 are voters listed in "inactive" status. A voter in active status is a voter whose poll record would appear in a poll book on election day, and an inactive voter is a voter believed to no longer reside at the address of record based on information received by the board of elections. Inactive voters are registered voters but their names do not appear in the poll

book, they must vote by affidavit ballot or pursuant to court order. (Defendants'
Trial Exhibit B, Connolly Decl. at 2.)

        Plaintiff's Response: Admitted.

**DEF FOF 66:** As of November 1, 2018, New York had 12,706,050 voters. Of that number
11,574,222 are in active status, and 1,131,828 are voters listed in inactive status.
(Defendants' Trial Exhibit B, Connolly Decl. at 4.)

        Plaintiff's Response: Admitted.

**DEF FOF 67:** As of November 1, 2016, New York had 12,493,250 voters. Of that number
11,476,433 are in active status, and 1,016,817 are voters listed in inactive status.
(Defendants' Trial Exhibit B, Connolly Decl. at 6.)

        Plaintiff's Response: Admitted.

**DEF FOF 68:** The voter turnout in 2016 was 7,801,985. (Defendants' Trial Exhibit B, Connolly
Decl. at 20.)

        Plaintiff's Response: Admitted.

**DEF FOF 69:** At the 2018 General Election, 125,920 affidavit ballots were cast statewide. Of
that number 73,922 were valid. (Defendants' Trial Exhibit B, Connolly Decl. at
68.)

        Plaintiff's Response: Admitted.

**DEF FOF 70:** In the 2018 General Election Annual Statistical Report, New York City did not
provide data indicating voters reactivated as a result of casting an affidavit ballot.
For the jurisdictions that did provide this information, reactivated voters (voters
moving from inactive to active status as a result of casting an affidavit ballot)
were 10,444 of the 53,250 affidavits processed (19.6%) and 10,444 of the 33,852

valid affidavits cast in those jurisdictions (30.85%). (Defendants' Trial Exhibit B,

Connolly Decl. at 71.)

       <u>Plaintiff's Response</u>: Admitted.

**DEF FOF 71:** At the General Election in 2016, 268,964 affidavit ballots were cast statewide. Of

those, the 141,293 affidavits found valid for various reasons specified in the

report, although not every jurisdiction provided a full breakdown. Of the 124,933

found invalid, 69,472 were persons found not to be registered in the county

(55.6%). (Defendants' Trial Exhibit B, Connolly Decl. at 69.)

       <u>Plaintiff's Response</u>: Admitted.

**DEF FOF 72:** In the 2016 General Election Annual Statistical Report, New York City and

Nassau County did not provide data indicating voters reactivated as a result of

casting an affidavit ballot. For the jurisdictions that did provide this information,

reactivated voters (voters moving from inactive to active status as a result of

casting an affidavit ballot) were 17,511 of the 81,379 affidavits processed

(21.5%), and 17,511 of the 45,379 valid affidavits cast in those jurisdictions

(38%). (Defendants' Trial Exhibit B, Connolly Decl. at 72.)

       <u>Plaintiff's Response</u>: Admitted.


**<u>Nancy Feldman</u>**

**DEF FOF 73:** The reason Ms. Feldman was not because she was in inactive status, but because

she was not registered. (Plaintiff's Trial Exhibit 192, Feldman Decl. at 16).

       <u>Plaintiff's Response</u>: Plaintiff does not understand what is being asserted

by Defendant through Finding of Fact No. 73.  Accordingly, Plaintiff

cannot respond.

**Alison Matika**

**DEF FOF 74:** In her declaration, Alison Matika testified that during the 2016 General Election, there were no poll books at her poll site, and she was forced to vote via an affidavit ballot. (Plaintiff's Trial Exhibit 198, Matika Decl.) The allegations in this declaration do not relate to the issues in this case; that New York's implementation of its Removal Policy violates section 8 of the NVRA. While this declaration may show New York's election officials are not infallible, such standard cannot reasonably used for NVRA violations.

> Plaintiff's Response: Admitted as to the first sentence. The second and third sentences are proposed conclusions of law, and as such, do not merit a response.

**Susan Stewart**

**DEF FOF 75:** The Ulster County Board of Elections placed Susan Stewart in "inactive status" in 2018 as a result of a postcard mailed by the Board of Elections having been returned by the United States Postal Service as "not deliverable as addressed." (Defendants" Trial Exhibit 179.) A confirmation notice notifying the voter she was placed in inactive status was mailed to the same address, to which there was no response. (Defendants" Trial Exhibit 179.)

