**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **COMMON CAUSE/NEW YORK, as an organization and on behalf of its members,**<br><br>    Plaintiff,<br><br>    v.<br><br>**ROBERT A. BREHM**, Co-Executive Director, **TODD D. VALENTINE**, Co-Executive Director, in their official capacities as Co-Executive Directors of the **NEW YORK STATE BOARD OF ELECTIONS**; and **PETER S. KOSINSKI,** Co-Chair, **DOUGLAS A. KELLNER,** Co-Chair, **ANDREW J. SPANO,** Commissioner, and **GREGORY P. PETERSON**, Commissioner, in their official capacities as Commissioners of the **NEW YORK STATE BOARD OF ELECTIONS,**<br><br>    Defendants. | CIVIL ACTION NO.<br>1:17-cv-06770-AJN<br><br>_____ |

**DECLARATION OF EZRA D. ROSENBERG**

1.   My name is Ezra D. Rosenberg.  I am over twenty-one (21) years of age and am fully competent to execute this Declaration.  I have knowledge of the facts recited here, which are true and correct, and are based on my personal knowledge and my review of the records of the Lawyers' Committee for Civil Rights Under Law (hereinafter, "Lawyers' Committee").

2.   I make this Declaration in support of the application for fees and costs by the Lawyers' Committee, one of the attorneys for Plaintiff in this action.

3.   The Lawyers' Committee is a nonpartisan, nonprofit organization, formed in 1963 at the request of President John F. Kennedy to enlist the private bar's leadership and resources in

1

combating racial discrimination and the resulting inequality of opportunity. The principal mission of the Lawyers' Committee is to secure equal justice for all through the rule of law, targeting in particular the inequities confronting African Americans and other racial and ethnic minorities, including, but not limited to, in the field of voting rights.

4. I am the Co-Director of the Voting Rights Project at the Lawyers' Committee and have been responsible for supervising the handling of this matter by the Lawyers' Committee attorneys and staff throughout this litigation, helping to formulate and direct the case strategy, and helping to implement the strategy for all aspects of the case.

5. I have personal knowledge of the work of the Lawyers' Committees' attorneys and support staff on behalf of Plaintiff in this lawsuit.

**Legal Background and Experience**

6. I joined the Lawyers' Committee in November 2014 as Special Senior Counsel in the Legal Mobilization Project before being named Co-Director of the Voting Rights Project in July 2015. During my tenure at the Lawyers' Committee, I have supervised over 40 litigation matters dealing with voting rights and election protection, including several that involved successful fundamental right to vote claims brought pursuant to the First and Fourteenth Amendments to the U.S. Constitution and successful claims brought under the National Voter Registration Act of 1993. *See, e.g., Common Cause/New York v. Bd. of Elecs. in the City of New York*, No. 16-CV-6122 (NGG) (RML) (E.D.N.Y.) (consent order in place following successful NVRA challenge to NYC BOE's purge of more than 100,000 voters); *Ga. State Conf. of NAACP v. State of Georgia*, No. 1:17-cv-1397-TCB (N.D. Ga.) (successful NVRA challenge to registration deadline for federal runoff elections), *Ga. Coalition for the Peoples' Agenda v. Deal*, No. CV416-269 (S.D. Ga.) (registration deadline extension after Hurricane Matthew), *Ga. State Conf. of the NAACP v.*

2

*Hancock Cty. Bd. of Elecs. & Registration*, No. 5:15-cv-414 (M.D. Ga.) (county under consent decree following successful NVRA challenge to voter purges),

7.   Prior to joining the Lawyers' Committee for Civil Rights Under Law, I was a partner at Dechert LLP, where I served several terms on the firm's Policy Committee, as a Deputy Chair of the firm, and as co-chair of Dechert's Product Liability and Mass Torts Group.  I have been recognized for my litigation work in New Jersey and nationwide by numerous publications, including *Chambers*, *The Legal 500 United States*, *Benchmark Litigation,* and, in 2014, was named as one of the top 500 lawyers in the nation by *Lawdragon*.

8.   At Dechert, I was actively involved in *pro bono* representations, including several significant cases with the Lawyers' Committee.  I served as one of the lead counsel challenging Texas's photo ID voting law, served as co-lead trial and lead coordinating counsel in both the Section 2 and Section 5 cases (tried in 2014 and 2012 respectively); served as co-lead trial counsel in a school desegregation case tried in Pitt County, North Carolina in 2013; and supervised the advantageous settlements of a minority profiling case in New Jersey and of a prison conditions case in Passaic County, New Jersey.  In 2014, I successfully argued an appeal on behalf of the NJ-ACLU before the New Jersey Supreme Court, dealing with the admissibility of a defendant's rap lyrics in his attempted murder trial, helping to persuade the court to adopt stringent standards before admitting such evidence.  In 2014, I was named to *The National Law Journal*'s "Pro Bono Hot List" for my role in significant public interest cases of national importance.