> Plaintiff's Response: Admitted.

**Ellen Edelman**

**DEF FOF 76:** Election records indicate that Ellen Edelman went to the correct poll site, but wrong election district table. (Defendants' Trial Exhibit A, Brehm Decl. at 66.) Because the poll workers could not find her name in the poll book, Ellen Edelman

was offered an affidavit ballot, which she submitted. (Defendants' Trial Exhibit A, Brehm Decl. at 67.) Ellen Edelman's affidavit ballot was determined to be valid and was counted. (Defendants' Trial Exhibit A, Brehm Decl. at 68.)

       Plaintiff's Response: Admitted.

**Mitchell Lavnick**

**DEF FOF 77:** Poll workers provided Mitchell Lavnick with an affidavit, which he submitted. (Plaintiff's Trial Exhibit 197, Lavnick Decl. 11-12.) Mitchell Lavnick's affidavit ballot was determined to be valid and was counted. (Defendants' Trial Exhibit A, Brehm Decl. at 72)

       Plaintiff's Response: Admitted.

**Robert Holman**

**DEF FOF 78:** Robert Holman also testified that he was not listed in the poll book and was offered an affidavit ballot. (Plaintiff's Trial Exhibit 195, Holman at 14 and 17-18.) The Erie County Board of Elections placed Robert Holman in "inactive status" in 2016 as a result of a postcard mailed by the Board of Elections having been returned by the United States Postal Service as "not deliverable as addressed." (Defendants' Trial Exhibit D, Mohr Decl. at 17.) A confirmation notice notifying the voter he was placed in inactive status was mailed to the same address, to which there was no response. (Defendants' Trial Exhibit D, Mohr Decl. at 17.)

       Plaintiff's Response: Admitted.

**Sandra Copps**

**DEF FOF 79:** Sandra Copps testified that in the September 2018 primary, she went to her local poll site, but was not listed in the poll book despite being an active voter. (Plaintiff's

Trial Exhibit 189, Copps Decl. at 13.) Sandra Copps testified that she did was not

offered an affidavit ballot. (Plaintiff's Trial Exhibit 189, Copps Decl. at 18.) Voter

registration records show that Sandra Copps is an active voter registered in the

Independence Party. (Defendants' Trial Exhibit A, Brehm Decl. at 50.) There were

no Independence Primary races in Sandra Patricia Copps' election district on

September 2018. (Defendants' Trial Exhibit A, Brehm Decl. at 51.) Because there is

no primary, there was no Independence Party poll book that would have listed

Sandra Copps' name. There was a Democratic Primary in September 2018 that

listed Democratic voters. Sandra Patricia Copps would not have been listed in that

book, as she is not a registered Democrat. (Defendants' Trial Exhibit A, Brehm

Decl. at 52.)

        <u>Plaintiff's Response</u>: Admitted.

**Denise Roberts and Angela Roberts**

**DEF FOF 80:** Both Denise Roberts and Angela Roberts testified that during the 2016 General

Election they were not listed in the poll book and were offered an affidavit ballot.

(Plaintiff's Trial Exhibit, 201, D. Roberts Decl. at 11 and 14.) Denise Roberts

testified that her vote did not count. The Tioga County Board of Elections should

have counted the vote. The State Board followed up with the Tioga County Board

of Elections to ensure that the board counts such affidavit ballots in the future.

(Defendants' Trial Exhibit B, Connolly Decl. at 110.)

        <u>Plaintiff's Response</u>: Admitted.

**Katherine Baldus**

**DEF FOF 81:** Katherine Baldus testified that she was not listed in the poll book and voted via an

affidavit ballot in the September 2018 primary. (Plaintiff's Trial Exhibit 187, Baldus

Decl. at 13-18.) However, election records show that she was in active status.

(Defendants' Trial Exhibit A, Brehm Decl. at 47.) Katherine Louise Baldus'

affidavit ballot was deemed valid and was counted. (*Id.* at 49.)

Plaintiff's Response: Admitted.

**Mara Wilson**

**DEF FOF 82:** Mara Wilson testified that she was not listed in the poll book and voted via an

affidavit ballot in the September 2018 primary. (Plaintiff's Trial Exhibit 203,

Wilson Decl. at 10 and 17, 20.) Mara Wilson received a letter from the New York

City Board of Elections that her voted counted. (Plaintiff's Trial Exhibit 203,

Wilson Decl. at 23.) Election records show that Mara Wilson was in active status

during the 2016 General Election. (Defendants' Trial Exhibit A, Brehm Decl. at 74.)