9.   I began my career with the New Jersey Department of the Public Advocate, focusing on "special project" criminal appeals, arguing several times before the New Jersey Supreme Court, including a landmark case that set the standard for judicial review of prosecutorial denials of

3

pretrial intervention, and a series of cases which established protections against discovery by the prosecution of investigative and expert reports criminal defendants did not intend to use at trial.  I joined the Lands & Natural Resources Division of the United States Department of Justice in 1979, where, as a Senior Trial Attorney, I handled a variety of cases relating to the nation's lands, including the defense of surface mining regulations and a pre-*Chadha* "one House veto" case under the Wilderness Act.

10. I graduated from the University of Pennsylvania, B.A., *Cum laude*, in 1971 and from New York University School of Law, J.D., 1974, *Cum laude*, where I received the Founders Day Award and was admitted to the Order of the Coif.

11. I am a past President of the Mercer County, NJ, Bar Association and have received numerous awards during my career, including the Department of Justice Award for Meritorious Service in 1982, the New Jersey Commission on Professionalism "Professional Lawyer of the Year Award" in 1997, the American Jewish Congress' "Learned Hand Award" in 2011, the Mercer County Bar Association's "Michael J. Nizolek Award for  Service to the Bar"  in 2014, the Lawyers' Committee's "Brooke R. Burdette Award for Best New Board Member" in 2014, the ACLU of NJ's "Legal Leadership Award" in 2015, and a Joint Resolution of the New Jersey Legislature in 2015, honoring my *pro bono* service.

12. I am familiar with the legal work that the Lawyers' Committee attorneys and staff performed on behalf of Plaintiff in connection with all aspects of this litigation.  Based on my experience and knowledge of that representation, I believe that the work performed was reasonable and appropriate.

13. The staffing of this litigation by the Lawyers' Committee included myself, Counsel John Powers, and Legal Fellow Ryan Snow, along with other fellows, interns, and support staff.  In

4

the exercise of my billing judgment, the Lawyers' Committee is not seeking an award of fees for the time expended on this matter by myself or any staff other than Mr. Powers and Mr. Snow.  I am familiar with the backgrounds and experience of Mr. Powers and Mr. Snow, for whose time the Lawyers' Committee is seeking a fees award.

### Timekeepers, Their Experience, and Their Roles

14. John Powers is a Counsel in the Voting Rights Project of the Lawyers' Committee for Civil Rights Under Law, which he joined in September of 2015.  He was admitted to practice law in Maryland in 2013 and in the District of Columbia in 2015.  He is also admitted to practice before the United States District Court for the District of Columbia.

15. Since joining the Lawyers' Committee, Mr. Powers has led investigations and cases and played a significant role in important voting rights litigation in federal and state courts in New York and other states.  Those cases include *Common Cause/New York v. Bd. of Elecs. in the City of New York*, No. 16-CV-6122 (NGG) (RML) (E.D.N.Y.) (challenge to NYC BOE's purge of more than 100,000 voters), *Adams Jones v. Boockvar*, No. 717 MD 2018 (Pa. Commw. Ct) (challenge to Pennsylvania's earliest-in-the-nation absentee ballot return deadline); *New Va. Majority Educ. Fund v. Fairfax Cty. Bd. of Elections*, No. 1:19-cv-1379-RDA-MSN (E.D. Va.) (challenge to barriers to registration for George Mason University students); *Ga. State Conf. of the NAACP v. Kemp*, No. 2:16-cv-219-WCO (N.D. Ga.) ("exact match" registration verification), *Ga. Coalition for the Peoples' Agenda v. Kemp*, No. 1:18-cv-4727-ELR (N.D. Ga.) (citizenship verification), *Ga. State Conf. of NAACP v. State of Georgia*, No. 1:17-cv-1397-TCB (N.D. Ga.) (registration deadline for federal runoff elections), *Ga. Coalition for the Peoples' Agenda v. Deal*, No. CV416-269 (S.D. Ga.) (registration extension after Hurricane Matthew), *Ga. State Conf. of the NAACP v. Hancock Cty. Bd. of Elecs. & Registration*, No. 5:15-cv-414 (M.D. Ga.)