Plaintiff's Response: Admitted.

**Keoma Blake and Walter Ancarrow, IV**

**DEF FOF 83:** Keoma Blake and Walter Ancarrow, IV both testified that they had issues with the

online NYS voter lookup page. The New York City Board of Elections entered

Keoma Blake's date of birth incorrectly, preventing the look up from making a

match until it was corrected. (Defendants' Trial Exhibit A, Brehm Decl. at 74.) It is

unclear why Walter Ancarrow, IV had a problem with the voter lookup, whether it

was a system failure or user error. Regardless, the declaration of two individuals

having issues with the voter lookup is insufficient to show a systemic problem with

the voter lookup.

Plaintiff's Response: Admitted.

**Jacques Fages**

**DEF FOF 84:** Jacques Fages testified that he was not listed in the poll book and voted via an affidavit ballot in the 2017 General Election. (Plaintiff's Trial Exhibit 191, Fages Decl. at 10 and 13-23.) Jacques Fages affidavit ballot was deemed valid and was counted. (Plaintiff's Trial Exhibit 191, Fages Decl. at 24.)

> Plaintiff's Response: Admitted.  Mr. Fages was an inactive voter at the time of the November 2016 election.  Ex. P191, Fages Decl., ¶ 17; Ex. P218, Fages' voter records.  He was never informed whether or not his affidavit ballot was counted.  *Id.* ¶ 19.

**Lauren Wolfe**

**DEF FOF 85:** Lauren Wolfe testified that she went to vote at her poll site in Brooklyn Borough Hall for the 2016 General Election, but was told that she was not in the poll book and that she was in the wrong poll site. (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 10-11.) She was told that she had to go to St. Francis College. (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 12.) The poll site in St. Francis college told her that she was not in the poll book, and that her correct poll site was Borough Hall. (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 12.) After going back and forth, Lauren Wolf voted in St. Francis college. (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 12.) Lauren Wolfe was in active status prior to the 2016 General Election. (Defendants' Trial Exhibit A, Brehm Decl. at 59.) Election records show that the proper poll site

for Lauren Wolfe is Brooklyn Borough Hall. It is unclear why poll workers were unable to find Lauren Wolfe's name in the poll book. It is also unclear why poll workers directed Ms. Wolfe to a different poll site per her testimony. Lauren Wolfe's affidavit ballot was determined to be invalid because she voted at the wrong poll site, St. Francis College. (Plaintiff's Trial Exhibit 204, Wolfe Decl. at 62.)

Plaintiff's Response: Admitted.

**Allison Agro-Paulson**

**DEF FOF 86:** Allison Agro-Paulson testified that she was not listed in the poll book and voted via an affidavit ballot in the 2016 General Election. (Plaintiff's Trial Exhibit 186, Agro-Paulson Decl. at 18-24.) Allison Agro-Paulson's affidavit ballot was deemed valid and was counted. (Plaintiff's Trial Exhibit 186, Agro-Paulson Decl. at 10.)

Plaintiff's Response: Admitted.

**Tracey Goldblum**

**DEF FOF 87:** Tracey Goldblum testified that she was not listed in the poll book and voted via an affidavit ballot in the 2016 General Election. (Plaintiff's Trial Exhibit 194, Goldblum decl. 1014.) Voter registration records show was in active status prior to the 2016 General Election. (Defendants' Trial Exhibit A, Brehm Decl. at 78.) Tracey Goldblum's affidavit ballot was determined to be valid and was counted. (Defendants' Trial Exhibit A, Brehm Decl. at 80.)

Plaintiff's Response: Admitted.

**James Johnson**

**DEF FOF 88:** James Johnson testified that he was not listed in the poll book and voted via an affidavit ballot in the 2016 General Election. (Plaintiff's Trial Exhibit 196, Johnson Decl. 10-14.) He testified that he received a letter stating that his affidavit ballot counted. (Plaintiff's Trial Exhibit 196, Johnson Decl. 10-14.)

> Plaintiff's Response: Admitted.

**Stephanie Goldberg**

**DEF FOF 89:** Ms. Goldberg was an Orange County voter in inactive status at the time of the November 2018 general election. Ms. Goldberg went to vote at the correct polling place but was turned away from the polls without being offered an affidavit ballot because her name was not in the poll book. (Plaintiff's Trial Exhibit 193, Goldberg Decl. at 19 and 29.)