(voter purges), *Ga. State Conf. of NAACP v. Kemp*, No. 1:17-CV-1427-TCB-MLB-BBM (N.D. Ga.) (Georgia State House redistricting plan), and *Ga. State Conf. of NAACP v. Gwinnett County, Ga.*, No. 1:16-cv-02852-AT (N.D. Ga.) (Gwinnett County Board of Commissioners and Board of Education redistricting plans).

16. Mr. Powers has spoken and presented on the subject of voting rights at the American Bar Association's annual "State of Voting Rights" event, the Georgia NAACP's annual convention, and at many civic engagement and other events around the country.  Mr. Powers has also drafted and assisted in the drafting of *amicus* briefs filed by the Lawyers' Committee in the Supreme Court on important voting rights issues.

17. Before joining the Lawyers' Committee, he worked for eight years in the Voting Section at the Department of Justice.  Prior to the 2013 *Shelby County* decision, Mr. Powers reviewed submissions for preclearance under Section 5 of the Voting Rights Act.  More recently, he was part of DOJ litigation teams challenging the Texas voter ID and North Carolina omnibus election laws in federal district court.  While at DOJ, Mr. Powers received the AAG Distinguished Service Award and other awards for his work.

18. Mr. Powers recently co-authored *Strict Construction of Voter Registration Laws: Georgia's Experience in 2018*, to be published in America Votes! Challenges to Modern Election Law and Voting Rights (ABA December 2019).   Mr. Powers obtained his J.D. from the Georgetown University Law Center in 2013.  He served as Executive Articles Editor for the Georgetown Journal of Law and Modern Critical Race Perspectives.  He has been published in that journal, as well as The Georgetown Law Journal and the Harvard Journal on Racial and Ethnic Justice.  Mr. Powers earned his B.A. in History from Haverford College, and attended Mansfield College at Oxford University for a year.

6

19. Mr. Powers was the lead attorney assigned to this matter from its inception.  Mr. Powers conceived of the potential litigation, led the initial factual investigation, and drafted a litigation approval memorandum authorizing the Lawyers' Committee to bring this case.

20. Mr. Powers continued to work on all aspects of the case throughout its duration, including extensive work in overall case strategy and development.  Mr. Powers was the primary contact for Plaintiff, Common Cause/NY, and spent considerable time developing the facts of the case, identifying witnesses, and obtaining relevant documents and material from the clients, witnesses, and other sources.  Mr. Powers also communicated with the Defendants' counsel; drafted and revised pleadings; and appeared at telephone conferences with the litigation team and with opposing counsel.  Mr. Powers also prepared for, appeared at, and participated in hearings such as the post-discovery status conference, the pre-trial conference, and trial, including closing argument.

21. Ryan Snow joined the Lawyers' Committee in September 2018 as a Legal Fellow in the Voting Rights Project.  He was admitted to practice law in the District of Columbia in April of 2019.  Prior to joining the Lawyers' Committee, he worked as a Volunteer Legal Intern in the Voting Section of the Civil Rights Division of the United States Department of Justice during the Summer of 2017; as a Legal Intern at the Campaign Legal Center during the Summer of 2016; and as a Legal Intern at the NAACP Legal Defense and Educational Fund in January of 2016.

22. Mr. Snow obtained his J.D. from the University of Virginia School of Law in 2018.  He served as Executive Editor for the Journal of Law & Politics; as a Dillard Teaching Fellow for the Legal Research and Writing Program; and as a Student Clinician in the Civil Rights Litigation Pro Bono Clinic at the Legal Aid Justice Center in Charlottesville, VA.  His original scholarship has been published in the University of Pennsylvania Law Review Online.  Mr.

Snow earned a B.A. in Politics and a B.M. in Jazz Studies from Oberlin College and Conservatory of Music in 2005.

23. Since joining the Lawyers' Committee, Mr. Snow has contributed to investigations and litigation in numerous voting rights cases, including *O'Neil v. Hosemann*, No. 3:18-cv-815-DPJ-FKB (S.D. Ms.) (absentee ballot process and deadlines); *Thomas v. Bryant*, No. 3:18-cv-441-CWR-FKB (S.D. Ms.) (Section 2 VRA vote dilution); *Martin v. Raffensperger*, No. 1:18-cv-4776-LMM (N.D. Ga.) ("exact match" absentee ballot verification); and *Common Cause/NY v. Board of Elections in the City of New York*, No. 1:16-cv-6122-NGG-RML (E.D.N.Y.) (list maintenance, enforcement of consent decree), among others.