> Plaintiff's Response: Admitted.

**DEF FOF 90:** Ms. Goldberg attempted to call the Orange County Board of Elections but could not get through. She then emailed the NYS BOE. By the time the State Board responded to Ms. Goldberg's email, she was already on her way to New York City for work and class, and did not have enough time to cast a ballot before the polls closed. (Plaintiff's Trial Exhibit 193, Goldberg Decl.)

> Plaintiff's Response: Admitted.  Ms. Goldberg undertook additional efforts to try to vote in the November 2018 election, such as by looking up her voter registration status on her phone, returning to the polling place, and showing her record to the poll workers.  Ex. P193, Goldberg Decl., ¶¶ 22, 26-28.

**DEF FOF 91:** This Court has already determined that requiring voters in inactive status to vote via an affidavit ballot is compliant with the NVRA. (ECF 118.) As such, declarations where an affidavit ballot was deemed valid cannot show a systematic failure of New York's Election system.

> Plaintiff's Response: Denied.  This is a proposed legal conclusion, not a finding of fact, and is disputed.  This Court recognized in its ruling on Defendants' motion to dismiss that "there are limits on how expansively states may use affidavit ballots when such use impedes voting rights separately protected by the First Amendment, Fourteenth Amendment or Voting Rights Act." ECF 58 at 24.   Moreover, Mr. Brehm acknowledged that as a practical matter (and contrary to the words of the Election Law relied on by the Court in its motion to dismiss ruling), "the list that's available at the poll site" is the official list of eligible voters.  Trial Tr. (Vol. II) 235:19-22 (R. Brehm) ("Q. But the official list of eligible voters is the printed poll book at the [poll site] on Election Day.  Is that correct?  A: On Election Day at the poll site, that is the list that's available at the poll site.").

**DEF FOF 92:** Out of the 19 declarations filed, only three would have been impacted by this lawsuit: Denise Roberts, Angela Robert, and Stephanie Goldberg. In relation to Denise and Angela Roberts, the State Board has already taken action in correcting the issue that arose in Tioga County. (Defendants' Trial Exhibit B, Connolly Decl. at 110.)

> Plaintiff's Response: Denied.  The first sentence is a proposed conclusion of law, and as such, does not merit a response.  It is admitted that the "Tioga

County's Election Commissioners were made aware of the[ir] errors [with respect to Ms. Denise Roberts and Ms. Angela Roberts]."  Ex. B, Connolly Decl., ¶ 110.

**DEF FOF 93:** Given the above, the 19 declarations submitted by Plaintiff cannot reasonably show systemic failure on the part of the Defendants.

> Plaintiff's Response: Denied.  This is a proposed conclusion of law, and, as such, it does not merit a response.

**Attorney General List and County Boards of Elections Complaints**

**DEF FOF 94:** Other evidence Plaintiff relies upon are records from the Attorney General's office and other documents from local county boards of election. (Plaintiff's Trial Exhibits 115-172.) These records include various emails and/or notes of complaints from the Attorney General Election Day hotline or from the County Boards of Election. All of these documents contain hearsay, and are, thus, weighed appropriately.

> Plaintiff's Response: Admitted as to the first two sentences and denied as to the third.

**DEF FOF 95:** Given the above, the Attorney General List fails to reasonably show systemic failure on part of the Defendants. (Plaintiff's Trial Exhibits 115-172.) The Attorney General's emails and complaint reports details complaints which are inevitable in election events involving millions of voters.

> Plaintiff's Response: Denied.  This is a proposed conclusion of law, and, as such, it does not merit a response.

**Expert Witness Marc Meredith**

**DEF FOF 96:** Generally, as outlined in Marc Meredith's report, "voting costs" can depress voter turnout. (Meredith Decl. at 4-5.) Marc Meredith does concede that most voter laws, rules, and regulations, including requiring voters to register, have some quantifiable voting cost. (Trial Tr. 315:3-316:4).

> Plaintiff's Response: Admitted as to the first sentence and denied as to the second sentence. Dr. Meredith testified that in a particular study, a 2 percentage point drop in voter turnout could be attributed to the presence of a voter registration requirement. Trial Tr. (Vol. III) (315:3-22) (M. Meredith).

**DEF FOF 97:** In his report, Marc Meredith states that one of the voter costs includes longer wait times, which could lead to voters deciding not to vote. (Meredith Decl. at 6-7.) However, Marc Meredith does not quantify an increase in wait time related to inactive voters using affidavit ballots, and has not performed any observational studies related to the same. (Trial Tr. 317:13-25).