24. Mr. Snow began working on this matter immediately upon joining the Lawyers' Committee in September 2018.  He conducted legal and factual research, identified and interviewed witnesses, took and assisted with depositions, drafted and edited motions, and reviewed documents.  Mr. Snow continued to work on the matter during the course of the litigation through trial, during which he conducted the re-direct examination of an expert witness.

### The Lawyers' Committee's Representation of Plaintiff and How the Work for Plaintiff Was Recorded, Edited and Summarized

25. The Lawyers' Committee was engaged to represent Plaintiff on a *pro bono* basis, with the understanding that it would retain the right to petition the court for recovery of its fees and costs in the event Plaintiff prevailed in its claims.

26. In connection with its representation of Plaintiff, the Lawyers' Committee agreed that its staff would keep contemporaneous records of the time spent on the matter, which would include sufficient specificity to identify the date, amount of time spent, and the work accomplished by each timekeeper on this matter.

27. Thus, in accordance with these agreements, and as part of the Lawyers' Committee's normal business practice, the assigned attorneys tracked the time they worked on this matter.  As is normal and customary for Lawyers' Committee staff, the attorneys working on this matter entered their time into a computer program designed to track the time that staff devoted to the case.

28. A chart compiling the time incurred by each Lawyers' Committee staff member on this action for which we are seeking payment is attached and incorporated herein by reference as Exhibit 2.  The chart is a summary based upon the electronic time keeping records of the Lawyers' Committee's personnel, which were prepared in the regular and ordinary course of business.  It is the practice of the Lawyers' Committee staff to prepare and keep such records; the records were made and kept by individuals with personal knowledge of the entries; and the entries were made at or about the date reflected in the chart.

29. I have personally reviewed the entries.  In the reasonable exercise of billing judgment, the Lawyers' Committee is not seeking payment for certain billing entries—denoted in Exhibit 2 by "NC", meaning "No Charge"—for time spent on certain tasks which may have been excessive, duplicative, redundant, inefficient, not directly related to the case, not sufficiently detailed, or for which, in the exercise of my reasonable billing judgment, the Lawyers' Committee has agreed not to seek recovery for one reason or another.

30. As reflected in Exhibits 1 and 2, the Lawyers' Committee is not seeking an award for 39.4 hours of my time, 37.8 hours of Mr. Weiss's time, 105.4 hours of Mr. Powers' time, and 54.4 hours of Mr. Snow's time.  In total, the Lawyers' Committee is not seeking an award for 237 hours worked by staff on this case.  The Lawyers' Committee is seeking recompense for 1,461.3 of the 1,698.3 recorded hours worked by staff on this case.

9

31. In a further exercise of billing judgment, to account for any duplication or inefficiencies in the amount of hours worked, the Lawyers' Committee is further reducing the total amount of attorney's fees sought by ten percent.

32. As shown in the summary chart attached as Exhibit 1, the Lawyers' Committee seeks reimbursement for the time of its attorneys and staff spent working on this case at the following hourly rates: (1) John Powers, Counsel, $450; (2) Ryan Snow, Legal Fellow, $325.

33. Attached hereto as Exhibit 3 is a chart itemizing each of the expenses incurred and paid by the Lawyers' Committee in connection with, and in furtherance of, this litigation.  Attached hereto as Exhibit 4 are the backup records corresponding to these expenses.  Exhibit 3 is a summary based upon both the electronic records maintained by the Lawyers' Committee to keep track of expenses for its clients and the individual backup records for each expense.  The electronic and backup records were prepared in the regular and ordinary course of business; it is the practice of the Lawyers' Committee to prepare and keep such records; the records were made and kept by individuals with personal knowledge of the entries; and the entries were made at or about the date reflected in the chart.

**Hourly Rates Charged by the Lawyers' Committee**
**Compared to Market Rates**

34. In connection with this submission, I reviewed the Adjusted Laffey Matrix.  *See generally Laffey v. Northwest Airlines, Inc*., 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985); *see also* Adjusted Laffey Matrix, http://www.laffeymatrix.com/see.html.  The Adjusted Laffey matrix specifies rates of $458 per hour for attorneys with between four and seven years of experience, and $372 per hour for attorneys with between one and three years of experience.  *See id.*