> Plaintiff's Response: Admitted. Dr. Meredith testified that while he could not specify an exact number for the increase in wait time, he can say that it is greater than zero. Trial Tr. (Vol. III) (317:16-318:2) (M. Meredith). He explained that "it is hard to put an exact number . . . [because] the amount of time it would take to fill out an affidavit ballot would depend heavily on someone's reading comprehension." *Id.* at 317:5-8 (M. Meredith). Moreover, quantifying a "median" wait time increase does not reflect the fact that different voters will be impacted differently: some voters may

experience significant increases in wait times while other voters might be minimally affected.  *Id.* at 350:13-351:2 (M. Meredith).

**DEF FOF 98:** Marc Meredith estimates that 30,000-37,000 inactive voters are still residing at the same address of their registration. (Trial Tr. 324:16-325:9).

Plaintiff's Response: Denied.  Dr. Meredith explained that between 30,000 and 37,000 inactive voters who had not moved cast affidavit ballots in the November 2016 election – and therefore does not constitute the total number of inactive voters who are still residing at the same address of registration.  Trial Tr. (Vol. III) 324:16-325:9 (M. Meredith); see also Ex. P265, Meredith Supp. Decl., ¶ 3.  That number does not include inactive voters who have not moved but did not vote or who cast an affidavit that was rejected.  Trial Tr. (Vol. III) 326:3-327:8, 354:1-355:2 (M. Meredith). That number is substantial because the turnout rate for inactive voters is lower than that of active voters, in part because of the voting costs imposed by New York's practices at issue in this case.  *See id.* 354:1-355:2.

**DEF FOF 99:** In context, in November 2016, there were 12,493,250 registered voters in New York State. See (Defendants' Trial Exhibit B, Connolly Decl. at 6.) Using the 30,000, that would represent 0.24% of all New York State voters. In the 2016 General election, 7,801,985 ballots were canvassed in New York. (Defendants' Trial Exhibit B, Connolly Decl. at 10.) Using the 30,000 figure, that would represent 0.38% of all the ballots. Further, on November 2016, there were 1,016,817 inactive voters. (Defendants' Trial Exhibit B, Connolly Decl. at 6.) Using the 30,000 figure, that would constitute 2.9% of inactive voters. Given

these figures, this Court cannot reasonably find that 30,000 inactive voters living

at the same address is such a large deviation where it systematically

disenfranchises voters.

>    Plaintiff's Response: Admitted that (i) in November 2016, there were
>
>    12,493,250 registered voters in New York State; (ii) in the 2016 General
>
>    election, 7,801,985 ballots were canvassed in New York; and (iii) in
>
>    November 2016, there were 1,016,817 inactive voters.  Denied as to the
>
>    final sentence, which is a proposed conclusion of law.  With respect to
>
>    Defendants' references to "the 30,000 figure," Plaintiff incorporates by
>
>    reference Plaintiff's response to Defendants' Finding of Fact No. 98 to the
>
>    extent Defendants mischaracterize Dr. Meredith's testimony regarding the
>
>    total number of inactive voters who no longer reside at their address of
>
>    residence.

**DEF FOF 100:** Marc Meredith speculates that "tens of thousands, if not more, additional inactive

voters likely reneged either because it was taking too long to vote, the poll worker

failed to offer an affidavit ballot, or they did not believe their vote would count."

(Meredith Decl. at 29.) Notably, Plaintiff fails to point to one example of an

inactive voter not receiving an affidavit ballot, or leaving a poll site because the

affidavit process was taking too long.

>    Plaintiff's Response:  Denied that Dr. Meredith's testimony was
>
>    speculation.  Admitted that Dr. Meredith provided the testimony quoted in
>
>    the first sentence.  Denied as to the last sentence because voter Stephanie
>
>    Goldberg "had to leave [the polling place before poll workers offered an

affidavit ballot] so I could get to work at Lincoln Center for the Performing

Arts, and later attend classes at New York University."  Ex. P193, Goldberg

Decl., ¶ 37.

**Expert Report of Trey Grayson**

**DEF FOF 101:** Trey Greyson opines that requiring inactive voters to fill out an affidavit ballot is

a burden because it takes more time to fill out an affidavit ballot. However, he

does not quantify the purported extra time. (Grayson Rep. at 36.)

Plaintiff's Response: Admitted.