10

35. I also reviewed a number of cases in the United States District Court for the Southern District of New York in which courts have made attorneys' fee awards in recent years.  *See*, *e.g.*, *Local 1180, Commc'ns Workers of Am. ALF-CIO v. City of New York*, 392  F. Supp. 3d 361, 380 (S.D.N.Y. Aug. 7, 2019); *Williams v. Epic Security Corp.*, 368 F. Supp. 3d 651 (S.D.N.Y. Mar. 25, 2019); *Abdell v. City of New York*, 2015 WL 898974, at *4 (S.D.N.Y. Mar. 2, 2015); *Powell v. Metro One Loss Prevention Servs. Grp. (Guard Div. NY), Inc.*, 2015 WL 9287121, at *2 (S.D.N.Y. Feb. 5, 2015), *report and recommendation adopted,* 2015 WL 9255338 (S.D.N.Y. Dec. 17, 2015); *Ognibene v. Parkes*, 2014 WL 3610947, at *2 (S.D.N.Y. July 22, 2014); *Barbour v. City of White Plains*, 2011 WL 2022884 (S.D.N.Y. May 24, 2011).

36. Based on my education, experience, and knowledge of hourly rates in the Southern District and the relevant New York case law, it is my opinion that the hourly rates assigned to Mr. Powers and Mr. Snow in <u>Exhibit 1</u> are reasonable and appropriate under the circumstances, particularly in light of the significant voluntary reductions in billing entries and hours the Lawyers' Committee has agreed to apply in the exercise of billing judgment.

### **The Lawyers' Committee's Attorneys' Fees**

37. The Lawyers' Committee's staff worked in a manner in which responsibilities were divided according to the respective skill sets of the lawyers involved.  As Co-Director of the Voting Rights Project at the Lawyers' Committee, my role is similar to that of a senior partner in a private firm.  I am responsible for developing and implementing strategy, assigning and supervising staff and reviewing pleadings and evidence.  As Counsel in the Voting Rights Project, Mr. Powers has a role similar to that of a 6th-year associate in a private firm.  As Legal Fellow in the Voting Rights Project, Mr. Snow has a role similar to that of a junior associate in a private firm.  Based on these respective roles, the tasks and time spent on the litigation were

11

divided in a manner so as to maximize efficiency while providing competent counsel, prevent unnecessary duplication of work, and ensure that the matter proceeded in an expeditious but orderly fashion.  This division of labor is reflected in the work hours billed and in the dollar amount of the fees being claimed by the Lawyers' Committee attorneys.

38. The total value of attorneys' fees for work performed by the Lawyers' Committee's staff in this matter from August 16, 2016, through January 30, 2020, less the aforementioned line item ("NC") reductions in the exercise of billing judgment, is in the amount of $596,860.00.  This encompasses 1,461.3 hours of work performed in this matter by Mr. Powers and Mr. Snow through January 30, 2020.  *See* Exhibits 1 & 2.

39. After a ten percent or $59,686 reduction in the total amount of attorney's fees sought in an exercise of billing judgment, the Lawyers' Committee is seeking recompense for $537,174.00 in attorney's fees.  *See* Exhibit 1.

40. Based upon my education and experience, it is my professional opinion that the work performed and the amount of attorneys' fees sought by the Lawyers' Committee in this application are reasonable in light of the issues presented in this case, the length and complexity of the case, the defendants' refusal to resolve the case prior to trial, the successful results achieved under the circumstances, and the across-the-board reduction in the amount sought.

### The Lawyers' Committee's Litigation Expenses

41. In addition to its attorneys' fees, the Lawyers' Committee seeks to recover its expenses of litigation incurred and paid in this matter, in the amount of $12,729.19.

42. These litigation expenses primarily include travel, lodging, and other fees such as those incurred through Westlaw or for printing and copying.

43. It is the Lawyers' Committee's standard practice to account for these types of expenses separate from the hourly rates recorded for the legal work performed its attorneys. Based on my experience, this practice is consistent with the typical practice in all markets including the United States District Court for the Southern District of New York.

### Total Amount Sought for Attorneys' Fees and Related Litigation Expenses Incurred Through January 30, 2020

44. The total amount of attorneys' fees and litigation expenses sought by the Lawyers' Committee in this matter for work performed, and expenses incurred, through January 30, 2020, is $549,903.19. This amount is comprised of $537,174.00 in attorneys' fees and $12,729.19 in litigation expenses.

45. Based on my experience with other litigation matters and my personal knowledge of the facts and circumstances of this litigation, the total amount requested is reasonable and appropriate under the circumstances.

46. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury on this day of January 31, 2020 that the foregoing is true and correct.

Ezra D. Rosenberg, Esq.
Lawyers' Committee for Civil Rights Under Law