**DEF FOF 102:** It takes approximately two to three minutes for fill out an affidavit ballot. (Trial

Tr. (Vol. 3) 316:20-37; Trial Tr. (Vol. 2) 285:7-13.)

Plaintiff's Response: Admitted that is a reasonable average estimate of the

amount of time involved, but denied that is additional amount of time

experienced by all voters.  Trial Tr. (Vol. III) (317:16-318:2, 317:5-8) (M.

Meredith) (explaining that "it is hard to put an exact number . . . [because]

the amount of time it would take to fill out an affidavit ballot would depend

heavily on someone's reading comprehension"); *see also* Ex. P262, Holman

Dep., 67:16-25 (voting an affidavit ballot took 15 to 20 minutes more than

voting a regular ballot); Ex. P186, Agro-Paulson, Decl. ¶¶ 14, 16, 19, 27

(voting experience took approximately one hour because poll worker told

her to try to find her name in every election district); Ex. P193, Goldberg

Decl., ¶¶ 15, 19, 21-22, 27-28, 30-32 (voter attempted to vote multiple times

and went back and forth from her car to try to ascertain her registration

status and contact election officials); Ex. P202, Stewart Decl., ¶¶ 13, 16-21,

25, 27 (describing interaction with poll workers, poll worker attempt to make phone call "took a long time," prompting her to call her board of elections); Ex. P204, Wolfe Decl., ¶¶ 10-14 (voter describes being redirected back and forth between two different polling places by poll workers); Ex, P194, Goldblum Decl., ¶¶ 10-11 (voter went to a second table at the request of poll workers to attempt to find her name in the poll book but was unsuccessful and had to cast an affidavit ballot).

**DEF FOF 103:** Trey Greyson notes that it is New York policy for the poll worker to give information to the voter about how to find out whether the affidavit ballot will be counted. (Grayson Rep. at 37.) However, Trey Greyson opines that inactive voters being unsure if their vote counted, or if they are eligible to vote when leaving a poll site is another burden. (Grayson Rep. at 40 and 41.)

        Plaintiff's Response: Admitted.

**DEF FOF 104:** Additionally, Trey Greyson opined that New York's process increases voter wait times, however, he does not provide quantify such wait times, or provide any analysis of how he came to that conclusion. (Grayson Rep. at 43.)

        Plaintiff's Response: Admitted.

**DEF FOF 105:** The average voter wait time nationwide is over 8.6 minutes. (Plaintiff's Trial Exhibit 67.) New York's average wait time is below the national average, at 8.6 minutes. (Plaintiff's Trial Exhibit 67; Trial Tr. (Vol. 3) 321:7-13.)

        Plaintiff's Response: Admitted that New York's average wait time of 8.6 minutes is below the national average. Plaintiff incorporates by reference Plaintiff's response to Defendants' Finding of Fact No. 102.

Dated:  New York, New York
        November 25, 2019

Respectfully submitted,

/s/ Neil A. Steiner
**DECHERT LLP**
Neil A. Steiner
Katherine Shorey (*pro hac vice*)
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Telephone: 212-891-9418
Fax: 212-891-9598

Anna Do (*pro hac vice*)
633 West 5th Street
Suite 4900
Los Angeles, CA 90071
Telephone: 213-808-5700
Fax: 213-808-5760

Hilary Bonaccorsi (*pro hac vice*)
One International Place, 40th Floor
100 Oliver Street
Boston, MA 02110
Telephone: 617-728-7153
Fax: 617-426-6567

Tharuni Jayaraman (*pro hac vice*)
1900 K Street NW
Washington, DC 20006
Telephone: 202-261-3420
Fax: 202-261-3333

/s/ *John Powers*
**LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW**
Ezra Rosenberg (*pro hac vice*)
John Powers (*pro hac vice*)
Ryan Snow (*pro hac vice*)
Lawyers' Committee for Civil Rights
Under Law
1401 New York Avenue, N.W., Suite 400
Washington, D.C.  20005
(202) 662-8336
erosenberg@lawyerscommittee.org
jpowers@lawyerscommittee.org
rsnow@lawyerscommittee.org

**LATINOJUSTICE PRLDEF**
Jackson Chin
LatinoJustice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 739-7572
jchin@latinojustice.org

*Attorneys for Plaintiff*
*Common Cause/New York*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 25, 2019 a true and correct copy of the foregoing

document was served via the Court's ECF system to all counsel of record.


*/s/ Neil A. Steiner*

Neil A. Steiner
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036-6797
neil.steiner@dechert.com